**IN THE UNITED STATES**
**COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| NINESTAR CORPORATION, ZHUHAI NINESTAR INFORMATION TECHNOLOGY CO., LTD., ZHUHAI PANTUM ELECTRONICS CO., LTD., ZHUHAI APEX MICROELECTRONICS CO., LTD., GEEHY SEMICONDUCTOR CO., LTD., ZHUHAI G&G DIGITAL TECHNOLOGY CO., LTD., ZHUHAI SEINE PRINTING TECHNOLOGY CO., LTD., and ZHUHAI NINESTAR MANAGEMENT CO., LTD.,<br><br>*Plaintiffs*,<br><br>v.<br><br>UNITED STATES OF AMERICA; DEPARTMENT OF HOMELAND SECURITY; UNITED STATES CUSTOMS AND BORDER PROTECTION; FORCED LABOR ENFORCEMENT TASK FORCE; ALEJANDRO MAYORKAS, *in his official capacity as the Secretary of the Department of Homeland Security*; TROY A. MILLER, *in his official capacity as the Senior Official Performing the Duties of the Commissioner for U.S. Customs and Border Protection*; and ROBERT SILVERS, *in his official capacity as Under Secretary for Office of Strategy, Policy, and Plans and Chair of the Forced Labor Enforcement Task Force*,<br><br>*Defendants*. | Case No. ___23-182___ |

**DECLARATION OF YILING CHENG**

I, Yiling Cheng, declare under penalty of perjury and to the best of my knowledge, information, and belief as follows:

1. I am over 18 years of age and with capacity, and I provide this declaration based on my personal knowledge.

2. I currently hold the position of Director of Enterprise Planning Department at Ninestar Corporation.

3. In my role as Director of Enterprise Planning Department, I am familiar with the business of Ninestar Corporation and several of its affiliated companies, including: Zhuhai Ninestar Information Technology Co., Ltd.; Zhuhai Pantum Electronics Co., Ltd.; Zhuhai Apex Microelectronics Co., Ltd.; Geehy Semiconductor Co., Ltd.; Zhuhai G&G Digital Technology Co., Ltd.; Zhuhai Seine Printing Technology Co., Ltd.; and Zhuhai Ninestar Management Co., Ltd. (collectively Ninestar, unless otherwise indicated).

4. I have been authorized by Ninestar to testify in this declaration as their representative. The facts set forth in this declaration are based on my personal knowledge, review of corporate records, and discussion with relevant Ninestar employees knowledgeable about the facts set forth herein or responsible for the documents referenced.

5. Ninestar and its subsidiaries are in the business of developing, manufacturing, and selling laser printers, printer consumables, and integrated circuit chips around the globe, and supporting those same operations.

6. Of the eight companies listed above, five sell products that are exported to customers in the United States. In past years, these United States customers have ordered [     ] of crates of Ninestar products, worth [    ] of dollars.

7. Several Ninestar subsidiaries facilitate sales into the United States. Customers enter into a long-term supply agreement or establish a supply-and-demand partnership with the Ninestar sales entities. Once a United States customer is ready for a supply of Ninestar products,

it places a purchase order with the sales entity, which will in turn place a corresponding order with the Ninestar manufacturing entity. If the customer cancels its order with the sales entity, that entity will cancel its order with the Ninestar manufacturing entity. United States-based customers are aware that when they place an order with a Ninestar sales entity, it will be fulfilled by a Ninestar manufacturing entity.

8. Ninestar is not aware of it having faced any meaningful difficulties importing products into the United States relating to labor practices or protected classifications prior to June 2023.

9. In June 2023, the United States government added Ninestar and several of its affiliate companies to the Uyghur Forced Labor Prevention Act Entity List, identifying them as entities "working with the government of the Xinjiang Uyghur Autonomous Region to recruit, transport, transfer, harbor or receive forced labor or Uyghurs, Kazakhs, Kyrgyz, or members of other persecuted groups out of the Xinjiang Uyghur Autonomous Region." (the "Listing Decision").

