**PUBLIC VERSION**

## IN THE UNITED STATES
## COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| NINESTAR CORPORATION, ZHUHAI NINESTAR INFORMATION TECHNOLOGY CO., LTD., ZHUHAI PANTUM ELECTRONICS CO., LTD., ZHUHAI APEX MICROELECTRONICS CO., LTD., GEEHY SEMICONDUCTOR CO., LTD., ZHUHAI G&G DIGITAL TECHNOLOGY CO., LTD., ZHUHAI SEINE PRINTING TECHNOLOGY CO., LTD., and ZHUHAI NINESTAR MANAGEMENT CO., LTD. | |
| *Plaintiffs*, | |
| v. | Case No. 23-182 |
| UNITED STATES OF AMERICA; DEPARTMENT OF HOMELAND SECURITY; UNITED STATES CUSTOMS AND BORDER PROTECTION; FORCED LABOR ENFORCEMENT TASK FORCE; ALEJANDRO MAYORKAS, *in his official capacity as the Secretary of the Department of Homeland Security*; TROY A. MILLER, *in his official capacity as the Senior Official Performing the Duties of the Commissioner for U.S. Customs and Border Protection*; and ROBERT SILVERS, *in his official capacity as Under Secretary for Office of Strategy, Policy, and Plans and Chair of the Forced Labor Enforcement Task Force*, | |
| *Defendants*. | |

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR**
**MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................... ii

INTRODUCTION ............................................................................................... 1

ARGUMENT ..................................................................................................... 1

    A.   This Court Has Jurisdiction Over Claims Arising Out Of The UFLPA. ........................... 1

    B.   There Is No Exhaustion Requirement In This Case.............................................. 5

    C.   The Government Failed Again To Provide An Adequate Explanation, So Ninestar Is Likely To Succeed On The Merits. ............................................................. 7

    D.   Ninestar Has Suffered And Will Continue To Suffer Irreparable Harm Absent A Preliminary Injunction. ..................................................................... 13

        1.   Ninestar sought relief as swiftly as possible in the circumstances. ................. 13

        2.   Evidence supports Ninestar's financial losses. ..................................... 15

        3.   Ninestar's lost business opportunities are irreparable harm. ....................... 17

        4.   Ninestar's reputational injury alone warrants injunctive relief...................... 18

        5.   *Invenergy*'s procedural-injury doctrine applies here. ............................... 20

    E.   The Equities And Public Interest Favor Injunctive Relief................................... 21

CONCLUSION.................................................................................................. 21

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AFGE Local 3599 v. EEOC,*
920 F.3d 794 (Fed. Cir. 2019)................................................................10

*Amerijet Int'l, Inc. v. Pistole,*
753 F.3d 1343 (D.C. Cir. 2014) ............................................................8, 9

*Amoco Prod. Co. v. Village of Gambell,*
480 U.S. 531 (1987)...............................................................................19

*Aqua Prods., Inc. v. Matal,*
872 F.3d 1290 (Fed. Cir. 2017)...........................................................1, 7

*Canadian Lumber Trade All. v. United States,*
441 F. Supp. 2d 1259 (Ct. Int'l Trade 2006) .........................................16

*Celsis In Vitro, Inc. v. CellzDirect, Inc.,*
664 F.3d 922 (Fed. Cir. 2012)...............................................................18

*Corus Grp. PLC v. Bush,*
217 F. Supp. 2d 1347 (Ct. Int'l Trade 2002) ...................................15, 17

*CS Wind Vietnam Co. v. United States,*
832 F.3d 1367 (Fed. Cir. 2016)...............................................................8

*CSX Transp., Inc. v. Surface Transp. Bd.,*
584 F.3d 1076 (D.C. Cir. 2009).................................................................6

*Darby v. Cisneros,*
509 U.S. 137 (1993)..........................................................................5, 6, 7

*Dickson v. Sec'y of Def.,*
68 F.3d 1396 (D.C. Cir. 1995)..............................................................8, 9

*Douglas Dynamics, LLC v. Buyers Prods. Co.,*
717 F.3d 1336 (Fed. Cir. 2013)...............................................................19

*DSE, Inc. v. United States,*
169 F.3d 21 (D.C. Cir. 1999)....................................................................6

*Earth Island Inst. v. Christopher,*
6 F.3d 648 (9th Cir. 1993) ......................................................................3

*Elkins v. United States,*
    364 U.S. 206 (1960) ................................................................................9

*Fund for Animals v. Frizzell,*
    530 F.2d 982 (D.C. Cir. 1975) ...............................................................15

*Honig v. Doe,*
    484 U.S. 305 (1988) ................................................................................7

*Houghton v. Shafter,*
    392 U.S. 639 (1968) ................................................................................7

*Humane Soc'y of U.S. v. Brown,*
    901 F. Supp. 338 (Ct. Int'l Trade 1995) .................................................5

*Int'l Lab. Rts. Fund v. Bush,*
    357 F. Supp. 2d 204 (D.D.C. 2004) .....................................................3, 4

*Int'l Lab. Rts. Fund v. United States,*
    391 F. Supp. 2d 1370 (Ct. Int'l Trade 2005) ..........................................3

*Invenergy Renewables LLC v. United States,*
    422 F. Supp. 3d 1255 (Ct. Int'l Trade 2019) ...............................8, 11, 20

*Invenergy Renewables LLC v. United States,*
    476 F. Supp. 3d 1323 (Ct. Int'l Trade 2020) .................................8, 9, 20

*Invenergy Renewables LLC v. United States,*
    552 F. Supp. 3d 1382 (Ct. Int'l Trade 2021) ........................................20

*K Mart Corp. v. Cartier, Inc.,*
    485 U.S. 176 (1988) ................................................................................3

*Kentucky v. Biden,*
    57 F.4th 545 (6th Cir. 2023) .................................................................16

*Kirwa v. Dep't of Def.,*
    285 F. Supp. 3d 257 (D.D.C. 2018) .....................................................12

*League of Women Voters of U.S. v. Newby,*
    838 F.3d 1 (D.C. Cir. 2016) ..................................................................21

*McCarthy v. Madigan,*
    503 U.S. 140 (1992) ................................................................................7

