## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| NINESTAR CORPORATION, ZHUHAI NINESTAR INFORMATION TECHNOLOGY CO., LTD., ZHUHAI PANTUM ELECTRONICS CO., LTD., ZHUHAI APEX MICROELECTRONICS CO., LTD., GEEHY SEMICONDUCTOR CO., LTD., ZHUHAI G&G DIGITAL TECHNOLOGY CO., LTD., ZHUHAI SEINE PRINTING TECHNOLOGY CO., LTD., and ZHUHAI NINESTAR MANAGEMENT CO., LTD. | |
| *Plaintiffs*, | |
| v. | Before: Gary S. Katzmann, Judge<br>Case No. 23-00182 |
| UNITED STATES OF AMERICA; DEPARTMENT OF HOMELAND SECURITY; UNITED STATES CUSTOMS AND BORDER PROTECTION; FORCED LABOR ENFORCEMENT TASK FORCE; ALEJANDRO MAYORKAS, *in his official capacity as the Secretary of the Department of Homeland Security*; TROY A. MILLER, *in his official capacity as the Senior Official Performing the Duties of the Commissioner for U.S. Customs and Border Protection*; and ROBERT SILVERS, *in his official capacity as Under Secretary for Office of Strategy, Policy, and Plans and Chair of the Forced Labor Enforcement Task Force*, | |
| *Defendants*. | |

## PLAINTIFFS' NOTICE REGARDING ADDITIONAL EXHIBITS TO BE USED AT PRELIMINARY INJUNCTION HEARING

Pursuant to the Court's October 24 Order, ECF No. 39, Plaintiffs Ninestar Corporation

and affiliates respectfully provide notice to the Court and Defendants that Plaintiffs may use the

attached additional exhibits at the November 2 hearing regarding Plaintiffs' motion for a preliminary injunction.  Exhibits 1–3 contain publicly available information about the harm to Ninestar's business and reputation caused by Defendants' actions.  Exhibits 4–13 are formal statements made by public officials, or individuals testifying before them, regarding enforcement of the Uyghur Forced Labor Prevention Act.  *See ACLU v. Nat'l Sec. Agency*, 925 F.3d 576, 599 n.126 (2d Cir. 2019) ("[T]he Government's … public statements are precisely the sort of materials of which we may take judicial notice."); *Am. Council of the Blind v. Mnuchin*, 878 F.3d 360, 366 n.8 (D.C. Cir. 2017) (same).

Dated:  October 30, 2023

Respectfully submitted,

*/s/ Gordon D. Todd*

MICHAEL E. MURPHY
GORDON D. TODD
MICHAEL E. BORDEN
CODY M. AKINS
SIDLEY AUSTIN LLP

1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8760
gtodd@sidley.com

*Counsel for Plaintiffs*

**TABLE OF EXHIBITS**

| Exhibit | Document |
|---------|----------|
| 1 | *Int'l ITC Denies Ninestar's STMC Recertification on Ethical Grounds*, Int'l Imaging Tech. Council (Oct. 24, 2023), https://tinyurl.com/2f4ja95r |
| 2 | *What is STMC*, Int'l Imaging Tech. Council (last visited Oct. 29, 2023), https://tinyurl.com/2p8hdp43 |
| 3 | Ninestar Corp.—Stock Price Chart, *Wall St. J.* (last visited Oct. 29, 2023), https://tinyurl.com/hxwaayp2 |
| 4 | Letter from Congressional–Exec. Comm'n on China to Robert P. Silvers, Chair, Forced Labor Enf't Task Force (Apr. 11, 2023), https://tinyurl.com/5n7z4wrr |
| 5 | Rep. Christopher H. Smith, Remarks at Hearing on Implementation of the UFLPA & the Impact on Global Supply Chains, Congressional–Exec. Comm'n on China (Apr. 18, 2023), https://tinyurl.com/ymdpxhem |
| 6 | Laura T. Murphy, Testimony at Hearing on Implementation of the UFLPA & the Impact on Global Supply Chains, Congressional–Exec. Comm'n on China (Apr. 18, 2023), https://tinyurl.com/3rnjvf7f |
| 7 | Letter from Robert P. Silvers, Chair, Forced Labor Enf't Task Force, to Sen. Jeffrey A. Merkley, Cochair, Congressional–Exec. Comm'n on China (June 9, 2023), https://tinyurl.com/2edyusse |
| 8 | Letter from House Select Comm. on the Chinese Communist Party to John Donahoe, President & CEO, Nike, Inc. (May 2, 2023), https://tinyurl.com/yzr4nfpw |
| 9 | Letter from House Select Comm. on the Chinese Communist Party to Rupert Campbell, President, Adidas N. Am., Inc. (May 2, 2023), https://tinyurl.com/3h46ysyj |
| 10 | Letter from House Select Comm. on the Chinese Communist Party to Yangtian Xu, CEO, Shein (May 2, 2023), https://tinyurl.com/3rkcu8de |
| 11 | Letter from Sen. Ron Wyden, Chairman, Sen. Comm. on Finance, to James D. Farley, Jr., President & CEO, Ford Motor Co. (Dec. 22, 2022), https://tinyurl.com/yckdrx49 |
| 12 | Letter from Sen. Ron Wyden, Chairman, Sen. Comm. on Finance, to Mary Barra, Chair & CEO, General Motors Co. (Dec. 22, 2022), https://tinyurl.com/2494wuf3 |
| 13 | Letter from Sen. Ron Wyden, Chairman, Sen. Comm. on Finance, to Elon Musk, CEO, Tesla, Inc. (Dec. 22, 2022), https://tinyurl.com/y8kka5dm |

# Exhibit 1



NEWS

# Int'l ITC Denies Ninestar's STMC Recertification on Ethical Grounds

posted on
October 24, 2023 (October 24, 2023)

Today, the International Imaging Technology Council (Int'l ITC), the North American trade association for imaging supplies remanufacturers, and its Standardized Test Methods Committee (STMC) announced that they have declined to renew STMC certification for Ninestar Corporation due to its recent association with forced labor.

"The Int'l ITC Board of Directors, along with the STMC Chairman, considered the issue carefully, but in the end, the decision was unanimous," said Executive Director Tricia Judge. "The ethical issues just demanded that we not put our quality seal of approval on products made by slave labor."

The U.S. government has identified a problem in China with state-sponsored forced labor; according to a recent court filing by the U.S., "Over the last four years, the [PRC] . . . has carried out a mass detention and political indoctrination campaign against Uyghurs, who are predominantly Muslim, and members of other ethnic and religious minority groups in . . . Xinjiang . . . , a large region in western China...Authorities use threats of physical violence, forcible drug intake, physical and sexual abuse, and torture to force detainees to work in adjacent or off-site factories or worksites producing [many different products]."

In response, the U.S. government has enacted the Uyghurs Forced Labor Protection Act (UFLPA) and created a consortium of government agencies called the Forced Labor Enforcement Task Force (FLETF), led by the Department of Homeland Security (DHS), to enforce the UFLPA.

The FLETF identified Ninestar as violating the UFLPA by engaging in this practice and filed a very lengthy administrative record that determined as follows: "The information in (the administrative record) demonstrates that Ninestar has worked with the government of the Xinjiang Uyghur Autonomous Region through a third-party agency to recruit, transport, transfer, and receive Uyghur laborers out of the Xinjiang Uyghur Autonomous Region to work in its manufacturing facilities in the city of Zhuhai, located in the Guangdong Province.

"Accordingly, on May 15, 2023, FLETF Member Agencies voted unanimously to add Ninestar Corporation to the Entity List described in Section 2(d)(2)(B)(ii) of the UFLPA." On June 9, the DHS announced the nationwide importation ban on products made by Ninestar and eight of its subsidiaries.

Int'l ITC is required to abide by the same bylaws that apply to its members and must, therefore, "Prioritize the safety and well-being of all individuals affected by [Int'l' ITC's] actions" and "Prioritize the welfare of vulnerable populations."

Thus, to the extent STMC certification of Ninestar would facilitate enhanced sales of products identified by the United States as likely to be produced by slave labor, the Int'l ITC's Bylaws compel it to refrain from renewing Ninestar's STMC certification.

---

💬 **NO COMMENTS**

# Exhibit 2

# What is STMC

## The STMC logo is well recognized as the printer cartridge industry's seal of approval.

**STMC** stands for the **S**tandardized **T**est **M**ethods **C**ommittee. This global committee formed to find and promote standardized test methods for the printer cartridge industry. The test methods are used to evaluate printer cartridge performance. Standardized test methods make it possible to evaluate a cartridge anywhere and come up with the same test results no matter who tests it. Standardized tests do not specify how a cartridge must perform; they only measure it.

**ASTM International** is an independent organization of volunteers that write test methods that are approved by strict consensus. **STMC and ASTM are not the same.** The STMC has accepted several ASTM International test methods as well as ISO, ISTA, and ANSI test methods.

A company that is STMC certified is one that has had their employees successfully trained by an authorized STMC trainer in these test methods, attests to using these test methods, has purchased the correct test equipment and has proven to the STMC committee that it is well versed in the use of these test methods. The companies that are STMC certified are committed to making the best printer cartridges.

Once certified, companies are issued a logo with their specific number assigned that they can use in their business and marketing materials.  STMC certification identifies the company as one that seeks to manufacture cartridges high-quality cartridges and tests them according to the STMC guide. Uncertified companies cannot use STMC in their marketing literature and packaging without violating Int'l ITC's copyrights.

The STMC logo is well recognized as the printer cartridge industry's seal of approval.

Privacy - Terms

There are many government contracts that will only be awarded to STMC certified companies. There are even private contracts that will only be awarded to STMC certified companies.

The STMC will seek to stop companies from unlawful use of STMC. We must do that to maintain the integrity of the STMC process.  We police its use that tradeshows and on the internet, and have taken legal action against its misuse.

How can you see if your cartridge manufacturer is STMC certified? Check the list of companies that are certified HERE.  If your company isn't listed, please call us. (Int'l ITC 702-838-4279).

## POPULAR CATEGORIES

NEWS

43 posts

BLOG

10 posts

## MOST POPULAR

**01**  **"The Day from HP Hell"**
2.4k views

**02**  **HP Releases More Diabolical Firmware Updates**
2.1k views

# 03   Int'l Imaging Technology Council Brings Another Complaint Against HP Inc. over Firmware and Greenwashing

1.2k views

# Exhibit 3

WSJ    Barron's    MarketWatch    IBD

DJIA 32417.59 1.12% ▼     Nasdaq 12643.01 0.38% ▲     U.S. 10 Yr 0/32 Yield 4.841% ▼     Crude Oil 85.16 0.44% ▼     Euro 1.057 0.06% ▲

English Edition    |    Print Edition    |    Video    |    Audio    |    Latest Headlines    |    **More**

World    Business    U.S.    Politics    Economy    Tech    Finance    Opinion    Arts & Culture    Lifestyle    Real Estate    Personal Finance    Health    Science    Style    Sports

## Ninestar Corp. A

002180  (China: Shenzhen)

OVERVIEW    PROFILE    FINANCIALS ⌄    RESEARCH & RATINGS ⌄    ADVANCED CHARTING

**Chart Range**

1D   5D   1M   3M   6M   YTD   1Y   2Y   3Y   5Y   10Y   All   Custom

**Frequency**

Daily                                                          ⌄

**Display**

Line                                                          ⌄

**Indicators**

Chart Overlays                    ⌄        Lower Charts                    ⌄        Events                    ⌄        News                    ⌄

**Compare**

| Symbol | ADD |

Clear Settings

CN:002180



NOTES & DATA PROVIDERS ⌁

Advertisement

BACK TO TOP »

English Edition

| **WSJ Membership** | **Customer Service** | **Tools & Features** | **Ads** | **More** |
|---|---|---|---|---|
| Buy Side Exclusives | Customer Center | Newsletters & Alerts | Advertise | About Us |
| Subscription Options | Contact Us | Guides | Commercial Real Estate Ads | Content Partnerships |
| Why Subscribe? | Cancel My Subscription | Topics | Place a Classified Ad | Corrections |
| Corporate Subscriptions | | My News | Sell Your Business | Jobs at WSJ |
| WSJ Higher Education Program | | RSS Feeds | Sell Your Home | News Archive |
| WSJ High School Program | | Video Center | Recruitment & Career Ads | Register for Free |

WSJ High School Program

Public Library Program

WSJ Live

Company, Dow Jennor Procekurs

Video Center

Watchlist

Podcasts

Recruitment & Career Ads

Digital Self Service

Register for Free

Reprints & Licensing

Buy Issues

Barron's  BigCharts  Dow Jones Newswires  Factiva  Financial News  Mansion Global  MarketWatch  WSJ Shop  Compliance

Buy Side from WSJ  WSJ Pro  WSJ Video  WSJ Wine

Privacy Notice  |  Cookie Notice  |  Do Not Sell or Share My Personal Information  |  Limit the Use of My Sensitive Personal Information  |  Copyright Policy  |  Data Policy  |

Subscriber Agreement & Terms of Use  |  Your Ad Choices  |  Accessibility

Copyright ©2023 Dow Jones & Company, Inc. All Rights Reserved.

