**Web Pages Cited in the Opinion**

# UYGHUR FORCED LABOR PREVENTION ACT



## U.S. CUSTOMS AND BORDER PROTECTION
## OPERATIONAL GUIDANCE FOR IMPORTERS
### June 13, 2022

CBP Publication No. 1793-0522

# TABLE OF CONTENTS

## I. Importation Process and Enforcement of UFLPA ............................................7

    A. Detention ................................................................................................ 8

    B. Release .................................................................................................... 8

    C. Exclusion ................................................................................................ 8

    D. Seizure/Forfeiture ................................................................................. 9

## II. Requesting an Exception to the Rebuttable Presumption ............................9

## III. Resources for Supply Chain Due Diligence, Tracing, and Management ..11

## IV. Type and Nature of Information that May Be Required by CBP .............13

    A.  Due Diligence System Information .................................................... 13

    B.  Supply Chain Tracing Information .................................................... 14

    C.  Information on Supply Chain Management Measures ...................... 15

    D.  Evidence Goods Were Not Mined, Produced, or Manufactured Wholly or In Part in the Xinjiang Uyghur Autonomous Region .................................................. 15

    E.  Evidence Goods Originating in China Were Not Mined, Produced, or Manufactured Wholly or In Part by Forced Labor ................................................................. 15

## Appendix A. Commodity-Specific Supply Chain Tracing Documentation .....16

**This CBP guidance document is intended to provide operational guidance to trade stakeholders and complement the UFLPA Strategy's guidance. Importers must comply with the importer guidance within the UFLPA Strategy.  UFLPA, Section 3(b).**

# Introduction

The Uyghur Forced Labor Prevention Act (UFLPA), signed into law on December 23, 2021, reinforces the United States' policy to strengthen the prohibition against the importation of goods made with forced labor.  The UFLPA ensures support for enforcement of Section 307 of the Tariff Act of 1930, as amended (19 U.S.C. § 1307), which prohibits the importation of all ". . . goods, wares, articles, and merchandise mined, produced, or manufactured wholly or in part in any foreign country by convict labor or/and forced labor or/and indentured labor under penal sanctions."

The UFLPA requires the Commissioner of U.S. Customs and Border Protection (CBP) to apply a presumption that imports of all goods, wares, articles, and merchandise mined, produced, or manufactured wholly or in part in the Xinjiang Uyghur Autonomous Region (Xinjiang) of the People's Republic of China (PRC), or by entities identified by the U.S. government on the UFLPA Entity List, are presumed to be made with forced labor and are prohibited from entry into the United States.  The presumption also applies to goods made in, or shipped through, the PRC and other countries that include inputs made in Xinjiang.

The presumption is rebuttable, and, to overcome it, importers must, among other requirements in the UFLPA, respond to all CBP requests for information about merchandise under CBP review and demonstrate by clear and convincing evidence that the good, ware, article, or merchandise was not mined, produced, or manufactured wholly or in part by forced labor.  CBP may consider evidence other than what is provided by the importer in determining whether there is clear and convincing evidence.  The UFLPA also requires that importers demonstrate due diligence, effective supply chain tracing, and supply chain management measures to ensure that they do not import any goods made, in whole or in part, by forced labor, especially from the Xinjiang Region.  This requirement extends throughout the entire supply chain, to include goods that may be shipped from elsewhere in the PRC and to third countries for further processing.

Importers must consult the *Strategy to Prevent the Importation of Goods Mined, Produced, or Manufactured with Forced Labor in the People's Republic of China* (UFLPA Strategy), to be published by the Department of Homeland Security (DHS), in its role as the chair of the Forced Labor Enforcement Task Force (FLETF), on June 21, 2022, for specific importer guidance as required by the UFLPA.  Section 2(d)(6) of the UFLPA requires the FLETF to develop guidance to importers on due diligence, supply chain tracing and management, and evidence to demonstrate goods were not mined, produced, or manufactured wholly or in part in the Xinjiang region of China or by forced labor.  Importers must comply with the importer guidance in the UFLPA Strategy in order to be eligible for an exception to the rebuttable presumption.  In line with internal risk assessments, businesses and individuals should undertake heightened due diligence to ensure compliance with U.S. law, and to identify potential supply chain or other exposure to companies operating in Xinjiang, linked to Xinjiang (e.g., through the pairing

program or Xinjiang supply chain inputs), or utilizing Uyghur and other Muslim minority laborers from Xinjiang.  In the event companies identify linkages to entities with connections to Xinjiang, businesses and individuals must avoid unlawful activities.

