**IN THE UNITED STATES
COURT OF INTERNATIONAL TRADE**

|  |  |
|---|---|
| NINESTAR CORPORATION, ZHUHAI NINESTAR INFORMATION TECHNOLOGY CO., LTD., ZHUHAI PANTUM ELECTRONICS CO., LTD., ZHUHAI APEX MICROELECTRONICS CO., LTD., GEEHY SEMICONDUCTOR CO., LTD., ZHUHAI G&G DIGITAL TECHNOLOGY CO., LTD., ZHUHAI SEINE PRINTING TECHNOLOGY CO., LTD., and ZHUHAI NINESTAR MANAGEMENT CO., LTD. | |
| *Plaintiffs*, | |
| v. | Case No. 23-182 |
| UNITED STATES OF AMERICA; DEPARTMENT OF HOMELAND SECURITY; UNITED STATES CUSTOMS AND BORDER PROTECTION; FORCED LABOR ENFORCEMENT TASK FORCE; ALEJANDRO MAYORKAS, *in his official capacity as the Secretary of the Department of Homeland Security*; TROY A. MILLER, *in his official capacity as the Senior Official Performing the Duties of the Commissioner for U.S. Customs and Border Protection*; and ROBERT SILVERS, *in his official capacity as Under Secretary for Office of Strategy, Policy, and Plans and Chair of the Forced Labor Enforcement Task Force*, | |
| *Defendants*. | |

**PLAINTIFFS' MOTION FOR JUDGMENT ON THE AGENCY RECORD**

\* Most of the redactions in this document were made at the request of Defendants.

**TABLE OF CONTENTS**

TABLE OF CONTENTS...................................................................................................... i

TABLE OF AUTHORITIES ........................................................................................... iii

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................... 3

    A.    The Uyghur Forced Labor Protection Act ........................................................ 3

    B.    The Listing Decision.......................................................................................... 4

    C.    Procedural Background....................................................................................... 6

    D.    Administrative Record ....................................................................................... 9

RULE 56.1 STATEMENT ............................................................................................... 10

    A.    Administrative Determination To Be Reviewed.............................................. 10

    B.    Issues Presented ............................................................................................... 10

    C.    Summary of Argument ..................................................................................... 10

ARGUMENT ................................................................................................................... 12

    I.    FLETF's Listing Decision is Arbitrary and Capricious Because it is Not
Supported by Substantial Evidence. ...............................................................12

        A.    The determination that Ninestar recruited, transported, harbored, or
received Uyghurs is not supported by substantial evidence. ............................... 13

            1.    [    ]............................................................................................ 14

            2.    The [    ] that there are Uyghurs at Ninestar is unreliable and does
not support a finding that Ninestar is working with the XUAR. ................. 16

            3.    Reports of "poverty alleviation" do not support FLETF's finding............. 18

            4.    [    ]............................................................................................ 19

        B.    The finding that Ninestar has been working with the government of the
XUAR lacks substantial evidence....................................................................... 20

        C.    There is no evidence that Ninestar was presently "working" to recruit
Uyghurs at the time of the listing decision. ........................................................ 22

    II.    FLETF's Listing Decision is Not Supported by an Adequate, Reasoned
Explanation. ....................................................................................................24

        A.    FLETF failed to explain Ninestar's link to the XUAR government.................... 24

        B.    FLETF failed to explain its reliance on stale evidence........................................ 25

        C.    FLETF failed to explain why it found the informant credible............................. 26

III. FLETF Exceeded its Statutory Authority by Applying the Wrong Standard of Proof ............................................................................................................... 26

    A. There is a strong presumption that a preponderance standard applies ................. 27

    B. The nature of the fact finding directed by the UFLPA confirms the preponderance presumption. ............................................................................. 27

    C. The severe consequences of listing confirm that the UFLPA requires a preponderance standard. ...................................................................................... 29

    D. The section 307 regulations point toward a preponderance standard. .................. 30

IV. Vacatur of the Listing Decision is the Appropriate Remedy. ........................................ 33

CONCLUSION ............................................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ad Hoc Shrimp Trade Enf't Comm. v. United States,*
    632 F. Supp. 3d 1369 (Ct. Int'l Trade 2023) .........................................................13

*Addington v. Texas,*
    441 U.S. 418 (1979)............................................................................................37

*Aqua Prods., Inc. v. Matal,*
    872 F.3d 1290 (Fed. Cir. 2017)..........................................................................32

*Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of Fed. Rsrv. Sys.,*
    745 F.2d 677 (D.C. Cir. 1984) ............................................................................13

*Atchison, T. & S.F. Ry. v. United States,*
    284 U.S. 248 (1932)............................................................................................31

*Best Mattresses Int'l Co. v. United States,*
    622 F. Supp. 3d 1347 (Ct. Int'l Trade 2023) .................................................14, 21

*Boyce Motor Lines v. United States,*
    342 U.S. 337 (1952)............................................................................................28

*Carr v. United States,*
    560 U.S. 438 (2010)............................................................................................30

*Chamber of Com. of U.S. v. U.S. Dep't of Lab.,*
    885 F.3d 360 (5th Cir. 2018) ..............................................................................23

*Charlton v. FTC,*
    543 F.2d 903 (D.C. Cir. 1976)............................................................................38

*Circus Circus Casinos, Inc. v. NLRB,*
    961 F.3d 469 (D.C. Cir. 2020)......................................................14, 21, 33, 34

*Commc'ns Workers of Am. Loc. 4123 ex rel. AT&T Servs., Inc. v. Sec'y of Lab.,*
    518 F. Supp. 3d 1342 (Ct. Int'l Trade 2021) .......................................................19

*CS Wind Vietnam Co. v. United States,*
    832 F.3d 1367 (Fed. Cir. 2016)................................................................23, 31, 32

*Data Mktg. P'ship, LP v. U.S. Dep't of Lab.,*
    45 F.4th 846 (5th Cir. 2022) ...............................................................................41

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
140 S. Ct. 1891 (2020) ................................................................33, 41, 42

*Dish Network Corp. v. NLRB*,
953 F.3d 370 (5th Cir. 2020) ......................................................................18

*Elbit Sys. of Am., LLC v. Thales Visionix, Inc.*,
881 F.3d 1354 (Fed. Cir. 2018)..................................................................29

*Erie Brush & Mfg. Corp. v. NLRB*,
700 F.3d 17 (D.C. Cir. 2012) ......................................................................24

*Falko-Gunter Falkner v. Inglis*,
448 F.3d 1357 (Fed. Cir. 2006)............................................................14, 25

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000)......................................................................................34

*Fort Stewart Schs. v. Fed. Lab. Relations Auth.*,
495 U.S. 641 (1990)......................................................................................39

*In re Gartside*,
203 F.3d 1305 (Fed. Cir. 2000)..................................................................13

*In re Google*,
56 F.4th 1363 (Fed. Cir. 2023) ..........................................14, 23, 26, 27

*Husteel Co. v. United States*,
426 F. Supp. 3d 1376 (Ct. Int'l Trade 2020) ............................14, 19, 23

*Ilunga v. Holder*,
777 F.3d 199 (4th Cir. 2015) ......................................................................33

*Intellectual Ventures I LLC v. Motorola Mobility LLC*,
870 F.3d 1320 (Fed. Cir. 2017)..................................................................23

*Invenergy Renewables LLC v. United States*,
552 F. Supp. 3d 1382 (Ct. Int'l Trade 2021) ........................................42

*Larson v. Dep't of the Army*,
260 F.3d 1350 (Fed. Cir. 2001)..................................................................25

*Michigan v. EPA*,
576 U.S. 743 (2015)......................................................................................33

*Miles v. Apex Marine Corp.*,
498 U.S. 19 (1990)........................................................................................40

iv

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ............................................................31, 32, 33

*Nat. Res. Def. Council v. Wheeler*,
    955 F.3d 68 (D.C. Cir. 2020) ..................................................42

*Nat'l Org. of Veterans' Advocates, Inc. v. Sec'y of Veterans Affairs*,
    260 F.3d 1365 (Fed. Cir. 2001)..........................................41, 42

*NEXTEEL Co. v. United States*,
    28 F.4th 1226 (Fed. Cir. 2022) ...........................................14, 31

*Nippon Steel Corp. v. United States*,
    458 F.3d 1345 (Fed. Cir. 2006).......................................14, 25, 29

*In re Nuvasive, Inc.*,
    842 F.3d 1376 (Fed. Cir. 2016)..................................................32

*Pahls v. Thomas*,
    718 F.3d 1210 (10th Cir. 2013) ................................................29

*Rodriguez v. Dep't of Veterans Affairs*,
    8 F.4th 1290 (Fed. Cir. 2021) .........................34, 35, 36, 38, 39

*Rodriguez v. United States*,
    480 U.S. 522 (1987).....................................................................40

*Rothe Dev. Corp. v. Dep't of Def.*,
    545 F.3d 1023 (Fed. Cir. 2008)..................................................28

*Sasol N. Am. Inc. v. NLRB*,
    275 F.3d 1106 (D.C. Cir. 2002) ...........................................19, 21

*In re Section 301 Cases*,
    570 F. Supp. 3d 1306 (Ct. Int'l Trade 2022) ........................42

*Shandong Huarong Mach. Co. v. United States*,
    435 F. Supp. 2d 1261 (Ct. Int'l Trade 2006) ........................27

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
    985 F.3d 1032 (D.C. Cir. 2021) ................................................41

