Slip Op. 24-24

## UNITED STATES COURT OF INTERNATIONAL TRADE

NINESTAR CORPORATION, ZHUHAI
NINESTAR INFORMATION
TECHNOLOGY CO., LTD., ZHUHAI
PANTUM ELECTRONICS CO., LTD.,
ZHUHAI APEX MICROELECTRONICS
CO., LTD., GEEHY SEMICONDUCTOR
CO., LTD., ZHUHAI G&G DIGITAL
TECHNOLOGY CO., LTD., ZHUHAI
SEINE PRINTING TECHNOLOGY CO.,
LTD., and ZHUHAI NINESTAR
MANAGEMENT CO., LTD.,

          Plaintiffs,

    v.

UNITED STATES OF AMERICA;
DEPARTMENT OF HOMELAND
SECURITY; UNITED STATES CUSTOMS
AND BORDER PROTECTION; FORCED
LABOR ENFORCEMENT TASK FORCE;
ALEJANDRO MAYORKAS, in his official
capacity as the Secretary of the Department of
Homeland Security; TROY A. MILLER, in
his official capacity as the Senior Official
Performing the Duties of the Commissioner
for U.S. Customs and Border Protection; and
ROBERT SILVERS, in his official capacity
as Under Secretary for Office of Strategy,
Policy, and Plans and Chair of the Forced
Labor Enforcement Task Force,

          Defendants.

Before: Gary S. Katzmann, Judge
Court No. 23-00182

*PUBLIC VERSION*

## OPINION

[ Plaintiffs are not required to exhaust their administrative remedies under the particular facts of this case. Plaintiffs' Motion for Preliminary Injunction is denied. ]

Dated: <u>February 27, 2024</u>

Court No. 23-00182                                                                 Page 2
**PUBLIC VERSION**

Gordon D. Todd, Sidley Austin LLP, of Washington, D.C., argued for Plaintiffs Ninestar
Corporation, Zhuhai Ninestar Information Technology Co., Ltd., Zhuhai Pantum Electronics Co., Ltd.,
Zhuhai Apex Microelectronics Co., Ltd., Geehy Semiconductor Co., Ltd., Zhuhai G&G Digital
Technology Co., Ltd., Zhuhai Seine Printing Technology Co., Ltd., and Zhuhai Ninestar Management
Co., Ltd.  With him on the briefs were Cody M. Akins, Michael E. Murphy, and Michael E. Borden.

Monica P. Triana, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S.
Department of Justice, of New York, N.Y., argued for Defendant United States.  With her on the
brief were Brian M. Boynton, Principal Deputy Assistant Attorney General, Patricia M. McCarthy,
Director, Claudia Burke, Deputy Director, Justin R. Miller, Attorney-In-Charge International
Trade Field Office, Guy Eddon, Trial Attorney, and Luke Mathers, Trial Attorney.

Katzmann, Judge:  Plaintiffs Ninestar Corporation and its corporate affiliates (collectively,

"Ninestar") are Chinese manufacturers and sellers of laser printers and printer-related products to

U.S. companies and consumers.  Defendants the United States and various federal agencies and

officials determined last year that Ninestar was working with the government of the Xinjiang

Uyghur Autonomous Region ("XUAR") of the People's Republic of China ("China") to recruit,

transport, transfer, harbor or receive forced labor or persecuted ethnic minorities out of the XUAR.

After such determination by the interagency Forced Labor Enforcement Task Force ("FLETF"),

an embargo against Ninestar immediately entered into force under the Uyghur Forced Labor

Prevention Act ("UFLPA").  See Pub. L. No. 117-78, 135 Stat. 1525 (2021); see also Notice

Regarding the Uyghur Forced Labor Prevention Act Entity List, 88 Fed. Reg. 38080, 38082 (Dep't

Homeland Sec. June 12, 2023) ("Listing Decision").  Now before the court is Ninestar's Motion

for Preliminary Injunction staying the Listing Decision.  The motion is denied, and the embargo

remains in force.

Following reports of forced labor and ongoing genocide in the XUAR, Congress passed and the President signed into law the UFLPA.[1]  Per the text of the statute, the UFLPA is designed to "strengthen the prohibition against the importation of goods made with forced labor, including by ensuring that the Government of the People's Republic of China does not undermine the effective enforcement of section 307 of the Tariff Act of 1930."  Pub. L. 177-78, § 1(1), 135 Stat. at 1525.  Section 307 of the Tariff Act, as amended, moreover, prohibits the importation of merchandise created wholly or in part by forced labor.  See Tariff Act of 1930, Pub. L. 71-361, § 307, 46 Stat. 590, 689–90 (as amended at 19 U.S.C. § 1307) ("Section 307").  The FLETF's addition of Ninestar to the Entity List of the UFLPA presumptively prohibits, under section 307, the importation into the United States of any goods produced by Ninestar.  See UFLPA § 3(a), 135 Stat. at 1529.  The FLETF also provided a procedure for listed entities to request removal.  See Listing Decision, 88 Fed. Reg. at 38082.

Without first availing itself of the FLETF's removal procedure, Ninestar filed this action before the U.S. Court of International Trade ("CIT") requesting that the court vacate the Listing Decision and lift the embargo because the Listing Decision violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), on four counts: (1) the FLETF failed to adequately explain its

---

[1] The State Department has characterized the atrocities in the XUAR as genocide.  See Press Release, A. Blinken, Sec'y of State, The Signing of the Uyghur Forced Labor Prevention Act (Dec. 23, 2021), https://www.state.gov/the-signing-of-the-uyghur-forced-labor-prevention-act/ ("[The President] today signed the [UFLPA], underscoring the United States' commitment to combatting forced labor, including in the context of the ongoing genocide in Xinjiang."); Press Release, M. Pompeo, Sec'y of State, Determination of the Secretary of State on Atrocities in Xinjiang (Jan. 19, 2021), https://2017-2021.state.gov/determination-of-the-secretary-of-state-on-atrocities-in-xinjiang/ (concluding that the atrocities in the XUAR constituted "genocide against the predominantly Muslim Uyghurs and other ethnic and religious minority groups in Xinjiang" and that "this genocide is ongoing").

Court No. 23-00182                                                                                    Page 4
**PUBLIC VERSION**

decision; (2) the FLETF's determination is unsupported by substantial evidence; (3) the FLETF

exceeded its authority by using a burden of proof of reasonable cause rather than preponderance

of the evidence; and (4) the FLETF's determination amounted to an impermissibly retroactive

application of the UFLPA.   See Am. Compl. ¶¶ 61–79, Dec. 6, 2023, ECF No. 69.   Before the

court now, however, is Ninestar's Motion for Preliminary Injunction—the first of its kind since

the UFLPA was signed in 2021—requesting the court to (1) stay the FLETF's decision to add

Ninestar to the Entity List and (2) prevent the Government from taking any action predicated on

the Listing Decision against the importation of Ninestar's goods.   See Mot. for Prelim. Inj., Aug.

22, 2023, ECF No. 9 ("PI Mot.").   In a prior decision, the court concluded that Ninestar was likely

to establish the CIT's exclusive subject matter jurisdiction over this action under 28 U.S.C.

§ 1581(i)(1) because the UFLPA's import prohibition is an embargo.   See Ninestar Corp. v. United

States ("Ninestar I"), 47 CIT __, __, 666 F. Supp. 3d 1351, 1363 (2023), ECF No. 58.

        The court first exercises its discretion under 28 U.S.C. § 2637(d) to determine that the

administrative exhaustion requirement is not appropriate in this case due to the conclusory nature

of the FLETF's initial Listing Decision.   Turning next to Ninestar's Motion for Preliminary

Injunction, the court concludes that Ninestar (1) is not likely to succeed on Counts One, Three,

and Four of the Amended Complaint, (2) has failed to establish irreparable harm, and (3) does not

prevail in the balancing of equities and public interest.   The Motion for Preliminary Injunction is

therefore denied.   The embargo is still in force, meaning that Ninestar's merchandise continues to

be prohibited from entering the United States.

**BACKGROUND**

### I.    *Legal Background*

Federal law has long prohibited the importation of foreign goods made by forced labor.

Section 307 states in relevant part:

> All goods, wares, articles, and merchandise mined, produced, or manufactured wholly or in part in any foreign country by . . . forced labor . . . shall not be entitled to entry at any of the ports of the United States, and the importation thereof is hereby prohibited . . . .

19 U.S.C. § 1307. Section 307 further defines forced labor as "all work or service which is exacted from any person under the menace of any penalty for its nonperformance and for which the worker does not offer himself voluntarily" and includes forced child labor. Id.

In the United States–Mexico–Canada Agreement Implementation Act of 2020, Congress directed the President to establish a Forced Labor Enforcement Task Force, referred to as the FLETF, "to monitor United States enforcement of the prohibition under section 307 of the Tariff Act of 1930." Pub L. No. 116-113, § 741(a), 134 Stat. 11, 88 (2020) (codified at 19 U.S.C. § 4681). Per the statute and the President's subsequent Executive Order, the FLETF is chaired by the Secretary of the Department of Homeland Security ("DHS") and comprises seven member agencies: DHS, the U.S. Trade Representative ("USTR"), and the Departments of Justice, Labor, State, Treasury, and Commerce. See 19 U.S.C. § 4681(b)(1); Exec. Order No. 13923 § 2, 85 Fed. Reg. 30587, 30587 (May 20, 2020).[2]  The FLETF also includes six observer agencies: the

---

[2] DHS, as the FLETF Chair, may invite representatives from other agencies to participate as either members or observers. See Executive Order No. 13923 § 2. DHS invited the Department of Commerce ("Commerce") to join the FLETF as a member. See Listing Decision, 88 Fed. Reg. at 38081 n.1.

Departments of Energy and Agriculture, the U.S. Agency for International Development, the

National Security Council, U.S. Customs and Border Protection ("Customs"), and the U.S.

Immigration and Customs Enforcement Office of Homeland Security Investigations.  Listing

Decision, 88 Fed. Reg. at 38081.

      In January 2021, the State Department determined that China was committing "genocide

against the predominantly Muslim Uyghurs and other ethnic and religious minority groups in

Xinjiang" and that "this genocide is ongoing," a characterization that the State Department has

repeatedly maintained.  Supra note 1.  "Other human rights abuses in Xinjiang involve

discriminatory surveillance, ethno-racial profiling measures designed to subjugate and exploit

minority populations in internment camps and, since at least 2017, the use of widespread state-

sponsored forced labor."  DHS, Strategy to Prevent the Importation of Goods Mined, Produced,

or Manufactured with Forced Labor in the People's Republic of China 10 (2022) (footnote

omitted) ("FLETF Strategy").[3]  According to the FLETF, forced labor, either through state-run

internment camps or labor transfer programs, is a key part of the Chinese government's repression

of Uyghurs and other minorities in Xinjiang:

> Forced labor is a central tactic used for repression in state-run internment camps.
> The PRC has implemented labor programs across the country with a stated
> objective of eradicating poverty.  However, use of such programs in Xinjiang and
> the use of labor sourced from persecuted groups carries a particularly high-risk of
> forced labor for members of ethnic and religious minority groups. . . .
>
> The PRC government administers labor programs that target Uyghurs, Kazakhs,
> Kyrgyz, Tibetans, and members of other persecuted groups.  Purported "poverty
> alleviation," "pairing assistance," and "labor transfer" programs can include

---

[3] Available at https://www.dhs.gov/sites/default/files/2022-06/22_0617_fletf_uflpa-strategy.pdf.
The court may take note of matters of public record, including public agency reports.  See, e.g.,
Sebastian v. United States, 185 F.3d 1368, 1374 (Fed. Cir. 1999).

> discriminatory social control, pervasive surveillance, and large-scale internment.
> An official PRC government report published in September 2020 indicated that the
> government reports to have placed over two and a half million workers at farms
> and factories in Xinjiang and across the PRC.  Research has since shown that
> workers in these schemes are largely members of ethnic minorities who are
> subjected to systemic oppression through forced labor and do not offer themselves
> voluntarily.

Id. at 18 (footnotes omitted).

As has been noted, in December 2021, Congress passed and the President signed into law

the UFLPA, Pub. L. No. 117-78, 135 Stat. 1525.  The UFLPA declared that it is the policy of the

United States to "strengthen the prohibition against the importation of goods made with forced

labor, including by ensuring that the Government of the People's Republic of China does not

undermine the effective enforcement of section 307 of the Tariff Act of 1930 (19 U.S.C. § 1307)."

UFLPA § 1(1), 135 Stat. at 1525.  Other aims that Congress identified included "to lead the

international community in ending forced labor practices . . . by stopping the importation of any

goods made with forced labor"; "to actively work to prevent, publicly denounce, and end human

trafficking including with respect to forced labor"; "to regard the prevention of atrocities as it is in

the national interest of the United States, including efforts to prevent torture, enforced

disappearances, severe deprivation of liberty, including mass internment, arbitrary detention, and

widespread and systematic use of forced labor, and persecution targeting any identifiable ethnic or

religious group"; and "to address gross violations of human rights in the Xinjiang Uyghur

Autonomous Region."  Id. § 1(2), (4)–(6), 135 Stat. at 1525.

The UFLPA implements those policies in two main parts.  First, the UFLPA requires that

the FLETF "develop a strategy for supporting enforcement of Section 307 of the Tariff Act of

1930 (19 U.S.C. 1307) to prevent the importation into the United States of goods mined, produced,

Court No. 23-00182                                                                                   Page 8
**PUBLIC VERSION**

or manufactured wholly or in part with forced labor in the People's Republic of China." Id. § 2(c),

135 Stat. at 1526.  The FLETF published this strategy in June 2022.  See FLETF Strategy, supra.

As part of that strategy, the FLETF must create and update four statutory sub-lists:

> (i) a list of entities in the Xinjiang Uyghur Autonomous Region that mine, produce, or manufacture wholly or in part any goods, wares, articles and merchandise with forced labor;

> (ii) a list of entities working with the government of the Xinjiang Uyghur Autonomous Region to recruit, transport, transfer, harbor or receive forced labor or Uyghurs, Kazakhs, Kyrgyz, or members of other persecuted groups out of the Xinjiang Uyghur Autonomous Region;

> . . .