10. By adding these companies to the Entity List, the United States government has effectively banned Ninestar's goods from being imported in the United States.

11. Ninestar is unaware of any facts supporting the Listing Decision. No agency or representative of the United States government has explained, publicly or privately, the bases for the Listing Decision. The Listing Decision provided no evidence to support its accusations. The Government made no inquiry of Ninestar regarding these allegations. And Ninestar has not been afforded any notice or hearing regarding the Listing Decision.

12. The Listing Decision has substantially and irreparably harmed Ninestar's reputation with its partners and customers, and within the print industry media. Since the Listing Decision, Ninestar has been the subject of disparaging accusations and harmful rumors.

13. [    ]

14. Despite the lack of any supporting facts or explanation, many in the print industry have nevertheless assumed publicly that Ninestar is guilty of the forced-labor allegations simply by virtue of the listing alone.

15. In June 2023, shortly after the Listing Decision, the European Toner and Inkjet Remanufacturers Association (ETIRA), an influential European Union-based trade group, cited the Listing Decision in calling for EU distributors to "distance themselves from Ninestar." ETIRA's leader admonished the industry: "Let there be no profiteering from forced labor." A true and correct copy of this ETIRA press release is attached hereto as Exhibit A.

16. In July 2023, the Business Technology Association (BTA), an influential industry organization, terminated the membership of one of Ninestar Corporation's subsidiaries because of the Listing Decision. The BTA stated that "the conduct cited" in the Listing Decision "is contrary to the high standards of the BTA." In light of the Listing Decision, at its annual conference later this month BTA plans to host a panel discussion entitled, "Will Slave Labor Disrupt the Supply Chain?" A true and correct copy of the BTA's press release is attached hereto as Exhibit B.

17. In August 2023, the International Imaging Technology Counsel (IITC), a U.S.-based trade association in the printing industry, issued an open letter accusing Ninestar Corporation and the other listed Ninestar entities of "profit[ing] from modern-day slavery." The letter cited only the Listing Decision as support for this allegation. IITC then offered to assist

4

purchasers in determining whether their cartridges were made by Ninestar Corporation or one of its corporate affiliates to "ensure the[ purchasers] are not inadvertently procuring products banned by [the Department of Homeland Security]." A true and correct copy of the IITC's letter is attached hereto as Exhibit C.

18. These organizations include competitors of Ninestar who will benefit commercially from the exclusion of Ninestar's products. Indeed, these statements tend to misstate the Listing Decision.

19. Since the Listing Decision, Ninestar's customers have expressed concern over the companies' products and practices. Some customers have demanded evidence refuting the allegations in the Listing Decision. Because Ninestar does not know the bases for the Listing Decision, Ninestar cannot assuage these customers' concerns.

20. The Listing Decision has also significantly and irreparably injured Ninestar's business, and will continue to do so unless and until the listing is rescinded. If the listing persists, and its negative effects continue to spread, Ninestar risks losses in U.S. sales approaching [     ] and [     ] of losses in the global market over the next year.

21. Each of the listed companies has suffered and continues to suffer irreparable harm as a result of the Listing Decision. The following are representative of a rapidly evolving and deteriorating situation.

*Ninestar Corporation*

22. Ninestar Corporation is engaged in the business of manufacturing and selling printer cartridges.

23. Ninestar Corporation has only one customer based in the United States. In response to the Listing Decision, that customer cancelled all of its outstanding orders for Ninestar Corporation products in the United States, worth approximately [     ]. Moreover, that

5

customer announced that it would replace Ninestar as a supplier globally, which means Ninestar Corporation will lose all of its manufacturing business due to the Listing Decision.

24.     Unless the Listing Decision is rescinded, Ninestar Corporation will lose in excess of [     ] of U.S. sales in the next year.

### *Zhuhai Ninestar Information Technology Co., Ltd.*

25.     Zhuhai Ninestar Information Technology Co., Ltd. (Zhuhai Ninestar Information Technology) is engaged in the business of developing, manufacturing, and selling printer consumables and accessories. It is a wholly owned subsidiary of Zhuhai Hengqin G&G Technology Co., Ltd., which is a wholly owned subsidiary of Ninestar Corporation.