*McKinney v. U.S. Dep't of Treasury,*
    614 F. Supp. 1226 (Ct. Int'l Trade 1985), *aff'd*, 799 F.2d 1544 (Fed. Cir.
    1986) ........................................................................................................3

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)..................................................................................................7

*Nat. Res. Def. Council v. Dep't of Interior*,
410 F. Supp. 3d 582 (S.D.N.Y. 2019)....................................................................9

*Nat'l Fed. of Indep. Bus. v. Dep't of Lab.*,
595 U.S. 109 (2022)..............................................................................................17

*Open Top Sightseeing USA v. Mr. Sightseeing, LLC*,
48 F. Supp. 3d 87 (D.D.C. 2014) .........................................................................14

*Premier Trading, Inc. v. United States*,
144 F. Supp. 3d 1354 (Ct. Int'l Trade 2016) .......................................................17

*Pub. Citizen, Inc. v. FAA*,
988 F.2d 186 (D.C. Cir. 1993)...............................................................................7

*Qualcomm Inc. v. Intel Corp.*,
6 F.4th 1256 (Fed. Cir. 2021) ................................................................................6

*Ramirez v. Collier*,
595 U.S. 411 (2022)..............................................................................................13

*Roelofs v. Sec'y of Air Force*,
628 F.2d 597 (D.C. Cir. 1980).............................................................................20

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
141 S. Ct. 63 (2020).............................................................................................18

*Sea Shepherd New Zealand v. United States*,
639 F. Supp. 3d 1367 (Ct. Int'l Trade 2023) .........................................................5

*Shandong Huarong Gen. Grp. v. United States*,
122 F. Supp. 2d 1367 (Ct. Int'l Trade 2000) ..................................................16, 17

*Standard Havens Prods., Inc. v. Gencor Indus., Inc.*,
897 F.2d 511 (Fed. Cir. 1990)..............................................................................17

*Strait Shipbrokers Pte. Ltd. v. Blinken*,
560 F. Supp. 3d 81 (D.D.C. 2021).......................................................................10

*Sulemane v. Mnuchin*,
No. 16-1822 (TJK), 2019 WL 77428 (D.D.C. Jan. 2, 2019) ...............................12

*Tandon v. Newsom*,
141 S. Ct. 1294 (2021).........................................................................................17

*TikTok Inc. v. Trump*,
    507 F. Supp. 3d 92 (D.D.C. 2020) .................................................................................18

*Winter v. Nat. Res. Def. Council*,
    555 U.S. 7 (2008) ..............................................................................................13, 19

*Xiaomi Corp. v. Dep't of Def.*,
    No. 21-280 (RC), 2021 WL 950144 (D.D.C. Mar. 12, 2021) ...........................11, 12

**Statutes**

5 U.S.C. § 704 ..............................................................................................................6

5 U.S.C. § 706 .........................................................................................................8, 20

16 U.S.C. § 1371(a)(2) ...................................................................................................5

16 U.S.C. § 1826a(b) ......................................................................................................5

19 U.S.C. § 1307 ............................................................................................................2

19 U.S.C. § 1514(a) ........................................................................................................2

28 U.S.C. § 1581(i)(1)(C) .............................................................................1, 2, 3, 4, 5

Pub. L. No. 117-78, 135 Stat. 1525 (2021).............................................................2, 4, 8

**Other Authorities**

19 C.F.R. § 12.42 ...........................................................................................................2

19 C.F.R. § 12.43 ...........................................................................................................5

87 Fed. Reg. 47,777 (Aug. 4, 2022).............................................................................6, 7

88 Fed. Reg. 38,080 (June 12, 2023) .............................................................................1

Dep't of Homeland Sec., *Report to Congress: Strategy to Prevent the Importation
    of Goods Mined, Produced, or Manufactured with Forced Labor in the
    People's Republic of China* (June 17, 2022) ...........................................................4

## INTRODUCTION

This case is about a basic tenet of administrative law: "[A]n agency must explain why it decides any question the way it does. … [I]t may not simply provide a conclusion." *Aqua Prods., Inc. v. Matal*, 872 F.3d 1290, 1325 (Fed. Cir. 2017) (citation and quotation marks omitted). When it announced Ninestar's addition to the Uyghur Forced Labor Prevention Act (UFLPA) Entity List, the Forced Labor Enforcement Task Force (FLETF) provided nothing more than a conclusion. *See* 88 Fed. Reg. 38,080, 38,082 (June 12, 2023). And now it offers a supposedly sufficient explanation in the Administrative Record, but even the most diligent reader will find only the same, rephrased conclusion. The Government has violated its simple but fundamental obligation to explain itself.

The Government has little response to this straightforward analysis. Instead, it offers distractions and desperate reaches: the Government contends that this Court lacks jurisdiction because a presumptive ban on importation of Ninestar's goods is not an "embargo"; that Ninestar did not exhaust its claim because it bypassed optional and illusory administrative remedies; that Ninestar's claim is moot because the Government has filed a 99% redacted Administrative Record whose few legible portions repeat the agency's bottom-line conclusion; and that none of Ninestar's irreparable financial, business, reputational, or procedural injuries justify injunctive relief. None of these arguments rebut Ninestar's initial showing as to the preliminary injunction factors. The Court should preliminarily enjoin enforcement of the Government's unlawful decision and stop the ongoing irreparable harm to Ninestar.

## ARGUMENT

### A.    This Court Has Jurisdiction Over Claims Arising Out Of The UFLPA.

Contrary to the Government's representations, this Court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(i)(1)(C), which gives the Court of International Trade "exclusive

jurisdiction of any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for … embargoes or other quantitative restrictions on the importation of merchandise for reasons other than the protection of the public health or safety."  28 U.S.C. § 1581(i)(1)(C).  This action arises out of two such laws: Section 307 of the Tariff Act of 1930 and the UFLPA.

Section 307 of the Tariff Act of 1930 states that "[a]ll goods, wares, articles, and merchandise mined, produced, or manufactured wholly or in part in any foreign country by … forced labor … shall not be entitled to entry at any of the ports of the United States, and the importation thereof is hereby prohibited."  19 U.S.C. § 1307.  In 2021, seeking to "ensur[e] that the Government of the People's Republic of China does not undermine the effective enforcement of section 307," Congress passed and the president signed into law the UFLPA, Pub. L. No. 117-78, § 1(1), 135 Stat. 1525, 1525 (2021).