# Exhibit 4



ONE HUNDRED EIGHTEENTH CONGRESS
REPRESENTATIVE CHRISTOPHER H. SMITH, CHAIR
SENATOR JEFF MERKLEY, COCHAIR

April 11, 2023

Robert P. Silvers
Under Secretary for Strategy, Policy, and Plans
Chair, Forced Labor Enforcement Task Force (FLETF)
Department of Homeland Security

Dear Under Secretary Silvers:

As the lead sponsors of the bipartisan *Uyghur Forced Labor Prevention Act* (P.L. 117-78, or UFLPA), we write regarding the law's implementation. We appreciate the candor and professionalism of officials from the Department of Homeland Security, including U.S. Customs and Border Protection (CBP), who have regularly briefed our offices on UFLPA's implementation. We believe that UFLPA's enforcement is making an impact, putting substantial political and economic pressure on the government of the People's Republic of China (PRC) and forcing global corporations to investigate and disclose supply chains. Nonetheless, despite the welcome introduction of the new UFLPA Statistics Dashboard, we remain concerned that Congress lacks sufficient information and transparency to accurately assess whether implementation of the law comports with congressional intent.

The UFLPA presumptively bans the import of goods, wares, articles, and merchandise mined, produced, or manufactured wholly, or in part, in the Xinjiang Uyghur Autonomous Region (XUAR) or by entities engaged in forced labor transferred from the region unless "clear and convincing evidence" to the contrary is presented by importers. The rebuttable presumption sets a high bar for companies seeking to import any goods from the PRC, especially those in high-risk sectors, such as textiles, agriculture, and solar panels. This section covers all goods with any links to forced labor from the region and subjects them to potential detention unless importers can prove that the products are clean and are not tainted by forced labor.

Section 3(c) of the UFLPA requires that there be a report to Congress whenever cargo is released for entry into the United States after having been stopped due to evidence or reasonable suspicion of links to the XUAR or the forced labor of Uyghurs and other persecuted groups outside of the XUAR. We are concerned that importers whose goods are detained are claiming that UFLPA does not apply and these goods receive an "applicability review" which CBP does not believe needs to be reported publicly or to Congress. Such reviews seem to skirt the intent of UFLPA, which already gives importers the opportunity to rebut CBP's detainment orders.

We understand that there have been instances where importers have had cargo released, even though CBP initially stopped it because of evidence of a link to the forced labor of Uyghurs outside of the XUAR. We also learned that nearly 300 cargo shipments were stopped and later released because the importer claimed—and CBP accepted—that the UFLPA didn't apply. The goods released included items from high-risk sectors with significant ties to the XUAR and labor transfer

programs. **While we appreciate the difficulty and scope of enforcing UFLPA, we seek greater transparency about this review process and more clarity why goods stopped based on evidence of a link to the XUAR or labor transfer programs outside the XUAR are being cleared without congressional or public reporting.**

The CBP's UFLPA Statistics Dashboard is an important first step in increased transparency, though more is needed to help Congress, nongovernmental organizations, and the public understand the tools, processes and decisions that the agency uses to enforce the law, toward our shared goal of robust implementation of UFLPA.

Secondly, we also have concerns regarding the number of entities included under the Entity List required by the UFLPA. It is our contention that UFLPA implementation requires a robust Entity List that can be a useful guide for importers and CBP operations. Numerous civil society groups have compiled data on many entities that are linked to the XUAR and forced labor that are not currently included in the Forced Labor Enforcement Task Force (FLETF) list. We want to understand whether this discrepancy is a matter of criteria or process or both.  FLETF has received information from nongovernmental organizations and researchers that detail a wide scope of entities engaged in forced labor in Xinjiang and beyond. But all this information has not led to additional listings. Based on the briefing our staff received on the FLETF deliberative process, we are concerned that the process is too bureaucratically cumbersome to allow for effective decision-making on listings. Additionally, we do not see in the current listings any entity engaged in the state-sponsored labor transfer program. For us, the volume and scope of entity listing is an important measure of the FLETF's commitment to implementing UFLPA. Therefore, **we request that the FLETF accelerate its efforts to expand the Entity List as soon as possible, and to continually update that list during the year as circumstances require, utilizing fully the data provided by reputable civil society organizations.**

Thirdly, we agree with CBP that addressing transshipment from third countries is a major challenge in implementation of the law amid global supply chains, and we would like to help CBP improve its enforcement process to ensure that the law —which also imposes a rebuttable presumption on goods from third countries as long as those goods use inputs produced in XUAR—is implemented as intended. **We request that, in its annual reporting to Congress on updating the implementation strategy under UFLPA, CBP report on how it intends to address this challenge of transshipment of XUAR-related goods, what kind of tools and technology it plans to employ, and what, if any, further resources it needs in this effort.**

In addition, we ask that FLETF provide information on the current status of (1) Canadian enforcement of its new forced-labor import ban as required under United States-Mexico-Canada Agreement (USMCA), given press reports that Canada has detained only one shipment on suspicion of forced labor, which it subsequently released; (2) obstacles that CBP faces for enforcing UFLPA in cases of rail, road and air transportation; (3) whether CBP has prioritized particular countries for risk-based targeting of transshipments; (4) statistics on the unit/value of all goods from the PRC that fall under high-risk sectors and the proportion of those goods that have been detained since June 2022; and (5) an overall update on whether USMCA-mandated actions on forced-labor imports are currently met by Mexico as well as Canada.

Finally, we acknowledge that the "de minimis" importation channel presents a further concern for U.S. ability to enforce the UFLPA. News reports about Chinese companies such as SHEIN and TEMU raise concerns about direct-to-consumer purchases. We know that de minimis shipping allows vendors to send materials without having to report basic data, such as country-of-

origin and manufacturer, if they claim that the value is under $800, using Section 321 of the Tariff Act of 1930. In order to better understand how the "de minimis" rules affect the UFLPA implementation as we contemplate legislative actions to address this loophole, **we request more information about how CBP enforces UFLPA with regard to "de-minimis" shipments from the PRC and to report to us about how CPB intends to update the UFLPA implementation strategy to address the challenges posed by direct-to-consumer businesses such as TEMU, whose Superbowl ads signaled its efforts to expand its reach in the United States and whose app is now the one of the most downloaded in the United States. The fact that the Google Play Store recently suspended the app of TEMU's Chinese parent company Pinduoduo (PPD)—citing security concerns about malware—only makes a concerted response to TEMU based imports all the more urgent.**

As we continue to support the full enforcement of this historic law that passed Congress with near unanimity, please understand our intention is to empower the FLETF and CBP to be at the forefront of this critical fight against modern slavery. We stand ready to work with you in identifying obstacles and addressing challenges in fulfilling the congressional intent in implementing this law, and we appreciate the candor and transparency you have demonstrated to date in briefing Congress.

To advance our mutual goal of robust implementation of the law, the Congressional-Executive Commission on China will hold a hearing later this month with a panel of experts on trade, forced labor, and labor trafficking to examine UFLPA implementation. While we understand that scheduling conflicts make it impossible for you to attend this hearing, we hope that you and other administration officials tasked with addressing forced labor issues related to the PRC can testify at a future hearing. In the meantime, we look forward to your response.

Representative Christopher Smith
Chair

Senator Jeffrey A. Merkley
Cochair

Representative James P. McGovern
Ranking Member

Senator Marco Rubio
Ranking Member

# Exhibit 5

**Implementation of the Uyghur Forced Labor Prevention Act and the
Impact on Global Supply Chains
Congressional-Executive Commission on China
Rep. Christopher H. Smith
April 18, 2023**

Good morning, and welcome to the first hearing held in

Congress on implementation of the Uyghur Forced Labor

Prevention Act, a truly landmark piece of legislation that has

the potential to alter the dynamic of our ongoing *struggle* with

the People's Republic of China – but only if it is implemented

properly.

And make no mistake about what the stakes are: we are in

a *struggle* with Communist China – not something anodyne, like

simple "strategic competition."

Rather, the United States is in a *survival struggle* with an

authoritarian state that seeks global hegemony and the

fundamental displacement of the United States and the liberal

economic order.  To that end, the PRC will take advantage of

the Western world's liberal trade regime, while utilizing forced

labor to give itself an unfair trade advantage – all with the

ultimate objective of imposing its governance model upon the

rest of the world.

We have known for years that the PRC has used forced

and indeed prison slave labor… Indeed, I knew this as far back

as 1991, when former Congressman Frank Wolf and I went to

Beijing Prison No. 2 and found at least 40 Tiananmen Square

activists being forced to make jelly shoes and socks for export

to the United States.  We asked for, and were given samples,

which we then promptly brought back to the United States and

had an import ban imposed, pursuant to the Smoot Hawley Act

of 1930.

There was some personal satisfaction to be had from that, but in terms of net practical effect, in impacting the PRC's policy of utilizing forced prison labor, it was next to zero.  In this case we had direct evidence, but that was a unique set of circumstances.  How else could Customs and Border Protection prove that goods were being made by prison labor, absent a couple of Congressmen bringing back jelly shoes from a visit to a prison factory?

This is where the genius of the Uyghur Forced Labor Prevention Act comes in – the burden is no longer upon the good men and women of CBP to prove goods have been made by forced labor, but upon importers to prove that goods made in Xinjiang Uyghur Autonomous Region and elsewhere *are free from the taint of forced labor*.

For we now know that the CCP under Xi Jinping has declared war on the Uyghur people, labeling them terrorists who must be destroyed "root and branch."  This has led to massive detentions of more than a million Uyghurs, many of whom are forced to labor and subjected to horrific human rights abuses, including forced sterilization, forced abortion and, indeed, forced organ harvesting.

These egregious human rights abuses are what the UFLPA is designed to combat.  We know from reports released yesterday in advance of this hearing, CBP has seized over $961 million worth of goods since last June.  This is an important start, as is CBP's holding of a tech expo for industry last month and its launch of a dashboard to track trade statistics.

As Co-chair Merkley and I, joined by Ranking Member McGovern and Senator Rubio, stated in a letter addressed to the Department of Homeland Security last week, however, we do remain concerned over the lack of full transparency that would enable Congress to evaluate the efficacy of implementation.

We are also concerned as to whether the "rebuttable presumption" standard is being fully implemented, and whether goods that are initially detained are subsequently being released without congressional or public reporting.

We have questions as to why the robust Entity List of bad actors that UFLPA requires remains so spartan.

We also question whether CBP is utilizing technology to its fullest to identify goods produced in the Xinjiang Uyghur Autonomous Region, such as [isotopic and DNA testing](.).