Enforcement of the UFLPA and application of the rebuttable presumption will apply to merchandise imported on or after June 21, 2022.  CBP will exercise its authority under the customs laws to detain, exclude, and/or seize and forfeit shipments that are within the scope of the UFLPA.  The UFLPA requires CBP to presume that goods manufactured wholly or in part in the Xinjiang region of China or made by entities on the UFLPA Entity List violate 19 U.S.C. § 1307, but does not require CBP to issue Withhold Release Orders and Findings pursuant to the regulations promulgated under 19 U.S.C. § 1307.  This CBP guidance document describes the UFLPA enforcement process and complements the UFLPA Strategy by providing importers with information about the documentation to present to CBP to rebut the presumption contained in Section 3 of the UFLPA.  Shipments imported prior to June 21, 2022 will be adjudicated through the WRO/Findings process.  Shipments imported on or after June 21, 2022 that are subject to the UFLPA, which previously would have been subject to a XUAR WRO, will be processed under UFLPA procedures, and detained, excluded, or seized.

This guidance document reflects CBP's interpretation of the UFLPA and other applicable laws and regulations enforced by CBP as of the date of publication of this guidance.  This CBP guidance document does not in any way replace or supersede those laws or regulations.  Only the latest official version of the applicable laws or regulations, as codified, is authoritative.

# I. Importation Process and Enforcement of UFLPA

To enforce the UFLPA, CBP will take specific enforcement actions, including identifying, detaining, and/or excluding, or seizing shipments subject to the UFLPA's rebuttable presumption, depending upon the specific facts involved in each importation. CBP will review each shipment for UFLPA applicability, and appropriate action to be taken, on a case-by-case basis. CBP will identify shipments through a variety of sources including from the UFLPA Entity List required by Section 2(d)(2)(B) of the UFLPA and published in the *Federal Register*. Any detentions effectuated to enforce the UFLPA will be pursuant to CBP's authority to inspect, examine, and detain imported merchandise in accordance with 19 U.S.C. § 1499.

CBP will provide importers with notice, in accordance with the customs laws, when enforcement actions are taken on their shipments. As set forth in more detail below, in response to a detention notice, exclusion notice, or notice of seizure, an importer may provide information to CBP to request an exception to the UFLPA's rebuttable presumption (see Section II). Importers may also identify additional shipments that have identical supply chains to those that have been reviewed previously and determined to be admissible by CBP, to facilitate the faster release of identical shipments.

It should be noted that in instances in which CBP has taken an enforcement action under the UFLPA on an importation, but an importer believes that its importation is outside the scope of the UFLPA, an importer may provide information to CBP to that effect, *i.e.*, information that the imported goods and their inputs are sourced completely from outside Xinjiang and have no connection to entities on the UFLPA Entity List. An importer must provide documentation that substantiates the absence of inputs subject to UFLPA from its supply chain. (Refer to Section IV, B & D of this CBP guidance document for a non-exhaustive list of documents that CBP may request from importers.) In the event CBP determines that the information provided by the importer demonstrates that the merchandise is outside the scope of the UFLPA because it lacks a connection to Xinjiang or to an entity on the UFLPA Entity List, the importer will not need to obtain an exception to the UFLPA presumption and CBP will release such shipments, provided they are otherwise in compliance with U.S. law.

The UFLPA will supersede current WROs related to Xinjiang for goods imported on or after June 21, 2022. In situations in which the importer contends the UFLPA does not apply to its imports, and thus, that its imports are not subject to the UFLPA presumption, the importer may submit documentation demonstrating that neither the goods nor their components were produced wholly or in part in Xinjiang or by entities identified in the UFLPA Entity List.