*Terry v. Ohio*,
    392 U.S. 1 (1968)..........................................................................37

*TQ Delta, LLC v. CISCO Sys., Inc.*,
    942 F.3d 1352 (Fed. Cir. 2019)..................................................17

*U.S. Steel Grp. v. United States*,
96 F.3d 1352 (Fed. Cir. 1996) .................................................................18, 19

*United States v. Wilson*,
503 U.S. 329 (1992) ..........................................................................................29

*United Steel v. Mine Safety & Health Admin.*,
925 F.3d 1279 (D.C. Cir. 2019) .......................................................................41

*Van Trinh v. Sec'y of Agric.*,
395 F. Supp. 2d 1259 (Ct. Int'l Trade 2005) ..............................................19, 25

*Zhejiang Mach. Imp. & Exp. Corp. v. United States*,
471 F. Supp. 3d 1313 (Ct. Int'l Trade 2020) ...............................................13, 33

**Statutes and Regulations**

5 U.S.C. § 706...................................................................................................41

5 U.S.C. § 706(2)(C) .........................................................................................34

19 U.S.C. § 1307............................................................................................4, 40

19 U.S.C. § 1673a(a)(2).................................................................................36, 37

19 U.S.C. § 1673b(b)(1)(A).................................................................................37

28 U.S.C. § 1581(i) .............................................................................................8

50 U.S.C. § 4533(g) ...........................................................................................36

UFLPA, Pub. L. No. 117-78, 135 Stat. 1525................................................ *passim*

19 C.F.R. § 12.42(a)–(e) ........................................................................38, 39, 40

19 C.F.R. § 12.42(e)............................................................................................39

19 C.F.R. § 12.42(g).........................................................................................40

65 Fed. Reg. 45,873 (July 26, 2000)..................................................................39

88 Fed. Reg. 38,080 (June 12, 2023)...............................................................6, 11

**Other Authorities**

Business Traveler, *Guangdong–Hong Kong–Macau Greater Bay Area: Megalopolis in the Making* (Nov. 9, 2023), https://www.businesstraveller.com/features/guangdong-hong-kong-macau-greater-bay-area-megalopolis-in-the-making/ ........................................................29

[      ]........................................................................................................................18

Dep't of Homeland Sec., *DHS to Ban Imports* (June 9, 2023), https://www.dhs.gov/news/2023/06/09/dhs-ban-imports-two-additional-prc-based-companies-part-its-enforcement-uyghur ....................................................6

Google Maps, http://tinyurl.com/53w52jwj.....................................................................29

Kristin E. Hickman & Richard J. Pierce, Jr., *Administrative Law Treatise* (7th ed. 2023) ......................................................35

[      ]........................................................................................................................16

[      ]........................................................................................................................18

Min W. et al., *The Special Economic Zones and Innovation: Evidence from China*, 1 China Econ. Q. Int'l 319 (2021)...............................................................29

**INTRODUCTION**

In June 2023, Defendants announced the addition of the Plaintiff Ninestar Companies (collectively, Ninestar) to a list of entities accused of working with the government of the Xinjiang Uyghur Autonomous Region (XUAR) to recruit, traffic, and harbor Uyghur laborers out of Xinjiang. Defendants made this listing without any public notice, comment, hearing, or investigation, and without any notice to or inquiry from Ninestar. The result of this listing—which Ninestar learned of only when it was published without explanation in the Federal Register—was the immediate and complete embargo of all Ninestar goods from the United States. The only recourse Defendants offered Ninestar was to appear before Defendants and to prove, [     ] that Ninestar did not meet the bases on which it was added to the list, but *without* learning the particulars of *why* Ninestar had been listed in the first place. Underwhelmed with that option, Ninestar instead filed this suit under the Administrative Procedure Act. Now, after months of litigation, and after repeated efforts to pry loose the Administrative Record, Ninestar understands the bases for and fundamental infirmities of the Government's Listing Decision.

In the Administrative Record, as in prior briefing in this case, Defendants assert that the listing decision finds support in Ninestar documents, PRC documents, and media publications. That is simply not true. Reviewing the Administrative Record, no [     ] states that Ninestar recruited Uyghur laborers from Xinjiang (or anywhere else) or worked with the XUAR government to do any of the things required for this listing. Nor [     ] say those things. Rather, these materials document [     ]. None of this is illegal, and none of this satisfies the requirements for the Listing Decision.

To make that connection, the Government relies heavily on the uncorroborated and redacted reports [     ] reported that [     ], Ninestar employed [     ] Uyghur laborers from

1

Xinjiang at its facilities in Zhuhai.  In making that accusation, [     ]  DHS too warmly embraced [     ] In failing to properly [     ] instead accepting unquestioningly [     ], FLETF blinded itself to obvious questions regarding [     ] and other shortcomings in the Administrative Record.  Rejecting the possibility of [     ] at Ninestar, FLETF instead set out to interpret the balance of the evidence to fit its preconceived narrative, [     ].

In fact, no credible evidence in the Administrative Record documents Ninestar working with the XUAR to do anything, not in the least trafficking protected minorities.  Defendants do not claim that Ninestar worked with the XUAR directly, but rather through an unnamed "third party" [     ] Yet the record nowhere documents this third party's relationship with Ninestar, the workers, or the XUAR, provides no evidence of the "third party" working with the XUAR, and provides no basis for attributing any such efforts to Ninestar.  [     ]  Rather, the record refers obliquely a shady "third party," but nowhere explains how it is "working with" the XUAR or how that is attributable to Ninestar.

To bolster its lack of evidence—including no evidence of any relevant conduct post-2021 and the informant's own statement that [     ]—FLETF packed the record with materials that long predate enactment of the UFLPA.  Moreover, FLETF accuses Ninestar of having [     ] As briefed previously, and as the Government did not contest, the UFLPA does not apply retroactively; that is, it does not ascribe new legal consequences to actions that predated its enactment.  The Government now contends that FLETF simply relied on pre-enactment evidence to support post-enactment conduct.  Yet the record neither sets forth that discussion, nor includes any evidence to support it.  Defendants cannot now fix these factual and legal shortcomings in their deliberations.

Lastly, to glue its weak and stale evidence together, FLETF applied to its record a standard of proof used in American law only for preliminary investigations or in response to express Congressional directives, the [    ] standard.  Nothing in the UFLPA supports FLETF's *sua sponte* adoption of this meager standard, or sets aside the strong and longstanding legal presumption that agency factfinding and adjudications require at least a preponderance of the evidence.  Indeed, given the grave circumstances that flow automatically from a listing decision, and the challengingly high burden for delisting [    ] it would be shocking for so low an evidentiary standard to obtain.

The Administrative Procedure Act governs how agencies make decisions and how those decision are communicated to the governed.  Decisions must be made based on substantial evidence, consistent with an agency's legal mandate, and must be delivered with a reasoned explanation.  Because in listing Ninestar FLETF violated each of these principles, this unlawful agency action should be vacated and set aside.

## BACKGROUND

### A.      The Uyghur Forced Labor Protection Act

The Uyghur Forced Labor Prevention Act (UFLPA) became law in December 2021. Pub. L. No. 117-78, 135 Stat. 1525.  The UFLPA built on the enforcement framework of section 307 of the Tariff Act of 1930, which bars importation of all "goods, wares, articles, and merchandise mined, produced, or manufactured wholly or in part in any foreign country by convict labor or/and forced labor or/and indentured labor under penal sanctions."  19 U.S.C. § 1307.  The UFLPA tasks the Forced Labor Enforcement Task Force[1] with "develop[ing] a

---

[1] FLETF is chaired by the DHS Secretary and includes representatives from six other agencies: the Office of the United States Trade Representative and the Departments of State,

strategy for supporting enforcement of Section 307 of the Tariff Act of 1930 (19 U.S.C. 1307) to prevent the importation into the United States of goods mined, produced, or manufactured wholly or in part with forced labor in the People's Republic of China." UFLPA § 2(c). "As part of that strategy, the FLETF must create and update four statutory sub-lists." Slip Op. 23-169, ECF No. 58, at 6. As relevant here, the UFLPA directs FLETF to create and regularly update "a list of entities working with the government of the Xinjiang Uyghur Autonomous Region to recruit, transport, transfer, harbor or receive forced labor or Uyghurs, Kazakhs, Kyrgyz, or members of other persecuted groups out of the Xinjiang Uyghur Autonomous Region." UFLPA § 2(d)(2)(B)(ii).

As to any entity placed on one of these lists, CBP must presume that any goods, wares, articles, or merchandise produced by that entity were manufactured by forced labor in violation of section 307 and "are not entitled to entry at any of the ports of the United States." UFLPA § 3(a). Under the UFLPA, a listed entity can rebut this presumption on an entry-by-entry basis only, and even then only by proving to CBP with "clear and convincing evidence" that the "good, ware, article, or merchandise was not mined, produced, or manufactured wholly or in part by forced labor" *and also* proving to the satisfaction of the Commissioner that the importer of record has fully complied with FLETF supply chain guidance and cooperated fully with the Commissioner's informational requests. UFLPA § 3(b).

B.      The Listing Decision

Ninestar Corporation, based in the southern coastal city of Zhuhai, China, is the world's fourth largest developer and manufacturer of printers and printer-related goods. Ninestar and its

Treasury, Justice, Labor, and Commerce. The DHS Secretary delegated his authority as chair of FLETF to the Under Secretary for Office of Strategy, Policy, and Plans.

subsidiaries are in the business of developing, manufacturing, and selling printers, printer consumables, and integrated circuit chips to customers around the globe, and support those same activities. ECF No. 20-1 ¶ 5.