> (iv) a list of entities that exported products described in clause (iii) from the People's Republic of China into the United States; [and]

> (v) a list of facilities and entities, including the Xinjiang Production and Construction Corps, that source material from the Xinjiang Uyghur Autonomous Region or from persons working with the government of the Xinjiang Uyghur Autonomous Region or the Xinjiang Production and Construction Corps for purposes of the "poverty alleviation" program or the "pairing-assistance" program or any other government labor scheme that uses forced labor . . . .

UFLPA § 2(d)(2)(B), 135 Stat. at 1527; see also FLETF Strategy, supra, at 22–25.  The UFLPA

Entity List refers to "a consolidated register of the above four lists."  Listing Decision, 88 Fed.

Reg. at 38081.  The statute requires that the FLETF update the strategy annually.  See UFLPA,

Pub. L. 177-78, § 2(e)(2), 135 Stat. at 1527; see also FLETF Strategy, supra, at 58 ("The FLETF

also intends to update the UFLPA Entity List multiple times per year.").[4]  An entity added to the

---

[4] Moreover, "[a]ny FLETF member agency may submit a recommendation to the FLETF Chair to add an entity to the UFLPA Entity List.  Following review of the recommendation by the FLETF member agencies, the decision to add an entity to the UFLPA Entity List will be made by majority vote of the FLETF member agencies."  Listing Decision, 88 Fed. Reg. at 38082.

Court No. 23-00182                                                                            Page 9
**PUBLIC VERSION**

Entity List may petition the FLETF for its removal.  See, e.g., Listing Decision, 88 Fed. Reg. at

38082.

Second, the UFLPA requires Customs to apply a rebuttable presumption that the imports

of merchandise produced by any entity on the Entity List are prohibited under section 307.  The

statute reads in relevant part:

> (a) In General.—[Customs] shall, except as provided by subsection (b), apply a
> presumption that, with respect to any goods, wares, articles, and merchandise
> mined, produced, or manufactured wholly or in part in the Xinjiang Uyghur
> Autonomous Region of the People's Republic of China or produced by an entity on
> a list required by clause (i), (ii), (iv) or (v) of section 2(d)(2)(B)—
>
>> (1) the importation of such goods, wares, articles, and merchandise is
>> prohibited under section 307 of the Tariff Act of 1930 (19 U.S.C. 1307);
>> and
>
>> (2) such goods, wares, articles, and merchandise are not entitled to entry at
>> any of the ports of the United States.

UFLPA § 3(a), 135 Stat. at 1529.  Customs applies the rebuttable presumption requirement of the

UFLPA through its general authority to examine and decide whether to detain, release, exclude,

or seize merchandise under 19 U.S.C. § 1499 and associated regulations.  See Customs, Uyghur

Forced Labor Prevention Act: U.S. Customs and Border Protection Operational Guidance for

Importers 7 (2022) ("Operational Guidance").[5]  Customs "will provide importers with notice, in

accordance with the customs laws, when enforcement actions are taken on their shipments."  Id.

Until that presumption is rebutted, the UFLPA's import prohibition in § 3(a) imposes an embargo.

See Ninestar I, 666 F. Supp. 3d at 1363.

---

[5] Available at https://www.cbp.gov/sites/default/files/assets/documents/2022-Jun/CBP_Guidance
_for_Importers_for_UFLPA_13_June_2022.pdf.

Court No. 23-00182                                                                        Page 10
*PUBLIC VERSION*

An affected importer may rebut the UFLPA's presumption if it complies with relevant

agency regulations, orders, and guidance, and if it demonstrates the admissibility of the

merchandise by clear and convincing evidence.  Specifically, the UFLPA requires Customs to

enforce the presumptive embargo unless it determines:

> (1) that the importer of record has—
>
>> (A) fully complied with [guidance in the <u>FLETF Strategy</u>] and any
>> regulations issued to implement that guidance; and
>>
>> (B) completely and substantively responded to all inquiries for information
>> submitted by the Commissioner to ascertain whether the goods were mined,
>> produced, or manufactured wholly or in part with forced labor; and
>
> (2) by clear and convincing evidence, that the good, ware, article, or merchandise
> was not mined, produced, or manufactured wholly or in part by forced labor.

<u>Id.</u> § 3(b), 135 Stat. at 1529.  Customs has a process for requesting an exception to the rebuttable

presumption and for furnishing information that would meet the UFLPA's admissibility

requirements.  <u>See</u> <u>Operational Guidance</u>, <u>supra</u>, at 9–10.  And the <u>FLETF Strategy</u> contains

detailed guidance on how importers may demonstrate the admissibility of their merchandise.

<u>Supra</u>, at 40–51.  If Customs decides to exclude the merchandise after the importer's attempted

showing of admissibility, the importer may challenge that decision by filing a protest under 19

U.S.C. § 1514(a)(4) and 19 C.F.R. part 174.  <u>See</u> <u>Operational Guidance</u>, <u>supra</u>, at 7–8.

## II.    *Factual Background and Procedural History*

As has been noted, Plaintiff Ninestar Corporation is a Chinese company that manufactures

and sells laser printers, integrated circuit chips, and printer consumables such as toner and inkjet

cartridges.  Am. Compl. ¶¶ 8, 35–36.  All other plaintiffs in this case are corporate affiliates of

Ninestar Corporation.  <u>Id.</u> ¶¶ 9–15.  Ninestar manufactures and sells, or supports the manufacture

and sale of, products directly and indirectly to numerous U.S.-based companies and customers.  Id.

¶¶ 36–37.    According to the Amended Complaint, prior to June 2023, Customs did not

communicate to Ninestar that any of Ninestar's products violate section 307.  See id. ¶ 39.

On June 9, 2023, the FLETF announced that Ninestar would be added to the UFLPA's

Entity List.[6]  Three days later on June 12, DHS, on behalf of the FLETF, published an updated

Entity List in the Federal Register (the "Listing Decision").  See Listing Decision, 88 Fed. Reg. at

38082.  Specifically, Ninestar was added to the second sub-list created pursuant to § 2(d)(2)(B)(ii)

of the UFLPA, which contains the entities determined to be working with the XUAR government

to "recruit, transport, transfer, harbor or receive forced labor or Uyghurs, Kazakhs, Kyrgyz, or

members of other persecuted groups out of the Xinjiang Uyghur Autonomous Region."  See id.

Ninestar alleges that the listing was accompanied by no further explanation.  Ninestar received

public notice of a process to submit to the FLETF a request for removal from the Entity List, see

id., which Ninestar did not submit, see Am. Compl. ¶ 47.

On August 22, 2023, Ninestar filed the initial Complaint initiating this action before the

CIT.  See id.  Ninestar alleged that it was "unaware of any facts relating to their respective

businesses or otherwise supporting such an allegation," and that "[w]ithout learning the bases upon

which Defendants added Plaintiffs to the UFLPA Entity List, Plaintiffs [were] unable meaningfully

to seek removal from the list or otherwise challenge this final agency action."  See Compl. ¶ 45.

The Complaint pleaded one cause of action for arbitrary and capricious agency action violating

---

[6] See Press Release, Dep't of Homeland Sec., DHS to Ban Imports from Two Additional PRC-Based Companies as Part of Its Enforcement of the Uyghur Forced Labor Prevention Act (UFLPA) (June 9, 2023), https://www.dhs.gov/news/2023/06/09/dhs-ban-imports-two-additional-prc-based-companies-part-its-enforcement-uyghur.

the APA, 5 U.S.C. § 706(2)(A), for failure to provide "any explanation[] for adding Plaintiffs to

the UFLPA Entity List."  Compl. ¶ 62.  Ninestar further asserted that it was not "able to seek relief

under the APA challenging the action as contrary to the evidence in the administrative record, as

Plaintiffs know neither the bases for the charge, nor the contents of the record."  Id. ¶ 46.  "After

filing," Ninestar continued, "Plaintiffs will seek the record and, when appropriate, seek additional

relief."  Id.

        On the same day, Ninestar also filed a motion for preliminary injunction requesting that

the court (1) stay the Listing Decision and (2) prevent the Government from taking any action

against the importation of Ninestar's goods predicated on the Listing Decision.  See PI Mot. at 2;

see also Pls.' Mem. of Law in Support of Mot. for Prelim. Inj., Aug. 22, 2023, ECF No. 9 ("Pls.'

Br.").  On October 3, 2023, the Government responded in opposition to Ninestar's Motion for

Preliminary Injunction and moved to dismiss the case.  See Defs.' Mot. to Dismiss & Opp. to Pls.'

Mot. for a Prelim. Inj., Oct. 3, 2023, ECF No. 24 ("Defs.' Resp.").  Ninestar filed a reply in support

of their motion on October 13, 2023.  See Pls.' Reply, Oct. 13, 2023, ECF No. 30.  The Government

also filed a confidential administrative record that Ninestar's counsel—but not Ninestar the

client—could review under the terms of an amended Judicial Protective Order.  See Conf. Admin.

R., Oct. 24, 2023, ECF No. 41; Am. Protective Order, Oct. 24, 2023, ECF No. 40.  Certain portions

of the Confidential Administrative Record are redacted, even to Ninestar's counsel, and the court

ordered a privilege log documenting the Government's reasons for redaction.  See Privilege

Redaction Log, Oct. 26, 2023, ECF No. 43.  Additionally, pursuant to 28 U.S.C. § 2635(d)(2)[7] and

---

[7] "The agency shall identify and transmit under seal to the clerk of the court any document,
comment, or other information that was obtained on a confidential basis and that is required to be

USCIT Administrative Order No. 21-01, the court ordered the Government to file paper copies of

the fully unredacted administrative record and to move to treat such submissions as highly

sensitive documents.[8]  See Order, Oct. 27, 2023, ECF No. 44.  The Government so moved, see

Mot. to Treat Subm. as Highly Sensitive Doc., Oct. 30, 2023, ECF No. 45, and the court granted

that motion, see Order, Oct. 30, 2023, ECF No. 49.  The paper copies of the fully unredacted

administrative record are now stored securely with the court for in camera review.

A preliminary injunction hearing was initially scheduled for November 2, 2023, but was

ultimately postponed to December 7, 2023, because the parties had been exploring the possibility

of negotiating a process for the FLETF's consideration of a request of removal from the Entity

List.  See Joint Status Report & Mot. to Modify the Schedule at 2, Nov. 13, 2023, ECF No. 55;

Order, Nov. 15, 2023, ECF No. 56.  On November 30, 2023, the court issued an opinion holding

that Ninestar was likely to establish the CIT's exclusive subject matter jurisdiction over this action

under 28 U.S.C. § 1581(i)(1) because the UFLPA is a law providing for embargoes.  See Ninestar

I, 666 F. Supp. 3d at 1363.

---

transmitted to the clerk under paragraph (1) of this subsection. . . . The confidential or privileged
status of such material shall be preserved in the civil action, but the court may examine such
material in camera and may make such material available under such terms and conditions as the
court may order." Id. § 2635(d)(2) (emphasis added).

[8] Per USCIT Administrative Order 21-01, highly sensitive documents "are limited to documents
containing information that has such a high level of sensitivity as to present a clear and compelling
need to avoid filing on the existing CM/ECF system, such as certain privileged information or
information the release of which could pose a danger of physical harm to any person."  Admin.
Order 21-01, at 1.  Due to their sensitive nature, such documents "must be filed in paper format"
and "may not be uploaded to CM/ECF." Id. at 2.

On December 4, 2023, the parties filed a joint status report indicating that the parties were unable to negotiate an out-of-court process.  See Joint Status Report, Dec. 4, 2023, ECF No. 59.  On the same day, Ninestar filed a motion to unseal and unredact the administrative record.  See Mot. to Unseal & Unredact Admin. R., Dec. 4, 2023, ECF No. 60.  The court held a status conference on the following day to discuss the next steps in the litigation, see Videoconference, Dec. 5, 2023, ECF No. 63, after which Ninestar moved to amend the Complaint to add three new causes of action, see Mot. for Leave to File Am. Compl., Dec. 6, 2023, ECF No. 64.  The court granted the motion the next day and deemed the Amended Complaint as filed.  See Order, Dec. 6, 2023, ECF No. 68; see also Am. Compl.  Specifically, Count 2 of the Amended Complaint alleges arbitrary and capricious agency action as unsupported by substantial evidence; Count 3 alleges agency action in excess of statutory authority for FLETF's use of a burden of proof that is below preponderance of the evidence; and Count 4 alleges agency action in excess of statutory authority for having applied the UFLPA's provisions retroactively.  See Am. Compl. ¶¶ 69–79.

On December 8, the court issued a scheduling order.  See Order, Dec. 8, 2023, ECF No. 77.  Specifically, the court ordered supplemental briefing for Ninestar's Motion for Preliminary Injunction in light of the newly Amended Complaint; denied the Government's Motion to Dismiss as moot without prejudice to renewal; and set due dates for briefs related to Ninestar's Motion to Unredact and Unseal, the forthcoming Motion for Judgment on the Agency Record, and other motions concerning the record.  See id. at 2.  Ninestar filed its supplemental brief in support of the Motion for Preliminary Injunction on December 15, 2023.  See Pls.' Supp. Br., Dec. 15, 2023, ECF No. 78.  On December 22, 2023, the Government did not renew their motion to dismiss and instead filed an answer to Ninestar's Amended Complaint.  See Answer, Dec. 22, 2023, ECF No.

Court No. 23-00182                                                    Page 15
***PUBLIC VERSION***

81. On January 3, 2024, the Government filed a supplemental response in opposition to Ninestar's

Motion for Preliminary Injunction, <u>see</u> Defs.' Supp. Resp., Jan. 3, 2024, ECF No. 82, to which

Ninestar replied on January 10, 2024, <u>see</u> Pls.' Supp. Reply, Jan. 10, 2023, ECF No. 89. Regarding

the Motion to Unseal and Unredact the Administrative Record, the Government filed its response

on January 8, 2024, <u>see</u> Defs.' Resp. in Opp. to Mot. to Unseal & Unredact, Jan. 8, 2024, ECF No.