26.     Prior to the Listing Decision, Zhuhai Ninestar Information Technology had [     ] stable customers in the United States.

27.     Zhuhai Ninestar Information Technology caused approximately [     ] of printer consumables to be imported into the United States from July 2022 to June 2023.

28.     Because of the Listing Decision, Zhuhai Ninestar Information Technology cannot export any products to the United States, effectively reducing its annual sales from [     ] down to 0.

29.     Because of the Listing Decision, Zhuhai Ninestar Information Technology's United States customers have cancelled orders worth approximately [     ]. Unless the listing decision is rescinded, Zhuhai Ninestar Information Technology may lose well over [     ] in U.S. sales in the next year.

30.     Citing the Listing Decision, [     ].

*Zhuhai Pantum Electronics Co., Ltd.*

31. Zhuhai Pantum Electronics Co., Ltd. (Pantum), is engaged in the business of designing, manufacturing, and selling laser printers, printer consumables, and accessories. It is a wholly owned subsidiary of Ninestar Corporation.

32. In early 2023, [     ] United States customers were in the process of entering supply agreements with Pantum, having agreed to general terms and sales targets for very significant orders. Because of the Listing Decision, these U.S. customers have abandoned those discussions and will no longer purchase any Pantum products, impacting more than [     ] in expected revenue.

33. Due to the Listing Decision, [     ] In total, these incidents cost Pantum approximately [     ].

34. The Listing Decision has also interfered with Pantum's prospective business relationships in the United States. In an effort to develop the U.S. market, Pantum participated in a multi-day product exhibition in Las Vegas in early 2023. That exhibition generated leads with more than [     ] new customers who expressed interest in future collaborations. Those collaborations have been put on hold because of the Listing Decision and may not be recoverable.

35. Pantum has also encountered business disruptions outside the United States. Because of the Listing Decision, [     ]

36. Unless the listing decision is rescinded, Pantum will lose approximately [     ] in U.S. sales in the next year.

### *Zhuhai Apex Microelectronics Co., Ltd.*

37. Zhuhai Apex Microelectronics Co., Ltd. (Apex Microelectronics) is engaged in the business of designing, manufacturing, and selling chips used in printer consumables. Ninestar Corporation is a majority shareholder of Apex Microelectronics.

38. Prior to the Listing Decision, Apex Microelectronics had [      ] regular customers in the United States.  [      ]

39. From July 2022 to June 2023, Apex Microelectronics caused approximately [      ] of its products to be exported to the United States.

40. Because of the Listing Decision, Apex Microelectronics' United States customers have cancelled purchase orders worth approximately [      ].

41. Unless the Listing Decision is rescinded, Apex Microelectronics risks losing approximately [      ] in U.S. sales in the next year.

42. Many of Apex Microelectronics' Chinese customers have paused their sales and supply contracts with Apex Microelectronics out of concern that, if they integrate Apex Microelectronics components into their products, they will not be able to sell to United States customers.

43. Apex Microelectronics has also been harmed in European markets by the Listing Decision.  [      ] Apex Microelectronics has experienced similar degradation of other business relationships.  Apex Microelectronics anticipates losing substantial annual revenue as a result.

### *Geehy Semiconductor Co., Ltd.*

44. Geehy Semiconductor Co., Ltd. (Geehy Semiconductor) is engaged in the business of designing, manufacturing, and selling microcontroller units.  Geehy Semiconductor is a wholly owned subsidiary of Zhuhai Apex Microelectronics Co., Ltd..

45. Prior to the Listing Decision, [     ] United States customers regularly placed orders for Geehy Semiconductor products. Geehy Semiconductor worked with domestic customers to export [     ] of products into the United States.

46. Because of the Listing Decision, Geehy Semiconductor's United States customers have already cancelled sales contracts worth about [     ].