The UFLPA is an adjunct to Section 307.  Under the normal operation of Section 307, CBP investigates the provenance of goods being imported into the United States.  *See* 19 C.F.R. § 12.42. If CBP finds that such goods were produced with forced labor, CBP will order them excluded pursuant to Section 307 and will instruct Port Directors not to release them.  The importer can then challenge the goods' exclusion with an administrative protest filed under 19 U.S.C. § 1514(a).  The UFLPA simply short-circuits that process.  When FLETF adds a company to the entity list, CBP is relieved of any obligation to investigate whether goods produced by that company were made with forced labor.  Instead, the CBP is required by law to "apply a presumption" that such goods are "prohibited under section 307."  UFLPA § 3(a)(1).  As a result, "such goods, wares, articles, and merchandise are not entitled to entry at any of the ports of the United States."  *See id.* § 3(a)(2). As Ninestar explained in its initial submission, the Listing Decision obligated CBP "to presume

that any goods associated with any listed Ninestar entity are prohibited from importation under Section 307 as the product of forced labor."  ECF No. 20 at 14 ("Motion").

There is a word for such a prohibition on the importation of all of a company's goods—an embargo.  "An embargo is a '[g]overnment order prohibiting commercial trade with individuals *or businesses* of other nations.'"  *K Mart Corp. v. Cartier, Inc.*, 485 U.S. 176, 184 (1988) (emphasis added) (quoting Black's Law Dictionary 468 (5th ed. 1979)); *see also id.* at 185 ("[T]he ordinary meaning of 'embargo,' and the meaning that Congress apparently adopted in the statutory language 'embargoes or other quantitative restrictions,' is a governmentally imposed quantitative restriction—of zero—on the importation of merchandise.").  There is thus no doubt that Section 307 is a "law … providing for … embargoes."  28 U.S.C. § 1581(i)(1)(C).  Section 307 "sets forth a policy that may be invoked to prevent goods from entering the country."  *Int'l Lab. Rts. Fund v. Bush*, 357 F. Supp. 2d 204, 208 (D.D.C. 2004) ("*ILRF I*").  In the plainest terms, Section 307 is a prohibition on the importation of all goods of a certain type.  Accordingly, this Court has repeatedly exercised jurisdiction in claims involving the government's administration of Section 307, including claims that, like this one, invoke the Administrative Procedure Act's cause of action. *See, e.g.*, *Int'l Lab. Rts. Fund v. United States*, 391 F. Supp. 2d 1370 (Ct. Int'l Trade 2005) ("*ILRF II*"); *McKinney v. U.S. Dep't of Treasury*, 614 F. Supp. 1226, 1232 (Ct. Int'l Trade 1985), *aff'd*, 799 F.2d 1544 (Fed. Cir. 1986).  At the same time, United States *district* courts have dismissed claims involving the government's administration of Section 307, reasoning that such claims "fall within the exclusive jurisdiction of the CIT" specified by § 1581.  *ILRF I*, 357 F. Supp. 2d at 208; *Earth Island Inst. v. Christopher*, 6 F.3d 648, 651 (9th Cir. 1993).  Further, these courts reasoned that "[n]either the interest in uniformity of judicial review, nor Congress' intent to reserve certain cases for the specific expertise of the CIT, would be served by retaining jurisdiction over the

plaintiffs' claims." *ILRF I*, 357 F. Supp. 2d at 209.  Ninestar has no choice but to bring its claims in this Court.

The government argues that this Court lacks jurisdiction under § 1581(i)(1)(C) "[b]ecause importers can overcome or avoid the UFLPA's rebuttable presumption."  ECF No. 25 at 18 ("Response").  This argument brazenly obfuscates.  For starters, Ninestar's claim concerns *both* the UFLPA and Section 307, as the UFLPA provides the procedure but Section 307 provides the consequence to which Ninestar is now subject and against which Ninestar seeks a preliminary injunction.  Jurisdiction is established without even examining the UFLPA.  But even looking at the UFLPA alone, it is clear that the UFLPA is also a "law … providing for … embargoes."  28 U.S.C. § 1581(i)(1)(C).  The "rebuttable presumption" that the government incantates is a presumption that *the goods must be embargoed*.  *See* UFLPA § 3(a) (explaining that listing triggers presumption that "the importation of such goods … is prohibited under section 307" and, further, that "such goods … are not entitled to entry at any of the ports of the United States"); *see also* Dep't of Homeland Sec., *Report to Congress: Strategy to Prevent the Importation of Goods Mined, Produced, or Manufactured with Forced Labor in the People's Republic of China* (June 17, 2022) at 40 (explaining that goods produced by a listed entity "are prohibited from entry into the United States").  The importer of record can overcome this presumption and reverse the embargo only by (1) demonstrating by clear and convincing evidence that the goods in question were not produced wholly or in part by forced labor, (2) fully responding to all CBP requests for information about goods under CBP review, and (3) demonstrating that it has fully complied with DHS guidance.  *See* UFLPA § 3(b).  In other words, the UFLPA creates a process by which an entity's goods are embargoed unless the CBP Commissioner grants an exemption in accordance with statutory criteria.

That the UFLPA provides a process for granting exemptions or reversing an embargo does not alter the fact that the UFLPA is a law providing for embargoes.  Many laws providing for embargoes also provide for the granting of exemptions or reconsideration.  *See, e.g.*, 16 U.S.C. § 1826a(b) (High Seas Driftnet Fisheries Enforcement Act); *id.* § 1371(a)(2) (Marine Mammal Protection Act).  And this Court has accordingly exercised its jurisdiction over challenges arising under these laws pursuant to § 1581(i)(1)(C).  *See, e.g.*, *Humane Soc'y of U.S. v. Brown*, 901 F. Supp. 338, 346 (Ct. Int'l Trade 1995); *Sea Shepherd New Zealand v. United States*, 639 F. Supp. 3d, 1367, 1376 n.14 (Ct. Int'l Trade 2023).  Indeed, just like UFLPA, Section 307 permits importers to overcome CBP's finding that a good is inadmissible by submitting proof of admissibility.  *See* 19 C.F.R. § 12.43.  The government's argument that "[b]ecause importers can overcome or avoid the UFLPA's rebuttable presumption … the presumption does not meet the definition of 'embargo,'" Response 31, is thus in conflict with this Court's consistent precedent.