Finally, we also question whether goods produced by forced labor outside of the Autonomous Region are being captured.  We have been working with Homeland Security to follow up on well-founded reports that work gloves sold under the Milwaukee Tool label in venues such as Home Depot are indeed produced by prison labor – at Chishan Prison in Hunan province to be precise.

Going forward, we will be taking a closer look at companies such as Milwaukee Tool and their alleged profiteering from forced labor, just as we have highlighted the role of Thermo Fisher Scientific in genetic data collection that

enables repressive practices in both the Xinjiang Uyghur and Tibet Autonomous Regions – and, more nefariously, has been implicated in finding DNA matches from organ harvesting victims.

It is my hope that UFLPA will prick the consciences of corporate actors, and encourage them to scour their supply chains to make sure they are free from the taint of forced labor. If not motivated by altruism, then by raising the cost of doing business in the PRC, it is my further hope that companies will determine that bottom line concerns will motivate them to do the right thing.  Finally, for those that are incorrigible and seek to skirt the law, we will seek enforcement action and bring public scrutiny to bear.

With that, I look forward to enlightening testimony from our witnesses, and I now yield to my esteemed colleague and co-chair of this Commission, Senator Merkley.

# Exhibit 6

**Hearing of the Congressional Executive Commission on China (CECC)**

**Implementation of the Uyghur Forced Labor Prevention Act
and the Impact on Global Supply Chains**

April 18, 2023

Testimony of Professor Laura T. Murphy
Sheffield Hallam University
Helena Kennedy Centre for International Justice

Thank you Chairman Smith and Co-Chairman Merkley for convening this meeting and to all of the Congresspeople who are attending today and to all who have supported the rights and freedom of Uyghur people. My name is Laura Murphy, and I am Professor of Human Rights and Contemporary Slavery at Sheffield Hallam University in the UK. I have studied forced labor globally for nearly 20 years, and my work for the last three years has focused exclusively on the Uyghur Region of China.

**Successes**

The Uyghur Forced Labor Prevention Act is landmark legislation. Researchers who study the perilous situation of people enslaved around the world have known that the level of supply chain scrutiny and corporate accountability required by the UFLPA is necessary if we want to ensure that the people who work to produce our goods are not being enslaved or trafficked. It is painful to realize that it took a genocide for us to understand just how dire the consequences of our ignorance could be. There is no silver lining to the oppression of the Uyghurs and other minoritized people in the Uyghur Region, but it is commendable that the U.S. has been the first to create the legislation necessary to level real economic costs on the PRC government's state-sponsored forced labor program and on the corporations that directly benefit from those forced to work.

It is critical to note that while we still have a long way to go before we intercept all products made in whole or in part in the Uyghur Region, the UFLPA is indeed working as it was intended. In the short nine months that the UFLPA has been in effect, we have seen a swift and decisive enforcement response. Customs and Border Protection has indicated that it has refused at least 424 shipments entry into the United States after investigating their links to Uyghur forced labor. Those products span a broad spectrum including electronics, solar panels, apparel, and building materials. Congress has allocated significant resources – though more will still be needed – to enable CBP to conduct the in-depth supply chain investigations required to understand where our products are made, down to the raw materials. This work has protected consumers from unwittingly buying products that we know to be made in the midst of a genocide, in the shadows of a massive internment camp system, by people who are visited day after day by government agents and prosecutors and prison bureau officials demanding that they leave their children and parents and land and culture and religion behind to work in the factories that make goods that end up on our shelves. Even though Uyghurs continue to be forced to work in China, we in the United States have some small comfort that we might not be financing their suffering and that every day U.S. corporations are reducing their complicity in these crimes against humanity.

**Challenges of Enforcement: Corporate Compliance**

Of course, enforcement of the UFLPA is not an easy task. What our research at Sheffield Hallam University has found is that since the UFLPA went into effect, companies have not all responded with enthusiasm. Many U.S. (and multinational corporations selling in the US market) lobbied to prevent the law from being passed, and then fought to limit how it would be enforced, and now are complaining that the investigations are not convenient for them. Companies that are not making products involving the UFLPA "priority sectors" still have their heads in the sand, hoping that their products will not be scrutinized. Many are shifting the burden of due diligence onto their suppliers, rejecting the responsibility and the costs of knowing the conditions of workers in their supply chains. They throw their hands up in the air as auditors are jailed, their offices ransacked, and say they cannot do anything to address forced labor in the Uyghur Region because that could put the lives of their China-based staff at risk. They care about their own directly employed personnel and yet do not worry about the Uyghur workers at the end of their supply chains. Those that have done the right thing by terminating their relationships with suppliers implicated in the Uyghur forced labor have refused to be transparent about it, out of fear of retaliation in China. And many still refuse to admit what is becoming increasingly clear – that there is no feasible way to verify labor standards compliance in the Uyghur Region or of Uyghurs working outside the region. This all shows that **companies across sectors must be compelled through vigorous enforcement to comply with the UFLPA.**

Some international companies and governments are claiming the UFLPA is merely about a trade war between the US and China, trying to justify their indifference toward profiting from a genocide. **It is crucial that US government encourage our allies to align their laws to prohibit the import of forced labor made goods, but we should not link the UFLPA to trade and economic competition issues – we must make it clear that this is a human rights issue, not a strategic one. If we don't, the US is likely to remain the only country with a ban on Uyghur forced labor imports.**

### Enforcement Challenge: Obscuring Supply Chains

In China, we are seeing companies pretend to sell their Uyghur Region factories, only to transfer them to executives within their own leadership team or family. They change the names of their subsidiaries to obscure the names that have been revealed by the media to be involved in Uyghur oppression. They are shipping their products first to third countries, where they know that convoluted supply chains mask their complicity. They are bifurcating their supply chains so that they can continue to sell goods in the US market while still selling Uyghur-forced-labor-tainted goods elsewhere in the world, sometimes even continuing to manufacture directly in the Uyghur Region and even continue using people "transferred" by the state for work. Some of those companies are benefiting from the Inflation Reduction Act (IRA) incentives, while continuing to operate in the Uyghur Region. **The US should prohibit companies from using US government incentives to expand their manufacturing in the United States while they continue to profit from Uyghur forced labor in China.**

### Enhancing Priority Sectors

We know that this affects a wide range of goods. The Xi Jinping government has published explicit directives indicating the manufacturing sectors they are investing in in the Uyghur Region. These include items that are critical to our supply chains and to meeting our climate goals, including renewable energy related products, critical minerals, steel and aluminum, PVC, agricultural products. **The U.S. urgently needs to add these products to its priority list of goods produced in the Uyghur Region** to ensure that we are stopping these goods from coming into our markets and to

alert the business community to the enormous risk of sourcing forced labor made goods if they do not commit to more diligent supply chain tracing.

## Enhancing the Entity Lists

Our research team has identified 55,000 companies, large and small, operating in the Uyghur Region. We have published in-depth investigations that have documented at least 150 specific companies in the Uyghur Region and elsewhere in China for which there is significant evidence of participation in state-sponsored labor transfer programs that are tantamount to forced labor. These companies are hiding in plain sight. Some of them are massive state-owned corporate conglomerates that served as the architects of the repressive programs that oppress minoritized people in the Uyghur Region; others produce the lion's share of commodities essential to manufacturing worldwide. These companies sell their goods into international markets.

The UFLPA requires FLETF to create a "comprehensive" description of the situation of forced labor in the Uyghur Region and list the companies that are engaged in those programs. And yet the entity lists include only four of the companies we have identified as offenders – and zero new ones have been added since the UFLPA was passed.

The first version of these lists did nothing more than reiterate the 20 companies that had already been named in previous withhold release orders. It is hard to comprehend why still not even a single addition has been made to these lists, especially in light of the evidence provided by civil society organizations to FLETF that warrants the addition of potentially thousands more entities.

Undersecretary of Homeland Security Robert Silvers recently committed to expanding the entity list. **The US government needs to prioritize making the UFLPA entity lists as comprehensive as possible, per the mandate of the UFLPA**. FLETF should begin with the state-owned companies that have openly done the bidding of the PRC government to force sometimes thousands of people to work for their companies. FLETF should then add to the lists those companies operating in the shadows in the mining and processing tiers of our supply chains that are least visible to companies. **Congress should make clear to FLETF that it must presume that all state-sponsored labor transfers in the Uyghur Region constitute forced labor and thus add any company engaged in those coerced transfers of laborers onto the lists**. These iterative and constantly expanding lists will assist importers in ensuring that they know which suppliers to exclude from their sourcing.

## Conclusion

The UFLPA provides us with a robust set of tools for weeding out the fruits of forced labor from the products that reach our markets. The rebuttable presumption is one important tool, but the priorities list and the entity lists are also critically important tools that consumers, advocates, industry, and enforcement all benefit from. We should put those tools to their most robust use. We cannot be hesitant about doing every single thing we can, using every single tool at our disposal, to address the genocide in the Uyghur Region. I'm pleased that we're having this hearing to review all that the UFLPA has accomplished and to consider what more we can do to lead the world in addressing what is likely the worst human rights crisis we'll see in our lifetimes. I believe that we should not rest until we know we've done every single thing we possibly can to end the Uyghur genocide and to end corporate complicity in it.

# Exhibit 7



*Office of Strategy, Policy, and Plans*

**U.S. Department of Homeland Security**
**Washington, DC 20528**

June 9, 2023

The Honorable Jeffrey A. Merkley
Cochair, Congressional-Executive Commission on China
United States Senate
Washington, DC 20510

Dear Senator Merkley:

Thank you for your April 11, 2023, letter regarding the Uyghur Forced Labor Prevention Act (UFLPA)[1], and for your support of the U.S. Department of Homeland Security's (DHS) robust implementation of this law.  Forced labor is a scourge that violates human rights, undermines the rule of law, and harms American workers and businesses.  The state-imposed nature of forced labor occurring in the Xinjiang Uyghur Autonomous Region (Xinjiang) of the People's Republic of China is particularly reprehensible.  DHS is committed to enforcing all forced labor laws under its purview.  We could not take this issue more seriously.

To date, our enforcement of the UFLPA has been speedy and strong.  Speedy because we released the UFLPA Strategy ahead of the 180-day schedule required by law, and strong because we have devoted the full weight of our resources to enforcing it.  In this fight to combat forced labor, DHS has worked closely with civil society organizations to uncover potential violations of the UFLPA and to hold violators accountable.  With industry, DHS has stressed that corporate leaders have a responsibility to ensure their supply chains are free of forced labor, and that we expect forced labor to be a top-tier compliance issue in the board room and C-Suite.

I appreciate the Congressional-Executive Commission on China's (the Commission) engagement with the Forced Labor Enforcement Task Force (FLETF) and its efforts to eliminate forced labor from U.S. and global supply chains.  I address the issues raised in your letter below, and also am pleased to offer a briefing to you and your staff to engage in more detailed, data-driven discussions if that would be helpful.  Congress has equipped us with powerful tools to combat forced labor, and it is important to us that we offer Congress transparency so that you can understand the full scope of our efforts to put those tools to work.

## U.S. Customs and Border Protection's (CBP) Applicability Review and UFLPA Reporting Requirement

The UFLPA's rebuttable presumption applies to goods mined, produced, or manufactured wholly or in part in Xinjiang or by an entity on the UFLPA Entity List.[2]  CBP reviews high-risk imports on a shipment-by-shipment basis to determine whether the UFLPA rebuttable

---

[1] Pub. L. No. 117-78, 135 Stat. 1525 (2021).
[2] Pub. L. No. 117-78, § 3(a), 135 Stat. 1525 (2021).

The Honorable Jeffrey A. Merkley
Page 2

presumption applies.  When CBP analyzes risk factors to identify shipments considered high risk, it must then conduct a review to determine whether in fact the goods were made, in whole or in part, in Xinjiang.