**A. Detention**

When CBP detains goods or merchandise under the UFLPA, CBP will issue a detention notice in accordance with 19 U.S.C. § 1499 and 19 C.F.R. § 151.16, providing the reason for detention (*i.e.* UFLPA) and the anticipated length of the detention.  The detention notice will also include instructions to the importer for submitting information to CBP to rebut the UFLPA presumption. For information on how to establish that an importation is outside the scope of the UFLPA (and therefore not subject to the presumption) or for information regarding how to overcome the rebuttable presumption, refer to Section II of this CBP guidance document and the UFLPA Strategy.

Pursuant to its authority under 19 U.S.C. § 1499 and 19 C.F.R. 151.16, CBP has five days (excluding weekends and holidays) following the date on which merchandise is presented for examination to CBP to decide whether to release or detain the merchandise.  Merchandise that is not released within such five-day period will be considered to be detained merchandise.  CBP will evaluate information provided by the importer to determine admissibility during and after the five-day period.  Importers may present an Immediate Export in-bond to seek permission from the port director to export detained shipments at any point prior to exclusion or seizure.[1]

**B. Release**

In cases in which the CBP Commissioner determines that an importer has complied with Section 3(b) of the UFLPA, and there is clear and convincing evidence that the goods were not made wholly or in part with forced labor, the Commissioner will determine that an exception to the presumption is warranted and the port director will release the merchandise.  In accordance with Section 3(c) of the UFLPA, information submitted by an importer will be subject to public disclosure and Congressional reporting when CBP grants an exception.  Specifically, the UFLPA mandates that when an exception is granted, CBP must submit to Congress and the public a report identifying the good and the evidence considered in reaching the determination that an exception is warranted under Section 3(b) of the UFLPA.  Certain information may be withheld from release under applicable exemptions contained in the Freedom of Information Act, 5 U.S.C. § 552.

**C. Exclusion**

CBP may exclude shipments determined to be in violation of the UFLPA.  Importers may protest exclusions pursuant to 19 U.S.C. § 1514.  Importers must select "Merchandise Excluded From Entry" as the relevant Issue when creating the protest within the Automated Commercial Environment (ACE) to ensure proper processing.  Protests should be routed electronically to the appropriate Center of Excellence and Expertise (Center).  For information on how to overcome the rebuttable presumption, refer to Section II of this CBP guidance document and the UFLPA Strategy.  For additional information about the protest process, refer to 19 C.F.R Part 174.

---

[1] *See* https://www.cbp.gov/sites/default/files/assets/documents/2019-Jul/in-bondprocessdocumentversion2.0_0.pdf

**D. Seizure/Forfeiture**

Importations determined to be in violation of the UFLPA may be subject to seizure and forfeiture. *See* 19 U.S.C. § 1595a; 19 C.F.R. Part 171. When a decision has been made by CBP to seize a shipment in violation of the UFLPA, the case will be referred to the Fines, Penalties and Forfeitures (FPFO) officer at the port of entry. The FPFO will send the importer and all other interested parties a Notice of Seizure letter outlining the petition rights for interested parties. For information on how to overcome the rebuttable presumption, refer to Section II of this document and the UFLPA Strategy. FPFO notices will advise the importer how to provide information to CBP for review, as well as the deadline for submitting a petition. Petitions and supplemental petitions will be reviewed by the FPFO or Regulations and Rulings following existing processes and delegations of authority and collaboration with internal stakeholders. Refer to the Mitigation Guidelines for additional information on seizure processes.

# II. Requesting an Exception to the Rebuttable Presumption

The UFLPA establishes a rebuttable presumption that the importation of any goods, wares, articles, and merchandise mined, produced, or manufactured wholly or in part in Xinjiang, or mined, produced, or manufactured by certain entities on the UFLPA Entity List, is prohibited by 19 U.S.C. § 1307, and that such goods, wares, articles, and merchandise are not entitled to entry into the United States.