Ninestar's United States customer base is particularly strong. In past years, Ninestar companies exported [     ] of crates of products to the United States. Id. at ¶ 6. Those products are sold to both wholesalers who interface with printing customers and equipment manufacturers who integrate the components produced by Ninestar into their own products. U.S.-based customers have ordered [     ] of dollars' worth of Ninestar companies' products in the past years. Id. And for many years, Ninestar had very few issues exporting its products to the United States. Id. ¶8.

But on June 9, 2023, DHS announced the addition of Ninestar and "eight of its Zhuhai-based subsidiaries" to the UFLPA Entity List. Dep't of Homeland Sec., DHS to Ban Imports (June 9, 2023).[2] That decision followed sustained political pressure demanding that Defendants add more names to the Entity List. See ECF No. 48 Exs. 4–11. FLETF's decision took effect three days later upon publication of an updated UFLPA Entity List in the Federal Register. Notice Regarding the Uyghur Forced Labor Prevention Act Entity List, 88 Fed. Reg. 38,080, 38,082 (June 12, 2023). CBP must now presume that any goods associated with the listed Ninestar entities are prohibited from importation under section 307 as the product of forced labor.[3]

---

[2]   *See*   https://www.dhs.gov/news/2023/06/09/dhs-ban-imports-two-additional-prc-based-companies-part-its-enforcement-uyghur. One of the listed entities, Zhuhai Pu-Tech Industrial Co., Ltd., is not in fact affiliated with Ninestar Corporation.

[3] One of the curious features of the UFLPA is that for some parties it imposes an embargo based on conduct other than they are actually accused of. Here, Ninestar is accused of "working with"

FLETF did not explain the basis for the Listing Decision publicly or to Ninestar. The Federal Register publication stated simply that Ninestar had been added to list of entities "working with the government of Xinjiang to recruit, transport, transfer, harbor or receive forced labor or Uyghurs, Kazakhs, Kyrgyz, or members of other persecuted groups out of Xinjiang." Id. The Notice did not elaborate on how FLETF reached that conclusion, and Ninestar learned of the listing decision at the same time as everyone else.

## C.     Procedural Background

The Listing Decision's impact on Ninestar's business was immediate and catastrophic—barring all Ninestar products from entry into the United States, smearing Ninestar's reputation globally, and freezing Ninestar's business with other Chinese manufacturers, who feared that incorporation of Ninestar-made products would render their merchandise subject to the same embargo. ECF No. 20-1 ¶¶ 10, 15, 20–21, 42.

Ninestar had no meaningful administrative recourse. The UFLPA allows a listed entity to rebut the embargo on a shipment-by-shipment basis by, *inter alia*, demonstrating, to the satisfaction of Customs, that there is "clear and convincing evidence, that the good, ware, article, or merchandise was not mined, produced, or manufactured wholly or in part by forced labor." UFLPA § 3(b)(2). And while FLETF announced an administrative process for considering petitions for delisting, that process was—and to the public, remains—opaque. As it turns out, to secure delisting, [     ] AR221. In other words, [     ]. And at no point does FLETF make any provision for informing listed entities, including petitioners for delisting, the factual bases for the listing. *See generally* AR220–28.

---

the XUAR government to recruit, transport, or harbor Uyghurs, yet its goods are excluded on the presumption that Ninestar manufactures goods with forced labor.

Faced with the prospect of trying to prove a negative by clear and convincing evidence without knowing why it was listed in the first place; seeking delisting through an opaque, undefined, and open-ended agency process; or suing under the Administrative Procedure Act to vacate the Listing Decision as unlawful agency action, Ninestar chose the latter course.

On August 22, 2023, Ninestar filed its original complaint. The Complaint asserted a single claim: that FLETF's decision to add Ninestar to the UFLPA Entity List was arbitrary and capricious because it failed to articulate any explanation, let alone a reasoned one, for its decision. ECF No. 8 ¶¶ 57–62. The Complaint also noted that, once the Government filed the Administrative Record, Ninestar may add claims based on the record's contents. *Id.* ¶ 46. Ninestar simultaneously sought a preliminary injunction prohibiting the Government from enforcing the Listing Decision during the pendency of this case. *See* ECF No. 9.

In response, the Government requested a 41-day extension of time to respond, invoking the burden of gathering and reviewing the Administrative Record from FLETF's seven member agencies. ECF No. 21 at 7–8. The Court recognized that the "APA requires the court to 'review the whole record and those parts of it cited by a party' when evaluating agency action," and directed the Government to produce the Administrative Record by October 3, 2023. ECF No. 23 at 2 (quoting 5 U.S.C. § 706). The Government's filings on October 3 failed to provide the Court with the unredacted Administrative Record in full or to provide the required description for any information deemed confidential. Instead, the so-called Public Administrative Record comprised a 2-page index and 229 pages of materials, of which 23 pages were unredacted (including 17 exhibit cover pages), 9 were partially (albeit mostly) redacted, and 199 were

entirely redacted.  ECF No. 33 at 4.[4]  The contemporaneously-filed confidential record contained only [     ] ECF No. 25-1.

Following motions practice and an order from the Court, *see* ECF Nos. 33, 39, the Government filed an amended confidential Administrative Record, which allowed Ninestar's counsel, but not Ninestar, to view more of the Government's evidence.  *See* ECF No. 41; *see also* ECF No. 42 (privilege log).  To date, Plaintiffs themselves have viewed only approximately 20 percent of the record, and Plaintiffs' counsel's access also remains restricted.

Once provided with most of the Administrative Record, Ninestar's counsel were able to identify additional legal infirmities in the Listing Decision.  With the Court's leave, Ninestar amended the Complaint to include three additional counts: (1) that the Listing Decision is arbitrary and capricious because it is not supported by substantial evidence; (2) that the Listing Decision exceeded FLETF's statutory authority because FLETF applied a standard of proof lower than the statutorily required preponderance of the evidence standard; and (3) that the Listing Decision exceeded FLETF's statutory authority insofar as it applied the UFLPA retroactively.  ECF No. 71.  The parties filed supplemental preliminary injunction briefing on these additional grounds.  *See* ECF Nos. 78, 82, 88.  The Court held a hearing on that motion on January 18, 2024, which remains pending.

---

[4] The Government also opposed the preliminary injunction motion and moved to dismiss the complaint on several bases, including that this Court lacked subject-matter jurisdiction under 28 U.S.C. § 1581(i).  ECF No. 24.  This Court has already rejected those jurisdictional arguments, concluding "that Plaintiffs are likely to establish subject matter jurisdiction because the UFLPA is a law providing for embargoes within the meaning of 28 U.S.C. § 1581(i)."  Slip Op. 23-169 at 13.  On December 8, 2023, this Court denied the remainder of the motion to dismiss as moot.  ECF No. 77 at 2.  The Government has not renewed its motion.

### D. Administrative Record

While we discuss the Administrative Record in detail below, *see infra* § I, a brief summary sets the stage.  The Administrative Record opens with a partially redacted two-page memorandum from DHS to the seven FLETF member agencies, dated May 24, 2023, documenting FLETF's listing of Ninestar.  Specifically, on March 3, 2023, DHS had circulated to FLETF "Entity List Package 23-002," which proposed listing Ninestar and eight purported subsidiaries as entities that "ha[ve] worked with the government of the Xinjiang Uyghur Autonomous Region through a third-party agency to recruit, transport, transfer, and receive Uyghur laborers out of the Xinjiang Uyghur Autonomous Region to work in its manufacturing facilities in the city of Zhuhai, located in Guangdong Province."  AR1.  With the exception of the [      ].  AR1–2.

The balance of the Administrative Record comprises that "Package 23-002," plus a few DHS memoranda and presentations summarizing the allegations against Ninestar.  The Package begins with a cover memorandum that restates the statutory standard and asserts that DHS's recommendation relies on a confidential informant, PRC government documents, Ninestar's corporate documents, and PRC state media reports.  AR6.  But the actual documents reveal DHS's descriptions to be exaggerated.  The "corporate documents" DHS refers to are just [      ] Similarly, the news reports or PRC documents merely [      ]  DHS also included background on [      ]

The remainder of the Administrative Record consists of: [      ]

# RULE 56.1 STATEMENT

## A.    Administrative Determination To Be Reviewed

This case challenges portions of *Notice Regarding the Uyghur Forced Labor Prevention Act Entity List*, 88 Fed. Reg. 38,080, 38,082 (June 12, 2023) (the "Listing Decision"), specifically the addition of "Ninestar Corporation and its eight Zhuhai-based subsidiaries, which include Zhuhai Ninestar Information Technology Co. Ltd., Zhuhai Pantum Electronics Co. Ltd., Zhuhai Apex Microelectronics Co., Ltd., Geehy Semiconductor Co., Ltd., Zhuhai Pu-Tech Industrial Co., Ltd., Zhuhai G&G Digital Technology Co., Ltd., Zhuhai Seine Printing Technology Co., Ltd., and Zhuhai Ninestar Management Co., Ltd." to the Uyghur Force Labor Protection Act Section 2(d)(2)(B)(ii) List.

## B.    Issues Presented

(1)    Is the Listing Decision arbitrary and capricious because it is not supported by substantial evidence?

(2)    Did FLETF exceed its statutory authority by listing Ninestar based solely on conduct that occurred prior to the effective date of the UFLPA?