85, and Ninestar replied on January 15, 2024, <u>see</u> Pls.' Reply in Supp. of Mot. to Unseal &

Unredact, Jan. 15, 2024, ECF No. 92.[9]

On January 18, 2023, the court held a hearing on Ninestar's Motion for Preliminary

Injunction and Ninestar's Motion to Unredact and Unseal the Administrative Record that was open

in part and closed in part. <u>See</u> Hearing, Jan. 18, 2023, ECF No. 99. The next day, the Government

filed a new version of the Confidential Administrative Record that does not contain clerical errors;

this is the version that the court uses as the authoritative record for resolving the instant motion.

<u>See</u> Conf. Admin. R., Jan. 19, 2023, ECF No. 100 ("CAR"). The court also requested that the

parties file letters recounting all authorities cited at the hearing and invited the parties to make

post-hearing submissions; all parties made such filings on January 25, 2024. <u>See</u> Pls.' Post-

---

[9] In the Government's response to the Motion to Unseal, the Government agreed to the disclosure
of certain portions of the Confidential Administrative Record to Ninestar the client. <u>See</u> Defs.'
Resp. in Opp. to Mot. to Unseal & Unredact at 3. On January 9, 2024, Ninestar filed a motion
seeking immediate leave for such disclosure. <u>See</u> Mot. for Leave to Disclose Non-Conf. Info.,
Jan. 9, 2024, ECF No. 88. The court denied the motion as premature and requested proposed
modifications to the existing Judicial Protective Order. <u>See</u> Paperless Order, Jan. 10, 2024, ECF
No. 90. Upon review of the parties' proposed modifications, <u>see</u> Resps. to Order, Jan. 16, 2024,
ECF Nos. 94–95, and the Government's modification of the Confidential Administrative Record
to indicate which portions of the record may be disclosed with Ninestar the client, <u>see</u> Conf.
Admin. R., Jan. 16, 2024, ECF No. 96, the court adopted the Government's modifications and
ordered that Ninestar's counsel could share certain confidential information with its client. <u>See</u>
Order, Jan. 16, 2024, ECF No. 97.

Court No. 23-00182                                                                                    Page 16
**PUBLIC VERSION**

Hearing Subm., Jan. 25, 2024, ECF No. 104; Pls.' Post-Hearing Letter, Jan. 25, 2024, ECF No.

103; Defs.' Post-Hearing Subm., Jan. 25, 2024, ECF No. 106; Defs.' Post-Hearing Subm., Jan. 25,

2024, ECF No. 107.  Ninestar has also filed its Motion for Judgment on the Agency Record, Jan.

31, 2024, ECF No. 109, and its Motion to Complete or Supplement the Administrative Record,

Jan. 31, 2024, ECF No. 108, neither of which is ripe for the court's decision at this time.

    With the parties' extensive filings in hand, the court resolves only Ninestar's Motion for

Preliminary Injunction in this opinion.  The court will decide Ninestar's Motion to Unredact and

Unseal the Administrative Record at a future date.

## JURISDICTION AND LEGAL STANDARD

    The CIT has exclusive jurisdiction over this action under 28 U.S.C. § 1581(i) because the

UFLPA is a "law . . . providing for . . . embargoes." Ninestar I, 666 F. Supp. 3d at 1363 (quoting

28 U.S.C. § 1581(i)(1)).  The statutory procedures associated with CIT jurisdiction apply here.

See 28 U.S.C. ch. 169.

    Actions falling within the CIT's "residual" jurisdiction as provided under § 1581(i) are

subject to the standard of review set forth in the APA, 5 U.S.C. § 706.  See 28 U.S.C. § 2640(e);

Humane Soc'y of U.S. v. Clinton, 236 F.3d 1320, 1324 (Fed. Cir. 2001).  Under the APA, the

court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . .

arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess

of statutory jurisdiction, authority, or limitations."  5 U.S.C. § 706(2).  The court's inquiry is

"highly deferential to the administrative agency's factual findings."  Humane Soc'y, 236 F.3d at

1325 (internal quotation marks and citation omitted).

**DISCUSSION**

Ninestar requests a preliminary injunction to stay the Listing Decision and to prevent the Government from taking any action against the importation of Ninestar's goods predicated on the Listing Decision.  See PI Mot. at 2.  The Government opposes, arguing that Ninestar is not likely to succeed on the merits of its claim for failure to exhaust administrative remedies and for failure to prevail on Counts I, III, and IV of the Amended Complaint.  See Defs.' Resp. at 15–31; Defs.' Supp. Resp. at 5–12.  The Government also contends that Ninestar has not been irreparably harmed and that the public interest and balance of hardships compel a denial of injunctive relief.  See Defs.' Resp. at 31–40; Defs.' Supp. Resp. at 12–13.

The court first determines that, on the specific facts of this case, the FLETF's exhaustion requirement does not bar Ninestar's action.  The court then concludes that Ninestar fails to establish any of the four elements required for a preliminary injunction.  The Motion for Preliminary Injunction is therefore denied, and the embargo remains in force.

## I.    *Administrative Exhaustion Does Not Bar Ninestar's Action*

As a threshold matter, the Government argues that Ninestar is not entitled to preliminary relief for its failure to exhaust administrative remedies.  See Def.'s Resp. at 19–22.[10]  Neither the

---

[10] The Government's exhaustion defense was originally raised in the portion of its response brief in support of an independent motion to dismiss the case for lack of subject matter jurisdiction under USCIT Rule 12(b)(1).  See id.  While the Government did not renew its Motion to Dismiss following Ninestar's filing of the Amended Complaint, the Government did "incorporate by reference [its] initial response to Ninestar's motion for a preliminary injunction" and cited the entirety of its brief at ECF No. 24.  Defs.' Supp. Resp. at 1.  Moreover, all parties and the court understood that exhaustion would be considered as part of the Government's opposition to the Motion for Preliminary Injunction.  See Ct.'s Letter to Parties at 2–3; Pls.' Post-Hearing Subm. at 1–3; Defs.' Post-Hearing Subm. at 2–8.

UFLPA nor any associated regulation outlines an administrative procedure for contesting the

addition of an entity to the Entity List.  The procedure was instead noticed in the <u>Listing Decision</u>,

which allows listed entities to request removal:

> Any listed entity may submit a request for removal (removal request) from the
> UFLPA Entity List along with supporting information to the FLETF Chair at
> FLETF.UFLPA.EntityList[at]hq.dhs.gov.  In the removal request, the entity (or its
> designated representative) should provide information that demonstrates that the
> entity no longer meets or does not meet the criteria described in the applicable
> clause ((i), (ii), (iv), or (v)) of section 2(d)(B) of the UFLPA.  The FLETF Chair
> will refer all such removal requests and supporting information to FLETF member
> agencies.  Upon receipt of the removal request, the FLETF Chair or the Chair's
> designated representative may contact the entity on behalf of the FLETF regarding
> questions on the removal request and may request additional information.
> Following review of the removal request by the FLETF member agencies, the
> decision to remove an entity from the UFLPA Entity List will be made by majority
> vote of the FLETF member agencies.
>
> Listed entities may request a meeting with the FLETF after submitting a removal
> request in writing to the FLETF Chair at FLETF.UFLPA.EntityList[at]hq.dhs.gov.
> Following its review of a removal request, the FLETF may accept the meeting
> request at the conclusion of the review period and, if accepted, will hold the meeting
> prior to voting on the entity's removal request.  The FLETF Chair will advise the
> entity in writing of the FLETF's decision on its removal request.   While the
> FLETF's decision on a removal request is not appealable, the FLETF will consider
> new removal requests if accompanied by new information.

<u>Listing Decision</u>, 88 Fed. Reg. at 38082; <u>see also</u> <u>Notice on the Addition of Entities to the Uyghur</u>

<u>Forced Labor Prevention Act Entity List</u>, 87 Fed. Reg. 47777, 47778 (DHS Aug. 4, 2022)

(detailing the same procedure in a prior Entity List addition notice).

    The Government asks the court to require Ninestar to first request removal from the Entity

List pursuant to FLETF's process before bringing suit before the CIT.  <u>See</u> Defs.' Resp. at 20–21.

Ninestar objects, arguing that (1) the APA prevents the court from requiring exhaustion in

§ 1581(i) cases and, in the alternative, (2) exhaustion would not be prudent here due to the delay,

futility, and inadequacy of FLETF's removal request procedure.  <u>See</u> Pls.' Reply at 5–7 & n.1.

The court first holds that the APA does not categorically bar the CIT from applying prudential exhaustion in cases within its subject matter jurisdiction. The court then concludes that while exhaustion pursuant to FLETF's request removal procedure is generally required, the particular facts of this case do not warrant enforcing the exhaustion requirement.

### A.    The APA Does Not Limit Prudential Exhaustion in CIT Cases

"The doctrine of exhaustion of administrative remedies provides that judicial relief is not available for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." Sunpreme Inc. v. United States, 892 F.3d 1186, 1192 (Fed. Cir. 2018). The exhaustion requirement may apply either by statute, called "statutory exhaustion," or judicial discretion, called "prudential exhaustion." Specifically, "[w]here Congress specifically mandates, exhaustion is required. But where Congress has not clearly required exhaustion, sound judicial discretion governs." McCarthy v. Madigan, 503 U.S. 140, 144 (1992) (citations omitted), superseded by statute on other grounds.

Beyond the exhaustion doctrines that apply generally when reviewing federal agency action is the CIT's unique exhaustion statute. As mentioned above, the CIT has exclusive subject matter jurisdiction over this action under 28 U.S.C. § 1581(i). See Ninestar I, 666 F. Supp. 3d at 1363. And in § 1581(i) actions, "the Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies." 28 U.S.C. § 2637(d). The Federal Circuit has held that in § 2637(d), "Congress has not required exhaustion." Cemex, S.A. v. United States, 133 F.3d 897, 905 (Fed. Cir. 1998). Indeed, Congress's use of the phrase "where appropriate" has "vested discretion in the [CIT] to determine the circumstances under which it shall require the exhaustion

of administrative remedies." <u>Luoyang Bearing Factory v. United States</u>, 26 CIT 1156, 1186 n.26,

240 F. Supp. 2d 1268, 1297 n.26 (2006).

But § 2637(d) is not a mere hollow codification of prudential exhaustion. "Although that

[provision's] statutory injunction is not absolute, it indicates a congressional intent that, absent a

strong contrary reason, the court should insist that parties exhaust their remedies before the

pertinent administrative agencies." <u>Corus Staal BV v. United States</u>, 502 F.3d 1370, 1379 (Fed.

Cir. 2007). And "[o]f paramount importance to any exhaustion inquiry," including prudential

exhaustion, "is congressional intent." <u>McCarthy</u>, 503 U.S. at 144. Indeed, "even in this field of

judicial discretion, appropriate deference to Congress'[s] power to prescribe the basic procedural

scheme under which a claim may be heard in a federal court requires fashioning of exhaustion

principles in a manner consistent with congressional intent and any applicable statutory scheme."

<u>Id.</u> Section 2637(d), then, is a succinct congressional directive to the CIT: require exhaustion

broadly, excuse it carefully.

In a matter of first impression before this court, Ninestar argues that the APA's exhaustion

standard forecloses the prudential exhaustion codified in § 2637(d). Recall that the CIT applies

the APA's standard of review in § 1581(i) actions. <u>See</u> 28 U.S.C. § 2640(e); <u>Humane Soc'y</u>, 236

F.3d at 1324. Section 10(c) of the APA, quoted in relevant part below, gives rise to its own

exhaustion doctrine:

> Except as otherwise expressly required by statute, agency action otherwise final is
> final for the purposes of this section whether or not there has been presented or
> determined an application for a declaratory order, for any form of reconsideration,
> or, unless the agency otherwise requires by rule and provides that the action
> meanwhile is inoperative, for an appeal to superior agency authority.

Court No. 23-00182                                                          Page 21
**PUBLIC VERSION**

5 U.S.C. § 704.  Interpreting that provision, the Supreme Court has held that "where the APA applies," exhaustion "is a prerequisite to judicial review only when [1] expressly required by statute or [2] when an agency rule requires appeal before review and the administrative action is made inoperative pending that review."  Darby v. Cisneros, 509 U.S. 137, 154 (1993).  Absent either circumstance, "[c]ourts are not free to impose an exhaustion requirement as a rule of judicial administration."  Id.  The parties agree that exhaustion here is not expressly required by either the UFLPA or any applicable agency rules.

Ninestar argues that Darby, then, prevents the court from applying prudential exhaustion in this case.  That broad reading—relying on Darby's holding that courts "are not free" to impose prudential exhaustion, 509 U.S. at 154—sets § 10(c) of the APA on a collision course with 28 U.S.C. § 2637.  On the one hand would be § 2637, a specific congressional directive to apply prudential exhaustion.  See Corus Staal, 502 F.3d at 1379.  And on the other would be the APA, which contains a generalized congressional directive barring prudential exhaustion.  See 5 U.S.C. § 704; Darby, 509 U.S. at 154.  To the question of whether the CIT may exercise prudential exhaustion in § 1581(i) cases, § 2637(d) answers yes; the APA and Darby answer no.  Under Ninestar's reading, the two statutes are irreconcilable.

But there is better reading of the two provisions that avoids conflict.  Recall that exhaustion under the APA "is a prerequisite to judicial review only [1] when expressly required by statute or [2] when an agency rule requires appeal before review and the administrative action is made inoperative pending that review."  Darby, 509 U.S. at 145 (emphasis added); see also 5 U.S.C. § 704 ("Except as otherwise expressly required by statute . . . .").  Section 2637 is the statute here that "expressly require[s]" exhaustion and, therefore, exempts CIT cases from the APA default

rule of no prudential exhaustion.  See Corus Staal, 502 F.3d at 1379.  This reading of two potentially conflicting statutes would "give effect to each . . . while preserving their sense and purpose."  Watt v. Alaska, 451 U.S. 259, 267 (1981).

Ninestar disagrees, arguing that § 2637 does not "expressly require[]" exhaustion because of its discretionary, rather than mandatory, nature.  Pls.' Post-Hearing Subm. at 1.  But unlike Darby, where the court was reviewing a statutory limitation on judge-made prudential exhaustion, this case involves two competing statutory directives—one limiting (the APA) and the other authorizing (§ 2637(d)).  Ninestar's theory would mean that Congress could impose either a mandatory exhaustion requirement or no exhaustion requirement, but never a prudential exhaustion requirement.  Relatedly, the Federal Circuit has already determined that § 2637 reflects a congressional intent of implementing prudential exhaustion.  See Corus Staal, 502 F.3d at 1379.  Holding for Ninestar would ignore that legislative directive and run counter to Federal Circuit precedent, effectively turning § 2637 into dead letter for all CIT cases involving the APA.  And at bottom it would be odd to graft Darby's holding, which interprets a statute that limits judicial discretion, onto a statute that authorizes judicial discretion.