47. Because of the Listing Decision, Geehy Semiconductor's projected sales to United States customers has decreased from [     ] to zero.

48. The Listing Decision is also adversely affecting Geehy Semiconductor's business outside the United States. Some customers outside the United States have already indicated that they would cancel orders or terminate business relationships because of the Listing Decision.

49. Because many of Geehy Semiconductor's Chinese customers sell products in the global market, the Listing Decision will cause them to discontinue their relationship with Geehy Semiconductor. Even for products that would be sent to Europe, Japan, or other regions, these customers' inability to sell products with Geehy Semiconductor components into the United States will cause them to look for alternative suppliers.

*Zhuhai G&G Digital Technology Co., Ltd.*

50. Zhuhai G&G Digital Technology Co., Ltd. (G&G Digital) is engaged in the business of selling printer consumables. It is a wholly owned subsidiary of Zhuhai Hengqin G&G Technology Co., Ltd., which is a wholly owned subsidiary of Ninestar Corporation.

51. Although G&G Digital does not export products to the United States, it has been substantially injured by the Listing Decision.

52. In particular, G&G Digital's reputation has been harmed in the same way as the other listed Ninestar entities. Industry members, commentators, and media assume that G&G Digital, like the other listed Ninestar entities, is guilty of the conduct alleged in the Listing

9

Decision. In fact, industry group and competitor allegations have gone beyond the Listing Decision to claim that Ninestar itself manufactures goods with forced labor. Those accusations have irreparably tainted G&G Digital's reputation, and negatively impacted its existing and prospective business relationships and opportunities.

### *Zhuhai Seine Printing Technology Co., Ltd.*

53. Zhuhai Seine Printing Technology Co., Ltd., (Seine Printing Technology) is engaged in the business of plant leasing operations. It is a parent company of Ninestar Corporation.

54. Although Seine Printing Technology does not export products to the United States, it has been substantially injured by the Listing Decision.

55. In particular, Seine Printing Technology's reputation has been harmed in the same way as the other listed Ninestar entities. Industry members, commentators, and media seem to have assumed that Seine Printing Technology, like the other listed Ninestar entities, is guilty of the conduct alleged in the Listing Decision, as well as conduct not reflected in the listing, the use of forced labor. Those accusations have irreparably tainted Seine Printing Technology's reputation, contractual relationships, and prospective business prospects.

### *Zhuhai Ninestar Management Co., Ltd.*

56. Zhuhai Ninestar Management Co., Ltd. (Ninestar Management) is engaged in the business of corporate management consultation and intellectual property management. It is a wholly owned subsidiary of Ninestar Corporation.

57. Although Ninestar Management does not export products to the United States, it has been substantially injured by the Listing Decision.

58. In particular, Ninestar Management's reputation has been irreparably harmed in the same way as the other listed Ninestar entities discussed above.

Pursuant to the requirements of 28 U.S.C. section 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on: August 22, 2023

_____
Yiling Cheng

# EXHIBIT A

# ETIRA shocked that Ninestar is found engaged in forced labor, asks EU regulators to act

June 12, 2023



As of 12 June 2023, the US bans all imports of Ninestar products under their Uyghur Forced Labor Protection Act. Ninestar was added to a US government list that includes "*entities working with the government of Xinjiang to recruit, transport, transfer, harbor or receive forced labor or Uyghurs, Kazakhs, Kyrgyz, or members of other persecuted groups out of Xinjiang\**  .  And as result, the US has banned all imports of its products, such as cartridges, equipment, components, etc*.

"It is shocking that learn that according to the US government, the Chinese firm Ninestar is engaged in forced labor activities", said ETIRA manager Vincent van Dijk. "This is a very serious matter, because it is not some market rumour or NGO report saying this, but an official finding by the US federal government about one of the worlds' largest suppliers of low-cost non-OEM single-use cartridges ".