In sum, this Court has jurisdiction under § 1581(i)(1)(C), because Section 307 and the UFLPA are each laws providing for embargoes.  The government's first argument on the likelihood of success on the merits is thus entirely unavailing.

**B.  There Is No Exhaustion Requirement In This Case.**

The Government argues that that the doctrine of "prudential exhaustion" requires dismissal.  Response 19.  That argument is foreclosed by binding Supreme Court precedent.

"[W]here the APA applies" exhaustion of administrative remedies "is a prerequisite to judicial review *only* when expressly required by statute or when an agency rule requires appeal before review and the administrative action is made inoperative pending that review."  *Darby v. Cisneros*, 509 U.S. 137, 154 (1993).  The Government does not contend that the APA is somehow inapplicable here, and it points to no statutory exhaustion requirement.  *See* Response 19 (focusing solely on prudential exhaustion); *id.* at 8 ("The statute is silent on procedures for making requests

to be removed from the list."). The only question, then, is "whether an agency's regulations *require* recourse to a superior agency authority. Where an intra-agency appeal is discretionary, *Darby* teaches that '[c]ourts are not free to impose an exhaustion requirement as a rule of judicial administration where the agency action has already become "final" under [5 U.S.C. § 704].'" *DSE, Inc. v. United States*, 169 F.3d 21, 27 (D.C. Cir. 1999) (emphasis added) (quoting *Darby*, 509 U.S. at 154).

The FLETF removal request procedure at the heart of the Government's argument is, by its own terms, optional. The procedure provides that a listed entity "may" submit a removal request to FLETF. 87 Fed. Reg. 47,777, 47,778 (Aug. 4, 2022); *accord* ECF No. 25-1 at AR000224. That puts the FLETF procedure on all fours with the one *Darby* held to not be a prerequisite to judicial review. *See* 509 U.S. at 141 ("Any party *may* request such a review … ." (emphasis added)); *see also Qualcomm Inc. v. Intel Corp.*, 6 F.4th 1256, 1265 (Fed. Cir. 2021); *CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1079 (D.C. Cir. 2009). Nor does the FLETF review procedure provide that a listing decision is "inoperative pending that review"—another sign that the procedure is not necessary under *Darby*. 509 U.S. at 154; *see also DSE*, 169 F.3d at 27.

Because resort to FLETF's review procedure (or any other procedure) is not "required" by statute or agency rule, and because resort to FLETF's procedure does not "ma[k]e inoperative" its

6

decision "pending … review," there is no exhaustion requirement in this APA case.  *Darby*, 509 U.S. at 154.[1]

## C.   The Government Failed Again To Provide An Adequate Explanation, So Ninestar Is Likely To Succeed On The Merits.

In our Motion, we explained that the Listing Decision must be vacated because the Government has failed in the elementary requirement of administrative procedure that an agency "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).  Motion at 16.  The Government does not dispute that it is required to provide Ninestar with the aforementioned "satisfactory" or "adequate" explanation.  Instead the Government makes two arguments: (1)  the conclusory Federal Register Notice was sufficient and, in the alternative, (2)  the almost entirely redacted administrative record it has supplied this Court cured any such deficiency.  Both arguments are unavailing.

Fundamentally, the requirement that the FLETF provide Ninestar with an adequate explanation for its Listing Decision grows out of the APA's requirement that an agency not act in an arbitrary or capricious manner. *See Aqua Prod., Inc.*, 872 F.3d at 1325; *Pub. Citizen, Inc. v.*

---

[1] While *Darby* alone demands rejection of the Government's exhaustion argument, the FLETF procedure wouldn't pass muster even if the prudential exhaustion doctrine applied here.  Resort to that nebulous procedure would prejudice Ninestar because of its "indefinite timeframe" and the ongoing "irreparable harm" Ninestar would suffer "if unable to secure immediate judicial consideration of [its] claim."  *McCarthy v. Madigan*, 503 U.S. 140, 147 (1992).  It would be "futile," *Honig v. Doe*, 484 U.S. 305, 327 (1988), because Ninestar surely cannot have "demonstrate[d] that [it] no longer meets or does not meet" the listing criteria without knowing why it was listed in the first place, 87 Fed. Reg. at 47,778.  And it would be "inadequate" because FLETF had already "predetermined the issue before it." *McCarthy*, 503 U.S. at 148; *see Houghton v. Shafter*, 392 U.S. 639, 640–41 (1968) (prudential exhaustion unnecessary where appeal would be adjudicated by same entity that had already addressed the matter).

*FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993). A court cannot review the reasonableness of the agency action—and an aggrieved party cannot raise arguments under 5 U.S.C. § 706—unless the agency "explain[s] the facts on which it relied" and "the reasoning behind its decision." *Invenergy Renewables LLC v. United States*, 422 F. Supp. 3d 1255, 1288 (Ct. Int'l Trade 2019) (*Invenergy I*). "[T]he required explanation must reasonably tie the determination under review to the governing statutory standard and to the record evidence by indicating what statutory interpretations the agency is adopting and what facts the agency is finding." *CS Wind Vietnam Co. v. United States*, 832 F.3d 1367, 1376 (Fed. Cir. 2016); *see also Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1405 (D.C. Cir. 1995) (explaining that the agency may not "omi[t] the critical step" of "connecting the facts to the conclusion"). "[C]onclusory statements will not do; 'an agency's statement must be one of reasoning.'" *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) (quoting *Butte County v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010)).