Our applicability reviews are thorough.  We have in many instances detained shipments for months as our enforcement officers review and examine supply chain documentation rigorously, ask detailed follow-up questions, and request additional documentation from importers.  We release cargo only after an applicability review demonstrates that the contents of a shipment are not subject to the UFLPA's restrictions.  In many instances our applicability reviews have resulted in decisions to exclude cargo from entering the United States.  We are confident that our applicability reviews honor both the letter and the spirit of the UFLPA.

If CBP determines that an import is subject to the UFLPA rebuttable presumption, the importer may obtain an exception to the rebuttable presumption if the importer proves by clear and convincing evidence that the good is not mined, produced, or manufactured wholly or in part with forced labor, among other requirements.[3]  Regarding the UFLPA's related statutory reporting requirements, the law requires CBP to submit a report to Congress "after making a determination of an exception under subsection (b)."[4]  CBP is committed to reporting to Congress any exception that it may grant to a U.S. importer whose goods are subject to the rebuttable presumption.  To date, CBP has granted no such exceptions.

## Entity List Expansion

DHS and the FLETF, which I chair, are committed to expanding the UFLPA Entity List. We appreciate your support for that commitment, and the FLETF has recently approved two new additions to the UFLPA Entity List: Xinjiang Zhongtai Chemical Co. Ltd. and Ninestar Corporation, to include Ninestar's eight subsidiaries based in Zhuhai, China.[5]  The FLETF will continue to expand the UFLPA Entity List and is actively assessing additional nominations.  As FLETF Chair, DHS has prioritized this mission at Secretary Mayorkas's direction, and has redirected resources to create entirely-new operating procedures for the federal agencies to nominate and consider UFLPA Entity List designations.  DHS and other FLETF Members have developed robust partnerships with civil society organizations, labor organizations, and academia, which have been invaluable to the FLETF's work in this vein.  The FLETF is dedicated to fulfilling its mandate to identify companies that  perpetuate forced labor practices in China, and to holding them accountable.

## Addressing Transshipment

In response to your request that CBP report on how it intends to address the challenge of transshipment, CBP has contended with the illegal transshipment of merchandise to evade trade

---

[3] *Id.* § 3(b).
[4] *Id.* § 3(c).
[5] The eight Ninestar subsidiaries included are: Zhuhai Ninestar Information Technology Co. Ltd., Zhuhai Pantum Electronics Co. Ltd., Zhuhai Apex Microelectronics Co., Ltd., Geehy Semiconductor Co., Ltd., Zhuhai Pu-Tech Industrial Co., Ltd., Zhuhai G&G Digital Technology Co., Ltd., Zhuhai Seine Printing Technology Co., Ltd. and Zhuhai Ninestar Management Co., Ltd.

The Honorable Jeffrey A. Merkley
Page 3

enforcement activity for many years; this issue is not limited to UFLPA enforcement. CBP employs a range of techniques to combat illegal transshipment, to include: identifying risk factors for shipments that pose an illegal transshipment risk; leveraging trade analysts to identify potential violators and enforcement personnel to identify the true provenance of imported merchandise; and investing in modernized trade platforms that allow the agency to focus its resources to identify areas of highest risks, such as illegal transshipment, while simultaneously facilitating lawful and compliant trade. The agency also works to identify new technologies to counter illegal transshipment. CBP hosted a technical expo in March where the trade community was able to learn more about new supply chain tracing technology. I was pleased to see a number of congressional staff at the event.

CBP through the FLETF will provide an update on how it is addressing transshipment in the 2023 UFLPA Strategy. The FLETF also publishes biannual enforcement reports on key issues, which recently have touched on UFLPA implementation, that we would be happy to provide to the Commission if requested.

**De Minimis Enforcement**

In response to your request for information regarding "de-minimis" shipments, CBP enforces the UFLPA on all importations regardless of value. There is no de minimis exception for forced labor. All shipments, regardless of value, pass through CBP systems and are subject to CBP's risk assessment and screening. De minimis shipments pose unique challenges not only in forced labor but in all areas of trade enforcement, given that the advanced data required for those shipments is not as detailed as the data required for other types of entries. CBP has multiple initiatives underway that will increase data available to CBP and enhance its ability to assess risk, and take appropriate enforcement action, in the de minimis shipments context. We also would welcome the opportunity to work with Congress as it considers the many facets of the de minimis challenge.

**Conclusion**

I appreciate the Commission's continued support of DHS's efforts to implement the UFLPA. Thank you again for your letter and invitation to testify at a future hearing. I look forward to continued discussions with the Commission on the critical issue of combatting forced labor in China and around the world. I would appreciate your support in ensuring that DHS, CBP, and the FLETF are provided the necessary resources to continue to fully implement and enforce the UFLPA. This is intensive work and we need more resources, even as we pull assets away from other missions to ensure we are fully meeting our responsibilities under this important mandate.

Enforcing our forced labor laws is a top priority for us. It is important for human rights, workers' rights, and our values. It is the right thing to do. We are committed to this work and we appreciate your oversight and support for us.

The Honorable Jeffrey A. Merkley
Page 4

      The cosigners of your letter will each receive a separate, identical response.  Should you require any assistance, please do not hesitate to contact the DHS Office of Legislative Affairs at (202) 447-5890.

                    Sincerely,

                    Robert Silvers
                    Under Secretary for Policy
                    Chair, Forced Labor Enforcement Task Force

# Exhibit 8

MIKE GALLAGHER, WISCONSIN
CHAIRMAN
ROB WITTMAN, VIRGINIA
BLAINE LUETKEMEYER, MISSOURI
ANDY BARR, KENTUCKY
DAN NEWHOUSE, WASHINGTON
JOHN MOOLENAAR, MICHIGAN
DARIN LAHOOD, ILLINOIS
NEAL DUNN, FLORIDA
JIM BANKS, INDIANA
DUSTY JOHNSON, SOUTH DAKOTA
MICHELLE STEELE, CALIFORNIA
ASHLEY HINSON, IOWA
CARLOS GIMENEZ, FLORIDA

RAJA KRISHNAMOORTHI, ILLINOIS
RANKING MEMBER
KATHY CASTOR, FLORIDA
ANDRÉ CARSON, INDIANA
SETH MOULTON, MASSACHUSETTS
RO KHANNA, CALIFORNIA
ANDY KIM, NEW JERSEY
MIKIE SHERRILL, NEW JERSEY
HALEY STEVENS, MICHIGAN
JAKE AUCHINCLOSS, MASSACHUSETTS
RITCHIE TORRES, NEW YORK
SHONTEL BROWN, OHIO



**Congress of the United States**

**House of Representatives**

**SELECT COMMITTEE ON THE CHINESE COMMUNIST PARTY**
548 Cannon House Office Building
Washington, D.C. 20515
(202) 225-6002

May 2, 2023

Mr. John Donahoe
President, and Chief Executive Officer
Nike, Inc.
One Bowerman Drive
Beaverton, OR 97005

Dear Mr. Donahoe,

On March 23, 2023, the House Select Committee on the Strategic Competition between the United States and the Chinese Communist Party (CCP) held a hearing entitled, "The Chinese Communist Party's Ongoing Uyghur Genocide." At the hearing, we heard first-hand witness accounts about the CCP's concentration camps and expert testimony regarding the perpetration of genocide. We also received written testimony in which an expert assessed that "American companies are financing the state-sponsored forced labor programs in the Uyghur Region."[1] We seek additional information regarding this matter.

The U.S. Department of State has determined that the CCP is committing genocide against Uyghurs and other minority groups in Xinjiang.[2] In response to the CCP's atrocities, Congress passed the Uyghur Forced Labor Prevention Act (UFLPA) with bipartisan support. On December 23, 2021, the UFLPA was signed into law. The UFLPA prohibits the "importation of any goods made with forced labor, including those goods mined, produced, or manufactured wholly or in part in the Xinjiang Uyghur Autonomous Region."[3]

We received expert testimony which revealed that products made by Uyghurs in forced labor camps are still entering the United States.[4] One expert told the Select Committee that Nike is "sourcing garments made not only from cotton from the Uyghur Region but also viscose, lyocell, polyester, leather, and linen from the region."[5] Continuing to import goods produced in part with

---

[1] *The Chinese Communist Party's Ongoing Uyghur Genocide*: Hearing before the Select Comm. on Strategic Competition between the U.S. and CCP, 118 Cong. (Mar. 23, 2023) (Written Testimony of Nury Turkel) ("CCP's Uyghur Genocide Hearing").
[2] Edward Wong & Chris Buckley, *U.S. Says China's Repression of Uighurs Is 'Genocide'*, N.Y. TIMES (July 27, 2021).
[3] Uyghur Forced Labor Prevention Act, H.R. 6256, 116th Cong. (2021).
[4] CCP's Uyghur Genocide Hearing (Written Testimony of Nury Turkel).
[5] *Id*; According to a Sheffield Hallam University study, Nike is at high risk of having Xinjiang cotton in its supply chain due to its relationship with international intermediary manufacturers and Chinese textile companies sourcing

the forced labor of Uyghurs potentially violates the UFLPA and creates the conditions in which the CCP is able to continue committing genocide.

We would like to offer Nike an opportunity to respond to these serious allegations and to provide information regarding its compliance with the UFLPA. We therefore request that you respond to the following questions by May 16, 2023:

1. Do any garments imported into the United States by Nike contain inputs sourced from Xinjiang and/or inputs made with forced labor of Uyghurs?

2. Please provide a detailed description of the steps Nike has taken since the UFLPA took effect to examine its supply chains with respect to forced labor risk in the manufacture of its products. How do these steps differ, if at all, from the methods utilized before the UFLPA took effect?

3. Please provide a detailed description of the steps Nike has taken since the UFLPA took effect to ensure garments it sells that are made from cotton, viscose, lyocell, polyester, leather, and linen are not manufactured using forced labor by Uyghurs or other minority groups who are subjugated by the CCP.

4. Please provide a detailed description of the steps Nike has taken to examine its other supply chains to ensure that other products it sells are not produced by forced labor undertaken by Uyghurs or other minority groups who are subjugated by the CCP.

5. Do any of Nike's garment suppliers use fabric and/or yarn from any of the following corporations (including their subsidiaries): Jiangsu Lianfa Group, Luthai Textile, Huafu Fashion, Texhong Textile, or Weiqiao Textile?

6. Is fabric and/or yarn made by any of the corporations referenced above used in the production of Nike clothing sold in the United States? If so, please list each corporation whose fabric and/or yarn is used in the manufacture of Nike clothing sold in the United States.

7. If fabric and/or yarn from one of the corporations referenced above is used in the production of Nike clothing sold in the United States, what specific steps does Nike take to ensure that none of this material is made in, or contains cotton from, Xinjiang?

8. Has Nike contractually obligated all its garment suppliers to ensure that no inputs from Xinjiang are used in the manufacture of its clothes sold in the United States? Please provide all relevant documents to support such obligations.

---

cotton and employing state-sponsored labor transfers from the Uyghur Region. Most of the Chinese textile companies identified in the study have subsidiaries in Xinjiang that have employed state-sponsored labor transfers. *See,* Laura T. Murphy et al., *Laundering Cotton: How Xinjiang Cotton Is Obscured in International Supply Chains,* SHEFFIELD HALLAM UNIVERSITY (Nov. 2021).

9. What specific methods, other than mere written or verbal assurance from a garment supplier, does Nike use to verify that the supplier is not using inputs from Xinjiang?

10. What audit methods does Nike use to verify that suppliers in China—in and outside of Xinjiang—are not exploiting Uyghurs through state-sponsored labor transfers, given that workers in China cannot speak to auditors about forced labor without fear of government retaliation? Please provide all policies, guidelines, requirements, reviews, assessments, analyses, audits, PowerPoint or other presentations, or other documents that describe, govern, implement, or report conduct, processes, or results (without regard to the title of a given document) that are relevant to the conduct of such audits, as well as copies of any communications pertaining to any incident involving actual, alleged, or anticipated noncompliance with the UFLPA.