The UFLPA presumption applies unless the Commissioner of CBP determines that it has been rebutted—*i.e.*, that the importer has complied with specified conditions and, by clear and convincing evidence, that the goods, wares, articles, or merchandise were not mined, produced, or manufactured wholly or in part by forced labor. Specifically, the Commissioner shall apply the presumption unless the Commissioner determines—

    (1) that the importer of record has—

        (A) fully complied with the guidance described in section 2(d)(6) of the UFLPA (UFLPA Strategy) and any regulations issued to implement that guidance; and

        (B) completely and substantively responded to all inquiries for information submitted by the Commissioner to ascertain whether the goods were mined, produced, or manufactured wholly or in part by forced labor; and

    (2) by clear and convincing evidence, that the good, ware, article, or merchandise was not mined, produced, or manufactured wholly or in part by forced labor.

Importers may request an exception to the rebuttable presumption from CBP during a detention, after an exclusion, or during the seizure process. For these three processes, outlined in Section I of this CBP guidance document, importers will receive either a detention notice, exclusion notice, or a seizure notice. Such notices will provide information regarding the detention, exclusion, or seizure, along with options for additional administrative processes, in accordance with applicable legal requirements. When reviewing requests for exceptions, CBP will attempt

to prioritize the requests of Customs Trade Partnership Against Terrorism (CTPAT) Trade Compliance members in good standing.

- Importers who receive a **detention notice** regarding their shipments may respond to the detention notice within the applicable timeframe, pursuant to 19 C.F.R. Part 151, and generally within 30 days from the date the merchandise is presented for examination to CBP, to request an exception to the UFLPA rebuttable presumption.
- Importers who receive an **exclusion notice** may file an administrative protest within the applicable timeframe, pursuant to 19 C.F.R. Part 174, to request an exception to the UFLPA rebuttable presumption.
- Importers who receive a **seizure notice** may utilize the petition process outlined in 19 C.F.R. Part 171 to request an exception to the UFLPA rebuttable presumption.

In each of these situations, to request an exception to the UFLPA presumption, importers must clearly state that the importer is seeking an exception to the UFLPA presumption and provide appropriate supporting documentation substantiating the request. For the types of information required to overcome the presumption, refer to Section IV, A-C, E of this CBP guidance document and the UFLPA Strategy.

In addition, if CBP has taken an enforcement action under the UFLPA on an importation, but an importer believes that its importation is outside the scope of the UFLPA, an importer may provide information to CBP to that effect, *i.e.*, information that the imported goods and their inputs are sourced completely from outside Xinjiang and have no connection to the UFLPA Entity List. Providing such documentation in English will facilitate CBP's efficient review of these exception requests. For the types of information required to establish that the importation is outside the scope of UFLPA, refer to Section IV, B & D of this CBP guidance document and the UFLPA Strategy.

If the CBP Commissioner determines that an exception to the rebuttable presumption is warranted for a particular importation, CBP will notify the appropriate Congressional committees and, not later than 30 days after the Commissioner determines an exception is warranted, make available to the public a report identifying the good and the evidence considered in granting the exception.

# III. Resources for Supply Chain Due Diligence, Tracing, and Management

This CBP operational guidance document lists resources available to trade stakeholders to support their ability to conduct supply chain due diligence, tracing, and management, including resources available on CBP.gov and other websites. The following information is not intended to be an exhaustive list of resources:

**U.S. Government Resources:**

- Strategy to Prevent the Importation of Goods Mined, Produced, or Manufactured with Forced Labor in the People's Republic of China (forthcoming)
- The U.S. Department of State's Responsible Sourcing Tool;
- The U.S. Department of State's *Trafficking in Persons Report*;
- The U.S. Department of Labor's Comply Chain;
- The U.S. Department of Labor's Findings on the Worst Forms of Child Labor;
- The U.S. Department of Labor's List of Goods Produced by Child Labor or Forced Labor;
- The U.S. Department of Labor's List of Products Produced by Forced or Indentured Child Labor;
- The U.S. Department of Labor's Better Trade Tool;
- Federal Acquisition Regulations;
- National Action Plan on Responsible Business Conduct;
- Relevant business advisories issued by the Department of State with the cooperation of other U.S. Government agencies, including the updated Xinjiang Supply Chain Business Advisory (July 2021);
- The U.S. Customs and Border Protection's *Reasonable Care: An Informed Compliance Publication* and other relevant publications;
- The U.S. Customs and Border Protection's Forced Labor website resources;
- The U.S. Customs and Border Protection's Withhold Release Orders and Findings, including those involving China and Xinjiang, and related FAQs that may aid importers in identifying additional merchandise, regions, and producers whose imports into the United States may be subject to exclusion and/or seizure.

**International Resources:**

- The United Nations Guiding Principles on Business and Human Rights;
- The Organisation for Economic Co-operation and Development (OECD) Guidelines for Multinational Enterprises (including sector-specific guidance);
- The ILO Tripartite Declaration of Principles concerning Multinational Enterprises and Social Policy;
- The ILO publication, Combating Forced Labour: A Handbook for Employers and Business;
- ILO Guidelines Concerning the Measurement of Forced Labor;

- ILO General Principles and Operational Guidelines for Fair Recruitment;
- International Organization for Migration's ethical recruitment standards; and
- The Office of the High Commissioner for Human Rights guide on The Corporate Responsibility to Respect Human Rights (OHCHR guide).

**Other Resources:**

- Group of Seven (G7) Trade Ministers' Statement on Forced Labor; and
- The Human Trafficking Legal Center's guide, *Importing Freedom: Using the U.S. Tariff Act to Combat Forced Labor in Supply Chains*.

# IV. Type and Nature of Information that May Be Required by CBP

This section provides guidance to importers to assist them in understanding some of the types of information that CBP will require if the importer requests an exception to the UFLPA's presumption. **This CBP guidance document is intended to complement the forthcoming UFLPA Strategy's guidance for importers. Importers must comply with the importer guidance within the UFLPA Strategy. UFLPA, Section 3(b).**

The following information is not intended to be an exhaustive list of the documentation CBP may request, and the goal is to provide importers flexibility to provide documentation consistent with their business operations. Importers must respond completely and substantively to all CBP inquiries for information to clearly demonstrate the merchandise was not mined, produced, or manufactured wholly or in part by forced labor. Translation of documents into English and well-organized submissions (that are indexed and contain an explanation of the relevance of the documents provided) will facilitate CBP's review. Questions regarding the guidance provided in this section should be directed to UFLPAInquiry@cbp.dhs.gov. Additional details are contained within the UFLPA Strategy.

The following five categories are reflective of those outlined in the UFLPA and are intended to complement the UFLPA Strategy. Specifically, subheadings A, B, and C are applicable to Section 2(d)(6)(A), UFLPA; subheading D is applicable to Section 2(d)(6)(B), UFLPA; and subheading E is applicable to by Section 2(d)(6)(C), UFLPA.

Importers who contend their imports are not within the purview of the UFLPA should refer to Section IV, B & D, regarding documentation that the imported goods and their inputs are sourced completely from outside Xinjiang and have no connection to entities on the UFLPA Entity List. Importers requesting an exception to the UFLPA presumption should refer to Sections IV, A-C & E, as a showing under each of those subcategories is required for CBP to make a determination under UFLPA Section 3(b) that an exception is warranted.

## A. Due Diligence System Information
Documentation showing a due diligence system or process that may include the following:

- Engagement with suppliers and other stakeholders to assess and address forced labor risk;
- Mapping of the supply chain and assessment of forced labor risks along the supply chain from raw materials to production of the imported good;
- Written supplier code of conduct[2] forbidding the use of forced labor and addressing the risk of use of Chinese government labor schemes;
- Training on forced labor risks for employees and agents who select and interact with suppliers;
- Monitoring of supplier compliance with the code of conduct;

---

[2] Refer to Section III of this document, Resources for Supply Chain Due Diligence, Tracing, and Management, and the Department of Labor's Comply Chain resource which includes resources for codes of conduct.