(3)    Did FLETF exceed its statutory authority by listing Ninestar based solely on a [    ] standard?

(4)    Is the Listing Decision arbitrary and capricious because it is not supported by an adequate, reasoned explanation?

## C.    Summary of Argument

The Listing Decision is unlawful and should be vacated for any of four independent reasons.

**I.**    FLETF's decision is not supported by substantial evidence.   Three critical factual findings lack sufficient evidentiary support:  *First*, the finding that Ninestar employs Uyghurs at all rests on misleading evidence about [    ]; an unreliable [    ]; unsupportable inferences about "poverty alleviation" efforts; and irrelevant assertions about [    ].  *Second*, the finding

10

that Ninestar was working with the XUAR government to recruit Uyghurs turns on linking Ninestar to an unspecified [     ] and in turn to the Xinjiang government, but both of those links lack record support.  And *third*, to the extent FLETF found that Ninestar was "working" with the XUAR government at the time of the Listing Decision, the years-old evidence in the administrative record, especially when read in light of the intervening COVID-19 pandemic, cannot support that finding.

**II.**  FLETF's justification for the listing decision fails to supply the adequate, reasoned explanation required by the APA.  FLETF failed to explain the link between Ninestar and the Xinjiang government; how it concluded that Ninestar was presently cooperating with the Xinjiang government; and why it found the confidential informant credible.  Those unexplained leaps were critical to FLETF's decision, and they cannot now be papered over with post hoc justifications.

**III.**  To overcome its evidentiary shortfalls, FLETF exceeded its statutory authority by listing Ninestar based on a mere [     ] that Ninestar satisfied the listing criteria, rather than based on the statutorily required preponderance of the evidence.  There is a strong presumption that for an agency to take action against an individual based on predicate factual findings, it must find that those facts more likely than not exist.  The UFLPA nowhere explicitly or implicitly displaces this presumptive standard.  To the contrary, the specific nature of the facts on which listing is predicated and the serious, nearly irreversible consequences of listing, strongly reinforce that a preponderance standard applies.  That standard is consistent with both the section 307 enforcement regime and the UFLPA's purpose to strengthen section 307.

**IV.**  The proper remedy for FLETF's unlawful action is vacatur of the Listing Decision.  Vacatur is the usual remedy in APA cases.  Remand without vacatur is appropriate only in the

rare circumstances where the agency will likely be able to correct its errors on remand and vacatur would disrupt an important regulatory regime. Neither is the case here. FLETF is unlikely to overcome the significant evidentiary and legal flaws in its decision, particularly because the *Chenery* doctrine prohibits FLETF from offering new justifications on remand. Vacatur would also affect only the two parties before the Court and therefore have no disruptive consequences of the sort that justify remand without vacatur. The Court should vacate the Listing Decision.

**ARGUMENT**

**I.    FLETF's Listing Decision is Arbitrary and Capricious Because it is Not Supported by Substantial Evidence.**

Agency adjudications are arbitrary and capricious when not supported by substantial evidence. *See In re Gartside*, 203 F.3d 1305, 1315 (Fed. Cir. 2000); *Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 745 F.2d 677, 683–84 (D.C. Cir. 1984) (Scalia, J.); *accord Ad Hoc Shrimp Trade Enf't Comm. v. United States*, 632 F. Supp. 3d 1369, 1374 (Ct. Int'l Trade 2023). Substantial evidence supports an agency's determination only if "a reasonable mind might accept the evidence as sufficient to support the finding." *Zhejiang Mach. Imp. & Exp. Corp. v. United States*, 471 F. Supp. 3d 1313, 1326 (Ct. Int'l Trade 2020) (citation omitted). The evidence "must do more than create a suspicion" that the facts necessary to the determination exist. *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006). The reviewing court must examine the entire record, accounting for "both the evidence that justifies and detracts from an agency's opinion." *Falko-Gunter Falkner v. Inglis*, 448 F.3d 1357, 1363 (Fed. Cir. 2006); *see also Best Mattresses Int'l Co. v. United States*, 622 F. Supp. 3d 1347, 1369 (Ct. Int'l Trade 2023). Indeed, if an agency entirely "failed to consider contradictory evidence," its "determination is not supported by substantial evidence." *Husteel Co. v. United*

12

*States*, 426 F. Supp. 3d 1376, 1393 (Ct. Int'l Trade 2020), *aff'd sub nom. Hyundai Steel Co. v. United States*, 19 F.4th 1346 (Fed. Cir. 2021).

An agency finding that rests "explicitly on a mistaken notion," *Circus Circus Casinos, Inc. v. NLRB*, 961 F.3d 469, 485 (D.C. Cir. 2020) (citation omitted), or on "unsupported assertion[s]," *In re Google*, 56 F.4th 1363, 1369 (Fed. Cir. 2023), is not supported by substantial evidence. Nor does an agency's naked assertion that a "fact or principle is well-known" satisfy the standard. *Id.* at 1368. And crucially, an agency determination lacks substantial evidence when it relies on "mer[e] speculat[ion]." *NEXTEEL Co. v. United States*, 28 F.4th 1226, 1236 (Fed. Cir. 2022).

FLETF's listing decision can be upheld only if the Administrative Record contains substantial evidence to support a finding that, at the time of the listing decision, Ninestar was (1) working, (2) with the XUAR government, (3) to recruit, transport, harbor, or receive (4) forced labor or Uyghurs (or other persecuted groups) (5) out of the XUAR. UFLPA § 2(d)(2)(B)(ii). FLETF's decision falls short in three ways. *First*, the administrative record does not supply a reasonable basis for concluding that Ninestar "recruits, transports, transfers, and receives Uyghur laborers out of the XUAR." *Second*, the administrative record does not substantiate the accusation that Ninestar has worked with the *government* of the XUAR. And *third*, the stale administrative record does not support the finding that Ninestar was presently *working* with the XUAR government at the time of the listing decision.

A. **The determination that Ninestar recruited, transported, harbored, or received Uyghurs is not supported by substantial evidence.**

To support the necessary finding that Ninestar trafficked Uyghurs from Xinjiang to Ninestar facilities 3,000 miles away in Zhuhai, the Government points to [      ], company reports, Ninestar's participation in "poverty alleviation" efforts, and the alleged presence of

[      ].   This evidence is not substantial.   Rather, it succumbs to textbook fatal shortcomings: unsupported assumptions, *ipse dixit* assertions, factual inaccuracies, and ignoring contradictory evidence.

## 1.     FLETF's evidence of a [      ] is incomplete and incorrect.

The Government's case rests at core on the [      ] insistence that [      ] Ninestar employed Uyghur laborers at its Zhuhai facilities.   No other evidence—not PRC documents, media reports, or Ninestar records—corroborates that claim.   At first, the [      ] FLETF for its part asserted that [      ]

[      ] relied extensively on its representation that [      ] Indeed, this purported [      ]. FLETF too placed great weight on this [      ], which it asserts [      ] Notably, FLETF accepted [      ] DHS asserted, and FLETF accepted without question, that the [      ] In a footnote, DHS rejected out of hand an alternative [      ] DHS asserts, without support or corroboration, that [      ]

Only by rejecting [      ] could FLETF conclude that [      ] must be Uyghurs from Xinjiang, and credit the [      ] as supporting the allegation that there were Uyghurs at Ninestar. This is because [      ] refers to a different ethnic group, many of whom are Muslim, but that also shares "many cultural traditions and languages with Han Chinese," so a [      ].   [      ] do not generally hail from the XUAR and are not one of the persecuted ethnic groups identified in the UFLPA.[5]  The presence of [      ] would fundamentally call in question the [      ] of [      ], and all of the assumptions and conclusions that follow therefrom.   Given the consequential nature of [      ], one would expect DHS to have cited some source or have included in the Administrative Record an [      ]  It did not.   Rather, the Government simply asserted, without

---

[5] [      ]

14

explanation or support, that [      ].  That kind of *ipse dixit* does not contribute to substantial evidence.  *TQ Delta, LLC v. CISCO Sys., Inc.*, 942 F.3d 1352, 1362 (Fed. Cir. 2019).

FLETF's handling of this issue was sloppy at best and willfully ignorant at worst.  Unlike the Government, we (Ninestar's counsel) did [      ]  And, upon further inquiry, [      ]  In performing its duties under the UFLPA and the APA, Defendants should have done the same, providing some support for their *ipse dixit* assertion about [      ]  Accordingly, the presence of[6] [      ]—cannot contribute to substantial evidence because it rests on an "unsound factual foundation."  *Dish Network Corp. v. NLRB*, 953 F.3d 370, 376 (5th Cir. 2020); *see also U.S. Steel Grp. v. United States*, 96 F.3d 1352, 1357, 1363 (Fed. Cir. 1996) (excluding factually unsupported "subsidiary finding" from the "substantial evidence calculus").