The court therefore holds that where § 2637(d) applies, the APA does not bar the CIT from imposing exhaustion requirements.  Interpreting § 2637 to be a statute expressly exempting the default rule of the APA is the best reading because it harmonizes Congress's intentions behind the generally applicable APA and specifically applicable CIT exhaustion statute.  Cf. also RadLAX Gateway Hotel, LLC v. Amalgamated Bank, 566 U.S. 639, 645 (2012) ("It is a commonplace of statutory construction that the specific governs the general.  That is particularly true where . . . Congress has enacted a comprehensive scheme and has deliberately targeted specific problems

with specific solutions." (citations omitted)).  Whereas the APA "limits the authority of courts to

impose additional exhaustion requirements," <u>Darby</u>, 509 U.S. at 145, § 2637 grants that authority

to the CIT.

### B.    *Exhaustion Is Not Appropriate Here*

Having established that § 2637(d) applies here, the court now turns to whether exhaustion

is appropriate under the particular circumstances of this case.  The court concludes that while

exhaustion of FLETF's removal procedure would be appropriate before filing suit in most

circumstances, no exhaustion requirement is warranted here.

Two broad aims motivate the doctrine of exhaustion.  First is Congress's delegation of

responsibility to agencies to oversee and administer federal programs.  <u>McCarthy</u>, 503 U.S. at 145.

Indeed, "[e]xhaustion concerns apply with particular force when the action under review involves

exercise of the agency's discretionary power or when the agency proceedings in question allow

the agency to apply its special expertise."  <u>Id.</u>  Second is judicial efficiency; exhaustion allows an

agency to correct its own errors or further develop a record, which is valuable "especially in a

complex or technical factual context."  <u>Id.</u>  That said, the CIT has not required exhaustion pursuant

to § 2637(d) under four circumstances: when "(1) plaintiff's argument involves a pure question of

law; (2) there is a lack of timely access to the confidential record; (3) a judicial decision rendered

subsequent to the administrative determination materially affected the issue; or (4) raising the issue

at the administrative level would have been futile."  <u>Gerber Food (Yunnan) Co. v. United States</u>,

33 CIT 186, 193, 601 F. Supp. 2d 1370, 1377 (2009); <u>see also</u> <u>Budd Co., Wheel & Brake Div. v.</u>

<u>United States</u>, 15 CIT 446, 452 n.2, 773 F. Supp. 1549, 1555 n.2 (1991) (collecting cases).

The second exception applies here.  Exhaustion is not appropriate in this case because Ninestar did not receive "timely access to the confidential record" or even an explanation of why it was listed.  Gerber, 33 CIT at 193, 601 F. Supp. 2d at 1377.  At the time of filing this action, all the Listing Decision stated—and all that Ninestar knew—was that Ninestar was added to "the section 2(d)(2)(B)(ii) list of the UFLPA for working with the government of Xinjiang to recruit, transport, transfer, harbor or receive forced labor or Uyghurs, Kazakhs, Kyrgyz, or members of other persecuted groups out of Xinjiang." 88 Fed. Reg. at 38082.  That is a near-verbatim recitation of the statutory language.  See UFLPA § 2(d)(2)(B)(ii), 135 Stat. at 1527.  That is not to suggest that the FLETF's language in the Listing Decision is error under the APA.  See infra section II.A.1.  Nor does the court suggest that other UFLPA cases in the future—which may involve listing decisions accompanied by more detail than what was given here—are categorically exempt from the exhaustion requirement.  But this court has regularly recognized that exhaustion would be "necessarily speculative, illogical, and useless" when the facts or argumentation supporting an agency's conclusion either did not exist at the time of the opportunity to exhaust, Mid Continent Steel & Wire, Inc. v. United States, 41 CIT __, __, 219 F. Supp. 3d 1326, 1337 (2017) (facts supporting the challenge arose in the final determination, which was after the opportunity to exhaust), or were not yet made available to a party challenging agency action, see Philipp Bros., Inc. v. United States, 10 CIT 76, 80, 630 F. Supp. 1317, 1321 (1986) (plaintiff did not have timely access to confidential administrative record, which it "needed to make presentation of alternative arguments possible").  To illustrate the point, consider a hypothetical routine CIT case in which Commerce issues a final order stating, with no additional explanation, that an entity is selling subject merchandise at less than fair value.  See 19 U.S.C. § 1677b.  Refuting that broad conclusion

would of course be a "necessarily speculative, illogical, and useless" task. <u>Mid Continent</u>, 219 F.

Supp. 3d at 1337.

In short, parties are not held to the standard of guessing or preempting an agency's

reasoning when presented with the option to exhaust administrative remedies. Citing no cases to

the contrary of that principle, the Government instead contends that prudential concerns of agency

expertise and judicial efficiency, the twin aims of the exhaustion doctrine, compel exhaustion here.

<u>See</u> <u>McCarthy</u>, 503 U.S. at 145–46. But those benefits of exhaustion would have applied in greater

force if Ninestar had an opportunity to request delisting at the agency level with the benefit of

more than a near-verbatim recitation of the UFLPA. The FLETF's expertise on forced labor brings

little to bear on an agency-level delisting request where Ninestar cannot dispute or characterize the

agency's reasoning or belief. And gains to judicial efficiency are slim where Ninestar cannot

identify evidence that would allow the agency to correct its errors or hone the record. Dismissing

this case to encourage speculative exhaustion would not meaningfully further those twin aims here.

Requiring the exhaustion of administrative remedies is therefore not "appropriate" under the

particular facts of this case.[11]  28 U.S.C. § 2637(d).

## II.        *Ninestar Is Not Entitled to Preliminary Relief*

Ninestar requests a preliminary injunction to stay the Listing Decision and to prevent the

Government from taking any action against the importation of Ninestar's goods predicated on the

Listing Decision. <u>See</u> PI Mot. at 2. A preliminary injunction is an extraordinary remedy that is

"never awarded as of right." <u>Winter v. Nat. Res. Def. Council, Inc.</u>, 555 U.S. 7, 24 (2008) (citing

---

[11] The court later explains how, in future UFLPA cases, the twin aims of exhaustion may be
harmonized with the need for adequate explanation of agency action. <u>See</u> <u>infra</u> note 15.

Court No. 23-00182                                                                          Page 26
**PUBLIC VERSION**

Munaf v. Geren, 553 U.S. 674, 689–90 (2008)); see also Invenergy Renewables LLC v. United

States ("Invenergy I"), 44 CIT __, __, 422 F. Supp. 3d 1255, 1280 (2019).  The court weighs four

factors when deciding whether to grant a preliminary injunction: (1) whether the plaintiff is likely

to succeed on the merits; (2) whether the plaintiff would suffer irreparable harm without the

preliminary injunction; (3) whether the balance of hardships favors the plaintiff; and (4) whether

the preliminary injunction would serve the public interest.  See, e.g., Winter, 555 U.S. at 20; Silfab

Solar, Inc. v. United States, 892 F.3d 1340, 1345 (Fed. Cir. 2018); Invenergy I, 422 F. Supp. 3d at

1280.  "[T]he movant, by a clear showing, carries the burden of persuasion" on a motion for

preliminary injunction.  Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (internal quotation

marks, emphasis, and citation omitted).

        Because Ninestar does not make a clear showing on any of the four factors, the Motion for

Preliminary Injunction is denied.

### A.    *Ninestar Is Not Likely to Succeed on the Merits*

        Ninestar asserts likelihood of success on the merits for three out of the four challenges to

the Listing Decision: (1) arbitrary and capricious agency action for failure to explain agency action;

(2) agency action in excess of statutory authority for FLETF's use of a burden of proof that is

below preponderance of the evidence; and (3) agency action in excess of statutory authority for

having applied the UFLPA's provisions retroactively.  See Am. Compl. ¶¶ 61–68, 72–79.[12]  Tying

_____

[12] For the purposes of the Motion for Preliminary Injunction, Ninestar does not argue likelihood of success on the merits on Count 2 of the Amended Complaint, which alleges arbitrary and capricious agency action for lack of substantial evidence.  Ninestar explains that Count 2 "requires a detailed parsing of the record more suitable for Ninestar's forthcoming motion for judgment."  Pls.' Supp. Reply at 1 n.1.

Court No. 23-00182                                                                                        Page 27
**PUBLIC VERSION**

these causes of actions together is the request to "vacat[e] [the] FLETF's determination to add

Plaintiffs to the UFLPA Entity List and remand[] to [the] FLETF for such further action as is

lawful and appropriate consistent with the APA and other applicable laws." Id. at 23. That request

for relief is consistent with the Motion for Preliminary Injunction, which urges the court to "stay[]

the Listing Decision and prevent[] Defendants from taking any action against the importation of

Plaintiffs' goods predicated on the Listing Decision." PI Mot. at 2; see also Pls.' Br. at 11

("Because FLETF failed to explain its decision at all, that final agency action must be vacated.

Ninestar is therefore likely to succeed on the merits.").

### 1.    *Adequate Explanation*

Ninestar's first cause of action is that the Listing Decision must be vacated because it

lacked an adequate explanation, rendering it arbitrary and capricious agency action under the APA.

See Am. Compl. ¶¶ 61–68; see also Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut.

Auto. Ins. Co., 463 U.S. 29, 43 (1983) (holding that an agency acts unlawfully when it fails to

"articulate a satisfactory explanation for its action"). Upon review of the Public Administrative

Record filed in this litigation, the court concludes that the FLETF has provided an adequate

explanation that allows for meaningful judicial review at this preliminary stage of the litigation.

Recall that the Listing Decision states:

This update adds two entities and eight subsidiaries to the section 2(d)(2)(B)(ii) list
of the UFLPA for working with the government of Xinjiang to recruit, transport,
transfer, harbor or receive forced labor or Uyghurs, Kazakhs, Kyrgyz, or members
of other persecuted groups out of Xinjiang: . . . Ninestar Corporation and its eight
Zhuhai-based subsidiaries . . . .

88 Fed. Reg. at 38082. Compare that language to the text of the UFLPA, which requires the

FLETF to create a strategy that includes, as the second sub-list, "a list of entities working with the

government of the Xinjiang Uyghur Autonomous Region to recruit, transport, transfer, harbor or receive forced labor or Uyghurs, Kazakhs, Kyrgyz, or members of other persecuted groups out of the Xinjiang Uyghur Autonomous Region."  UFLPA § 3(d)(2)(B)(ii), 135 Stat. at 1527.  Beyond reciting the statutory text, the FLETF does not include any further explanation for adding Ninestar to the Entity List.

    As a general matter, a conclusory recitation of the statute without further explanation plainly fails the APA's arbitrary and capricious standard.  See Amerijet Int'l, Inc. v. Pistole, 753 F.3d 1343, 1350 (D.C. Cir. 2014) ("[C]onclusory statements will not do; an agency's statement must be one of reasoning." (internal quotation marks and citation omitted)); Dickson v. Sec'y of Def., 68 F.3d 1396, 1405 (D.C. Cir. 1995) ("When an agency merely parrots the language of a statute without providing an account of how it reached its results, it has not adequately explained the basis for its decision.").  That is because an agency's "explanation must reasonably tie the determination under review to the governing statutory standard and to the record evidence by indicating what statutory interpretations the agency is adopting and what facts the agency is finding."  CS Wind Viet. Co. v. United States, 832 F.3d 1367, 1376 (Fed. Cir. 2016).  That requirement is not mere formalism but a "basic principle" in administrative law that is "indispensable to sound judicial review."  Amerijet, 753 F.3d at 183.  "Such an explanation enables [the court] to fulfill [its] review function and also to avoid making choices reserved to the agency," id., which "would remove the discretionary judgment from the agency to the court," ICC v. Brotherhood of Locomotive Eng'rs, 482 U.S. 270, 283 (1987); see also, e.g., SMA Surfaces, Inc. v. United States, 47 CIT __, __, 617 F. Supp. 3d 1263, 1277 (2023) (applying the same principle under the CIT-specific administrative review statute); Nucor Corp. v. United States, 44 CIT __,

__, 461 F. Supp. 3d 1374, 1379 (2020) (same); <u>Borusan Mannesmann Boru Sanayi ve Ticaret A.S.</u>
<u>v. United States</u>, 41 CIT __, __, 222 F. Supp. 3d 1255, 1268–69 (2017) (same, with a discussion
of <u>Amerijet</u>).

When the grounds for agency action are inadequate, "a court may remand for the agency
to do one of two things:  First, the agency can offer a fuller explanation of the agency's reasoning
<u>at the time of the agency action</u>."  <u>Dep't of Homeland Sec. v. Regents of the Univ. of California</u>,
140 S. Ct. 1891, 1907 (2020) (internal quotation marks and citation omitted).  Importantly, "[w]hen
an agency's initial explanation 'indicate[s] the determinative reason for the final action taken,' the
agency may elaborate later on that reason (or reasons) but may not provide new ones."  <u>Id.</u> (quoting
<u>Camp v. Pitts</u>, 411 U.S. 138, 143 (1973) (per curiam)).  Second, "the agency can 'deal with the
problem afresh' by taking <u>new</u> agency action."  <u>Id.</u> (quoting <u>SEC v. Chenery Corp.</u>, 332 U.S. 194,
201 (1947)).

It is the first route that is relevant here.  When the Listing Decision was published on June
12, it recited the UFLPA's statutory provisions.  <u>See</u> <u>Amerijet</u>, 753 F.3d at 1350.  But the Listing
Decision, which "may have been curt," nonetheless "surely indicated the determinative reason for
the final action taken."  <u>Camp</u>, 411 U.S. at 143.  The agency's determinative reason—easily
discerned here—was that Ninestar was allegedly working with the XUAR government to recruit,
transport, transfer, harbor or receive forced labor or persecuted minorities out of the XUAR.  <u>See</u>
<u>Listing Decision</u>, 88 Fed. Reg. at 38082.  If that were the only basis for the FLETF's Listing
Decision that was ever provided to Ninestar, a remand for the FLETF to "elaborate later on that
reason" but to "not provide new ones" may have been appropriate.  <u>Dep't of Homeland Sec.</u>, 140
S. Ct. at 1907.