ETIRA, which represents European 3rd party remanufacturers of OEM toner and inkjet cartridges, said that the US ban will have a global impact. "Ninestar are also very active in the EU and has many different brands, so EU distributors would be wise to quickly distance themselves from Ninestar now to avoid being associated with forced labor. They should switch to reuse cartridges from European remanufacturers".  Also, ETIRA urgently asks the EU and national authorities to also immediately investigate for possible similar violations of European rules on sustainable sourcing, protection of human rights, etc overhere.

ETIRA also warns that Ninestar's US-destined single-use products may now be dumped on other world markets, including the EU. This would drive down prices of the environment-friendly non-OEM re-use cartridges, who already struggle to compete with polluting cheap unsustainable single-use cartridges from Asia, even more. Also, it would bring more waste to the EU, and kill many remanufacturing jobs in Europe, as these products will not be remanufactured for reuse as a cartridge.

"Let there be no profiteering from forced labor", said van Dijk. "European consumers and businesses should only buy reuse cartridges from trusted European suppliers "

*https://www.dhs.gov/uflpa-entity-list



Translate »

Our registered address is: European Toner & Inkjet Remanufacturers Association, Henri Wafelaertsstraat 34, 1060 Belgium. EU Transparency Register nr. is 66749712601-11

Tel.: +31 6 414 614 63 . Fax.: +31 76 56 404 51 . info@etira.org

© 2003 – 2023 ETIRA, all rights reserved.

Web design Dorset | Websites by Mark

# EXHIBIT B

 Login(https://www.bta.org/member-login/)

 Email(mailto:info@bta.org)

 (800) 505-2821(tel:8005052821)

Search

 (https://www.facebook.com/pages/Business-Technology-Association/89600864580)

 (https://twitter.com/BTA_ORG)

 (https://www.linkedin.com/company/business-technology-association?trk=biz-companies-cym)

 (https://www.youtube.com/channel/UCBSsarYTnpYafmHxiMDGQWw)

 (/)

 Menu

# Ninestar, Lexmark & the Business Technology Association: A Message to All BTA Members

Back to News (https://businesstechnologyassociation.growthzoneapp.com/news)

 By Business Technology Association      7/25/2023      

The Business Technology Association (https://www.bta.org/) (BTA) fully supports the Uyghur Forced Labor Prevention Act (UFLPA). Any product produced through forced labor should be foreclosed from use within the industry. BTA also abides by the bylaws under which it

operates and all laws of the United States of America. The U.S. Constitution guarantees "due process of the law." Likewise, our country has denied guilt by association. If a parent should commit a crime or a child is found to violate the law, the entire family is not punished.

The Forced Labor Enforcement Task Force (FLETF), a part of the Department of Homeland Security, imposed a ban on goods produced by Ninestar Corporation and eight of its subsidiaries. BTA is interfacing with FLETF to determine the breadth of these restrictions and the products banned. The ban applies to products produced in Zhuhai, China. Ninestar operates under numerous subsidiaries and has offices and plants throughout the world. FLETF has been clear that its ban applies only to products produced in the Zhuhai region of China. Products from many other Ninestar affiliates have not been banned and continue to enter through U.S. ports of entry.

Ninestar issued a statement on June 12 stating, in part, that: "it abides by the applicable standards of international labor protection, and fully protects the legitimate rights and interests of laborers."

Ninestar owns 63.04% of Lexmark and corporate records indicate Ninestar has lent funds to Lexmark. Although Lexmark is majority owned by Ninestar, "Lexmark investors have no operational control of the company." Lexmark is not the only office technology manufacturer that incorporates Ninestar components in its products. The sudden ban of Ninestar products has caused numerous companies to seek alternative sources. Suppliers contacted by BTA have acknowledged incorporation of Ninestar products and their immediate discontinuance while searching for alternative sources. All these companies are operating under a cloud until the dust settles and new sources are identified. The full extent of the ban is still being evaluated.