The FLETF has provided nothing more than conclusory assertions and rote recitations of the statutory standard. Because the APA obliges agencies to provide an "adequate, public explanation" of their decisions, *Invenergy Renewables LLC v. United States*, 476 F. Supp. 3d 1323, 1331 (Ct. Int'l Trade 2020) (*Invenergy II*), the natural starting point is FLETF's Federal Register Notice, which simply included Ninestar on the list of entities determined to "wor[k] with the government of Xinjiang to recruit, transport, transfer, harbor or receive forced labor or Uyghurs, Kazakhs, Kyrgyz, or members of other persecuted groups out of Xinjiang"—i.e., a verbatim repetition of the UFLPA § 2(d)(2)(B)(i) standard. As Ninestar explained it its motion, the Federal Register Notice "offers no evidence that formed the basis for its Listing Decision, identifies no factual findings with respect to Plaintiffs (or any other listed entity), and does not explain its reasoning for deciding to list Plaintiffs." Motion at 18. A Notice so barren of facts and reasoning

is woefully inadequate.  *See Dickson*, 68 F.3d at 1405 ("When an agency merely parrots the language of a statute without providing an account of how it reached its results, it has not adequately explained the basis for its decision."); *Nat. Res. Def. Council v. Dep't of Interior*, 410 F. Supp. 3d 582, 596 (S.D.N.Y. 2019) ("[A] rote restatement of the statutory language … is plainly inconsistent with the bedrock principle of administrative law requiring a reasoned explanation for agency action" (citations omitted)); *see also Amerijet*, 753 F.3d at 1352 ("programmatic boilerplate" is not a "reasoned explanation").  It can neither sufficiently inform judicial review nor give Ninestar a genuine opportunity to respond.

Yet the Government claims that the Federal Register Notice was, standing alone, sufficient to meet the demands of the APA.  According to the Government, "the Federal Register notice's specification of the basis for the FLETF's action adequately informed plaintiffs of the basis for their listing and also provided sufficient information for the plaintiffs to request removal from the list."  Response 38.  It is unclear how the Government expects Ninestar to refute these accusations when Ninestar has not been made aware of any of the factual allegations on which they are based. After all, "as a practical matter it is never easy to prove a negative."  *Elkins v. United States*, 364 U.S. 206, 218 (1960).  In any event, precedent makes clear that the agency falls well short of its duty when it does nothing more than repeat the statute, as the FLETF did in the Notice.

As a fallback, the Government argues that the provision of the Administrative Record cured any inadequacy in the Federal Register Notice and rendered Ninestar's claim moot.  *See* Response 25–31.  To be sure, the FLETF may "provide adequate explanation in a document outside of four corners of the Federal Register notice."  *Invenergy II*, 476 F. Supp. 3d at 1347.  But that explanation must be "made available to the parties or to the public at large."  *Id.* at 1346; *see also id.* at 1347 ("Requiring that the parties litigate a final agency decision in order to gain knowledge

9

of and access to the agency's rationale wastes judicial resources and delays corrective agency

action that would otherwise be addressed by the agency in the first instance."). The requirement

that the agency promptly and transparently disclose its explanation applies even when the agency

is issuing orders rather than rules. *See AFGE Local 3599 v. EEOC*, 920 F.3d 794, 799 (Fed. Cir.

2019).[2]

Putting the questions of timing and notice aside, the contents of the Administrative Record

also simply do not provide an adequate explanation. But the Government's misunderstanding of

its burden to explain itself informed the scant and conclusory Administrative Record that it

provides Ninestar and this Court.[3] The "Public" Administrative Record comprises a 2 page index

and 229 pages of materials, of which 23 pages are unredacted (including 17 exhibit cover pages),

9 are partially redacted (albeit most of them mostly redacted), and 199 are entirely redacted. Pages

AR000001–17 are expressly marked "unclassified," yet are mostly redacted without explanation.

Pages AR000202-212 are expressly marked "Law Enforcement Sensitive" with a detailed

description of that designation, and are entirely redacted, yet none of the other redacted pages bear

---

[2] The Government relies on just one case—*Strait Shipbrokers Pte. Ltd. v. Blinken*, 560 F. Supp. 3d 81 (D.D.C. 2021)—to dispute this argument. *See* Response at 25–27. But *Strait Shipbrokers* merely stands for the uncontroversial proposition that "defendants need not immediately turn over the entire administrative record on or around the date of designation." *Id.* at 94. In that case, the court found that the agency had given plaintiffs an adequate explanation because the designation "generally describe[d] the *conduct* that prompted the designations" and plaintiffs "were soon provided with more specific information regarding the precise transaction on which the designations were predicated," two elements totally missing here. *Id.* (emphasis added).

[3] The government spends the bulk of its argument as to the "adequate explanation" requirement setting fire to a straw man. According to the government, Ninestar is unlikely to succeed on the merits because the APA "does not require the agency to provide *all* of the relevant information at the time of its determination." Response 38 (emphasis added). But that is neither the standard nor our argument. As explained in our Complaint and Motion, the Federal Register Notice and press release were the *only documents* issued and neither provided *any* adequate explanation for the Listing Decision.

such a legend.  The handful of unredacted pages again parrot the language of the listing statute and add no meaningful detail explaining the specifics of the listing.  And while Ninestar's counsel cannot disclose, consistent with the Protective Order, what *is* in the Confidential Administrative Record, we can state authoritatively what is *not*—namely, the unredacted versions of *any* of the materials contained in the Public Administrative Record.  Rather, the [      ]

Neither Ninestar nor this Court has learned the factual basis for the Listing Decision from the Administrative Record.  Instead, the Administrative Record merely contains the vaguest of allegations that Ninestar "has worked with the government of the Xinjiang Uyghur Autonomous Region through a third-party agency to recruit, transport, and receive Uyghur laborers out of the Xinjiang Uyghur Autonomous Region to work in its manufacturing facilities in the city of Zhuhai."  AR000001; *see also* AR000005.  The only difference between that assertion and the statutory language is the reference to "a third-party agency."  The FLETF's proffered rationale thus remains inadequate.  As this Court explained in *Invenergy Renewables*, an agency does not satisfy its burden to explain itself when "the facts on which [the agency] relied … remain unknown to all but [the agency]."  422 F. Supp. 3d at 1288.  Similarly, in a recent case concerning the Department of Defense's arbitrary-and-capricious designation of the Xiaomi Corporation as a "Communist Chinese military company," the Department of Defense was faulted for an explanation more fulsome than the one FLETF provided here.  *See Xiaomi Corp. v. Dep't of Def.*, No. 21-280 (RC), 2021 WL 950144, at *5 (D.D.C. Mar. 12, 2021).  Even though the Defense Department pulled specific facts from Xiaomi's Annual Report (something the FLETF has not done), the Department nonetheless failed to make a "rational connection—or any connection" between the facts found and the choice made.  *Id.*  "Because the Department of Defense has done little more than parrot

11

the language of a statute followed by a conclusory statement, it has not adequately explained the basis for its decision." *Id.* (cleaned up).