11. Has Nike conclusively identified every supplier of fabric, cotton, and yarn in its global supply chain for products sold in the United States? If yes, please provide documents and evidence to substantiate Nike's conclusive identification of such fabric, cotton, and yarn suppliers, including any documents evidencing Nike's methodology with respect to this determination. If not, please provide a detailed explanation of how Nike assesses whether its clothing imports comply with the UFLPA, including any documents describing Nike's methodology with respect to such assessments.

12. Does Nike allow cotton and/or other inputs produced in Xinjiang to be used in the manufacture of Nike clothing sold in markets *outside* of North America?

13. In 2020, reporting revealed that hundreds of Uyghur laborers worked in a factory that manufactures 8 million pairs of Nikes each year.[6] Nike claims to have verified that this factory—owned by a leading Nike Supplier, TKG Taekwang—no longer uses Uyghur forced labor. Given its track record of using forced labor, how did Nike verify that TKG Taekwang no longer uses forced labor? And why does Nike still consider TKG Taekwang to be a suitable business partner?

14. Please provide a detailed description of the steps Nike is taking to examine and monitor its supply chains on an ongoing basis. Please provide all policies, guidelines, requirements, reviews, assessments, analyses, audits, PowerPoint or other presentations, or other documents (without regard to the title of a given document) that describe, govern, implement, or report conduct, processes, or results relevant to the conduct of such examination and monitoring.

15. Please provide a detailed description of your audit and compliance plan(s), and the steps taken thus far to implement controls to ensure that Nike products are not produced by forced labor and that all Nike products are obtained and sold in compliance with the requirements of the UFLPA. Please provide all policies, guidelines, requirements, reviews, assessments, analyses, audits, PowerPoint or other presentations, or other documents (without regard to the title of a given document) that describe, govern,

---

[6] Anna Fifield, *China compels Uighurs to work in shoe factory that supplies Nike*, WASH. POST (Feb. 29, 2020).

implement, or report conduct, processes, or results relevant to Nike's audit and compliance plan(s).

The House Select Committee on the Strategic Competition between the United States and the Chinese Communist Party has broad authority to "investigate and submit policy recommendations on the status of the Chinese Communist Party's economic, technological, and security progress and its competition with the United States" under H. Res. 11. Upon your receipt of this letter, please maintain and preserve all hard copy and electronic documents, including electronic communications, related to the subject matter of these questions.

To make arrangements to deliver a response, please contact Select Committee majority and minority staff at (202) 226-9678 and (202) 225-2489, respectively.

Thank you for your attention to this important matter and prompt reply.

Sincerely,

Mike Gallagher
Chairman

Raja Krishnamoorthi
Ranking Member

# Exhibit 9

MIKE GALLAGHER, WISCONSIN
CHAIRMAN
ROB WITTMAN, VIRGINIA
BLAINE LUETKEMEYER, MISSOURI
ANDY BARR, KENTUCKY
DAN NEWHOUSE, WASHINGTON
JOHN MOOLENAAR, MICHIGAN
DARIN LAHOOD, ILLINOIS
NEAL DUNN, FLORIDA
JIM BANKS, INDIANA
DUSTY JOHNSON, SOUTH DAKOTA
MICHELLE STEELE, CALIFORNIA
ASHLEY HINSON, IOWA
CARLOS GIMENEZ, FLORIDA

RAJA KRISHNAMOORTHI, ILLINOIS
RANKING MEMBER
KATHY CASTOR, FLORIDA
ANDRÉ CARSON, INDIANA
SETH MOULTON, MASSACHUSSETS
RO KHANNA, CALIFORNIA
ANDY KIM, NEW JERSEY
MIKIE SHERRILL, NEW JERSEY
HALEY STEVENS, MICHIGAN
JAKE AUCHINCLOSS, MASSACHUSSETTS
RITCHIE TORRES, NEW YORK
SHONTEL BROWN, OHIO



### Congress of the United States
### House of Representatives

**SELECT COMMITTEE ON THE CHINESE COMMUNIST PARTY**
548 Cannon House Office Building
Washington, D.C. 20515
(202) 225-6002

May 2, 2023

Mr. Rupert Campbell
President
Adidas North America, Inc.
5055 N. Greeley Avenue
Portland, OR 97217

Dear Mr. Campbell,

On March 23, 2023, the House Select Committee on the Strategic Competition between the United States and the Chinese Communist Party (CCP) held a hearing entitled, "The Chinese Communist Party's Ongoing Uyghur Genocide." At the hearing, we heard first-hand witness accounts about the CCP's concentration camps and expert testimony regarding the perpetration of genocide. We also received written testimony in which an expert assessed that "American companies are financing the state-sponsored forced labor programs in the Uyghur Region."[1] We seek additional information regarding this matter.

The U.S. Department of State has determined that the CCP is committing genocide against Uyghurs and other minority groups in Xinjiang.[2] In response to the CCP's atrocities, Congress passed the Uyghur Forced Labor Prevention Act (UFLPA) with bipartisan support. On December 23, 2021, the UFLPA was signed into law. The UFLPA prohibits the "importation of any goods made with forced labor, including those goods mined, produced, or manufactured wholly or in part in the Xinjiang Uyghur Autonomous Region."[3]

We received expert testimony which revealed that products made by Uyghurs in forced labor camps are still entering the United States.[4] One expert told the Select Committee that Adidas is "sourcing garments made not only from cotton from the Uyghur Region but also viscose, lyocell, polyester, leather, and linen from the region."[5] Continuing to import goods produced in part with

---

[1] *The Chinese Communist Party's Ongoing Uyghur Genocide*: Hearing before the Select Comm. on Strategic Competition between the U.S. and CCP, 118 Cong. (Mar. 23, 2023) (Written Testimony of Nury Turkel) ("CCP's Uyghur Genocide Hearing").
[2] Edward Wong & Chris Buckley, *U.S. Says China's Repression of Uighurs Is 'Genocide'*, N.Y. TIMES (July 27, 2021).
[3] Uyghur Forced Labor Prevention Act, H.R. 6256, 116th Cong. (2021).
[4] CCP's Uyghur Genocide Hearing (Written Testimony of Nury Turkel).
[5] *Id*; According to a Sheffield Hallam University study, Adidas is at high risk of having Xinjiang cotton in its supply chain due to its relationship with international intermediary manufacturers and Chinese textile companies sourcing

the forced labor of Uyghurs potentially violates the UFLPA and creates the conditions in which the CCP is able to continue committing genocide.

We would like to offer Adidas an opportunity to respond to these serious allegations and to provide information regarding its compliance with the UFLPA. We therefore request that you respond to the following questions by May 16, 2023:

1. Do any garments imported into the United States by Adidas contain inputs sourced from Xinjiang and/or inputs made with forced labor by Uyghurs?

2. Please provide a detailed description of the steps Adidas has taken since the UFLPA took effect to examine its supply chains with respect to forced labor risk in the manufacture of its products. How do these steps differ, if at all, from the methods used before the UFLPA took effect?

3. Please provide a detailed description of the steps Adidas has taken since the UFLPA took effect to ensure garments it sells that are made from cotton, viscose, lyocell, polyester, leather, and linen are not manufactured using forced labor by Uyghurs or other minority groups who are subjugated by the CCP.

4. Please provide a detailed description of the steps Adidas has taken to examine its other supply chains to ensure that other products it sells are not produced by using forced labor by Uyghurs or other minority groups who are subjugated by the CCP.

5. Do any of Adidas's garment suppliers use fabric and/or yarn from any of the following corporations (including their subsidiaries): Jiangsu Lianfa Group, Luthai Textile, Huafu Fashion, Texhong Textile, or Weiqiao Textile?

6. Is fabric and/or yarn made by any of the corporations referenced above used in the production of Adidas clothing sold in the United States? If so, please list each corporation whose fabric and/or yarn is used in the manufacture of Adidas clothing sold in the United States.

7. If fabric and/or yarn from one of the corporations referenced above is used in the production of Adidas clothing sold in the United States, what specific steps does Adidas take to ensure that none of this material is made in, or contains cotton from, Xinjiang?

8. Has Adidas contractually obligated all its garment suppliers to ensure that no inputs from Xinjiang are used in the manufacture of its clothes sold in the United States? Please provide all relevant documents to support such obligations.

---

cotton and employing state-sponsored labor transfers from the Uyghur Region. Most of the Chinese textile companies identified in the study have subsidiaries in Xinjiang that have employed state-sponsored labor transfers. *See,* Laura T. Murphy et al., *Laundering Cotton: How Xinjiang Cotton Is Obscured in International Supply Chains,* SHEFFIELD HALLAM UNIVERSITY (Nov. 2021).

9.  What specific methods, other than mere written or verbal assurance from a garment supplier, does Adidas use to verify that the supplier is not using inputs from Xinjiang?

10. What audit methods does Adidas use to verify that suppliers in China—in and outside of Xinjiang—are not exploiting Uyghurs through state-sponsored labor transfers, given that workers in China cannot speak to auditors about forced labor without fear of government retaliation? Please provide all policies, guidelines, requirements, reviews, assessments, analyses, audits, PowerPoint or other presentations, or other documents that describe, govern, implement, or report conduct, process, or results (without regard to the title of a given document) that are relevant to the conduct of such audits, as well as copies of any communications pertaining to any incident involving actual, alleged, or anticipated noncompliance with the UFLPA.

11. Has Adidas conclusively identified every supplier of fabric, cotton, and yarn in its global supply chain for products sold in the United States? If yes, please provide documents and evidence to substantiate Adidas's conclusive identification of such fabric, cotton, and yarn suppliers, including any documents evidencing Adidas's methodology with respect to this determination. If not, please provide a detailed explanation of how Adidas assesses whether its clothing imports comply with the UFLPA, including any documents describing Adidas's methodology with respect to such assessments.

12. Does Adidas allow cotton and/or other inputs produced in Xinjiang to be used in the manufacture of Adidas clothing sold in markets *outside* of North America?

13. Please provide a detailed description of the steps Adidas is taking to examine and monitor its supply chains on an ongoing basis. Please provide all policies, guidelines, requirements, reviews, assessments, audits, PowerPoint or other presentations, or other documents (without regard to the title of a given document) that describe, govern, implement, or report conduct, processes, or results relevant to the conduct of such examination and monitoring.

14. Please provide a detailed description of your audit and compliance plan(s), and the steps taken thus far to implement controls to ensure that Adidas products are not produced by forced labor and that all Adidas products are obtained and sold in compliance with the requirements of the UFLPA. Please provide all policies, guidelines, requirements, reviews, assessments, analyses, audits, PowerPoint or other presentations, or other documents (without regard to the title of a given document) that describe, govern, implement, or report conduct, processes, or results relevant to Adidas's audit and compliance plan(s).

The House Select Committee on the Strategic Competition between the United States and the Chinese Communist Party has broad authority to "investigate and submit policy recommendations on the status of the Chinese Communist Party's economic, technological, and security progress and its competition with the United States" under H. Res. 11. Upon your receipt

of this letter, please maintain and preserve all hard copy and electronic documents, including electronic communications, related to the subject matter of these questions.

To make arrangements to deliver a response, please contact Select Committee majority and minority staff at (202) 226-9678 and (202) 225-2489, respectively.

Thank you for your attention to this important matter and prompt reply.