- Remediation of any forced labor conditions identified or termination of the supplier relationship if remediation is not possible or is not timely completed;
- Independent verification of the implementation and effectiveness of the due diligence system; and
- Reporting performance and engagement publicly on its due diligence system.

## B. Supply Chain Tracing Information

Documentation tracing the supply chain from raw materials to the imported good. This following documentation is provided to illustrate the types of information that importers may provide, or that may be requested by CBP, to demonstrate their imports are either not subject to the UFLPA because their supply chains are wholly outside of Xinjiang and unconnected to listed entities, or to show that their imports are free of forced labor and in compliance with the UFLPA.

- **Evidence Pertaining to Overall Supply Chain**
  - Detailed description of supply chain including imported merchandise and components thereof, including all stages of mining, production, or manufacture;
  - The role(s) of the entities in the supply chain, including shippers and exporters: for example, CBP will need to determine whether a supplier is also a manufacturer;
  - For entities in the supply chain, identify any relationships in accordance with 19 C.F.R. § 152.102(g);
  - A list of suppliers associated with each step of the production process, including names and contact information (addresses, email addresses, and phone number);
  - Affidavits from each company or entity involved in the production process.

- **Evidence Pertaining to Merchandise or Any Component Thereof**

  - Purchase orders
  - Invoice for all suppliers and sub-suppliers
  - Packing list
  - Bill of materials
  - Certificates of origin
  - Payment records
  - Seller's inventory records, including dock/warehouse receipts
  - Shipping records, including manifests, bills of lading (e.g., airway/vessel/trucking)
  - Buyer's inventory records, including dock/warehouse receipts
  - Invoices and receipts for all suppliers and sub-suppliers
  - Import/export records

- **Evidence Pertaining to Miner, Producer, or Manufacturer**
  - Evidence listed above pertaining to merchandise or any component thereof for raw materials. See below for specific examples related to high-risk commodities, such as cotton, polysilicon, and tomatoes.
  - Mining, production, or manufacturing records

- o Documents should allow CBP to trace raw materials to merchandise mined, produced, or manufactured
- o Production orders
- o Reports on factory production capacity for the merchandise
- o Reports on factory site visits by the importer, a downstream supplier sourcing from this factory, or a third party
- o Evidence that the volume of inputs of component materials matches the volume of output for the merchandise produced
- Any other evidence to demonstrate that a good was not mined, produced, or manufactured wholly or in part by forced labor

**Note:** The appendix to this CBP operational guidance document contains suggested documents for some high-risk commodities from Xinjiang.

### C.  Information on Supply Chain Management Measures

Documentation on supply chain management measures, which may include:

- Internal controls to prevent or mitigate forced labor risk and remediate any use of forced labor identified in the mining, production, or manufacture of imported goods.
- An importer should be able to demonstrate that documents provided are part of an operating system or an accounting system that includes audited financial statements.

### D.  Evidence Goods Were Not Mined, Produced, or Manufactured Wholly or In Part in the Xinjiang Uyghur Autonomous Region

- Documentation that traces the supply chain for the goods (refer to Section IV, B on supply chain tracing for information on the types of documents).

### E.  Evidence Goods Originating in China Were Not Mined, Produced, or Manufactured Wholly or In Part by Forced Labor

Documentation may include, but is not limited to:

- Supply chain map identifying all entities involved in production of the goods;
- Information on workers at each entity involved in the production of the goods in China such as wage payment and production output per worker;
- Information on worker recruitment and internal controls to ensure that all workers in China were recruited and are working voluntarily; and
- Credible audits to identify forced labor indicators and remediation of these if applicable.

**Note:** The resources listed in Section III of this CBP operational guidance document provide additional information on due diligence, supply chain tracing, and supply chain management measures.

# Appendix A. Commodity-Specific Supply Chain Tracing Documentation

This appendix provides specific guidance for supply chain documentation that importers may consider submitting for commodities with a high-risk of forced labor.  Note: the lists below are not exhaustive.  Additional documentation may be required.  This guidance is intended to illustrate the types of documents CBP may require to be submitted on or after June 21, 2022.  For each detained shipment, CBP will provide a detention notice that includes the reason(s) for the detention.