FLETF's lack of curiosity did not stop there.  If the Court examines [      ] the Court will note additional [      ]  *See also* Mot. to Complete or Supplement the AR at 8–9, Ex. B.  First, there is [      ]  Had Defendants investigated [      ] they would have learned that [      ]

Additionally, in [      ]  For the Court's convenience, our Motion to Correct or Supplement the Record includes [      ][7]  This [      ] casts yet more doubt on FLETF's translation.  As FLETF itself notes, [      ] AR7.  It would be passing strange to [      ]

FLETF never "grapple[d] with" these contradictions.  *See Commc'ns Workers of Am. Loc. 4123 ex rel. AT&T Servs., Inc. v. U.S. Sec'y of Lab.*, 518 F. Supp. 3d 1342, 1356 (Ct. Int'l

---

[6] Ninestar's [      ] by itself says nothing about whether Ninestar cooperated by itself says nothing about whether Ninestar cooperated with the XUAR government to accomplish labor transfers, or whether the workers in question belonged to persecuted groups transferred out of the XUAR.  UFLPA § 2(d)(2)(B)(ii).  Indeed, [      ] are ubiquitous in China.  Most Chinese universities, for example offer [      ].  *See, e.g.*, [      ]

[7] The [      ] either [      ].  *See* AR204 [      ].  To avoid inadvertently disclosing the contents of the confidential record, we obtained [      ]

15

Trade 2021).  Certainly, DHS told its FLETF cohorts that [      ]  *See* AR7.  DHS thus drew the wrong comparison and swept [      ] under the proverbial rug.  This "fail[ure] to consider contradictory evidence" renders FLETF's [      ] and everything that follows from it "not supported by substantial evidence."  *Husteel*, 426 F. Supp. 3d at 1393; *see also Van Trinh v. Sec'y of Agric.*, 395 F. Supp. 2d 1259, 1274 (Ct. Int'l Trade 2005) ("The developed record must evince substantial evidence to confirm or refute relevant issues encountered during the course of the investigation … .").

In the final analysis, the [      ] and all of [      ] and FLETF's suppositions that followed from it do not constitute substantial evidence because they all "res[t] explicitly on a mistaken notion."  *Sasol N. Am. Inc. v. NLRB*, 275 F.3d 1106, 1112–13 (D.C. Cir. 2002).  Indeed, the [      ] casts substantial doubt on the informant's claims.  As noted, the informant relied on [      ]  The informant asserted that [      ]  The informant then [      ]  If the informant's information was incorrect—[      ]—the informant's many assumptions based thereupon are also suspect.  *See* AR203 [      ].  FLETF unquestioningly credited the informant's reports about [      ], ignoring the contradictions on their face and taking no action to verify the informant's [      ] or other details.  FLETF was obliged by law to do more, but it did not.  [      ] does not support FLETF's finding that there were Uyghurs at Ninestar.

### 2. The [      ] that there are Uyghurs at Ninestar is unreliable and does not support a finding that Ninestar is working with the XUAR.

FLETF relies heavily on the [      ] that there are Uyghurs at Ninestar's facilities.  *See* AR6, 8. But shorn of [      ], the [      ] has little credibility in light of other inconsistencies and unexplained logical leaps in his or her story.

16

Start with [      ] that there were Uyghurs at Ninestar.  Initially, [      ]  Yet, in subsequent [      ].[8]

Consider next the [      ] of [      ] all stem from the flawed premise that [      ]; but even crediting the premise, the [      ] alone casts doubt on the [      ], *see Circus Circus*, 961 F.3d at 484 (witness not credible if testimony is "self-contradictory").

The [      ] dubious [      ] infects other parts of FLETF's case.  For one thing, FLETF elsewhere concludes that Ninestar must have worked with the XUAR government [      ].  Not only did FLETF assume that [      ], but it also seems to have never investigated [      ].  *See Best Mattresses*, 622 F. Supp. 3d at 1369 (substantial evidence must "account for 'contradictory evidence or evidence from which conflicting inferences could be drawn'" (citation omitted)).  For another, FLETF ignored entirely the [      ].  Even if there had been [      ] only highlights the staleness of FLETF's evidence, *see infra* § I.C.[9]  In fact, [      ].

At bottom, FLETF relies on [      ]  But nothing in the Administrative Record substantiates that sweeping claim, and even if it did, nothing in the Administrative Record ties Ninestar to "working with" the XUAR to [      ].  To the contrary, lacking such evidence the Government argues instead that Ninestar [      ]  This sort of transitive property reasoning proves too much, and indeed by the Government's own accounting [      ]  Finding cooperation with [      ] is not enough; the UFLPA specifically requires a finding of "working with the

---

[8] [      ], the [      ] that [      ]  That finding lacks any support in the record and, indeed, is contradicted by [      ].  And, had FLETF stopped to ask Ninestar, it would have learned that [      ]  *See* Mot. to Complete or Supplement the AR at 12–13, Ex. D.  This is all, of course, currently outside the record, because FLETF did not investigate beyond its own preconceived narrative.

[9] To be sure, DHS relies on the [      ].  None of this meets the required factual predicates for the Listing Decision.

government *of the Xinjiang Uyghur Autonomous Region.*"  UFLPA § 2(d)(2)(B)(ii) (emphasis added).  FLETF's evidence does not support that finding.

### 3. Reports of "poverty alleviation" do not support FLETF's finding.

FLETF also asserts that Ninestar's participation in poverty alleviation programs confirms its participating in human trafficking from Xinjiang.  As FLETF's own documents acknowledge, and as counsel for the Government admitted during argument on the preliminary injunction motion, poverty alleviation programs are not synonymous with trafficking workers from Xinjiang.  To the contrary, as documented in [      ] included in the Record (and as also documented in many [      ] did not include in the Administrative Record), Ninestar's poverty alleviation activities include [      ]  FLETF ignored this evidence that undercut its favored definition of "poverty alleviation," *see Husteel*, 426 F. Supp. 3d at 1393, and instead—by agency "fiat," *Chamber of Com. of U.S. v. U.S. Dep't of Lab.*, 885 F.3d 360, 382 (5th Cir. 2018)—found that Ninestar's "poverty alleviation" efforts [      ].  FLETF's bald assertion "is not evidentiary support." *In re Google*, 56 F.4th at 1368.  To the extent FLETF was relying on its "expertise and experience," it failed to explain—as it must—how that experience led to its conclusion "in th[is] particular matter." *CS Wind Vietnam Co. v. United States*, 832 F.3d 1367, 1377 (Fed. Cir. 2016).

Even for the evidence that Ninestar's poverty alleviation efforts [      ], FLETF's conclusion that those workers were Uyghurs from Xinjiang is sheer speculation unsupported by the record. *Intell. Ventures I LLC v. Motorola Mobility LLC*, 870 F.3d 1320, 1331 (Fed. Cir. 2017).  [      ] poverty alleviation programs are not geographically limited to Xinjiang.  [      ] But an agency's "'[y]ou never know' is no substitute for substantial evidence." *Erie Brush & Mfg. Corp. v. NLRB*, 700 F.3d 17, 23 (D.C. Cir. 2012).

18

If anything, the evidence in the record *rebuts* FLETF's speculation. According to the record, [    ] FLETF's response is to allege that [      ][10] FLETF ignores at least three explanations more plausible than its [    ] theory: [    ]. FLETF did nothing to explore, let alone "refute" these plausible explanations, *Van Trinh*, 395 F. Supp. 2d at 1274, opting instead to focus only on the speculative explanation that "justifies … [its] opinion." *Falko-Gunter*, 448 F.3d at 1363. That is not substantial evidence. *Id.*

In the final analysis, counsel for the Government's admitted at preliminary injunction hearing that "poverty alleviation programs" [    ] And, even then, not all labor transfer is from Xinjiang or involves protected minorities. The Administrative Record is bereft of any evidence identifying the specific poverty alleviation programs Ninestar participated in, or documenting that any of them involved forced labor transfers. FLETF's commentaries on poverty alleviation programs do not, therefore, contribute to substantial evidence. *See Larson v. Dep't of the Army*, 260 F.3d 1350, 1354, 1356 (Fed. Cir. 2001) (no substantial evidence where administrative law judge made an "incorrect assumption" that caused the judge to "discount" other evidence).

### 4. Evidence of [    ] does not support FLETF's decision.

Apart from the [    ] dubious representations, the balance of FLETF's evidence about Uyghurs simply does not relate to Ninestar. FLETF relies extensively on the representation that [    ] But FLETF's evidence of Uyghurs [    ]—is simultaneously unsurprising and irrelevant to whether Ninestar is working with the XUAR government to recruit, transfer, or

---

[10] The Government's arguments based on [    ] is also difficult to address because FLETF did not include them in the Administrative Record. Those reports, which are published in Chinese, are available on the internet. DHS included [    ]. Yet, DHS omitted them from the record circulated to FLETF. Had they been included, they would have supplied yet more evidence as to what "poverty alleviation programs" Ninestar actually participates in—i.e., not forced labor transfers.

harbor such laborers itself. Substantial evidence must create more than mere "suspicion of the existence of the fact to be established." *Nippon Steel Corp.*, 458 F.3d at 1351 (citation omitted). The [        ] does not even create the suspicion that [        ].

**B.      The finding that Ninestar has been working with the government of the XUAR lacks substantial evidence.**

The listing decision is not supported by substantial evidence showing that Ninestar has been "working with the government of the Xinjiang Uyghur Autonomous Region." UFLPA § 2(d)(2)(B)(ii). In the first place, FLETF does not even assert that Ninestar has worked directly with the XUAR government. Rather, FLETF merely concluded that "Ninestar has worked with the government of the Xinjiang Uyghur Autonomous Region *through a third-party agency.*" AR1. Even assuming that using an intermediary agency satisfies the requirements of the UFLPA, *but see infra* § II.A, FLETF lacks substantial evidence showing that Ninestar worked with an agency that worked with the XUAR government.