But that was not the only basis that was provided to Ninestar.  As part of its litigation before the CIT, the FLETF docketed a Public Administrative Record, Oct. 3, 2023, ECF No. 24-1 ("PAR").  The first two pages of the Public Administrative Record are a memorandum from DHS explaining that the Listing Decision is based on an allegation from an informant, whose identity is redacted, as well as:

> PRC government documents, Ninestar's company documents, and media reports that corroborate that Ninestar is participating in the PRC government's 'poverty alleviation' programs transferring laborers from 'remote and underdeveloped areas' to its facilities.  This information reasonably indicates that these workers from the [XUAR] were coerced to enter state-sponsored labor transfer programs and are unable to leave voluntarily once they begin working in the facilities, which are thousands of miles away from their hometowns in the [XUAR].

PAR 1.  In a later document, the FLETF states that Ninestar "is reported to have worked with the government of the [XUAR] through a third-party agency" and that "[a]ll sources . . . corroborate that Uyghur laborers working at Zhuhai Ninestar facilities were recruited, transferred, and are presently still monitored by the officials of the XUAR government."  PAR 4.  The FLETF also elaborates that "Ninestar's company documents disclose its participation in the 'poverty alleviation' programs sponsored by the Guangdong provincial government.  Such information is further supported, both directly and circumstantially, by PRC government agencies and state media reports."  PAR 6.  In other words, whereas the June 12 publication of the Listing Decision did not have an accompanying explanation, the October 3 filing of the Public Administrative Record supplied that explanation.

At this juncture, that explanation satisfies the APA.  The UFLPA listing under § 3(d)(2)(B)(ii) requires the entity to be "[1] working with the government of the Xinjiang Uyghur Autonomous Region [2] to recruit, transport, transfer, harbor or receive [3] forced labor or

Uyghurs, Kazakhs, Kyrgyz, or members of other persecuted groups [4] out of the Xinjiang Uyghur

Autonomous Region." UFLPA § 3(d)(2)(B)(ii), 135 Stat. at 1527. The connection between the

facts found and each element is either expressly discussed in, or reasonably discerned from, the

Public Administrative Record: (1) officials of the XUAR government, through a third-party

agency, are involved; (2) laborers are recruited, transferred, and presently still monitored by such

officials; (3) the laborers are Uyghurs; and (4) the participation of Uyghurs in the PRC's 'poverty

alleviation' programs transferring laborers from 'remote and underdeveloped areas' is a reasonable

indication that such individuals were removed from their hometowns in the XUAR. The FLETF's

explanation therefore "reasonably tie[s] the determination under review to the governing . . .

standard and to the record evidence by indicating . . . what facts the agency is finding," CS Wind

Viet., 832 F.3d at 1376, and allows for meaningful judicial review, see Amerijet, 753 F.3d at 183.

Ninestar is therefore not likely to succeed on the merits of its adequate explanation claim at this

juncture.

      The Government takes it further, arguing that the filing of the administrative record renders

Ninestar's adequate explanation challenge moot. Not quite. "[A]n issue becomes moot 'when it

is impossible for a court to grant any effectual relief whatever to the prevailing party.'" Sea

Shepherd N.Z. v. United States, 47 CIT __, __, 639 F. Supp. 3d 1367, 1376 (2023) (quoting Chafin

v. Chafin, 568 U.S. 165, 172 (2013)). Later in these proceedings, either a more developed agency

record or the adjudication of Ninestar's substantial evidence claim could hypothetically lead to a

remand order requiring the FLETF to supply further explanation or reconsideration of the Listing

Decision. For example, Ninestar contends that relief is still available because the FLETF's

explanation "suffers from several explanatory deficiencies," and Ninestar cites to purported

**PUBLIC VERSION**

mismatches between certain facts in the Confidential Administrative Record and the FLETF's

explanation in support of the listing determination.[13]  Am. Compl. ¶ 68; see also Pls.' Supp. Br. at

9–11.  To be clear, it would be premature to opine on those challenges now.  Those arguments are

more accurately characterized as challenges to agency action for lack of substantial evidence,

which is any "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion."  Broadcom Corp. v. Int'l Trade Comm'n, 28 F.4th 240, 249 (Fed. Cir. 2022).  And

Ninestar does not advance its substantial evidence challenge at the preliminary injunction stage,

see supra note 12, so the court reserves it for final resolution in the Motion for Judgment on the

Agency Record.  But because remand for additional explanation remains a possible remedy in this

case, the court holds that the first cause of action remains live.[14]  Accordingly, without expressing

---

[13] Specifically, Ninestar's objections refer to portions of the Confidential Administrative Record,
including:

1.  A challenge to the FLETF's conclusion that Ninestar works "with the government of the
    [XUAR]" when [[
    ]]. PAR 4; CAR 4.

2.  A challenge to the FLETF's conclusion that Ninestar "works," presently, with the XUAR
    government, PAR 2, when its evidence purportedly only dates [[                              ]]. But
    see also infra section II.A.3 (holding that Ninestar is unlikely to prevail on its retroactivity
    challenge).

3.  A challenge to the FLETF's conclusion that Ninestar's [[


    ]].

See Am. Compl. ¶ 68.

[14] Ninestar also objects to mootness on the basis that the explanation in the "Confidential
Administrative Record . . . was not issued publicly."  Am. Compl. ¶ 67; Pls.' Supp. Br. at 8; see
also Invenergy Renewables LLC v. United States ("Invenergy IV"), 44 CIT __, __, 476 F. Supp.
3d 1323, 1331 (2020) (requiring the agency's explanation to be "made available to the parties or

Court No. 23-00182                                                                       Page 33
*PUBLIC VERSION*

any view as to the weight of the record evidence, the court concludes that Ninestar is not likely to

succeed on the merits of its adequate explanation claim, subject to the further proceedings of this

case.[15]

## 2. *Burden of Proof*

In its third cause of action, Ninestar requests that the Listing Decision be vacated for the

FLETF's failure to apply the correct burden of proof. See Am. Compl. ¶¶ 72–75. The FLETF

---

to the public at large"). But because Public Administrative Record is sufficient here for adequate
notice, that objection is inapposite.

[15] The court's holding is not to say that suing the FLETF before the CIT is the proper way for listed
entities to receive adequate notice. "Requiring that the parties litigate a final agency decision in
order to gain knowledge of and access to the agency's rationale wastes judicial resources and
delays corrective agency action that would otherwise be addressed by the agency in the first
instance." Invenergy, 476 F. Supp. 3d at 1347. As noted above, the FLETF was likely obligated
to provide more than what it did in the Listing Decision. See Amerijet, 753 F.3d at 183. Better
avenues for disclosure would include either the Federal Register notice itself or, considering the
unique sensitivities involved with the foreign affairs implications of the FLETF's determinations,
the FLETF's delisting request process. See, e.g., Strait Shipbrokers Pte. Ltd. v. Blinken, 560 F.
Supp. 3d 81, 94 (D.D.C. 2021) (denying challenge to OFAC designation notice, which repeated
verbatim the language of an executive order, for inadequate explanation under the APA because
the agency did not need to "immediately turn over the entire administrative record on or around
the date of designation" and the State Department later provided "more specific information"
through its administrative process for reconsideration).

This case's particular facts counsel the court to move on from this procedural quandary, both on
legal grounds, since the adequate notice requirement is likely satisfied by the filing of the Public
Administrative Record, and on prudential grounds, since exhaustion will no longer promote
economy here. See also supra section I.B. But the FLETF would do well to offer a more developed
explanation before future disputes reach the court. Conversely, if future litigants fail to exhaust
their remedies and then bring suit for lack of adequate explanation, this decision provides notice
that exhaustion may be particularly appropriate for those future cases so that listed entities receive
an explanation for their listing first. See 28 U.S.C. § 2637(d). Exhaustion of the FLETF's delisting
procedure, rather than litigation, is the preferable route through which a litigant should receive
adequate notice; it better conserves judicial resources and it makes use of the FLETF's expertise.
See McCarthy, 503 U.S. at 145.

determined that there was "reasonable cause to believe" that Ninestar was working with the XUAR

government in violation of the UFLPA.  PAR 2.  Ninestar argues that the FLETF erred because it

is "well-established" that, absent statutory instruction to the contrary, "preponderance of the

evidence is the minimal appropriate burden of proof in administrative proceedings."  Rodriguez v.

Dep't of Veteran Affs., 8 F.4th 1290, 1301 (Fed. Cir. 2021); see also Am. Compl. ¶¶ 74.  Ninestar

is not likely to succeed on the merits of this challenge.

No applicable statute expressly supplies a burden of proof here.  The UFLPA does not

specify a burden of proof for the FLETF when it determines whether an entity has engaged in

culpable conduct warranting addition to the Entity List.  See UFLPA § 2(d)(2)(B), 135 Stat. at

1527.  Nor does the APA, which establishes a preponderance-of-the-evidence standard for formal

agency adjudications but does not mandate a particular burden of proof for informal agency

adjudications like the one at issue here.  See Steadman v. SEC, 450 U.S. 91, 102 (1981) (reading

the burden of proof into 5 U.S.C. § 556(d), which applies only to formal adjudications).  Also

silent is the CIT's statute governing burdens of proof in agency proceedings.  See 28 U.S.C.

§ 2639.  "Where Congress has not prescribed the degree of proof which must be adduced by the

proponent of a rule or order to carry its burden of persuasion in an administrative proceeding," the

judiciary "has felt at liberty to prescribe the standard, for '[i]t is the kind of question which has

traditionally been left to the judiciary to resolve.'"  Steadman, 450 U.S. at 95 (quoting Woodby v.

INS, 385 U.S. 276, 284 (1966)).[16]

---

[16] The Government states that because the APA does not supply a burden of proof for informal
adjudications, "the FLETF is free to select a burden of proof appropriate under the circumstances."
Defs.' Supp. Resp. at 10.  The Government cites no authority for its position.  Moreover, the
Government's position would seem to lie in tension with Steadman, which left the question of

Relatedly, the Federal Circuit has held that "[p]reponderance of the evidence has long been recognized as the traditional burden of proof in civil administrative proceedings." Rodriguez, 8 F.4th at 1299 (citing Herman & MacLean v. Huddleston, 459 U.S. 375, 389–90 (1983); Steadman, 450 U.S. 91, 101 n.21 (1981)).[17]  That said, "[t]here may be exceptional circumstances in which a lower burden of proof than preponderance of the evidence could legitimately be applied. . . . But those circumstances would be rare and would typically require an explicit directive to use a burden of proof lower than preponderance in order to justify departing from the traditional standard." Id. at 1301.  If not express, the burden of proof may be implied from congressional intent, as inferred from text, context, and even legislative history.  See Steadman, 450 U.S. at 98–102 (using numerous tools of statutory interpretation); Rodriguez, 8 F.4th at 1301 (looking for "any language," either "explicit[]" or "implicit[]," concerning burden of proof).

---

administrative burdens of proof to the judiciary's "liberty" rather than the agency's discretion.  450 U.S. at 95; cf. FAG Italia S.p.A. v. United States, 291 F.3d 806, 816 (Fed. Cir. 2002) ("[T]he absence of a statutory prohibition cannot be the source of agency authority.").

To the extent that the FLETF suggests that the court owes deference to its choice of burden of proof, see Defs.' Supp. Br. at 11, that is not so, absent a statutory or regulatory hook upon which an agency may interpret ambiguous text.  See Bender v. Clark, 744 F.2d 1424, 1430 (10th Cir. 1984) ("The deference given to an agency's decision on a matter requiring expertise should be made only in the judicial forum . . . .  Hence, the scope of judicial review of final agency action has no effect on the requisite standard of proof in the administrative hearing itself." (citing FPC v. Fla. Power & Light Co., 404 U.S. 453, 463 (1972))).

[17] The agency proceeding under review in Rodriguez was a process "by which the Secretary of Veterans Affairs may remove, demote, or suspend employees of the Department of Veterans Affairs [('DVA')] 'if the Secretary determines the performance or misconduct of the covered individual' warrants such measures."  Id. at 1297 (quoting 38 U.S.C. § 714(a)(1)).  Because DVA-specific statutes, not the APA, governed those agency proceedings, see 38 U.S.C. § 714, Rodriguez does not conclusively resolve this case.

Reasonable cause is the appropriate burden of proof for UFLPA listing decisions. "In determining whether Congress has specifically addressed the question at issue, a reviewing court should not confine itself to examining a particular statutory provision in isolation." FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 132 (2000). Instead, it is "presumed that Congress legislates against the backdrop of existing law." Gazelle v. Shulkin, 868 F.3d 1006, 1011 (Fed. Cir. 2017). The operative existing law here, of course, is section 307. See Ninestar I, 666 F. Supp. 3d at 1361 (holding that the UFLPA and section 307 "do not operate independently from one another"). Indeed, the UFLPA's express goal is to "strengthen the prohibition against the importation of goods made with forced labor, including by ensuring that the Government of the People's Republic of China does not undermine the effective enforcement of section 307." UFLPA § 1(1), 135 Stat. at 1525.

Reasonable cause furthers that goal in two meaningful ways. First, a reasonable cause burden of proof avoids an illogical asymmetry where the Government can more easily obtain section 307 embargoes than UFLPA embargoes. Under the UFLPA, the FLETF makes the singular decision of listing an entity. See UFLPA § 2(d)(2)(B), 135 Stat. at 1527. Once the listing decision is issued, a presumptive embargo enters into force. See id. § 3(a), 135 Stat. at 1529; Ninestar I, 666 F. Supp. 3d at 1363. Enforcement of section 307 and its associated regulations, however, is more complicated and involves three successive agency actions.[18] First, a Customs

---

[18] More specifically, under the implementing regulations of section 307, if a port director or Customs officer "has reason to believe that any class of merchandise that is being, or is likely to be, imported into the United States is being produced" with forced labor, then such official will communicate their belief to the Commissioner of Customs. 19 C.F.R. § 12.42(a). If Customs "finds at any time that information available reasonably but not conclusively indicates that merchandise within the purview of section 307 is being, or is likely to be, imported," the agency

officer initiates an investigation of merchandise based on a reason to believe.  <u>See</u> 19 C.F.R.