**BTA's Response:**

> 1. Continued discussions with the FLETF as to the extent and scope of the Ninestar ban. Is Lexmark or are Lexmark products included?
> 2. Notice to Ninestar that the conduct cited by the FLETF is contrary to the high standards of BTA and violation has resulted in a motion to remove Ninestar as a BTA member. Consistent with due process, Ninestar must respond on or before Aug. 4, 2023.
> 3. Continued discussions with other suppliers to determine the impact of the Ninestar ban and the steps taken to overcome.
> 4. Continued member updates.
> 5. 2023 BTA National Conference (https://members.bta.org/calendar/Details/2023-bta-national-conference-808846?sourceTypeId=Hub) in Boston, Massachusetts:
> **Will Slave Labor Disrupt the Supply Chain?**
> *Moderated by Bob Goldberg, BTA General Counsel*
> The embargo entered against Ninestar and several of its subsidiaries has raised countless questions. How do the restrictions affect Lexmark and other OEMs relying on Chinese-made components and supplies? BTA has brought together leading industry executives to present the latest on the situation and project into the future. This panel will definitely be one of the most important discussions in 2023.

Powered By GrowthZone (https://www.growthzone.com)

# Resources

(https://www.facebook.com/pages/Business-Technology-Association/89600864580)

(https://twitter.com/BTA_ORG)

(https://www.linkedin.com/company/business-technology-association?trk=biz-companies-cym)

(https://www.youtube.com/channel/UCBSsarYTnpYafmHxiMDGQWw)

(https://www.bta.org/member-login/)  Member Login (https://www.bta.org/member-login/)

# Get in touch

Business Technology Association

(https://goo.gl/maps/KmPE13TDGpcQUZdv5)   12411 Wornall Road Suite 200, Kansas City, MO 64145 (https://goo.gl/maps/KmPE13TDGpcQUZdv5)

(tel:8005052821)   (800) 505-2821 (tel:8005052821)

(mailto:info@bta.org)   info@bta.org (mailto:info@bta.org)

© 2023 Business Technology Association.  All Rights Reserved. Site by GrowthZone (https://growthzone.com)

# EXHIBIT C



August 4, 2023

To Whom It May Concern:

Recent developments in the printer cartridge industry have brought to light the use of forced labor in the production process. As the executive director of the trade association for remanufactured printer cartridge dealers, we urge you to work with us when sourcing printer cartridges and ensure that they are not produced using forced labor. Let us work together to eradicate such unethical practices from our supply chains.

On June 9, the <u>U.S. Department of Homeland Security</u> (DHS) announced that <u>Ninestar Corp.</u> and eight of its Zhuhai, China-based subsidiaries had been added to the UFLPA list of companies whose products are restricted from entering the U.S. due to their involvement in business practices that target members of persecuted groups, including Uyghur minorities. UFLPA was signed into law in December 2021.

The inclusion of Ninestar brings the total number of Chinese companies on the UFLPA List to 22. So far, no company named to the list has been removed. U.S. Customs and Border Protection (CBP) began enforcing the Ninestar ban on June 12.

Ninestar is the third largest printer and printer cartridge manufacturer in the world, and trades under dozens of brand names. It's disheartening that these products continue to be sold under different brand names without any repercussions, particularly on e-commerce sites. By allowing such sales to persist, buyers are supporting an industry that profits from modern-day slavery.

Many RFPs that specify environmentally friendly remanufactured cartridges, or even "MSE" (a remanufacturer) or "equivalent" are being awarded to companies that are bidding using Ninestar compatibles' lower prices and then fulfilling them with one of the many brands of cartridges made by Ninestar in violation of the UFPLA ban.

We can help you verify the manufacturer of any cartridges you are buying, review your current contracts and RFP language, or set up a call to discuss further. The International Imaging Technology Council is committed to helping organizations ensure they are not inadvertently procuring products banned by the DHS.

Let me know how I can help or if you would like additional information. My members and I are here to help you.

Best regards,

*Tricia Judge*

Tricia Judge
Executive Director & General Counsel
International Imaging Technology Council
Our Website with Articles on this topic.
tricia@I-itc.org
(702) 498-4185

*7121 W. Craig Rd., Suite 11345, N. Las Vegas, NV, 89129   Telephone: (702) 498-4185 Email: tricia@i-itc.org*