The Government says the accusation came from a confidential source, but was confirmed through "government documents, Ninestar's company documents, and media reports." Response 42. Tellingly, however, the Government has either entirely redacted or refused to provide the "company documents" and "media reports," neither of which should be confidential under the terms of the Joint Protective Order. Ninestar and this Court are thus left to guess at whatever factual basis the FLETF has. And while there are good reasons to keep sensitive information out of the public Administrative Record, the potential sensitivity of a source does not relieve the Government of its obligation to provide an adequate explanation for the action it is taking.[4] After all, APA review "involves more than a court rubberstamping action based on bare declarations from the agency amounting to 'trust us, we had good national security reasons for what we did.'" *Kirwa v. Dep't of Def.*, 285 F. Supp. 3d 257, 270 (D.D.C. 2018) (citation omitted); *accord Xiaomi Corp.*, 2021 WL 950144, at *5. *Cf. Sulemane v. Mnuchin*, No. 16-1822 (TJK), 2019 WL 77428, at *7 (D.D.C. Jan. 2, 2019) (chronicling the detailed explanation given for OFAC designation while also preserving the secrecy of "law enforcement sensitive, diplomatic, [and] classified" information).

Given that the Administrative Record says "little more" than the obviously defective Federal Register Notice, the Government has not cured the inadequacy of its prior

---

[4] In its opposition to Ninestar's motion to amend the scheduling order, the Government notes that it is drafting a motion to amend the protective order. ECF No. 29 at 7. It is unclear to Ninestar what purpose this amendment will serve other than allowing the Government to shield from the public materials that are not classified or privileged. Ninestar is considering the Government's proposal, but is also evaluating moving to enforce the existing Protective Order.

representations—let alone render Ninestar's claims "moot."   Response 28–29.   Ninestar is therefore likely to prevail on the merits.

    **D.**    **Ninestar Has Suffered And Will Continue to Suffer Irreparable Harm Absent A Preliminary Injunction.**

Under the governing standard, Ninestar must show only that it is "likely" to suffer irreparable harm absent preliminary relief.  *Ramirez v. Collier*, 595 U.S. 411, 421 (2022) (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008)).  It has done so.  In its motion, Ninestar showed that the Listing Decision has inflicted four kinds of irreparable harm that will continue to accumulate without this Court's intervention: financial losses; ruined business opportunities; reputational slander; and irremediable procedural violations. Motion 12–14.  Any one of those injuries warrants injunctive relief; together, they compel it.  Defendants' arguments to the contrary are meritless.

        **1.**    **Ninestar sought relief as swiftly as possible in the circumstances.**

The Government contends first that Ninestar's "two-month delay" in seeking a preliminary injunction suggests that its harms are "not irreparable." Response 32.  The Government is wrong on the facts and on the law.

Ninestar was blindsided by FLETF's decision.  In the months leading up to the Listing Decision, Ninestar had no reason to believe it was being considered for addition to the UFLPA Entity List.  Then, as now, Ninestar was "unaware of any facts supporting" its addition the Entity List, and the Government never warned Ninestar about the matter.  ECF No. 20-1 ¶ 11 ("Cheng Decl.").  So the earliest Ninestar could even begin to consider its response to the Listing Decision was June 9—the day DHS announced without any explanation that Ninestar was one of the few entities ever to be affected by the UFLPA's unique, never-before-litigated statutory scheme.

Upon learning of the Decision, Ninestar acted with all deliberate haste.  Understanding that a Chinese company suing the United States government was, as litigation goes, a monumental decision, Ninestar immediately undertook an internal review, assisted by outside counsel, to identify any potential grounds for FLETF's charges.  After all, because FLETF did not explain itself, Ninestar's *only* chance of seeking removal without litigation was to itself determine the basis of FLETF's mistake.  When that investigation proved fruitless, Ninestar then engaged U.S. counsel to explore whether it would be possible to engage in the FLETF delisting process, notwithstanding having zero understanding of the basis for the listing and no ability to compel FLETF to share any information.  For the reasons discussed here and previously, that option offered no chance at all.  Only at that point—and with the Listing Decision's damage metastasizing beyond the United States, *see* Cheng Decl. ¶¶ 15, 20, 23, 35, 42–43, 48–49—did Ninestar engage United States litigation counsel and prepare this lawsuit.  And, notably, since filing Ninestar has been clear about the situation's urgency.  All told, two months hardly seems dilatory in light of the Government's novel and unexplained bushwhacking of a foreign company based in one of the world's most geopolitically sensitive areas.

The Government's cases do not say otherwise.  The dawdling plaintiffs in *Open Top Sightseeing USA v. Mr. Sightseeing, LLC*, 48 F. Supp. 3d 87, 88–89 (D.D.C. 2014), waited thirty days to sue their competitor, located in the same city, for run-of-the-mill trade dress and contract claims, then asked the court to set a hearing date and briefing schedule that would create at least another two months of delay.  Here, by contrast, Ninestar swiftly took steps to first avoid the significant act of suing a foreign government, then engaged counsel as quickly as possible to challenge the Government's shadowy implementation of a novel statutory scheme.  And since suing, Ninestar has urgently pressed for relief at every turn.  *See* ECF No. 9 (PI motion filed same

14

day as complaint); ECF No. 22 (opposing government's extension request); ECF No. 27 (moving

to expedite disposition of PI motion). *Fund for Animals v. Frizzell*, 530 F.2d 982 (D.C. Cir. 1975),

is similarly far afield. The plaintiffs there, serial domestic litigants who had already sued the

Government once over the regulations at issue, inexplicably waited forty-four days to raise an

ordinary due-process challenge to an agency's procedural error. *Id.* at 987. Again, that is not this

case. What the Government calls "delay" was, in reality, wholly justified caution given the

circumstances.

### 2. Evidence supports Ninestar's financial losses.

The Government next takes several shots at the significance or likelihood of financial

injuries the Listing Decision will inflict on Ninestar. Response 32–35. Each misses the mark.