Sincerely,

Mike Gallagher
Chairman

Raja Krishnamoorthi
Ranking Member

# Exhibit 10

MIKE GALLAGHER, WISCONSIN
CHAIRMAN
ROB WITTMAN, VIRGINIA
BLAINE LUETKEMEYER, MISSOURI
ANDY BARR, KENTUCKY
DAN NEWHOUSE, WASHINGTON
JOHN MOOLENAAR, MICHIGAN
DARIN LAHOOD, ILLINOIS
NEAL DUNN, FLORIDA
JIM BANKS, INDIANA
DUSTY JOHNSON, SOUTH DAKOTA
MICHELLE STEELE, CALIFORNIA
ASHLEY HINSON, IOWA
CARLOS GIMENEZ, FLORIDA

RAJA KRISHNAMOORTHI, ILLINOIS
RANKING MEMBER
KATHY CASTOR, FLORIDA
ANDRÉ CARSON, INDIANA
SETH MOULTON, MASSACHUSETTS
RO KHANNA, CALIFORNIA
ANDY KIM, NEW JERSEY
MIKIE SHERRILL, NEW JERSEY
HALEY STEVENS, MICHIGAN
JAKE AUCHINCLOSS, MASSACHUSETTS
RITCHIE TORRES, NEW YORK
SHONTEL BROWN, OHIO



**Congress of the United States**

**House of Representatives**

SELECT COMMITTEE ON THE CHINESE COMMUNIST PARTY
548 Cannon House Office Building
Washington, D.C. 20515
(202) 225-6002

May 2, 2023

Mr. Yangtian (Chris) Xu
Chief Executive Officer
SHEIN
7 Temasek Blvd, #12-07
Singapore 038987

Dear Mr. Xu,

On March 23, 2023, the House Select Committee on the Strategic Competition between the United States and the Chinese Communist Party (CCP) held a hearing entitled, "The Chinese Communist Party's Ongoing Uyghur Genocide," in which the Committee received first-hand witness accounts about the CCP's concentration camps and expert testimony regarding the perpetration of genocide. We received written testimony in which an expert assessed that SHEIN is "sourcing garments made not only from cotton from the Uyghur Region but also viscose, lyocell, polyester, leather, and linen from the region."[1] Given this assessment, we are concerned that SHEIN's use of Section 321 of the Tariff Act of 1930 for shipments to the U.S. may provide insufficient customs scrutiny to affirm that its products are not produced in whole or part with forced labor.[2] We seek additional information regarding this matter.

According to news reports, laboratory testing of garments shipped to the U.S. by SHEIN contained cotton from China's Xinjiang Uyghur Autonomous Region (XUAR).[3] We are concerned that SHEIN's products imported to the United States under Section 321 of the Tariff Act of 1930 (19 U.S.C. 1321)—the *de minimis* provision—limit formal scrutiny of those shipments and avoid standard apparel duties paid by traditional apparel retailers. The *de minimis* provision allows admission of articles free of duty and of any tax imposed on importation so long as the fair retail value in the country of shipment of articles imported by one person on one day and exempted from the payment of duty shall not exceed $800.

---

[1] *The Chinese Communist Party's Ongoing Uyghur Genocide*: Hearing before the Select Comm. on Strategic Competition between the U.S. and CCP, 118 Cong. (Mar. 23, 2023) (Written Testimony of Nury Turkel).
[2] Kenneth Rapoza, *How A U.S. Trade Loophole Called 'De Minimis' Is China's 'Free Trade Deal'*, FORBES (Feb. 19, 2023) *available at* www.forbes.com/sites/kenrapoza/2023/02/19/how-a-us-trade-loophole-called-de-minimis-is-chinas-free-trade-deal/?sh=37b346604c9b.
[3] Sheridan Prasso, *Shein Cotton Clothes Tied to Xinjiang, a Region Accused of Forced Labor in China*, BLOOMBERG (Nov. 20, 2022) *available at* www.bloomberg.com/news/features/2022-11-21/shein-s-cotton-clothes-tied-to-xinjiang-china-region-accused-of-forced-labor.

We received expert testimony which revealed that Section 321 may allow perpetrators of forced labor to circumvent U.S. laws—including the Uyghur Forced Labor Prevention Act (UFLPA)—prohibiting the importation of products produced in the XUAR.[4] The UFLPA prohibits the "importation of any goods made with forced labor, including those goods mined, produced, or manufactured wholly or in part in the Xinjiang Uyghur Autonomous Region."[5] Congress passed the UFLPA—with bipartisan support—in response to the subjugation of Uyghurs and other minority groups in Xinjiang. The U.S. Department of State has determined that the CCP is committing genocide against these minority groups.[6]

Since the implementation of the UFLPA, U.S. Customs and Border Protection (CBP) has scrutinized 3,237 shipments, valued at $961 million. Cotton is designated as a "high priority sector" in the statute for enforcement as 90 percent of China's cotton is produced in Xinjiang and is diffused throughout China's domestic textile supply chains.[7] As a result, 61 percent of shipments denied entry under the UFLPA are categorized as apparel, footwear, and textiles.[8] Considering SHEIN's numerous contract manufacturers in mainland China and heavy reliance on Section 321 for imports, we are concerned that products produced in whole or part from Xinjiang with forced labor might be present in SHEIN's supply chain.

In response to these concerns, we would like to offer SHEIN an opportunity to respond to these serious allegations and to provide information to better help us understand SHEIN's ties to supply chains in Xinjiang. We therefore request you respond to the following questions by May 16, 2023:

1. What percentage of SHEIN products—including but not limited to products made by sub brands MOTF, LUVLETTE, DAZY, EMERY ROSE, CUCCOO, GLOWMODE, and PETSIN—are made in whole or in part with cotton fibers?

2. Does SHEIN explicitly prohibit its contract manufacturers from using cotton fibers from the XUAR in the production of any product it sells? Please provide all policies, guidelines, requirements, reviews, assessments, analyses, audits, PowerPoint or other presentations, or other documents that describe, govern, implement, or report conduct, processes, or results (without regard to the title of a given document) that are relevant to the establishment of, implementation of, or failure to adhere to any such prohibition.

3. SHEIN's traceability system requires submission of chain of custody documents from "field to fabric." How does SHEIN verify the authenticity of chain of custody documents

---

[4] *The Chinese Communist Party's Ongoing Uyghur Genocide*: Hearing before the Select Comm. on Strategic Competition between the U.S. and CCP, 118 Cong. (Mar. 23, 2023).

[5] Uyghur Forced Labor Prevention Act, H.R. 6256, 116th Cong. (2021).

[6] Edward Wong & Chris Buckley, *U.S. Says China's Repression of Uighurs Is 'Genocide'*, N.Y. TIMES (July 27, 2021) *available at* www.nytimes.com/2021/01/19/us/politics/trump-china-xinjiang.html.

[7] Eric Davis & Fred Gale, *Shift in Geography of China's Cotton Production Reshapes Global Market*, USDA ERS (Dec. 5, 2022) *available at* www.ers.usda.gov/amber-waves/2022/december/shift-in-geography-of-china-s-cotton-production-reshapes-global-market/.

[8] *Uyghur Forced Labor Prevention Act Statistics,* U.S. CUSTOMS AND BORDER PROTECTION (2023) *available at* www.cbp.gov/newsroom/stats/trade/uyghur-forced-labor-prevention-act-statistics.

from its contract manufacturers?[9] Please provide all policies, guidelines, requirements, reviews, assessments, analyses, audits, PowerPoint or other presentations, or other documents that describe, govern, implement, or report conduct, processes, or results (without regard to the title of a given document) that are relevant to SHEIN's establishment of, enforcement of, or noncompliance with its traceability system.

4.  SHEIN's multi-layer approach to supply chain management indicates radio-isotopic analysis company Oritain regularly tests and verifies that SHEIN's products comply with U.S. laws. Since June 21, 2022, have Oritain's assessments of raw cotton and products that contain cotton from SHEIN contract manufacturers ever detected cotton fibers originating from the XUAR? If so, on how many occasions?[10]

5.  Will SHEIN make all Oritain testing information available to the Select Committee for our review?

6.  SHEIN's Responsible Sourcing Policy states that it "applies to all existing and newly admitted manufacturing partners and their work sites which produce products or provide materials for SHEIN and other sub brands (including ROMWE, MOTF, SHEGLAM, and EMERY ROSE) to be made into finished products."[11] Why are SHEIN brands LUVLETTE, DAZY, CUCCOO, GLOWMODE, and PETSIN excluded from the applicability scope? Are these sub brands not subject to SHEIN's Responsible Sourcing Policy? If not, why not?

7.  On average, how many shipments does SHEIN, ROMWE, MOTF, SHEGLAM, EMERY ROSE, LUVLETTE, DAZY, CUCCOO, GLOWMODE, and PETSIN cause to enter the United States from China or via third markets, such as Canada and Mexico, using the *de minimis* provision each day? How many of those shipments are scrutinized by CBP?

8.  Does SHEIN use the consumer's final retail transaction price as the value of each imported shipment declared to CBP?

9.  If a U.S. consumer places an order over $800, or multiple orders in a day with an accumulative value exceeding $800, is SHEIN still able to fulfill the shipment using the *de minimis* provision?

10. Has SHEIN ever been challenged on a *de minimis* shipment valuation, whether by CBP or by any consignee handling the *de minimis* shipment?

11. How many contract manufacturers does SHEIN contract with?

---

[9] *SHEIN's Multi-Layer Approach to Supply Chain Management & Customs Compliance*, SHEIN GROUP (2023) *available at* www.sheingroup.com/corporate-news/sheins-multi-layer-approach-to-supply-chain-management-customs-compliance/.
[10] *Id.*
[11] *Responsible Sourcing Policy*, SHEIN GROUP, *available at* www.sheingroup.com/pdfs/responsible-sourcing-policy/.

12. SHEIN's Responsible Sourcing Policy indicates it will "strive to conduct at least one on-site SHEIN Responsible Sourcing (SRS) assessment for existing manufacturing suppliers each year."[12] How many SRS assessments were conducted in 2022? How many manufacturing suppliers avoided an on-site SRS assessment in 2022?

13. How many of the SRS assessments conducted in 2022 resulted in zero tolerance violations (ZTV)? How many of those violations were related to severe human rights violations? What were the findings of those violations? Did SHEIN terminate contracts with violative manufacturing suppliers?

The House Select Committee on the Strategic Competition between the United States and the Chinese Communist Party has broad authority to "investigate and submit policy recommendations on the status of the Chinese Communist Party's economic, technological, and security progress and its competition with the United States" under H. Res. 11. Upon your receipt of this letter, please maintain and preserve all hard copy and electronic documents, including electronic communications, related to the subject matter of these questions.

To make arrangements to deliver a response, please contact Select Committee majority and minority staff at (202) 226-9678 and (202) 225-2489, respectively.

Thank you for your attention to this important matter and prompt reply.

Sincerely,

Mike Gallagher
Chairman

Raja Krishnamoorthi
Ranking Member

---

[12] *Id.*

# Exhibit 11

RON WYDEN, OREGON , CHAIRMAN

DEBBIE STABENOW, MICHIGAN
MARIA CANTWELL, WASHINGTON
ROBERT MENENDEZ, NEW JERSEY
THOMAS R. CARPER, DELAWARE
BENJAMIN L. CARDIN, MARYLAND
SHERROD BROWN, OHIO
MICHAEL F. BENNET, COLORADO
ROBERT P. CASEY, JR., PENNSYLVANIA
MARK R. WARNER, VIRGINIA
SHELDON WHITEHOUSE, RHODE ISLAND
MAGGIE HASSAN, NEW HAMPSHIRE
CATHERINE CORTEZ MASTO, NEVADA
ELIZABETH WARREN, MASSACHUSETTS

MIKE CRAPO, IDAHO
CHUCK GRASSLEY, IOWA
JOHN CORNYN, TEXAS
JOHN THUNE, SOUTH DAKOTA
RICHARD BURR, NORTH CAROLINA
ROB PORTMAN, OHIO
PATRICK J. TOOMEY, PENNSYLVANIA
TIM SCOTT, SOUTH CAROLINA
BILL CASSIDY, LOUISIANA
JAMES LANKFORD, OKLAHOMA
STEVE DAINES, MONTANA
TODD YOUNG, INDIANA
BEN SASSE, NEBRASKA
JOHN BARRASSO, WYOMING

JOSHUA SHEINKMAN, STAFF DIRECTOR
GREGG RICHARD, REPUBLICAN STAFF DIRECTOR



**United States Senate**

COMMITTEE ON FINANCE

Washington, DC 20510–6200

December 22, 2022

Mr. James D. Farley, Jr.
President & CEO
1 American Road
Dearborn, Michigan 48126

Dear Mr. Farley:

I write concerning recent reports that Ford Motor Company's (Ford) supply chain may include links to the Xinjiang Uyghur Autonomous Region of the People's Republic of China (Xinjiang), where the Chinese Communist Party imposes widespread forced labor practices on minorities. Last year, Congress passed – and President Biden signed into law – the Uyghur Forced Labor Prevention Act[1] (UFLPA) to bolster the prohibition on goods made with forced labor by ensuring that goods made in Xinjiang do not enter the United States market unless demonstrated to be made without forced labor. The information I am requesting from Ford will aid the Senate Finance Committee's investigation of the effectiveness of trade-based efforts by the United States to combat forced labor and other serious human rights abuses in China.