**Cotton:**

- Provide sufficient documentation, including any records that may be kept in the ordinary course of business (e.g., purchase orders, payment records, etc.), to show the entire supply chain, from the origin of the cotton at the bale level to the final production of the finished product.

- Provide a flow chart of the production process and maps of the region where the production processes occur.  Number each step along the production process and number any additional supporting documents associated with each step of the process.

- Identify all the entities involved in each step of the production process, with citations denoting the business records used to identify each upstream entity with whom the importer did not directly transact.

**Polysilicon:**

- Importers need to provide complete records of transactions and supply chain documentation that demonstrate all entities involved in the manufacture, manipulation, or export of a particular good, and the country of origin of each material used in the production of the products going back to the suspected source of forced labor, i.e., production in Xinjiang or by an entity on the UFLPA Strategy entities lists.

- Provide a flow chart mapping each step in the procurement and production of all materials and identify the region where each material in the production originated (e.g., from location of the quartzite used to make polysilicon, to the location of manufacturing facilities producing polysilicon, to the location of facilities producing downstream goods used to make the imported good).

- Provide a list of all entities associated with each step of the production process, with citations denoting the business records used to identify each upstream party with whom the importer did not directly transact.

- Importers should be aware that imports of goods from factories that source polysilicon both from within Xinjiang and outside of Xinjiang risk being subject to detention, as it may be harder to verify that the supply chain is using only non-Xinjiang polysilicon and that the

materials have not been replaced by or co-mingled with Xinjiang polysilicon at any point in the manufacturing process.

**Tomatoes:**

- Provide supply chain traceability documents (e.g., lot codes assigned based on the commodity, variety, location, and harvest date) demonstrating the point of origin of the tomato seeds, tomatoes, or tomato products.

- Identify the tomato processing facility, including both the parent company and the estate that sourced the tomato seeds and/or tomatoes.

- Records for the tomato seeds, tomatoes, and/or tomato products that identify all steps in the production process, from seed to finished product, from the farm to shipping to the United States.

- Provide a list of all entities associated with each step of the production process, with citations denoting the business records used to identify each upstream party with whom the importer did not directly transact.

 **Homeland Security**

U S  Department of Home and Secur ty

# DHS to Ban Imports from Two Additional PRC–Based Companies as Part of Its Enforcement of the Uyghur Forced Labor Prevention Act (UFLPA)

**Release Date:** June 9, 2023

*Nearly One Year After Implementation of the UFLPA, DHS Examined Over $1.3 Billion Worth of Goods Likely Manufactured with Forced Labor*

WASH NGTON    Today the U.S. Department of Home and Secur ty (DHS) announced new act ons to keep forced  abor pract ces out of the U.S. supp y cha n. The  nteragency Forced Labor Enforcement Task Force (FLETF)  ed by DHS, added two Peop e s Repub c of Ch na (PRC) based compan es to the Uyghur Forced Labor Prevent on Act (UFLPA) Ent ty L st. Effect ve June  2, 2023, goods produced by X nj ang Zhongta  Chem ca  Co., Ltd. and N nestar Corporat on and e ght of ts Zhuha  based subs d ar es w  be restr cted from enter ng the Un ted States as a resu t of the compan es  part c pat on  n bus ness pract ces that target members of persecuted groups,  nc ud ng Uyghur m nor t es  n the PRC.

The UFLPA, s gned  nto  aw by Pres dent B den  n December 202 , proh b ts goods from be ng  mported  nto the Un ted States that are e ther produced  n X nj ang, or by ent t es  dent f ed on the UFLPA Ent ty L st, un ess the  mporter can prove, by c ear and conv nc ng ev dence, the goods were not produced w th forced  abor. W th today's announcement, 22 Ch nese compan es are current y des gnated to the UFLPA Ent ty L st. U.S. Customs and Border Protect on (CBP) began enforc ng the UFLPA  n June 2022.  n the f rst year of enforcement, CBP has rev ewed [more than 4,000 sh pments (https://www.cbp.gov/newsroom/stats/trade/uyghur-forced-labor-prevention-act-statistics)] va ued at over $ .3 b  on under the new  aw.