Begin with the link between Ninestar and this [        ] which rests entirely [        ]. AR6. How could [      ] know [        ]? The record does not say. It was not, apparently, from [        ]. *See supra* § I.A.1. Indeed, if [        ] ever shared the identity of the supposed [        ], it is not in the record made available to counsel. Nor does [        ] share any information about the nature of that [        ], which it elsewhere calls just a [        ]. FLETF simply trusted the [        ]. *See Google*, 56 F.4th at 1369 (noting "unsupported assertion[s]" do not contribute to substantial evidence).

More to the point, [        ] clearly lacks knowledge as to whether the alleged [        ] agency worked with the government of the XUAR province—a requirement under the statute. [        ] describes the [        ] agency as having itself [        ]. There is no mention of the XUAR government in [        ] of the agency's actions. To the contrary, [        ] that [        ] which is not

20

probative of the XUAR government's involvement. [     ] FLETF never asks. "[C]onclusory determinations" like FLETF's "cannot be said to be supported by substantial evidence." *Shandong Huarong Mach. Co. v. United States*, 435 F. Supp. 2d 1261, 1288 (Ct. Int'l Trade 2006).

Instead, FLETF appears to have made the longest of inferential leaps to conclude that the XUAR government was involved with Ninestar.

*First*, the government posits that Ninestar must have worked with the XUAR government because [     ] FLETF's inference of government involvement lacks its stated basis. If, say, [     ], a group not from the XUAR, even [     ] could not support the conclusion of the XUAR government's involvement.

Moreover, FLETF did not cite a single report, article, or other evidence for its proposition that [     ] Such an "unsupported assertion cannot provide substantial evidence supporting [the agency's] decision." *Google*, 56 F.4th at 1369. FLETF instead assumes that [     ]. Setting aside FLETF's failure to show that there were indeed [     ], there are good reasons to question FLETF's assumption, which again is not supported by a single citation. While there can be no doubt that the Chinese economy still resembles a command economy in many ways, it does not necessarily follow that [     ]. Nor is there any evidence to support that [     ]

*Second*, FLETF fixated on the existence of an [     ] To be clear, Zhuhai is a city of more than two million people, and the Xiangzhou district is its economic center or downtown. *See Rothe Dev. Corp. v. Dep't of Def.*, 545 F.3d 1023, 1045 (Fed. Cir. 2008) (taking judicial notice of widely available population figures); *cf. Boyce Motor Lines v. United States*, 342 U.S. 337, 344 (1952) ("We may, of course, take judicial notice of geography.") (Jackson, J.,

21

dissenting).  [      ] is like saying that Tony Soprano and Prudential must be in business together because [      ].  FLETF's logic would implicate every business in Zhuhai.

FLETF doubles down and claims that [      ]  But Zhuhai, a city the size of Houston, was one of China's earliest Special Economic Zones during the era of Deng Xiaoping's reforms.  *See* Min W et al., *The Special Economic Zones and Innovation: Evidence from China*, 1 China Econ. Q. Int'l, 319, 320 (2021).  Zhuhai is now a fully integrated part of the Guangdong–Hong Kong– Macau Greater Bay Area ("GBA"), China's Silicon Valley with 86 million inhabitants.  *See* Business Traveler, *Guangdong–Hong Kong–Macau Greater Bay Area: Megalopolis in the Making* (Nov. 9, 2023), https://www.businesstraveller.com/features/guangdong-hong-kong-macau-greater-bay-area-megalopolis-in-the-making/.  It is not anomalous at all that [      ]  It also [      ] nearby Shenzhen, which, like Zhuhai, is a Special Economic Zone and not a provincial capital.[11]

That is the sum total of the government's evidence of the XUAR government's involvement: [      ].  FLETF's tenuous inferences are not "adequate to support [its] conclusion." *Nippon Steel Corp.*, 458 F.3d at 1351 (citation omitted).  Substantial evidence requires the agency to produce "more than a mere scintilla of evidence," *Elbit Sys. of Am., LLC v. Thales Visionix, Inc.*, 881 F.3d 1354, 1356 (Fed. Cir. 2018), but FLETF does not even have a scintilla.

### C.     There is no evidence that Ninestar was presently "working" to recruit Uyghurs at the time of the listing decision.

Section 2(d)(2)(B)(ii) of the UFLPA is phrased in the present tense: The listed entity must be "working" with the XUAR government to recruit, transport, transfer, harbor or receive the laborers.  "Congress' use of a verb tense is significant in construing statutes," *United States*

---

[11] [      ]; *see Pahls v. Thomas*, 718 F.3d 1210, 1216 n.1 (10th Cir. 2013) (taking judicial notice of a satellite image from Google Maps).

*v. Wilson,* 503 U.S. 329, 333 (1992), particularly when the interpreter is seeking "to ascertain a statute's temporal reach," *Carr v. United States*, 560 U.S. 438, 448 (2010) (holding the present-tense word "travels" did not apply to pre-enactment travel).

Despite language in the listing decision that indicates an impermissible retroactive application of the UFLPA, the Government has conceded that the UFLPA applies only prospectively, and that the Administrative Record was used "merely … to establish a current violation."  ECF No. 82 at 12.

But it is hard to fathom how the Administrative Record could support a reasonable conclusion that Ninestar was *working* with the XUAR government to recruit, transport, transfer, harbor or receive Uyghur laborers at the time of the listing decision in June 2023.   The Administrative Record pertains to Ninestar's participation in poverty alleviation programs [      ] [      ] cannot show a current violation if [      ] all concern past events.  Here, [      ] only that [      ]  That does not show that Ninestar was *working* with the XUAR in June 2023.  Rather, it suggests the opposite: that Ninestar—or, more precisely, the supposed [      ]—had ceased any "work" with the XUAR by [      ].

[      ] that [      ] the massive upheaval of manufacturing supply chains and demand for factory labor that was wrought by the coronavirus pandemic, which began in China at the very end of 2019.   The administrative record [      ], which cannot be assumed to reflect current practices and current conditions.   The administrative record is thus too stale to demonstrate an "adequate criterion of present requirements."  *Atchison, T. & S.F. Ry. v. United States*, 284 U.S. 248, 261 (1932); *see also NEXTEEL Co.¸* 28 F.4th at 1236–37 (accounts of events outside "the period of review" do not constitute substantial evidence).

On its face, the UFLPA requires evidence that a listed entity is currently "working with" the XUAR. Yet here, [     ] The record, at bottom, lacks substantial evidence.

## II.      FLETF's Listing Decision is Not Supported by an Adequate, Reasoned Explanation.

In addition to the evidentiary gaps, FLETF's listing decision is arbitrary and capricious because it lacks an adequate, reasoned explanation. Agency action is arbitrary and capricious if it fails to articulate "a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). That means the agency must "reasonably tie" its decision "to the governing statutory standard and to the record evidence by indicating what statutory interpretations the agency is adopting and what facts the agency is finding." *CS Wind*, 832 F.3d at 1376. The administrative record here falls short of that requirement in three respects.

### A.      FLETF failed to explain Ninestar's link to the XUAR government.

FLETF apparently concluded that Ninestar was "working with" the XUAR government based on its use of a [     ] which in turn worked with the XUAR government. AR6. Setting aside the evidentiary flaws in that conclusion, *see supra* § I.B, FLETF never explained whether—or, if so, why—it decided to equate "a third-party agency" with "the government of the XUAR." Nor can the court "reasonably discern" such a link. *In re Nuvasive, Inc.*, 842 F.3d 1376, 1382 (Fed. Cir. 2016) (citation omitted). Maybe FLETF (wrongly) interpreted the statutory phrase "works with government of the XUAR" to include cooperating through an intermediary. *But see CS Wind*, 832 F.3d at 1377 ("If Commerce has a different statutory interpretation, it should articulate and justify it on remand."). Or perhaps FLETF concluded that the "third-party" was an arm of the XUAR government. *But see id.* at 1379 (holding agency explanation "not satisfactory" where it was "not clear in making [relevant] distinctions"). Or,

perhaps the Government can surmise plausible explanations for FLETF's logical leap (though it has failed to offer one so far). None of that speculation matters. Neither courts nor litigants may "supply a reasoned basis for the agency's action that the agency itself has not given." *State Farm*, 463 U.S. at 43 (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)). And on this point, the record is all "conclusion" and no "reasoning." *Aqua Prods., Inc. v. Matal*, 872 F.3d 1290, 1325 (Fed. Cir. 2017).

**B.      FLETF failed to explain its reliance on stale evidence.**

The Government does not dispute that the UFLPA applies only prospectively, and therefore that FLETF has no authority to add Ninestar to the UFLPA entity list based solely on pre-enactment conduct. ECF No. 82 at 12. Instead, the Government contends that the entirely pre-enactment record is used merely to "establish a current violation." *Id.* That theory has two flaws: first, it is not supported by substantial evidence, *see supra* § I.C; and second, even if it were, that explanation comes from the mouths only of FLETF's lawyers, not FLETF itself. "[C]ourts may not accept appellate counsel's post hoc rationalizations for agency action." *State Farm*, 463 U.S. at 50. That is true whether the post hoc rationalization is *different* than the agency's expressed reasoning, *see Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1908 (2020), or is simply an attempt to backfill the agency's *lack* of any express "reasons at all," *State Farm*, 463 U.S. at 50; *accord Zhejiang*, 471 F. Supp. 3d at 1331–32 (rejecting "post hoc rationalization" where agency "did not note" why it took particular action). Accepting the Government's belated retroactivity argument now would "contradic[t] the foundational principle of administrative law that a court may uphold agency action only on the grounds that the agency invoked when it took the action." *Michigan v. EPA*, 576 U.S. 743, 758 (2015).