§ 12.42(a).  Next, Customs issues a WRO against particular merchandise based on its "reasonabl[e]

but not conclusive[]" belief, <u>see id.</u> § 12.42(e), which is comparable to a burden of proof of

reasonable cause.  At that point, an embargo against that suspect merchandise goes into effect.  <u>See</u>

<u>id.</u>  Finally, Customs publishes a formal finding based on its preponderance-of-the-evidence

"determin[ation]."  <u>See id.</u> § 12.42(f).

Ninestar argues that the preponderance standard for formal section 307 findings, rather

than the reasonable cause–like standard for section 307 WROs, should apply to UFLPA listing

decisions.  <u>See</u> Pls.' Post-Hearing Subm. at 5.  But Congress designed the UFLPA against the

backdrop of section 307's existing statutory and regulatory enforcement scheme.  <u>See</u> <u>Gazelle</u>, 868

F.3d at 1011.  And under that scheme, section 307 WROs, not formal section 307 findings, are the

main method of forced labor enforcement.  Customs currently enforces fifty-one section 307

WROs dating from 1991 but only eight formal section 307 findings.  <u>See</u> <u>Withhold Release Orders</u>

<u>and Findings List</u>, Customs, https://www.cbp.gov/trade/forced-labor/withhold-release-orders-

and-findings (last updated Nov. 17, 2023).  Moreover, WROs were the Government's main method

of targeting forced labor associated with Xinjiang before the UFLPA's effective date of June 22,

2022.  <u>See</u> <u>FLETF Strategy</u>, <u>supra</u>, at 28.  Those WROs even served as the "initial sources for the

---

issues an order withholding release of the merchandise ("withhold-release orders," or "WROs").
<u>Id.</u> § 12.42(e).  The WRO is subject to further "instructions from the Commissioner as to whether
the merchandise may be released otherwise than for exportation."  <u>Id.</u>

Upon completion of its investigation, if Customs "determine[s] on the basis of the foregoing that
the merchandise is subject" to section 307, "a finding to that effect" is published in the <u>Federal</u>
<u>Register</u>, after which point the importer may rebut the finding with "satisfactory evidence that the
merchandise" did not involve forced labor.  <u>Id.</u> § 12.42(f)–(g).

entities listed" pursuant to the UFLPA.  Id. at 22.  If the UFLPA required a preponderance of the

evidence instead of reasonable cause, the Government would need more evidence for UFLPA

embargoes than it does for section 307 WROs.  Section 307 WROs would become the easier

method of achieving Congress's directive of quickly prohibiting the entry of goods made with

forced labor.  But that would hardly "strengthen the prohibition against the importation of goods

made with forced labor" and would fall short of "ensuring . . . the effective enforcement of section

307."  UFLPA § 1(1), 135 Stat. at 1525 (emphasis added).  Reasonable cause, by contrast, better

strengthens forced labor enforcement by bringing UFLPA listing decisions in line with section 307

WROs and avoiding that statutory asymmetry.

Second, a preponderance standard in the UFLPA would not cohere with Congress's

concern with the difficulty of obtaining information regarding forced labor in China.  Congress

wanted to ensure that "the Government of the People's Republic of China," specifically, did not

"undermine the effective enforcement of section 307."  UFLPA § 1(1), 135 Stat. at 1525.  Beyond

that express statement of purpose, one lawmaker elaborated on the House floor:

> It has been illegal to import forced labor products into the United States for more
> than 90 years, but it is exceedingly difficult to spot them since Chinese producers
> often mix together products that are the result of both involuntary and voluntary
> labor.  Moreover, the lack of Chinese Government transparency and the police state
> atmosphere in Xinjiang make auditing of product sourcing unreliable if not
> impossible, according to the [Biden] administration's "Xinjiang Supply Chain
> Business Advisory."

212 Cong. Rec. H7499 (daily ed. Dec. 8, 2021) (statement of Rep. Jim McGovern).[19]  Put simply,

the UFLPA is in part intended to overcome the transparency issues prohibiting section 307's

---

[19] Another representative put the transparency issue in starker terms:

effective enforcement in Xinjiang.  The Government offers helpful examples in its briefing, such

as the fact that "the Chinese government must sign off on all information obtained from China,

which limits the availability of reliable information," Defs.' Supp. Resp. at 8, or that China has

evaded U.S. forced labor enforcement by developing a "web of agents, shippers, suppliers, and

sub-contractors" to "easily hide a product's point of origin," as well as "alternate product and

prison names" and "strictly limited" access to facilities.  Sarah A. Thornton, Importing Prison

Labor Products from the People's Republic of China: Re-Examining U.S. Enforcement of Section

307 of the Trade and Tariff Act of 1930, 3 Pac. Rim L. & Pol'y J. 437, 450–51 (1995).  Faced with

such informational scarcity, the FLETF under the preponderance standard would be required to

"rule out" a listed entity's "explanation for suspicious facts," even if it did not have the realistic

ability to do so.  District of Columbia v. Wesby, 583 U.S. 48, 61 (2018).  Requiring a

preponderance would therefore frustrate, not enhance, the FLETF's efforts to effectively

implement section 307's prohibition in Xinjiang.[20]

---

> We have no access, Mr. Speaker, to the concentration camps in Xinjiang.  We have
> no idea [sic] the supply chains.  It is closed.  It is a dictatorship.  There are no onsite
> inspections.  Again, we are talking genocide against these Muslims who are being
> wiped off the face of the Earth.

Id. at H7501 (statement of Rep. Christopher Smith).

[20] Ninestar contends that preserving the preponderance standard would not mean that the UFLPA
is a weaker enforcement tool than section 307.  See Pls.' Post-Arg. Subm. at 6.  Ninestar argues
that a few key differences between the two statutes would still give the UFLPA relative force: (1)
the UFLPA's replacement of Customs's findings as to particular merchandise under section 307
with a presumption that goods made in a certain region or by certain entities are subject to section
307; (2) the UFLPA's replacement of section 307's "satisfactory evidence" burden with "clear and
convincing evidence" when an importer tries to overcome an embargo; and (3) the UFLPA's
removal of the section 307 investigation and WRO steps entirely, jumping straight to the embargo.
See id.  While all true, those differences do not prove Ninestar's point that there is nothing in the
UFLPA to suggest that reasonable cause is preferable to preponderance of the evidence.  As

In sum, no law expressly supplies an administrative burden of proof in this case.  The court

concludes that a reasonable-cause burden of proof best coheres with Congress's clear intention of

promoting the effective enforcement of section 307.  Reasonable cause avoids the statutory

asymmetry that would follow from a preponderance standard and reflects the unique challenges to

forced labor enforcement involving Xinjiang.  Because the FLETF applied a burden of proof

consistent with the regulatory scheme created by section 307 and the UFLPA,[21] Ninestar is not

likely to succeed on the merits of its third cause of action.

### 3.      Retroactivity

Ninestar lastly argues that the Listing Decision should be vacated because the FLETF based

its Listing Decision on alleged conduct that preceded the UFLPA, which does not apply

retroactively.  See Pls.' Supp. Br. at 6.  "Retroactivity is not favored in the law," Bowen v.

---

discussed above, implementing a preponderance standard would interpret the statute in a manner
inconsistent with express congressional intent and the underlying section 307 enforcement scheme.

[21] Even assuming that the UFLPA and the underlying section 307 enforcement scheme compel no
result on the burden of proof question, the Rodriguez default rule is inapposite here.  Yes,
"[p]reponderance of the evidence has long been recognized as the traditional burden of proof in
civil administrative proceedings," but this case is far from a traditional civil administrative
proceeding.  Rodriguez, 8 F.4th at 1299.  Ninestar is a foreign company with insufficient contacts
in the United States to grant it any constitutional rights, see People's Mojahedin Org. of Iran v.
U.S. Dep't of State, 182 F.3d 17, 22 (D.C. Cir. 1999), and it lacks any express statutory rights
regarding burden of proof.

Rodriguez's default rule fits well with more typical adjudicative proceedings that are generally
bounded by due process concerns, such as veterans' benefits eligibility.  By contrast, reasonable
cause–like standards in more analogous agency determinations concerning U.S. foreign and
economic policy, such as listing decisions by Commerce's Bureau of Industry Security ("BIS")
and the Department of the Treasury's Office of Foreign Assets Control ("OFAC"), form a better
basis for a presumptive standard of proof here.  See 15 C.F.R. § 744.11(b) (authorizing BIS listings
based on "reasonable cause to believe"); Kadi v. Geithner, 42 F. Supp. 3d 1, 12 (D.D.C. 2012)
(upholding OFAC's "reason to believe" standard).

Georgetown Univ. Hosp., 488 U.S. 204, 208 (1988), and courts "will construe a statute to avoid retroactivity unless there is clear evidence that Congress intended otherwise," Hicks v. Merit Sys. Prot. Bd., 819 F.3d 1318, 1321 (Fed. Cir. 2016).

The Government does not dispute that the UFLPA is solely prospective.  See Defs.' Supp. Resp. at 12.  The parties appear to agree that because the UFLPA requires the listed entity to be "working" with the XUAR government to recruit, transport, transfer, harbor or receive forced laborers or ethnic minorities, UFLPA § 2(d)(2)(B)(ii), 135 Stat. at 1527, the FLETF must reasonably conclude that Ninestar's alleged conduct occurred after the statute's enactment.  See Frederick v. Shinseki, 684 F.3d 1263, 1270 (Fed. Cir. 2012) (noting that words used in the present tense describe future and present conduct but generally do not describe past conduct).  The Government argues that (1) the information provided by the informant supports a finding of post-enactment violations of the UFLPA, and that (2) there are otherwise no retroactivity concerns where pre-enactment conduct is being used as evidence of post-enactment violations.  See Defs.' Supp. Resp. at 12.[22]

The Government has it right on both points.  Having reviewed the unredacted Confidential Administrative Record in camera pursuant to 28 U.S.C. § 2635(d)(2),[23] the court concludes that the redacted information constitutes record evidence of post-enactment violations of the UFLPA

---

[22] The Government does not appear to dispute that, out of all the record evidence, it is only the redacted information from the confidential informant that describes ongoing violations of the UFLPA.  See id.  The Government does, however, argue that past evidence can support a finding of continuing violations of the UFLPA.  See id.

[23] "The confidential or privileged status of [the record] shall be preserved in the civil action, but the court may examine such material in camera and may make such material available under such terms and conditions as the court may order."  Id. § 2635(d)(2) (emphasis added).

at Ninestar's Zhuhai facilities.  Moreover, where there is record evidence of post-enactment

conduct, an agency's reliance on evidence dated before the statute is not per se unreasonable, see,

e.g., N. Plains Res. Council, Inc. v. Surface Transp. Bd., 668 F.3d 1067, 1086 (9th Cir. 2011)

(agency's reliance on ten-year-old data, without "any scientific studies or testimony in the record"

that the data was substantially the same ten years later, was arbitrary and capricious), nor does it

run afoul of the presumption against retroactivity, see, e.g., Frontier-Kemper Constructors, Inc. v.

U.S. Dep't of Lab., 876 F.3d 683, 689 (4th Cir. 2017), as amended (Dec. 12, 2017) ("[A] statute

has no retroactive effect where the conduct being regulated begins before a statutory change occurs

and continues after that change has taken effect."); McAndrews v. Fleet Bank of Mass., N.A., 989

F.2d 13, 16 (1st Cir. 1993) ("Even when the later-occurring circumstance depends upon the

existence of a prior fact, that interdependence, without more, will not transform an otherwise

prospective application into a retroactive one." (citing N.Y. Cent. & Hudson River R.R. Co. v.

United States, 212 U.S. 500, 505–06 (1909))).

      Today's holding is limited to the narrow question of whether there is any quantum of record

evidence supporting a finding of post-enactment culpable conduct.  Because such record evidence

exists in the form of the redacted informant evidence, Ninestar is not likely to succeed on its

retroactivity challenge.[24]  And with all three of Ninestar's asserted challenges unlikely to prevail

on the merits, the court concludes that Ninestar fails to satisfy the first prong of the preliminary

---

[24] Hypothetically, if the weight of the informant evidence is questioned at a later stage of this
litigation and the evidentiary link between post-enactment and pre-enactment conduct is
weakened, then the FLETF's Listing Decision could conceivably be presented with substantial
evidence and retroactivity issues.  But at this preliminary juncture, the court makes clear that it
does not intimate any view as to the weight of any record evidence.  See also supra section II.A.1.

injunction analysis.[25]

## B. *Ninestar Has Not Established Irreparable Harm*

Regarding the next prong of the preliminary injunction inquiry, Ninestar argues that it has

suffered and will continue to suffer irreparable harm due to the Listing Decision absent a

preliminary injunction. "A preliminary injunction will not issue simply to prevent a mere

---

[25] Even if Ninestar's challenges have merit, the Government argues that remand without vacatur is the appropriate remedy here. See Defs.' Resp. at 27–28. The court does not resolve that question at this preliminary juncture.

Remand with vacatur is the default remedy for unlawful agency action under the APA, which states that courts should "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2) (emphasis added). But a court may remand agency action without vacatur "where the failure lay in lack of reasoned decisionmaking [or] where the order was otherwise arbitrary and capricious." Int'l Union v. Fed. Mine Safety & Health Admin., 920 F.2d 960, 966 (D.C. Cir. 1990). When deciding whether to issue remand without vacatur, the court must consider "[1] the seriousness of the order's deficiencies . . . and [2] the disruptive consequences of an interim change that may itself be changed." Nat'l Org. of Veterans' Advocs., Inc. v. Sec'y of Veterans Affs., 260 F.3d 1365, 1380 (Fed. Cir. 2001) (quoting A.L. Pharma, Inc. v. Shalala, 62 F.3d 1484, 1492 (D.C. Cir. 1995)); see also In re Section 301 Cases, 46 CIT __, __, 570 F. Supp. 3d 1306, 1343 (2022). That said, remand without vacatur remains a rare remedy. See Env't Def. Fund v. FERC, 2 F.4th 953, 976 (D.C. Cir. 2021).