At the outset, it is worth noting what the government does not dispute: Because the APA

does not waive the Government's sovereign immunity against damages claims, monetary harms

in APA actions are necessarily irreparable. Motion 12–13 (collecting cases). The only question,

then, is whether Ninestar has adequately proven that such harms are likely to occur. And on that

score there can be little debate.

This simple observation alone defeats one of the Government's primary arguments. The

Government maintains that Ninestar's financial injuries are inadequate because they will not

inescapably lead to bankruptcy, plant closures, or other catastrophic business disruptions.

Response 33, 35. Even if the Government had the facts right—and it does not, *see* Cheng Decl.

¶¶ 13, 23—its legal premise is all wrong. "[T]here is no requirement that a party seeking injunctive

relief establish imminent [business] failure." *Corus Grp. PLC v. Bush*, 217 F. Supp. 2d 1347, 1354

(Ct. Int'l Trade 2002). Such events are *sufficient*, to be sure, because they foreclose "effective and

meaningful judicial review" regardless of who the defendant is. *See Shandong Huarong Gen. Grp.*

*v. United States*, 122 F. Supp. 2d 1367, 1370 (Ct. Int'l Trade 2000). But they cannot be *necessary*

in cases, like this one, where the government remains "cloaked in sovereign immunity." *Canadian Lumber Trade All. v. United States*, 441 F. Supp. 2d 1259, 1265 (Ct. Int'l Trade 2006).  In such cases, all that matters in the irreparable injury analysis is whether the plaintiff's financial harm is "more than 'merely trifling.'" *Id.* at 1264. (quoting *Consol. Canal Co. v. Mesa Canal Co.*, 177 U.S. 296, 302 (1900)); *see also Kentucky v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023) (citing Supreme Court precedent for the proposition that in APA cases the "peculiarity and size of a [financial] harm affects its weight in the equitable balance, not whether it should enter the calculus at all").[5]  Ninestar's staggering financial losses easily exceed that bar.

In all events, Ninestar's evidence of serious financial harm is far more direct than the speculative chain of events rejected in *Corus* and *Shandong*.  *See* Response 33–35.  In a detailed declaration from the Director of its Enterprise Planning Department, Ninestar explained that several of the listed entities have historically earned significant revenue from sales of products destined for the United States, Cheng Decl. ¶ 6; that the Listing Decision has already caused U.S. customers to cancel orders for Ninestar products, *id.* ¶¶ 23, 29, 32, 40, 46; and that, if the Listing Decision remains in effect, Ninestar would continue to lose substantial future sales in the U.S. and abroad, *id.* ¶¶ 20, 24, 29, 36, 41.  Far from "speculative" or "self-serving" assertions, Response 31, 33, it takes no mental gymnastics to conclude that a foreign company that routinely sells products to the United States will be financially harmed by an embargo on those products. *Compare Corus*, 217 F. Supp. 2d at 1354–56 (detailing five-step link between increased tariffs and

---

[5] The irrelevance of company-killing events in APA cases also nullifies the Government's demand for evidence about "how the purported losses [a]ffect the overall business."  Response 34 (relying on *Shandong*, 122 F. Supp. 2d at 1370–72).  *Shandong* insisted on such information for the simple reason that it was critical to the plaintiff's claim that without injunctive relief it would "be forced out of business and will lose its right to effective and meaningful judicial review."  122 F. Supp. 2d at 1370.

plaintiffs' plant closure); *Shandong*, 122 F. Supp. 2d at 1370 (listing holes in link between loss of major customer and business failure).

Finally, the Government claims that so-called "self-serving affidavits" are "often" insufficient to establish irreparable harm.  The government wisely does not assert that this rule is categorical.  It is not.  *See, e.g.*, *Nat'l Fed. of Indep. Bus. v. Dep't of Lab.*, 595 U.S. 109, 120 (2022) (identifying "billions of dollars in unrecoverable compliance costs" as justifying stay in case decided without evidentiary hearing); *Tandon v. Newsom*, 141 S. Ct. 1294, 1297 (2021) (similar); *Standard Havens Prods., Inc. v. Gencor Indus., Inc.*, 897 F.2d 511, 515 (Fed. Cir. 1990) (finding irreparable harm based solely on "affidavits" of plaintiff's executive vice president and accountant).  The affidavits presented in the cases cited by the government were insufficient not simply because they (unsurprisingly) supported the plaintiffs' position, but rather because they also lacked critical factual details.  *See Premier Trading, Inc. v. United States*, 144 F. Supp. 3d 1354, 1359 (Ct. Int'l Trade 2016) (failure to "specify the timeframe for spoilage of the subject garlic entries"); *Shandong*, 122 F. Supp. 2d at 1371 (failure to show inability to obtain financing to cover losses).  That is not the case here.  Ms. Cheng's declaration plausibly asserts every fact critical to Ninestar's ongoing, irreparable financial injury: Ninestar would have sold products to United States customers, but because of Defendants' embargo, it cannot.  Cheng Decl. ¶¶ 20, 24, 29, 36, 41.

### 3.    Ninestar's lost business opportunities are irreparable harm.

The Government says that the Listing Decision's hampering of Ninestar's future business opportunities does not justify injunctive relief.  Response 35.  The precise grounds for the Government's contention are difficult to grasp from the brief's cursory treatment.  If the Government means to say that the loss of prospective business relationships is categorically insufficient, then the Federal Circuit disagrees.  *E.g.*, *Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664

F.3d 922, 930 (Fed. Cir. 2012).  And if it means to say that Ninestar has not adequately quantified

the "financial ramifications" of these lost opportunities, Response 35, then the Government misses

the point—lost business opportunities and damage to customer relationships are irreparable

precisely because "there is no effective way to measure the loss of sales or potential growth—to

ascertain the people who do not knock on the door or to identify the specific persons who do not

reorder because of the [defendant's conduct]."  *Celsis In Vitro, Inc.*, 664 F.3d at 930 (citation

omitted).  Either way, the Government misses the mark, and Ninestar's continued loss of business

opportunities and prospective clients warrants relief.  *See also TikTok Inc. v. Trump*, 507 F. Supp.

3d 92, 113 (D.D.C. 2020) (finding irreparable harm where government listing decision "ero[ded]

TikTok's attractiveness as a commercial partner").