Automotive supply chains are vast and complex, but it is vital that automakers scrutinize their relationships with all suppliers linked to Xinjiang. A report this month from the Helena Kennedy Centre for International Justice at Sheffield Hallam University detailed links between Chinese companies with operations in Xinjiang and automakers that use their products, including metals, batteries, wiring and wheels.[2] The UFLPA imposes a rebuttable presumption that goods mined or manufactured, wholly or in part, in Xinjiang were produced with forced labor and are therefore prohibited from importation.[3] This provision protects American companies and consumers from unwittingly perpetuating human rights abuses abroad.

Unless due diligence confirms that components are not linked to forced labor, automakers cannot and should not sell cars in the United States that include components mined or produced in Xinjiang. The United States considers the Chinese government's brutal oppression of Uyghurs in

---

[1] P.L. 117-78.

[2] *Driving Force: Automotive Supply Chains and Forced Labor in the Uyghur Region*, Sheffield Hallam University Helena Kennedy Centre for International Justice, Dec. 2022, https://www.shu.ac.uk/helena-kennedy-centre-international-justice/research-and-projects/all-projects/driving-force.

[3] *Uyghur Forced Labor Prevention Act*, U.S. Customs and Border Protection, Oct. 25, 2022, https://www.cbp.gov/trade/forced-labor/UFLPA.

1

Xinjiang an "ongoing genocide and crimes against humanity."[4] According to the U.S. Department of State, more than one million Uyghurs and other minorities are held in as many as 1,200 state-run internment camps in Xinjiang.[5] Chinese authorities "use threats of physical violence, forcible drug intake, physical and sexual abuse, and torture to force detainees to work in adjacent or off-site factories or worksites."[6] Pursuant to Section 307 of the Trade Act of 1930,[7] goods produced through these appalling practices must not enter the U.S. market.

I recognize automobiles contain numerous parts sourced across the world and are subject to complex supply chains. However, this recognition cannot cause the United States to compromise its fundamental commitment to upholding human rights and U.S. law. I request that Ford provide the following information to aid the Committee's investigation of the effectiveness of trade-based efforts by the U.S. to prevent human rights abuses abroad, as well as the steps taken by your company to comply with these requirements:

1) Does Ford conduct its own supply chain mapping and analysis of raw materials, mining, processing, and parts manufacturing to determine if its supply chain is linked to Xinjiang? If so, please describe the extent of supply chain mapping and analysis, and specifically indicate if these efforts include sub-suppliers, including mines, mineral processors, and any affiliated entities.

2) Does Ford conduct its own supply chain mapping and analysis of raw materials, mining, processing, and parts manufacturing to determine if it its supply chain is linked to the Xinjiang Uyghur Autonomous Region government's "poverty alleviation" program or the "pairing-assistance" program outside of Xinjiang? If so, please describe the extent of supply chain mapping and analysis, and specifically indicate if these efforts include sub-suppliers, including mines, mineral processors, and any affiliated entities.

3) Does Ford conduct its own supply chain mapping and analysis of parts manufacturing in third countries, including Mexico and Canada, to determine if those parts suppliers have supply chains linked to Xinjiang? If so, please describe the extent of supply chain mapping and analysis, and specifically indicate if these efforts include sub-suppliers, including mines, mineral processors, and any affiliated entities.

4) Does Ford's supply chain include any raw materials, mining, processing, or parts manufacturing linked to Xinjiang, including through sub-suppliers and their affiliates imported directly into the United States? If so, please:
   a. describe how Ford ensures that the raw materials, mining, processing, or parts manufacturing linked to Xinjiang does not depend on the use of forced labor; and,
   b. if Ford has a plan to exit the Xinjiang region, provide details of such plan.

---

[4] *Press Statement by U.S. Secretary of State Antony J. Blinken*, UN Office of the High Commissioner for Human Rights Report on the Human Rights Situation in Xinjiang, Sep. 1 2022, https://geneva.usmission.gov/2022/09/01/statement-on-un-human-rights-office-report-on-xinjiang/.
[5] *Forced Labor in China's Xinjiang Region*, U.S. Department of State Office to Monitor and Combat Trafficking in Persons, July 2021, https://www.state.gov/forced-labor-in-chinas-xinjiang-region/.
[6] *Forced Labor in China's Xinjiang Region*, U.S. Department of State Office to Monitor and Combat Trafficking in Persons, July 2021, https://www.state.gov/forced-labor-in-chinas-xinjiang-region/.
[7] P.L. 71-361 (March 13, 1930), §307; 46 Stat. 590, 689, codified as amended at 19 U.S.C. §1307.

5) Has Ford ever terminated or curtailed, or threatened to terminate or curtail, a commercial relationship with a supplier or sub-supplier, including mines, mineral processors, and any affiliated entities, because of its use of raw materials, mining, processing, or parts manufacturing linked to Xinjiang? If so, please describe, for every such incident, the actual or threatened termination or curtailment and the ultimate outcome, and whether the outcome was reported publicly.

6) Has Ford ever terminated or curtailed, or threatened to terminate or curtail, a commercial relationship with a supplier or sub-supplier, including mines, mineral processors, and any affiliated entities, because of its failure to comply with supply chain mapping, auditing, or other diligence or compliance activities? If so, please describe the actual or threatened termination or curtailment and the ultimate outcome, and whether the outcome was reported publicly.

7) Has any shipment of any goods to Ford ever been detained, excluded, or seized by U.S. Customs and Border Protection (CBP) under any provision of Section 307 of the Trade Act of 1930 or the UFLPA? If so, for each such instance, please:
   a. describe the circumstances surrounding the CBP enforcement action;
   b. describe any information provided by CBP regarding the enforcement action, including information about the suspected forced labor; and
   c. describe Ford's response to the CBP enforcement action.

I ask that you provide the requested information as soon as possible but no later than January 13, 2023. If you have any questions, you may contact my Senate Finance Committee oversight staff at 202-224-4515. Thank you for your prompt attention to this important matter.

Sincerely,

Ron Wyden
United States Senator
Chairman, Committee on
Finance

# Exhibit 12

RON WYDEN, OREGON , CHAIRMAN

DEBBIE STABENOW, MICHIGAN
MARIA CANTWELL, WASHINGTON
ROBERT MENENDEZ, NEW JERSEY
THOMAS R. CARPER, DELAWARE
BENJAMIN L. CARDIN, MARYLAND
SHERROD BROWN, OHIO
MICHAEL F. BENNET, COLORADO
ROBERT P. CASEY, JR., PENNSYLVANIA
MARK R. WARNER, VIRGINIA
SHELDON WHITEHOUSE, RHODE ISLAND
MAGGIE HASSAN, NEW HAMPSHIRE
CATHERINE CORTEZ MASTO, NEVADA
ELIZABETH WARREN, MASSACHUSETTS

MIKE CRAPO, IDAHO
CHUCK GRASSLEY, IOWA
JOHN CORNYN, TEXAS
JOHN THUNE, SOUTH DAKOTA
RICHARD BURR, NORTH CAROLINA
ROB PORTMAN, OHIO
PATRICK J. TOOMEY, PENNSYLVANIA
TIM SCOTT, SOUTH CAROLINA
BILL CASSIDY, LOUISIANA
JAMES LANKFORD, OKLAHOMA
STEVE DAINES, MONTANA
TODD YOUNG, INDIANA
BEN SASSE, NEBRASKA
JOHN BARRASSO, WYOMING

JOSHUA SHEINKMAN, STAFF DIRECTOR
GREGG RICHARD, REPUBLICAN STAFF DIRECTOR



**United States Senate**

COMMITTEE ON FINANCE

WASHINGTON, DC 20510–6200

December 22, 2022

Ms. Mary Barra
Chair & CEO
General Motors Company
300 Renaissance Center
Detroit, Michigan 48243

Dear Ms. Barra:

I write concerning recent reports that General Motors Company's (GM) supply chain may include links to the Xinjiang Uyghur Autonomous Region of the People's Republic of China (Xinjiang), where the Chinese Communist Party imposes widespread forced labor practices on minorities. Last year, Congress passed – and President Biden signed into law – the Uyghur Forced Labor Prevention Act[1] (UFLPA) to bolster the prohibition on goods made with forced labor by ensuring that goods made in Xinjiang do not enter the United States market unless demonstrated to be made without forced labor. The information I am requesting from GM will aid the Senate Finance Committee's investigation of the effectiveness of trade-based efforts by the United States to combat forced labor and other serious human rights abuses in China.

Automotive supply chains are vast and complex, but it is vital that automakers scrutinize their relationships with all suppliers linked to Xinjiang. A report this month from the Helena Kennedy Centre for International Justice at Sheffield Hallam University detailed links between Chinese companies with operations in Xinjiang and automakers that use their products, including metals, batteries, wiring and wheels.[2] The UFLPA imposes a rebuttable presumption that goods mined or manufactured, wholly or in part, in Xinjiang were produced with forced labor and are therefore prohibited from importation.[3] This provision protects American companies and consumers from unwittingly perpetuating human rights abuses abroad.

Unless due diligence confirms that components are not linked to forced labor, automakers cannot and should not sell cars in the United States that include components mined or produced in

---

[1] P.L. 117-78.

[2] *Driving Force: Automotive Supply Chains and Forced Labor in the Uyghur Region*, Sheffield Hallam University Helena Kennedy Centre for International Justice, Dec. 2022, https://www.shu.ac.uk/helena-kennedy-centre-international-justice/research-and-projects/all-projects/driving-force.

[3] *Uyghur Forced Labor Prevention Act*, U.S. Customs and Border Protection, Oct. 25, 2022, https://www.cbp.gov/trade/forced-labor/UFLPA.

Xinjiang. The United States considers the Chinese government's brutal oppression of Uyghurs in Xinjiang an "ongoing genocide and crimes against humanity."[4] According to the U.S. Department of State, more than one million Uyghurs and other minorities are held in as many as 1,200 state-run internment camps in Xinjiang.[5] Chinese authorities "use threats of physical violence, forcible drug intake, physical and sexual abuse, and torture to force detainees to work in adjacent or off-site factories or worksites."[6] Pursuant to Section 307 of the Trade Act of 1930,[7] goods produced through these appalling practices must not enter the U.S. market.

I recognize automobiles contain numerous parts sourced across the world and are subject to complex supply chains. However, this recognition cannot cause the United States to compromise its fundamental commitment to upholding human rights and U.S. law. I request that GM provide the following information to aid the Committee's investigation of the effectiveness of trade-based efforts by the U.S. to prevent human rights abuses abroad, as well as the steps taken by your company to comply with these requirements:

1) Does GM conduct its own supply chain mapping and analysis of raw materials, mining, processing, and parts manufacturing to determine if its supply chain is linked to Xinjiang? If so, please describe the extent of supply chain mapping and analysis, and specifically indicate if these efforts include sub-suppliers, including mines, mineral processors, and any affiliated entities.