"Th s Adm n strat on s comm tted to erad cat ng forced  abor from U.S. supp y cha ns and w  do so wh e fac  tat ng  eg t mate trade and strengthen ng the U.S. economy,  **said Secretary of Homeland Security Alejandro N. Mayorkas**. "Our Department w  not to erate governments abus ng human r ghts and w  cont nue to restr ct a  goods at our ports of entry that use mater a s or workers from the X nj ang Uyghur Autonomous Reg on where the Peop e s Repub c of Ch na aggress ve y oppresses and exp o ts Uyghurs and other Mus m major ty commun t es.

 n June 2022, DHS re eased the [Strategy to Prevent the  mportat on of Goods M ned, Produced, or Manufactured w th Forced Labor  n the Peop e s Repub c of Ch na (https://www.dhs.gov/uflpa-strategy)] . The DHS Off ce of Strategy, Po  cy, and P ans; CBP; and U.S.  mm grat on and Customs Enforcement ( CE) are  ead ng the Department s efforts to change  mporters  behav or and ho d perpetrators accountab e for egreg ous forced  abor abuses. The FLETF wh ch a so  nc udes the Off ce of the U.S. Trade Representat ve and the U.S. Departments of Labor, State, the Treasury, Just ce and Commerce   w  cont nue to rev se the UFLPA Ent ty L st. DHS w  post these rev s ons and pub sh the rev sed UFLPA Ent ty L st as an append x to a Federa  Reg ster not ce.

"The Forced Labor Enforcement Task Force w  cont nue to ho d compan es accountab e for perpetuat ng human r ghts v o at ons n X nj ang, **said the Chair of the Forced Labor Enforcement Task Force, Under Secretary for Policy Robert Silvers**. "The use of forced  abor offends our va ues and undercuts Amer can bus nesses and workers. Forced  abor s now a top t er comp ance  ssue, and bus nesses must know the r supp y cha ns. DHS and the Forced Labor Enforcement Task Force w  cont nue the r v g ant approach to  mp ement ng the Uyghur Forced Labor Prevent on Act.

You can read more about the FLETF by v s t ng: [www.dhs.gov/uf pa (http://www.dhs.gov/uflpa)] .

## Topics

 N ERNA ONA  ENGAGEMEN  (/TOPICS/INTERNATIONAL-ENGAGEMENT)    HUMAN  RA   CK NG (/TOPICS/HUMAN-TRAFFICKING)
 MM GRA  ON AND CUS OMS EN ORCEMEN   (/TOPICS/IMMIGRATION-AND-CUSTOMS-ENFORCEMENT)
 RADE AND ECONOM C SECUR  Y (/TOPICS/TRADE-AND-ECONOMIC-SECURITY)

## Keywords

 CEN ER  OR COUN ER NG HUMAN  RA   CK NG (CCH  ) (/KEYWORDS/CENTER-COUNTERING-HUMAN-TRAFFICKING-CCHT)
 CUS OMS AND BORDER  RO EC  ON (CB ) (/KEYWORDS/CUSTOMS-AND-BORDER-PROTECTION-CBP)    EN ORCEMEN  (/KEYWORDS/ENFORCEMENT)
 ORCED  ABOR (/KEYWORDS/FORCED-LABOR)    HOME  AND SECUR  Y NVES  GA  ONS (HS ) (/KEYWORDS/HOMELAND-SECURITY-INVESTIGATIONS-HSI)
 HUMAN  RA   CK NG (/KEYWORDS/HUMAN-TRAFFICKING)     MM GRA  ON AND CUS OMS EN ORCEMEN  ( CE) (/KEYWORDS/IMMIGRATION-AND-CUSTOMS-ENFORCEMENT-ICE)
 RADE (/KEYWORDS/TRADE)