## C. FLETF failed to explain why it found the [    ].

An agency's credibility findings are "not immune from judicial scrutiny and must be reasonable and reasonably explained." *Circus Circus*, 961 F.3d at 484. The latter requirement, like the reasoned-explanation rule generally, demands that the agency "provide specific, cogent reasons supporting its decision" to credit a witness. *Ilunga v. Holder*, 777 F.3d 199, 206 (4th Cir. 2015) (cleaned up). The agency cannot simply gloss over "a relevant factor bearing on the credibility determinations at issue." *Circus Circus*, 961 F.3d at 486 (cleaned up).

That's exactly what FLETF did here—repeatedly. [   ] FLETF ignored the contradiction, and rejected without authority or support [   ]. AR6 n.3. Later, [   ]. FLETF's response? No questions asked. Need we mention the [   ] Again, silence from FLETF. Ignoring entirely the unexplained contradictions in the [   ], FLETF baldly asserted that [   ] That does not suffice. *Circus Circus*, 961 F.3d at 486 (overturning credibility determination where agency ignored contradictions in witness testimony).

## III. FLETF Exceeded its Statutory Authority by Applying the Wrong Standard of Proof.

FLETF manages to stitch together its mélange of suspect and stale evidence only by applying an absurdly and insupportably low standard of proof. As we explained in our previous briefs, the UFLPA authorizes FLETF to list an entity only if FLETF determines by a preponderance of the evidence that the entity meets the statutory listing criteria. FLETF failed to heed that requirement when it added Ninestar to the Entity List by applying a mere [   ] standard. In so doing, FLETF exceeded its statutory authority. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 161 (2000). This Court should therefore hold unlawful and set aside FLETF's decision to list Ninestar. 5 U.S.C. § 706(2)(C).

**A. There is a strong presumption that a preponderance standard applies.**

When Congress tells an agency to take action "based on predicate facts," that directive strongly suggests that the agency lacks authorization to take such action unless it has found that the relevant facts more likely than not exist. *See Rodriguez v. Dep't of Veterans Affs.*, 8 F.4th 1290, 1300 (Fed. Cir. 2021). The preponderance presumption is simply a recognition of this straightforward, intuitive, and "traditional principle." *Id.* That principle applies to formal and informal adjudication alike, *see* ECF No. 88 at 2–3, as *Rodriguez*—an informal adjudication case—clearly shows, *see* 8 F.4th at 1301. Whatever the forum, the presumption in favor of a preponderance standard is so strong that exceptions are "rare" and it typically can be rebutted only by "an explicit directive" to use a lower standard. *Id.* at 1301.

It is uncontested—and the Government has now admitted during argument—that the UFLPA contains no such "explicit directive." Congress, to be sure, *could* have written a statute that explicitly authorized making these findings under a lower standard of proof. It has done so elsewhere. *See* ECF No. 78 at 3–4 (providing examples). But it did not do so in the UFLPA. Indeed, if anything, the text and context of the UFLPA reinforces that a preponderance of the evidence test—the standard "applicable to most disputed factual issues," Kristin E. Hickman & Richard J. Pierce, Jr., *Administrative Law Treatise* § 9.7 (7th ed. 2023)—is appropriate here.

**B. The nature of the fact finding directed by the UFLPA confirms the preponderance presumption.**

To escape *Rodriguez*'s clear mandate, Defendants would have to identify an even more "rare" non-explicit mandate to depart downward from the presumptive preponderance standard. 8 F.4th at 1301. Far from doing so, the text of the UFLPA corroborates maintaining the usual standard for agency factfinding. The statute directs FLETF to undertake "[a] comprehensive description and evaluation" in populating the entity lists. UFLPA § 2(d)(2). Congress then

27

defined with exacting specificity the particular circumstances it considered sufficiently grave as to warrant a complete embargo—not just of a certain shipment or class of merchandise, but for *all* of an entity's goods. *Id.* § 2(d)(2)(B)(i)–(v). And within each description, Congress directed FLETF to determine particular factual predicates. As relevant here, to list an entity under UFLPA § 2(d)(2)(B)(ii), FLETF must determine that the entity (1) is working, (2) with the XUAR government, (3) to recruit, transport, harbor, or receive, (4) forced labor or Uyghurs (or other persecuted groups), (5) out of the XUAR. It would be particularly odd to construe such exacting statutory specificity as also authorizing FLETF to find each element based only on a vague and amorphous [    ] The better explanation for the detailed, factual focus of the UFLPA's listing provisions is that Congress designed the statute in accordance with the "traditional principle" that "for an agency to take … action against" an individual or entity "based on predicate facts," the agency "must *find* those facts" to be more likely than not true. *Rodriguez*, 8 F.4th at 1300 (emphasis added).

Those concrete factual predicates stand in sharp contrast to the kind of factual findings at issue in statutes where Congress has (arguably) implicitly authorized a lower standard of proof. We have previously discussed, for example, various "threat"-based listing statutes. *See* ECF No. 78 at 5 (discussing the No Fly List statute); ECF No. 88 at 4 (discussing similar language in the OFAC and BIS statutes). Similarly, Congress occasionally couches factual predicates in terms of an Executive officer's raw "judgment." *See, e.g.*, 50 U.S.C. § 4533(g) (authorizing President to provide for the "development of substitutes for strategic and critical materials" when, "*in the judgement of the President*," it will aid the national defense" (emphasis added)). Congress has done exactly that in other trade statutes. *See, e.g.*, 19 U.S.C. § 1673a(a)(2) (authorizing administering authority to "establish a monitoring program" if, "in the judgment of the

28

administering authority," there is an extraordinary pattern of dumping from a supplier country causing major commercial harm). But nothing like any of that is present in the UFLPA. Neither the text nor legislative history betrays any intention to draw on lower standards of proof available under the OFAC, BIS, or similar regimes. Rather, the directive to conduct a "comprehensive description and evaluation" that includes finding discrete, ascertainable facts before any listing may be made confirms the presumptive conclusion that preponderance of the evidence is the appropriate standard.

### C.     The severe consequences of listing confirm that the UFLPA requires a preponderance standard.

Listing under the UFLPA results in immediate and devastating consequences, which further suggests that the decision must be based on more than a mere hunch. Evidentiary standards "serve[] to allocate the risk of error between the litigants and to indicate the *relative importance attached to the ultimate decision*." *Addington v. Texas*, 441 U.S. 418, 423 (1979). That is why, for instance, Congress has authorized investigatory measures—*i.e.*, actions that might lead to liability but do not themselves impose it—based on lower standards of proof. *See* 19 U.S.C. § 1673b(b)(1)(A) (permitting initiation of an antidumping inquiry based on a "reasonable basis to believe or suspect" that imports are being sold for less than fair value); *id.* § 1673a(a)(2)(A)(ii) (authorizing establishment of a "monitoring program" if, among other things, the administering authority has "reason to believe or suspect an extraordinary pattern of persistent injurious dumping" from a supplier country). It is also, in part, why the Supreme Court has authorized investigatory stops on the basis of an officer's reasonable suspicion. *See Terry v. Ohio*, 392 U.S. 1 (1968).

A listing decision is at the other end of the spectrum. It is an "ultimate decision," *Addington*, 441 U.S. at 423, that carries overwhelmingly important consequences. To the entity,

a listing decision is a massive financial blow and a reputational death knell. Ninestar's case proves as much; millions of dollars' worth of goods have been embargoed, and business relationships—present and future—have been either ruined or severely damaged. Moreover, in the court of public opinion, a listing decision signals that FLETF has *concluded* its investigation and *determined* that the entity has engaged in human trafficking. FLETF fuels this impression by keeping its [    ] secret; to this day, it has refused to disclose the standard of proof it uses in making listing decisions to the public.

Not only are the consequences of a listing decision instantaneous, but they are also nearly impossible to reverse. Congress provided a mechanism for rebutting the presumption that attaches to a listing decision, but only on a shipment-by-shipment basis—and only if the entity can prove a negative by clear and convincing evidence. *See* UFLPA § 3(b)(2). That the UFLPA sets such a high bar for rebutting the presumption and contains no delisting procedure indicates that the listing decision in the first instance must be based on more than just *some evidence* or a hunch.[12] Before imposing these devastating and irreversible harms, FLETF must at the very least determine that the entity more likely than not meets the listing criteria. *Rodriguez*, 8 F.4th at 1300; *Charlton v. FTC*, 543 F.2d 903, 906–08 (D.C. Cir. 1976) (rejecting agency's use of a "totally incorrect standard of proof in passing on [an individual's] blameworthiness," because the preponderance standard is the "bare minimum for a finding of misconduct").

### D. The section 307 regulations point toward a preponderance standard.

The Government's only remaining argument in support of FLETF's meager standard of proof is that it matches the standard CBP uses to issue withhold-release orders when enforcing

---

[12] FLETF has provided an optional delisting process, which has no procedural safeguards and requires the listed entity to prove—without knowing why FLETF placed it on the Entity List— [    ]. AR221. In other words, according to FLETF, it takes a mere [    ] to be listed, [    ].

section 307. Not only is the Government's analogy flawed; the CBP regulations implementing section 307 reinforce that final listing decisions require a preponderance of the evidence.

As we have explained, ECF No. 88 at 3–4, FLETF uses a standard for its listing decisions similar to the standard that CBP uses for initiating its section 307 *investigation*. CBP may open an investigation when it "has reason to believe" that an import has been produced by forced labor, and may "withhold release of any such merchandise pending instructions from the Commissioner" at the conclusion of such investigation. *See* 19 C.F.R. § 12.42(a)–(e). If CBP then "determine[s]" that the merchandise is in fact subject to section 307, the Government shall "publish a finding to that effect." *Id.* § 12.42(f)–(g).