The court need not decide now whether the Listing Decision's "deficiencies," if any, are of sufficient "seriousness" that prompts the court to "doubt whether the agency chose correctly" in its final decision. Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n, 988 F.2d 146, 150 (D.C. Cir. 1993) (quoting Int'l Union, 920 F.2d at 967). But the court does note that, consistent with its analysis in the third and fourth factors for preliminary injunction, vacatur in this case would risk severe disruption of Congress's forced labor priorities. See infra section II.C (concluding that the hardships from an injunction balance in favor of the Government). Remand without vacatur may indeed be well suited to preserve, rather than disrupt, Congress's weighty humanitarian, economic, and foreign policy concerns. See North Carolina v. EPA, 550 F.3d 1176, 1178 (D.C. Cir. 2008) (remanding without vacatur where there were "fundamental flaws" requiring remand but allowing the EPA's rule to remain in effect to "at least temporarily preserve the environmental values covered by" the rule); see also NOVA, 260 F.3d at 1380 (remanding without vacatur a regulation governing veteran benefit eligibility due to "disruptive consequences").

possibility of injury, even where prospective injury is great.  A presently existing, actual threat must be shown."  <u>Zenith Radio Corp. v. United States</u>, 710 F.2d 806, 809 (Fed. Cir. 1983).  The movant must show "that irreparable injury is <u>likely</u> in the absence of an injunction."  <u>Winter</u>, 555 U.S. at 22 (citations omitted).  "Critically, irreparable harm may not be speculative or determined by surmise."  <u>Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negots. v. United States</u>, 43 CIT __, __, 393 F. Supp. 3d 1271, 1276 (2019) (citations omitted).

Ninestar asserts four bases of harm that the court broadly sorts into two categories: (1) the economic harms of financial loss, business opportunity loss, and reputational loss, and (2) the harm of being denied a procedural right under the APA.  Evaluating each theory in turn and proceeding with careful understanding of the Listing Decision's serious consequences, the court concludes that Ninestar has not established that it will be irreparably harmed "absent a preliminary injunction."  <u>Celsis In Vitro, Inc. v. CellzDirect, Inc.</u>, 664 F.3d 922, 930 (Fed. Cir. 2012).

### 1.    *Economic Harms of Financial Loss, Business Opportunity Loss, and Reputational Loss*

First, Ninestar argues that the financial losses resulting from the Listing Decision warrant a finding of irreparable harm.  <u>See</u> Pls.' Br. at 12–13.  While financial injuries alone are typically insufficient for a finding of irreparable harm, the calculus is different in APA cases where "the United States, and the agencies thereof, are cloaked in sovereign immunity" and may not be sued for monetary damages.  <u>Canadian Lumber Trade All. v. United States</u>, 30 CIT 892, 897, 441 F. Supp. 2d 1259, 1265 (2006) (collecting cases), <u>aff'd</u>, 517 F.3d 1319 (Fed. Cir. 2008); <u>see also</u> <u>Robert Bosch LLC v. Pylon Mfg. Corp.</u>, 659 F.3d 1142, 1156 (Fed. Cir. 2011) (reasoning that "the likely availability of those monetary payments helps define the circumstances" of whether a party is irreparably harmed absent an injunction).

But that "is not to say that the existence of any unrecoverable financial injury from an entity that enjoys sovereign immunity means irreparable harm can be established." Luokung Tech. Corp. v. Dep't of Def., 538 F. Supp. 3d 174, 192 (D.D.C. 2021). "To hold otherwise would essentially eviscerate the irreparable harm requirement for any cases brought against the government." Xiaomi Corp. v. Dep't of Def., No. CV 21-280 (RC), 2021 WL 950144, at *10 (D.D.C. Mar. 12, 2021). Avoiding an outcome where financial harms "even as little as $1" can be deemed irreparable, "[t]he wiser formula requires that the economic harm be significant, even where it is irretrievable because a defendant has sovereign immunity." Air Transp. Ass'n of Am., Inc. v. Exp.-Imp. Bank of the U.S., 840 F. Supp. 2d 327, 335 (D.D.C. 2012) (emphasis added). "Otherwise, a litigant seeking injunctive relief against the government would always satisfy the irreparable injury prong, nullifying that requirement in such cases." ConverDyn v. Moniz, 68 F. Supp. 3d 34, 49 (D.D.C. 2014).

In support of its showing of irreparable harm, Ninestar appends two declarations from Ms. Yiling Cheng, the Director of the Enterprise Planning Department at Ninestar Corporation. See Decl. of Yiling Cheng, Aug. 31, 2023, ECF No. 20-1 ("Cheng Decl."); Suppl. Decl. of Yiling Cheng, Dec. 15, 2023, ECF No. 78-1 ("Suppl. Cheng. Decl."). In the original declaration, Ninestar alleges the losses that it "risks . . . in U.S. sales" and "in the global market over the next year" and notes a related financial issue. Cheng Decl. ¶ 20.[26] In the supplemental declaration, Ninestar

---

[26] Regarding financial losses, the Cheng Declaration represents the following in particular:

- On net, Ninestar "risks losses in U.S. sales approaching [[              ]] and [[                                                ]] of losses in the global market over the next year" and notes [[                                              ]]. Cheng Decl. ¶ 20.

Court No. 23-00182                                                                                           Page 46
***PUBLIC VERSION***

alleges the diminished financial projections and related financial issues of another corporate

entity.[27] Ninestar also points to its declining share price on the Shenzhen Stock Exchange in China.

Id. ¶ 9.

That evidence falls short of establishing substantial financial harm. Generally, "affidavits

submitted by interested parties are weak evidence, unlikely to justify a preliminary injunction."

Shandong Huarong Gen. Grp. v. United States, 24 CIT 1286, 1290, 122 F. Supp. 2d 143, 147

(2000) (citation omitted); see also Premier Trading, Inc. v. United States, 40 CIT __, __, 144 F.

---

- Ninestar Corporation lost its only customer in the U.S., resulting in a cancellation of outstanding orders valued at [[                ]]. See id. ¶ 23. Ninestar Corporation will lose more than [[                ]] in U.S. sales in the next year. Id. ¶ 24.

- Zhuhai Ninestar Information Technology cannot export any products to the United States, "reducing its annual sales from [[                ]] down to 0." Id. ¶ 28. U.S. customers have cancelled orders worth [[                ]] and the company "may lose well over [[                ]] in U.S. sales." Id. Moreover, the company has experienced [[
                ]] Id. ¶ 30.

- Zhuhai Pantum Electronics Co., Ltd. ("Pantum") expects to lose [[                ]] in expected revenue and has lost [[
                ]]. Id. ¶¶ 32–33. In total, Pantum will lose [[                ]] in U.S. sales in the next year. Id. ¶ 36.

- Apex Microelectronics has lost [[                ]] due to cancelled purchase orders from U.S. customers and risks losing [[                ]] in U.S. sales in the next year. Id. ¶¶ 40–41.

- Geehy Semiconductor's U.S. customers have cancelled sales contracts worth [[                ]], and projected sales have decreased from [[                ]] to zero. Id. ¶¶ 46–47.

[27] Specifically, Ms. Cheng states that [[

                ]]. Suppl. Cheng Decl. ¶ 6.

Supp. 3d 1354, 1359 (2016).  Neither Cheng Declaration is supported by financial statements or

other "independent evidence indicating exactly how and when these lost sales would force

[Ninestar] out of business" or, at least, to incur substantial losses.  Shandong, 24 CIT at 1290, 122

F. Supp. 2d at 147 (citation omitted); see also, e.g., Premier Trading, 144 F. Supp. 3d at 1359

("This affidavit contains bald assertions without accompanying support. Plaintiff does not include

any financial statements . . . ."); Companhia Brasileira Carbureto de Calcio v. United States, 18

CIT 215, 217 (1994) ("No hard evidence was submitted to the court indicating what specific effect

loss of such sales would have upon [the plaintiff]."); Shree Rama Enterprises v. United States, 21

CIT 1165, 1167, 983 F. Supp. 192, 195 (1997) ("No marketing studies, written financial data or

other hard evidence of the serious permanent harm which would result from denial of the

injunction was presented." (citation omitted)).

The need for clarifying and corroborating evidence is particularly important because the

court cannot determine that Ninestar's losses are sufficiently substantial when considering its

many subsidiaries and affiliates across the globe.  For instance, Ninestar alleges that it "risks losses

in U.S. sales" and "in the global market over the next year."  Cheng Decl. ¶ 20; see also supra note

26.  To be sure, Ninestar's potential losses are a serious matter.  But at least two key questions

remain unanswered: (1) what is the likelihood of that risk, and (2) is the share of those losses

sufficiently substantial when considering Ninestar's overall enterprise?  See Shandong, 24 CIT at

1290, 122 F. Supp. 2d at 146 ("Plaintiff provides no evidence demonstrating how sales to this

customer fit within its total sales figures; nor how the loss of these sales will impact its overall

financial position."); Air Transp. Ass'n, 840 F. Supp. 2d at 338 (holding in a case with a sovereign

defendant that a hypothetical loss of $2.1 billion, representing less than 7 percent of total revenue,

would not establish irreparable harm).  The court acknowledges that financial losses are not to be
taken lightly for any business.  But ultimately, Ninestar's showing of substantial financial harm is
too "speculative" and "determined by surmise" to justify the extraordinary measure of preliminary
injunction.  <u>Coalition</u>, 393 F. Supp. 3d at 1276.

      Or take another example: Ninestar points to the diminished financial projections and
related financial issues of another corporate entity.  <u>See</u> Suppl. Cheng Decl. ¶ 6; <u>see also</u> <u>supra</u>
note 27.  But that entity is not a party to this action.  Even taking the declaration at face value,
Ninestar has not established with evidence on the record how, and to what extent, that entity's
losses translate to losses for Ninestar.  Alternatively, Ninestar appends a chart of its share price
without prices on the y-axis or any analysis attributing a fall in share price to the Listing Decision.
<u>See</u> <u>id.</u> ¶ 9.  Why that chart establishes irreparable harm remains unexplained.  Even if the court
were to presumably attribute the entire decline in share price to the Listing Decision, such losses
fall short of stock market losses that district courts have found to be substantial against sovereign
defendants.  <u>See, e.g.,</u> <u>Xiaomi</u>, 2021 WL 950144, at *11 ($10 billion in market capitalization loss
was accompanied by restrictions by three banks on trading of warrants linked to the plaintiff's
shares; plaintiff's listings on the Hong Kong Stock Exchange were terminated and withdrawn;
removal of plaintiff's shares from global stock indices; and $1.5 billion liquidity crunch due to
lack of access to U.S. capital markets); <u>Luokung</u>, 538 F. Supp. 3d at 192 (expected loss of $10
million in revenue was accompanied by delisting from Nasdaq, the only stock market for plaintiff's
shares, and removal of plaintiff's shares from global stock indices).  In sum, Ninestar does not
establish substantial financial loss that rises to the level of irreparable harm.

Court No. 23-00182                                                                          Page 49
**PUBLIC VERSION**

Ninestar next argues that the Listing Decision has interfered with Ninestar's opportunity

to build business relationships with U.S. and non-U.S. customers alike, thwarting efforts such as

a prior product exhibition in Las Vegas and a prolonged corporate negotiation.  See Cheng Decl.

¶¶ 34–58.[28]  Ninestar also contends that the Listing Decision irreparably tarnished its reputation

and goodwill, both in the printing industry and in the business world more broadly.  See id.  To

establish loss of reputation, Ninestar appends four public notices issued by three trade

associations—the European Toner & Inkjet Remanufacturers Association ("ETIRA"), the U.S.

Business Technology Association ("BTA"), and the International Imaging Technology Council

---

[28] Regarding losses of business opportunities, the Cheng Declaration represents the following
regarding the named parties in this litigation:

- Pantum participated in a multi-day product exhibition in Las Vegas in early 2023, resulting
  in more than [[    ]] new customers who expressed interest in future collaborations.  Id.
  34.  "Those collaborations have been put on hold because of the Listing Decision and may
  not be recoverable."  Id.

- Pantum "encountered business disruptions outside the United States," namely [[

  ]].  Id. ¶ 35.

- Apex Microelectronics's Chinese customers have paused sales "out of concern that . . .
  they will not be able to sell" to U.S. customers.  Id. ¶ 42.  One of Apex Microelectronics's
  [[

  ]].  Id. ¶ 43.

- Non-U.S. customers of Geehy Semiconductors have indicated that they would terminate
  business relationships due to the Listing Decision.  Id. ¶ 48.  Moreover, "the Listing
  Decision will cause [Chinese customers] to discontinue their relationship with Geehy
  Semiconductor" due to inability to sell into the United States.  Id. ¶ 49.

- Zhuhai G&G Digital Technology, Zhuhai Seine Printing Technology, and Zhuhai Ninestar
  Management Co. do not export products to the United States, but their "reputation has been
  harmed in the same way as the other listed Ninestar entities."  Id. ¶¶ 52, 55, 58.

Court No. 23-00182                                                      Page 50
**PUBLIC VERSION**

("IITC"). Id. at 13–21.  The ETIRA's and IITC's statements, dated on June 12, 2023, and August

4, 2023, respectively, advise businesses to distance themselves from Ninestar due to the Listing

Decision.  Id. at 14, 21.  On July 25, 2023, the BTA issued a statement moving to remove Ninestar

as a member due to the Listing Decision while noting that other Ninestar affiliates, such as

Lexmark International, should not be held "guilt[y] by association."  Id. at 17–19.  And on October

24, 2023, the ITTC announced that it would not renew Ninestar's STMC Recertification, a

valuable seal of approval in the printer cartridge industry, on ethical grounds with the reasoning

that "certification of Ninestar would facilitate enhanced sales of products identified by the United

States as likely to be produced by slave labor."  Suppl. Cheng Decl. at 8.