### 4.    Ninestar's reputational injury alone warrants injunctive relief.

The Government concedes that reputational injuries qualify as the kind of irreparable harm

that can warrant a preliminary injunction.  Response 35; *see also* Motion 14 (collecting cases).

Instead, it offers a grab-bag of arguments for why Ninestar's specific reputational injury does not

count.  Each is meritless.

The Government first says that reputational harm alone cannot justify injunctive relief  in

UFLPA cases because "placement on the Entity List could arguably cause some reputational

damage in every case."  Response 36.  What the government sees as an extraordinary feature of

this scheme isn't even unusual.  In numerous fields, courts recognize that irreparable harm may

routinely flow from the defendant's conduct.  *See, e.g.*, *Roman Cath. Diocese of Brooklyn v.*

*Cuomo*, 141 S. Ct. 63, 67 (2020) ("The loss of First Amendment freedoms, for even minimal

periods of time, unquestionably constitutes irreparable injury." (citation omitted)); *Amoco Prod.*

*Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987) ("Environmental injury, by its nature, can

18

seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable."); *Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1345 (Fed. Cir. 2013) ("Where two companies are in competition against one another, the patentee suffers the harm—often irreparable—of being forced to compete against products that incorporate and infringe its own patented inventions.").  The Government's argument to the contrary boils down to the untenable suggestion that, so long as the defendant *always* causes irreparable injury, the plaintiff can *never* get injunctive relief.  That, happily, is not the law.

The Government next says that a preliminary injunction cannot alleviate prevent Ninestar's reputational injury.  Response 36.  It is difficult to see how that is so.  In the end, Ninestar asks this Court to vacate the listing decision and declare that the Government violated the law in branding Ninestar a human trafficker.  *See* ECF No. 8.  To the listening public, such actions by an impartial adjudicator would go a long way toward clearing the cloud on Ninestar's name.  Similarly, if this Court now concludes that the Government's pronouncement "likely" violated the law, *Winter*, 555 U.S. at 20, and bars the Government from acting on its likely unlawful decision, the assault on Ninestar's reputation will surely slow, if not cease entirely.

Finally, the Government contends that Ninestar's claims are "conclusory" and lack "any" corroborating evidence.  Response 36.  Admittedly, it seems obvious to us that being publicly given the loathsome title of "human trafficker" would damage one's reputation.  But, in any event, Ninestar in fact provided exactly what the Government says is lacking.  Ms. Cheng's declaration provided three specific examples, along with corroborating evidence, of the print-industry media slandering Ninestar because of the Listing Decision.  *See* ¶¶ 15–17, Exs. A–C.

### 5.   *Invenergy*'s procedural-injury doctrine applies here.

As this Court has recognized—repeatedly—"a procedural injury can itself constitute irreparable harm." *Invenergy I*, 422 F. Supp. 3d at 1290; *accord Invenergy II*, 476 F. Supp. 3d at 1353.  That is because a "failure to comply with APA procedural requirements … cannot fully be cured by later remedial action." *Invenergy I*, 422 F. Supp. 3d at 1290.

The Government responds that, in "contrast" to *Invenergy I*, Ninestar's placement on the UFLPA Entity List can be eventually cured by this Court.  Response 37.  It is true that this Court can and should eventually vacate the Listing Decision.  *See* 5 U.S.C. § 706.  But that was equally true of the agency actions in *Invenergy*.  *See Invenergy II*, 476 F. Supp. 3d at 1356–57 ("The court vacates the First Withdrawal … ."); *Invenergy Renewables LLC v. United States*, 552 F. Supp. 3d 1382, 1404 (Ct. Int'l Trade 2021) (*Invenergy III*) ("[T]he Second Withdrawal is vacated … .).  The Court's ability to vacate agency action violative of the APA, however, is not the point.  What matters is that, without preliminary relief, "a procedurally flawed and inadequately explained decision" will "establish a new status quo and engender new reliance interests on a decision" that ignored APA procedures designed to guarantee fair and reasoned decision-making.  *Invenergy II*, 476 F. Supp. 3d at 1353; *see also Roelofs v. Sec'y of Air Force*, 628 F.2d 597, 600–01 (D.C. Cir. 1980) (reason-giving requirement "release[s] the clutch of unconscious preference and irrelevant prejudice" (citation omitted)).  This case presents those same concerns in spades.[6]

---

[6] It is irrelevant that the Government's procedural violation "is not the cause of [Ninestar's] financial or reputational harm."  Response 37.  A procedural-injury "claim does not depend upon the subsequent economic harms that flow therefrom."  *Invenergy I*, 422 F. Supp. 3d at 1291.

E.      **The Equities And Public Interest Favor Injunctive Relief.**

As explained in Ninestar's motion, the balance of equities and public interest strongly favor Ninestar: An injunction would alleviate Ninestar's substantial ongoing harms, ensure the fair and uniform application of the law, and vindicate the purposes of the UFLPA.  Motion 15–17.

The Government's only response is to explain that forced labor is bad.  Response 37–39. We agree.  Ninestar has repeatedly condemned, and will continue to condemn, forced labor.  But the government's "trust us" approach to the UFLPA does not further the Act's purpose—to say nothing of the rule-of-law more generally.  *See League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("There is generally no public interest in the perpetuation of unlawful agency action.").  Failing to properly identify human traffickers or adequately explain listing decisions neither incentivizes compliance nor deters (actual) bad actors.  The UFLPA's noble goals are served only through accurate, evenhanded, and reasoned agency decision-making—precisely what Ninestar seeks here.

## CONCLUSION

This Court should issue a preliminary injunction staying the Listing Decision and preventing Defendants from taking any action against the importation of Plaintiffs' goods predicated on the Listing Decision.


Dated: October 13, 2023

                                        Respectfully submitted,

*/s/ Gordon D. Todd*

MICHAEL E. MURPHY
GORDON D. TODD
MICHAEL E. BORDEN
CODY M. AKINS

SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8760
gtodd@sidley.com

*Counsel for Plaintiffs*

22

## CERTIFICATE OF COMPLIANCE

I certify that this reply brief complies with the word count limitation of Chambers Procedure 2(B)(1)(a) because it contains 6,789 words, as determined by the word count feature of the word-processing system used to prepare the brief, excluding the parts exempted by chambers procedure 2(B)(1)(c).

*/s/ Gordon D. Todd*
Gordon D. Todd