2) Does GM conduct its own supply chain mapping and analysis of raw materials, mining, processing, and parts manufacturing to determine if its supply chain is linked to the Xinjiang Uyghur Autonomous Region government's "poverty alleviation" program or the "pairing-assistance" program outside of Xinjiang? If so, please describe the extent of supply chain mapping and analysis, and specifically indicate if these efforts include sub-suppliers, including mines, mineral processors, and any affiliated entities.

3) Does GM conduct its own supply chain mapping and analysis of parts manufacturing in third countries, including Mexico and Canada, to determine if those parts suppliers have supply chains linked to Xinjiang? If so, please describe the extent of supply chain mapping and analysis, and specifically indicate if these efforts include sub-suppliers, including mines, mineral processors, and any affiliated entities.

4) Does GM's supply chain include any raw materials, mining, processing, or parts manufacturing linked to Xinjiang, including through sub-suppliers and their affiliates imported directly into the United States? If so, please:
   a. describe how GM ensures that the raw materials, mining, processing, or parts manufacturing linked to Xinjiang does not depend on the use of forced labor; and,

---

[4] *Press Statement by U.S. Secretary of State Antony J. Blinken*, UN Office of the High Commissioner for Human Rights Report on the Human Rights Situation in Xinjiang, Sep. 1 2022, https://geneva.usmission.gov/2022/09/01/statement-on-un-human-rights-office-report-on-xinjiang/.
[5] *Forced Labor in China's Xinjiang Region*, U.S. Department of State Office to Monitor and Combat Trafficking in Persons, July 2021, https://www.state.gov/forced-labor-in-chinas-xinjiang-region/.
[6] *Forced Labor in China's Xinjiang Region*, U.S. Department of State Office to Monitor and Combat Trafficking in Persons, July 2021, https://www.state.gov/forced-labor-in-chinas-xinjiang-region/.
[7] P.L. 71-361 (March 13, 1930), §307; 46 Stat. 590, 689, codified as amended at 19 U.S.C. §1307.

    b.   if GM has a plan to exit the Xinjiang region, provide details of such plan.

5) Has GM ever terminated or curtailed, or threatened to terminate or curtail, a commercial relationship with a supplier or sub-supplier, including mines, mineral processors, and any affiliated entities, because of its use of raw materials, mining, processing, or parts manufacturing linked to Xinjiang? If so, please describe, for every such incident, the actual or threatened termination or curtailment and the ultimate outcome, and whether the outcome was reported publicly.

6) Has GM ever terminated or curtailed, or threatened to terminate or curtail, a commercial relationship with a supplier or sub-supplier, including mines, mineral processors, and any affiliated entities, because of its failure to comply with supply chain mapping, auditing, or other diligence or compliance activities? If so, please describe the actual or threatened termination or curtailment and the ultimate outcome, and whether the outcome was reported publicly.

7) Has any shipment of any goods to GM ever been detained, excluded, or seized by U.S. Customs and Border Protection (CBP) under any provision of Section 307 of the Trade Act of 1930 or the UFLPA? If so, for each such instance, please:
    a.   describe the circumstances surrounding the CBP enforcement action;
    b.   describe any information provided by CBP regarding the enforcement action, including information about the suspected forced labor; and
    c.   describe GM's response to the CBP enforcement action.

I ask that you provide the requested information as soon as possible but no later than January 13, 2023. If you have any questions, you may contact my Senate Finance Committee oversight staff at 202-224-4515. Thank you for your prompt attention to this important matter.

               Sincerely,

               Ron Wyden
               United States Senator
               Chairman, Committee on
               Finance

# Exhibit 13

RON WYDEN, OREGON , CHAIRMAN

DEBBIE STABENOW, MICHIGAN
MARIA CANTWELL, WASHINGTON
ROBERT MENENDEZ, NEW JERSEY
THOMAS R. CARPER, DELAWARE
BENJAMIN L. CARDIN, MARYLAND
SHERROD BROWN, OHIO
MICHAEL F. BENNET, COLORADO
ROBERT P. CASEY, Jr., PENNSYLVANIA
MARK R. WARNER, VIRGINIA
SHELDON WHITEHOUSE, RHODE ISLAND
MAGGIE HASSAN, NEW HAMPSHIRE
CATHERINE CORTEZ MASTO, NEVADA
ELIZABETH WARREN, MASSACHUSETTS

MIKE CRAPO, IDAHO
CHUCK GRASSLEY, IOWA
JOHN CORNYN, TEXAS
JOHN THUNE, SOUTH DAKOTA
RICHARD BURR, NORTH CAROLINA
ROB PORTMAN, OHIO
PATRICK J. TOOMEY, PENNSYLVANIA
TIM SCOTT, SOUTH CAROLINA
BILL CASSIDY, LOUISIANA
JAMES LANKFORD, OKLAHOMA
STEVE DAINES, MONTANA
TODD YOUNG, INDIANA
BEN SASSE, NEBRASKA
JOHN BARRASSO, WYOMING

JOSHUA SHEINKMAN, STAFF DIRECTOR
GREGG RICHARD, REPUBLICAN STAFF DIRECTOR



**United States Senate**

COMMITTEE ON FINANCE

WASHINGTON, DC 20510–6200

December 22, 2022

Mr. Elon Musk
CEO
Tesla, Inc.
1 Tesla Road
Austin, Texas 78725

Dear Mr. Musk:

I write concerning recent reports that Tesla, Inc.'s (Tesla) supply chain may include links to the Xinjiang Uyghur Autonomous Region of the People's Republic of China (Xinjiang), where the Chinese Communist Party imposes widespread forced labor practices on minorities. Last year, Congress passed – and President Biden signed into law – the Uyghur Forced Labor Prevention Act[1] (UFLPA) to bolster the prohibition on goods made with forced labor by ensuring that goods made in Xinjiang do not enter the United States market unless demonstrated to be made without forced labor. The information I am requesting from Tesla will aid the Senate Finance Committee's investigation of the effectiveness of trade-based efforts by the United States to combat forced labor and other serious human rights abuses in China.

Automotive supply chains are vast and complex, but it is vital that automakers scrutinize their relationships with all suppliers linked to Xinjiang. A report this month from the Helena Kennedy Centre for International Justice at Sheffield Hallam University detailed links between Chinese companies with operations in Xinjiang and automakers that use their products, including metals, batteries, wiring and wheels.[2] The UFLPA imposes a rebuttable presumption that goods mined or manufactured, wholly or in part, in Xinjiang were produced with forced labor and are therefore prohibited from importation.[3] This provision protects American companies and consumers from unwittingly perpetuating human rights abuses abroad.

Unless due diligence confirms that components are not linked to forced labor, automakers cannot and should not sell cars in the United States that include components mined or produced in

---

[1] P.L. 117-78.

[2] *Driving Force: Automotive Supply Chains and Forced Labor in the Uyghur Region*, Sheffield Hallam University Helena Kennedy Centre for International Justice, Dec. 2022, https://www.shu.ac.uk/helena-kennedy-centre-international-justice/research-and-projects/all-projects/driving-force.

[3] *Uyghur Forced Labor Prevention Act*, U.S. Customs and Border Protection, Oct. 25, 2022, https://www.cbp.gov/trade/forced-labor/UFLPA.

Xinjiang. The United States considers the Chinese government's brutal oppression of Uyghurs in Xinjiang an "ongoing genocide and crimes against humanity."[4] According to the U.S. Department of State, more than one million Uyghurs and other minorities are held in as many as 1,200 state-run internment camps in Xinjiang.[5] Chinese authorities "use threats of physical violence, forcible drug intake, physical and sexual abuse, and torture to force detainees to work in adjacent or off-site factories or worksites."[6] Pursuant to Section 307 of the Trade Act of 1930,[7] goods produced through these appalling practices must not enter the U.S. market.

I recognize automobiles contain numerous parts sourced across the world and are subject to complex supply chains. However, this recognition cannot cause the United States to compromise its fundamental commitment to upholding human rights and U.S. law. I request that Tesla provide the following information to aid the Committee's investigation of the effectiveness of trade-based efforts by the U.S. to prevent human rights abuses abroad, as well as the steps taken by your company to comply with these requirements:

1) Does Tesla conduct its own supply chain mapping and analysis of raw materials, mining, processing, and parts manufacturing to determine if its supply chain is linked to Xinjiang? If so, please describe the extent of supply chain mapping and analysis, and specifically indicate if these efforts include sub-suppliers, including mines, mineral processors, and any affiliated entities.

2) Does Tesla conduct its own supply chain mapping and analysis of raw materials, mining, processing, and parts manufacturing to determine if it its supply chain is linked to the Xinjiang Uyghur Autonomous Region government's "poverty alleviation" program or the "pairing-assistance" program outside of Xinjiang? If so, please describe the extent of supply chain mapping and analysis, and specifically indicate if these efforts include sub-suppliers, including mines, mineral processors, and any affiliated entities.

3) Does Tesla conduct its own supply chain mapping and analysis of parts manufacturing in third countries, including Mexico and Canada, to determine if those parts suppliers have supply chains linked to Xinjiang? If so, please describe the extent of supply chain mapping and analysis, and specifically indicate if these efforts include sub-suppliers, including mines, mineral processors, and any affiliated entities.

4) Does Tesla's supply chain include any raw materials, mining, processing, or parts manufacturing linked to Xinjiang, including through sub-suppliers and their affiliates imported directly into the United States? If so, please:
   a. describe how Tesla ensures that the raw materials, mining, processing, or parts manufacturing linked to Xinjiang does not depend on the use of forced labor; and,

---

[4] *Press Statement by U.S. Secretary of State Antony J. Blinken*, UN Office of the High Commissioner for Human Rights Report on the Human Rights Situation in Xinjiang, Sep. 1 2022, https://geneva.usmission.gov/2022/09/01/statement-on-un-human-rights-office-report-on-xinjiang/.
[5] *Forced Labor in China's Xinjiang Region*, U.S. Department of State Office to Monitor and Combat Trafficking in Persons, July 2021, https://www.state.gov/forced-labor-in-chinas-xinjiang-region/.
[6] *Forced Labor in China's Xinjiang Region*, U.S. Department of State Office to Monitor and Combat Trafficking in Persons, July 2021, https://www.state.gov/forced-labor-in-chinas-xinjiang-region/.
[7] P.L. 71-361 (March 13, 1930), §307; 46 Stat. 590, 689, codified as amended at 19 U.S.C. §1307.

  b.  if Tesla has a plan to exit the Xinjiang region, provide details of such plan.

5)  Has Tesla ever terminated or curtailed, or threatened to terminate or curtail, a commercial relationship with a supplier or sub-supplier, including mines, mineral processors, and any affiliated entities, because of its use of raw materials, mining, processing, or parts manufacturing linked to Xinjiang? If so, please describe, for every such incident, the actual or threatened termination or curtailment and the ultimate outcome, and whether the outcome was reported publicly.

6)  Has Tesla ever terminated or curtailed, or threatened to terminate or curtail, a commercial relationship with a supplier or sub-supplier, including mines, mineral processors, and any affiliated entities, because of its failure to comply with supply chain mapping, auditing, or other diligence or compliance activities? If so, please describe the actual or threatened termination or curtailment and the ultimate outcome, and whether the outcome was reported publicly.

7)  Has any shipment of any goods to Tesla ever been detained, excluded, or seized by U.S. Customs and Border Protection (CBP) under any provision of Section 307 of the Trade Act of 1930 or the UFLPA? If so, for each such instance, please:
  a.  describe the circumstances surrounding the CBP enforcement action;
  b.  describe any information provided by CBP regarding the enforcement action, including information about the suspected forced labor; and
  c.  describe Tesla's response to the CBP enforcement action.

I ask that you provide the requested information as soon as possible but no later than January 13, 2023. If you have any questions, you may contact my Senate Finance Committee oversight staff at 202-224-4515. Thank you for your prompt attention to this important matter.

Sincerely,

Ron Wyden
United States Senator
Chairman, Committee on
Finance