A UFLPA listing decision is no mere investigation, but rather imposes a full and final embargo. In that respect it does not mirror the preliminary inquiries and investigatory stops authorized under § 12.42(a)–(e) to which Defendants point. Rather, a UFLPA Listing equates to a final section 307 determination and finding. *See id.* § 12.42(f)–(g) (if CBP "determine[s]" that merchandise is subject to section 307, the merchandise is embargoed "unless the importer establishes" that the merchandise was not produced by forced labor); *see Rodriguez*, 8 F.4th at 1298 (statute's command to "determin[e]" a fact requires preponderance standard); *see also* 65 Fed. Reg. 45,873, 45,874 (July 26, 2000) (noting a "finding" is "a more formal Customs action with a higher burden of proof than simple Customs detention of merchandise based on reasonable suspicion).

A listing decision differs from CBP's initial investigations and withhold-release orders in another critical way because—again, like a finding under section 307—a UFLPA listing marks the *end* of the agency's process and shifts the burden to the importer. That stands in stark contrast to a withhold-release order, which authorizes CBP to withhold the release of

merchandise "*pending*" further instructions.  19 C.F.R. § 12.42(e) (emphasis added).  In other words, CBP still has more to do after issuing a withhold-release order.[13]  Had Congress wanted to use a withhold-release order's lower standard of proof for a UFLPA listing, it easily could have done so.  *Cf. Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990) ("We assume that Congress is aware of existing law when it passes legislation.").  But Congress did not.

Nor does preservation of the preponderance standard somehow mean that the UFLPA is a weaker enforcement tool than section 307.  Congress intended the UFLPA to strengthen section 307 enforcement, and it did in a number of ways.  Most consequentially, the Act forgoes entirely the requirement that CBP find that goods were actually made with forced labor, *see* 19 U.S.C. § 1307, opting instead for a presumption that goods made in a certain region or by certain people associated with that region are subject to section 307.  *See* UFLPA § 2(d)(2)(B).  The Act also makes it significantly harder to overcome an embargo, replacing section 307's "satisfactory evidence" burden with "clear and convincing evidence."  *Compare* 19 C.F.R. § 12.42(g), *with* UFLPA § 3(b)(2).  And the Act short-circuits section 307's investigation and temporary-withholding steps entirely, jumping straight to the full and final embargo.  *Compare* 19 C.F.R. § 12.42(a)–(e), *with* UFLPA § 3(a)(1).

These additional tools—each grounded in the text of the Act—undoubtedly increased CBP's section 307 enforcement power.  But nothing in the UFLPA expresses Congress's intention, explicitly or implicitly, to abandon the preponderance standard required for a final listing and determination under section 307.  And it would "frustrat[e] rather than effectuat[e]

---

[13] To the extent the Government contends that in practice CBP uses withhold-release orders as "findings" to permanently embargo goods, CBP's failure to abide by its own regulations cannot prop up the Government's unavailing analogy to section 307.  *See Fort Stewart Schs. v. Fed. Lab. Rels. Auth.*, 495 U.S. 641, 654 (1990) ("It is a familiar rule of administrative law that an agency must abide by its own regulations.").

legislative intent simplistically to assume" that Congress must *also* have wanted to reduce the listing standard, despite all textual and contextual evidence pointing in the other direction. *Rodriguez v. United States*, 480 U.S. 522, 525–26 (1987). To the contrary, the UFLPA's streamlined procedures, graver consequences, and heightened rebuttal standard all militate in favor of at least preserving the preponderance standard.

## IV.     Vacatur of the Listing Decision is the Appropriate Remedy.

In an APA case, "[t]he ordinary practice is to vacate unlawful agency action." *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019); *accord Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*, 45 F.4th 846, 859 (5th Cir. 2022) ("The default rule is that vacatur is the appropriate remedy."); *see also* 5 U.S.C. § 706 ("The reviewing court *shall* … set aside agency action … found to be … arbitrary [or] capricious … ." (emphasis added)). Remand *without* vacatur is reserved for "rare cases" in which the agency will likely be able to remedy the deficiency on remand *and* vacatur would be particularly disruptive. *United Steel*, 925 F.3d at 1287; *see Nat'l Org. of Veterans' Advocs., Inc. v. Sec'y of Veterans Affs.*, 260 F.3d 1365, 1380 (Fed. Cir. 2001) (adopting D.C. Circuit's two-part test). Neither element is present here.

*First*, FLETF is not likely to remedy any of these deficiencies on remand. Remand is limited to where "there is a significant possibility that the agency may find an adequate explanation for its actions on remand." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1051 (D.C. Cir. 2021) (cleaned up). Here, FLETF investigated Ninestar for months to try and corroborate the accusations of a misleading or mistaken [     ] and fell well short of the substantial evidence standard. It is unlikely that FLETF would fare better now, particularly when needing to satisfy the correct (and higher) standard of proof. Further, FLETF's ability to provide an adequate justification on remand (rather than in a new agency proceeding

after vacatur) will be sharply limited by the "foundational principle of administrative law that judicial review of agency action is limited to the grounds that the agency invoked when it took the action." *Regents*, 140 S. Ct. at 1907 (cleaned up). "When an agency's initial explanation indicates the determinative reason for the final action taken, the agency may elaborate later on that reason (or reasons) but may not provide new ones." *Id.* at 1908 (cleaned up). Because of this doctrine, FLETF "would be limited to relying upon the reasoning stated" in the administrative record. *Invenergy Renewables LLC v. United States*, 552 F. Supp. 3d 1382, 1404 (Ct. Int'l Trade 2021). No amount of elaboration could fix the legal and evidentiary errors in FLETF's decision.

*Second*, vacatur would not be disruptive at all. To justify remand, the disruption must be "serious," far exceeding "the regulatory uncertainty that typically attends vacatur." *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 85 (D.C. Cir. 2020). Vacatur would lift the embargo on Ninestar's goods and begin to clear Ninestar's name. It would not disrupt, let alone *seriously* disrupt, the plans and livelihoods of individuals who are not parties to this case. Nor would it remove an indispensable component of an otherwise legitimate government policy. This case thus differs in all crucial respects from *National Organization of Veterans' Advocates*, where the Federal Circuit feared that vacatur would unnecessarily stall numerous pending veterans benefits claims, 260 F.3d at 1380, and from *In re Section 301 Cases*, 570 F. Supp. 3d 1306, 1343–44 (Ct. Int'l Trade 2022), where the court declined to vacate a list of products subject to duties because they were "part of a continuum of actions taken in conjunction with ongoing negotiations with China." Vacatur here would affect no one but the parties—a far cry from the kind of regulatory disruption that justifies the rare case of remand without vacatur.

**CONCLUSION**

For these reasons, the Court should vacate the unlawful listing decision.

Dated: January 22, 2024

Respectfully submitted,

*/s/ Gordon D. Todd*

MICHAEL E. MURPHY
GORDON D. TODD
MICHAEL E. BORDEN
CODY M. AKINS
SIDLEY AUSTIN LLP

1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8760
gtodd@sidley.com

*Counsel for Plaintiffs*

**CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the word count limitation of Chambers Procedure 2(B)(1)(a) because it contains 13,063 words, as determined by the word count feature of the word-processing system used to prepare the brief, excluding the parts exempted by Chambers Procedure 2(B)(1)(c).

*/s/ Gordon D. Todd*
Gordon D. Todd

**IN THE UNITED STATES
COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| NINESTAR CORPORATION, ZHUHAI NINESTAR INFORMATION TECHNOLOGY CO., LTD., ZHUHAI PANTUM ELECTRONICS CO., LTD., ZHUHAI APEX MICROELECTRONICS CO., LTD., GEEHY SEMICONDUCTOR CO., LTD., ZHUHAI G&G DIGITAL TECHNOLOGY CO., LTD., ZHUHAI SEINE PRINTING TECHNOLOGY CO., LTD., and ZHUHAI NINESTAR MANAGEMENT CO., LTD. | |
| *Plaintiffs,* | |
| v. | Case No. 23-182 |
| UNITED STATES OF AMERICA; DEPARTMENT OF HOMELAND SECURITY; UNITED STATES CUSTOMS AND BORDER PROTECTION; FORCED LABOR ENFORCEMENT TASK FORCE; ALEJANDRO MAYORKAS, *in his official capacity as the Secretary of the Department of Homeland Security*; TROY A. MILLER, *in his official capacity as the Senior Official Performing the Duties of the Commissioner for U.S. Customs and Border Protection*; and ROBERT SILVERS, *in his official capacity as Under Secretary for Office of Strategy, Policy, and Plans and Chair of the Forced Labor Enforcement Task Force,* | **Proposed Order Granting Motion for Judgment on the Agency Record** |
| *Defendants.* | |

Plaintiffs' motion for judgment on the agency record (ECF No. __) is **GRANTED**.  It is

hereby:

1

**DECLARED** that the FLETF's decision adding Plaintiffs to the UFLPA Entity List, 88 Fed. Reg. 38,080 (June 12, 2023), was unlawful, 5 U.S.C. § 706; and it is

**ORDERED** that the same is **VACATED** and **REMANDED** for further consideration in light of this opinion.

Dated: _____
        New York, New York

                          _____

                          Gary S. Katzmann, Judge