      Ninestar's losses of business opportunity and reputation, as presented here, do not amount

to irreparable harm.  Ninestar again suffers from a sufficiency problem.  It is true that "[p]rice

erosion, loss of goodwill, damage to reputation, and loss of business opportunities are all valid

grounds for finding irreparable harm."  Celsis, 664 F.3d at 930.  But the district court in Celsis

heard fact testimony regarding the plaintiff's specific financial records, particular instances of

customers purchasing from other companies, evidence of corporate policies and market

sensitivities, and unrebutted expert testimony about damage to irreversible price erosion and loss

of marketing capabilities.  See id. at 930–31.  On that robust record, the Federal Circuit found no

clear error in a determination that loss of reputation and business opportunity at an early growth

stage was irreparable for the plaintiff.  See id. at 931.  Ninestar simply has not offered the same

quantum of evidence here to show that the loss of its reputation is irreparable absent a preliminary

injunction.  The trade association statements all make clear that the guidance to remove Ninestar

from member companies' supply chains is due to the Listing Decision.  The same reasoning goes

for lost customers, who have purportedly abandoned their business relationships either due to the Listing Decision or because Ninestar can no longer import into the United States.  Given the absence of additional evidence that could make Ninestar's claim for irreparable harm stronger, such as evidence of the enduring nature of customers' objections or information on inelasticity in the global market for printer components, see Celsis, 664 F.3d at 930, there is little reason to believe that these customers and trade associations would not interpret and rely on a reversal of the Listing Decision as a clean bill of health.

That leads to another, broader point:  The decline of all U.S. sales to zero, as well as the deterioration of international business opportunities and corporate reputation, are obvious consequences that would be true for any entity on the UFLPA's Entity List.  Holding those harms to be sufficient would create an impermissible "per se irreparable harm rule," which would yield "a result likely contrary to the extraordinary nature" of preliminary injunctions.  Corus Grp. PLC v. Bush, 26 CIT 937, 944, 217 F. Supp. 2d 1347, 1356 (2002), aff'd in part sub nom. Corus Grp. PLC. v. Int'l Trade Comm'n, 352 F.3d 1351 (Fed. Cir. 2003); see also ConverDyn, 68 F. Supp. 3d at 49 (reasoning that a per se irreparable harm rule would "nullify[] that requirement").  That result is doubly disfavored here, where a per se irreparable harm rule would lie in tension with the UFLPA itself.  The UFLPA intended that the United States "lead the international community in ending forced labor practices . . . by stopping the importation of any goods made with forced labor" and "actively work to prevent, publicly denounce, and end human trafficking including with respect to forced labor," UFLPA § 1(2), (4), 135 Stat. at 1525 (emphasis added), and that the only way for a listed entity to lift the presumptive embargo is to make a clear and convincing showing of no forced labor, see also infra section II.C.  Because Ninestar's alleged irreparable harm here

would be the same for all other similarly situated plaintiffs, the court is careful not to undo Congress's choice of policy. Ninestar, therefore, does not establish irreparable harm on the facts of this case.

### 2.    *Procedural Harm*

Relying on Invenergy I, 422 F. Supp. 3d 1255, and Invenergy IV, 476 F. Supp. 3d 1323, Ninestar also argues that the FLETF's failure to comply with the APA's requirements constitutes irreparable harm of Ninestar's procedural rights. But the holdings of those cases do not apply to the facts presented here.

In the events leading to Invenergy I, the President had imposed safeguard duties protecting the domestic solar panel industry and had delegated to the USTR the authority to issue exclusions of certain products from those duties, which it had done after a lengthy process. See 422 F. Supp. 3d at 1263–64. Four months later, USTR reversed course and attempted to withdraw the exclusion without the APA's notice-and-comment procedures. See id. The plaintiffs, who were importers, purchasers, and consumers of solar panels, sought a preliminary injunction staying the USTR's withdrawal of its prior exclusion decision. See id. at 1264. This court granted that injunction. Id. at 1294. Regarding irreparable harm, the court concluded that "[a] procedural violation can give rise to irreparable harm justifying injunctive relief because lack of process cannot be remedied with monetary damages or post-hoc relief by a court," and that "[a] failure to comply with APA procedural requirements therefore itself causes irreparable harm because 'the damage done by [the agency's] violation of the APA cannot be fully cured by later remedial action.'" Id. at 1290 (quoting N. Mariana Islands v. United States, 686 F. Supp. 2d 7, 18 (D.D.C. 2009)).

That holding is inapplicable here for one simple reason: Ninestar's alleged procedural harms can be remedied on remand. While the Listing Decision remains in force, the FLETF can (1) issue a more thorough explanation of its agency action, (2) reconsider the weight of the record, (3) apply a higher burden of proof, or (4) rely on recent evidence. Compare the facts here to those in <u>Invenergy I</u>, where absent the preliminary injunction, the USTR's withdrawal of the exclusion would have gone into effect, and the plaintiffs' procedural harms relating to lost notice-and-comment opportunities would be without remedy on remand. <u>See</u> <u>id.</u> at 1291 ("[I]f the [Withdrawal] is not enjoined prior to its effective date, Invenergy will never have an equivalent opportunity to influence USTR's decision as to its imposition." (internal quotation marks and citation omitted)).

The same distinction separates this case from <u>Invenergy IV</u>. In that decision, the court concluded that the USTR's renewed attempt at withdrawal, which involved a notice and comment procedure, was likely to be unlawful as arbitrary and capricious and modified the original preliminary injunction accordingly to prevent procedural harm. <u>Invenergy IV</u>, 476 F. Supp. 3d at 1352. The court accordingly reasoned that "a procedurally flawed and inadequately explained decision" will "establish a new status quo and engender new reliance interests on a decision that did not take account of public input as required by the APA." <u>Id.</u> at 1353. Ninestar seeks to extend that reasoning to agency decisions that engender the alleged errors in this case, <u>see</u> Pls.' Reply at 20, but once again, the agency error alleged in the <u>Invenergy</u> cases is fundamentally different. The <u>Invenergy</u> plaintiffs would not have been able to vindicate their rights to participate in agency rulemaking once the withdrawal, which was the result of arbitrary and capricious agency action, went into effect. Here, Ninestar's errors may be resolved on remand without the need for a

preliminary injunction to preserve the status quo ante.  Unable to prevail on either a procedural or

economic theory, Ninestar has not demonstrated that "that irreparable injury is likely in the absence

of an injunction."  Winter, 555 U.S. at 22 (emphasis omitted).

### C.    *The Balance of Hardships Is in Favor of the Government*

Turning to the third and fourth preliminary injunction factors, Ninestar argues that the

balance of hardships tips in its favor and that the public interest will be served by a preliminary

injunction.  See Pls.' Br. at 15–17.  These factors require the court to "balance the competing

claims of injury and must consider the effect on each party of the granting or withholding of the

requested relief" and to "pay particular regard for the public consequences in employing the

extraordinary remedy of injunction."  Winter, 555 U.S. at 24 (internal quotation marks omitted)

(quoting Amoco Production Co. v. Gambell, 480 U.S. 531, 542 (1987); Weinberger v. Romero-

Barcelo, 456 U.S. 305, 312 (1982)).  When the Government opposes the preliminary injunction,

the balance of hardships and public interest factors merge.  See Nken v. Holder, 556 U.S. 418, 435

(2009).  Weighing the public interests as defined by the UFLPA against Ninestar's economic and

procedural harms, the court concludes that the balance of hardships tips for the Government.

Ninestar argues that the balance of hardships tips in its favor because of the "significant

economic losses" and "irreparable procedural injury" that it has incurred due to the Listing

Decision.  Pls.' Br. at 15.  Ninestar then states that the Government "would suffer no remotely

comparable hardship" beyond an increase in the administrative burden of implementing the

injunction, see id., which, the court agrees, is not usually sufficient hardship if the administrative

burden results from agency error under the APA, see Invenergy I, 422 F. Supp. 3d at 1292.  But

that proposed weighing of the equities gives short shrift to the Government.  "In balancing the

public interest, courts have traditionally looked to the underlying statutory purposes at issue."
<u>Canadian Lumber Trade</u>, 30 CIT at 900, 441 F. Supp. 2d at 1267 (collecting cases).  And the court
identifies at least two broadly defined public interests from the UFLPA's text and legislative
history.

First, the UFLPA makes clear that even a single entry of goods made with forced labor
from Xinjiang is one too many.  <u>See</u> <u>Ninestar I</u>, 666 F. Supp. 3d at 1362 & n.11.  That is because
the UFLPA is intended to "ensure [that] Americans and American companies are not complicit in
the Chinese Communist Party's human rights atrocities" in Xinjiang.  212 Cong. Rec. H7499 (daily
ed. Dec. 8, 2021) (statement of Rep. Gregory Meeks); <u>see also</u> <u>id.</u> at H7499 (statement of Rep.
Michael McCaul) ("We must refuse to be complicit in the CCP's genocide against the Uyghurs
. . . ."); <u>id.</u> at H7502 (statement of Rep. Tom Rice) ("[W]e must take steps to ensure that U.S.
companies and consumers are not complicit in the abuses.").  Lifting the embargo against Ninestar,
even if temporarily, would constitute a risk to the public interest—as defined by Congress—that
the American public and markets are complicit in, and legitimize goods made with, forced labor
from Xinjiang.

Second, the UFLPA's prohibitions are intended to strengthen international protections for
human rights beyond Xinjiang and to forcefully denounce any form of forced labor.  Congress
declared it the policy of the United States "to lead the international community in ending forced
labor practices . . . by stopping the importation of any goods made with forced labor"; "to actively
work to prevent, publicly denounce, and end human trafficking including with respect to forced
labor"; "to regard the prevention of atrocities as it is in the national interest of the United States,
including efforts to prevent torture, enforced disappearances, severe deprivation of liberty,

including mass internment, arbitrary detention, and widespread and systematic use of forced labor,

and persecution targeting any identifiable ethnic or religious group." Id. § 1(2), (4)–(5), 135 Stat.

at 1525.  One lawmaker stated that, "as the world's strongest economy, America has a moral duty

to tie our trade relations with human rights."  212 Cong. Rec. H7504 (daily ed. Dec. 8, 2021)

(statement of Rep. Nancy Pelosi).  Another emphasized that "[t]his legislation is critical to showing

that we are putting human rights at the center of our foreign policy and economic policy."  Id. at

H7499 (statement of Rep. Gregory Meeks).  The American public interest, then, extends beyond

consumer and corporate complicity in Chinese atrocities in Xinjiang.  It encompasses a directive,

global in scope, that the high watermark of human rights be satisfied in international trade.

       Ninestar counters that the public interest is in its favor rather than the Government's, but

neither of its cited reasons is availing.  First, while it is of course true that "[t]he public interest is

served by ensuring that governmental bodies comply with the law, and interpret and apply trade

statutes uniformly and fairly," Am. Signature, Inc. v. United States, 598 F.3d 816, 830 (Fed. Cir.

2010),[29] that reason cannot by itself resolve the public interest analysis.  If so, injunctions against

the Government would issue as a matter of course.  Second, Ninestar contends that an injunction

would vindicate the purposes of the UFLPA, which are "frustrated both by listing entities with no

involvement with forced labor or the Xinjiang region, and by failing to explain publicly legitimate

grounds for listings and their ensuing consequences."  Pls.' Br. at 16–17.  To the extent that

---

[29] Ninestar's citation to that case does not get them very far.  The Federal Circuit concluded in the next sentence that because "[b]oth sides in this dispute contend that they are seeking to effectuate these important goals," the public interest did not clearly favor either party.  Id.  All parties here would agree that all sides are concerned with effectuating the important goals of uniform and fair application of the law.

Ninestar's second argument is not a UFLPA-specific recitation of the first, it fails because Congress already considered the risk of incorrect listings in the UFLPA's scheme. By structuring the statute to have a presumptive embargo that can later be rebutted by clear and convincing evidence, Congress subordinated the risk of overbreadth to the public interests served by the UFLPA's presumptive embargo.

Having defined the broad contours of the Government's interests here, the court now turns to weighing the equities. The harm to the public interests protected by the UFLPA if a preliminary injunction enters must outweigh the economic and procedural harms to Ninestar if a preliminary injunction does not issue. As stated above, Ninestar points only to its economic and procedural hardships flowing from the Listing Decision. See Pls.' Br. at 15. The loss of financial revenues, business opportunities, and reputation is a matter to be weighed seriously in any circumstance. Cf. Celsis, 664 F.3d at 930. But those hardships are entirely predictable consequences that were likely foreseen by Congress, rather than unexpected or extraordinary byproducts, of an adverse listing. To hold here that Ninestar's foreseeable hardships outweigh the UFLPA-defined public interests would favor preliminary injunctions in nearly every challenge to the UFLPA. That conclusion would at best lie in tension with, and at worst entirely undermine, a statute that intentionally contemplates a difficult escape valve for importers: the rebuttal of the presumptive embargo with a clear and convincing showing of no forced labor. See UFLPA § 3(b), 135 Stat. at 1529. Indeed, that "rebuttable presumption is the key to this legislation," 212 Cong. Rec. H7501 (daily ed. Dec. 8, 2021) (statement of Rep. Christopher Smith), and the "core and essential provision," id. at H7502 (statement of Rep. Tom Rice), that renders section 307 enforcement effective against Chinese importers involved in Xinjiang.

Court No. 23-00182                                                                    Page 58
**PUBLIC VERSION**

Beyond its foreseeable economic and procedural hardships, Ninestar points to no other harms that would ensue if the preliminary injunction were denied.  Considering the significant weight of the public interests of avoiding American complicity and denouncing forced labor against the fact that Ninestar's only cited hardships are economic and procedural in nature, the court concludes that the balance of equities tips heavily for the Government.  And having resolved all four factors for preliminary injunction for the Government, each of which the court views as sufficient to sustain a denial independently, the court denies Ninestar's Motion for Preliminary Injunction.

## CONCLUSION

In sum, the court holds that while the CIT's prudential exhaustion statute applies to this APA case, administrative exhaustion is nonetheless not required under the particular facts here. The court then concludes that Ninestar (1) is not likely to succeed on the merits of its adequate explanation, burden of proof, and retroactivity claims, (2) has failed to establish irreparable harm, and (3) does not prevail against the weighty public interests defined by the UFLPA.  Ninestar's Motion for Preliminary Injunction is therefore denied for its failure to establish any of the four factors, see Winter, 555 U.S. at 20, each of which is sufficient to independently sustain the denial of the preliminary injunction.  The embargo against Ninestar remains in force.

                                                    /s/     Gary S. Katzmann
                                                    Gary S. Katzmann, Judge


Dated: February 27, 2024
          New York, New York