**PUBLIC VERSION**

**IN THE UNITED STATES**
**COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| NINESTAR CORPORATION, ZHUHAI NINESTAR INFORMATION TECHNOLOGY CO., LTD., ZHUHAI PANTUM ELECTRONICS CO., LTD., ZHUHAI APEX MICROELECTRONICS CO., LTD., GEEHY SEMICONDUCTOR CO., LTD., ZHUHAI G&G DIGITAL TECHNOLOGY CO., LTD., ZHUHAI SEINE PRINTING TECHNOLOGY CO., LTD., and ZHUHAI NINESTAR MANAGEMENT CO., LTD. | |
| *Plaintiffs*, | |
| v. | Case No. 23-182 |
| UNITED STATES OF AMERICA; DEPARTMENT OF HOMELAND SECURITY; UNITED STATES CUSTOMS AND BORDER PROTECTION; FORCED LABOR ENFORCEMENT TASK FORCE; KRISTI NOEM, *in her official capacity as the Secretary of the Department of Homeland Security*; RODNEY S. SCOTT, *in his official capacity as Commissioner for U.S. Customs and Border Protection*; and CHRISTOPHER PRATT, *in his official capacity as Senior Official Performing the Duties of the Under Secretary for Office of Strategy, Policy, and Plans and Chair of the Forced Labor Enforcement Task Force*, | |
| *Defendants*. | |

**SECOND AMENDED COMPLAINT**
**FOR DECLARATORY AND INJUNCTIVE RELIEF**

Ninestar Corporation, Zhuhai Ninestar Information Technology Co., Ltd., Zhuhai Pantum Electronics Co., Ltd., Zhuhai Apex Microelectronics Co., Ltd., Geehy Semiconductor Co., Ltd., Zhuhai G&G Digital Technology Co., Ltd., Zhuhai Seine Printing Technology Co., Ltd., and Zhuhai Ninestar Management Co., Ltd. (collectively, "Plaintiffs" or "Ninestar" unless otherwise indicated) complain and allege as follows against Defendant United States of America, Defendant U.S. Department of Homeland Security (DHS), Defendant U.S. Customs and Border Protection (CBP), Defendant Forced Labor Enforcement Task Force (FLETF), Defendant Kristi Noem, in her official capacity as the Secretary of the Department of Homeland Security, Defendant Rodney S. Scott, in his official capacity as Commissioner for U.S. Customs and Border Protection, and Defendant Christopher Pratt, in his official capacity as Senior Official Performing the Duties of the DHS Under Secretary for Office of Strategy, Policy, and Plans and Chair of FLETF (collectively, "Defendants").

## SUMMARY OF THE ACTION

1.     This action challenges the decisions of the Forced Labor Enforcement Task Force (FLETF) to take adverse action against Plaintiffs, causing them serious and irreparable economic, contractual, market-based, reputational, and other harm, without offering any explanation or justification for said actions.  Such arbitrary and capricious conduct violates the Administrative Procedures Act's reasoned decisionmaking requirement and must be set aside.

2.     The Uyghur Forced Labor Prevention Act, Pub. L. No. 117-78, 135 Stat. 1525 (2021) ("UFLPA" or the "Act"), charges FLETF with compiling and maintaining lists of entities that either produce goods using forced labor by persecuted groups in the Xinjiang Uyghur Autonomous Region of China, or that are currently "working with the government of the Xinjiang Uyghur Autonomous Region" to "recruit, transport, transfer, harbor or receive" such labor out of

the Xinjiang Uyghur Autonomous Region.  UFLPA § 2(d)(2)(B).  The Act further directs CBP to presume that any goods produced by a listed entity violate 19 U.S.C. § 1307's prohibition on the importation of goods manufactured with forced labor, and must therefore be excluded from the United States.  UFLPA § 3(a).

3.    DHS, as the Chair of FLETF, announces additions to these lists through a press release and notice in the Federal Register.  These announcements provide no explanation of why any particular entity was listed, nor do Defendants otherwise communicate such grounds to the listed entities.  *See Notice Regarding the Uyghur Forced Labor Prevention Act Entity List*, 88 Fed. Reg. 38,080, 38,082 (June 12, 2023) (the "Listing Decision"); *see also* UFLPA § 2(d)(2)(B)(ii).

4.    FLETF has announced that it will entertain requests for removal from the list, but only if an entity can "provide information that demonstrates that the entity no longer meets or does not meet the criteria described in the [Act]" for listing.  88 Fed. Reg. at 38,082.  In other words, Defendants place on the listed entity the burden to prove the negative that its goods are not manufactured with forced labor and/or that it does not cooperate with Xinjiang regional officials to transport or harbor forced laborers, all without having been told the bases for the listing in the first instance.

5.    In June 2023, FLETF added Plaintiffs to the UFLPA Entity List.  This decision, announced without any details or explanation, has caused massive and irreparable harm to Plaintiffs' business and reputation.

6.    Because FLETF failed to provide any reasoned explanation for its decision, and because Plaintiffs have no other recourse for learning the grounds on which they were listed or, therefore, to successfully question the listing, the Court should vacate the Listing Decision as arbitrary and capricious agency action.

7.      As Plaintiffs' counsel has learned from reviewing the Confidential Administrative Record, the evidence underlying FLETF's Listing Decision is virtually non-existent.  To overcome its lack of evidence that Ninestar is working with the Xinjiang government, FLETF relied on untenable inferences drawn from long-stale materials that pre-date enactment of the UFLPA.  And, to stitch them together, FLETF applied an indefensibly low burden of proof, mere "reasonable cause to believe" a violation occurred, rather than the statutory default preponderance-of-the-evidence standard.  For these independent reasons, FLETF's decision was arbitrary, capricious, and in excess of statutory authority, all in violation of the Administrative Procedure Act.

8.      In July 2024, Plaintiffs formally petitioned FLETF for removal from the UFLPA Entity List.  Over the next year, Plaintiffs responded to several rounds of follow-up questions from FLETF and provided thousands of pages of additional documents in support of their request.  On June 23, 2025, FLETF denied Plaintiffs' request (the "Removal Decision").  FLETF offered just two terse paragraphs to explain its decision.  In rejecting Plaintiffs' request, FLETF relied on "information provided by a confidential source" and "additional information" FLETF "obtained" "[i]n an effort to verify Ninestar's claims."  FLETF did not share this additional, apparently dispositive evidence with Plaintiffs or their counsel.  The Court should also vacate FLETF's unlawful Removal Decision, which lacks an adequate explanation and is not supported by substantial evidence.

## PARTIES

9.      Ninestar Corporation is a company organized and existing under the laws of the People's Republic of China, with a principal office located at Area B, 7th Floor, Building 01, 3883 Zhuhai Avenue, Xiangzhou District, Zhuhai, Guangdong, China.  Ninestar Corporation is engaged in the business of manufacturing and selling printer cartridges.

10.     Zhuhai Ninestar Information Technology Co., Ltd. is a company organized and existing under the laws of the People's Republic of China, with a principal office located at 2nd Floor, Building 01; Area A, 1st Floor, Building 02; Building 03; Building 04; Building 05; 1st Floor, 2nd Floor, 4th Floor, Building 06, 3883 Zhuhai Avenue, Xiangzhou District, Zhuhai, Guangdong, China.  Zhuhai Ninestar Information Technology Co., Ltd. is engaged in the business of developing, manufacturing, and selling printer consumables and accessories.  It is a wholly owned subsidiary of Zhuhai Hengqin G&G Technology Co., Ltd., which is a wholly owned subsidiary of Ninestar Corporation.

11.     Zhuhai Pantum Electronics Co., Ltd. is a company organized and existing under the laws of the People's Republic of China, with a principal office located at Building 02, Building 06, Building 08, 888 Shengping Avenue, Pingsha Town, Jinwan District, Zhuhai, Guangdong, China.  Zhuhai Pantum Electronics Co., Ltd., is engaged in the business of designing, manufacturing, and selling laser printers, printer consumables, and accessories, and is a wholly owned subsidiary of Ninestar Corporation.

12.     Zhuhai Apex Microelectronics Co., Ltd. is a company organized and existing under the laws of the People's Republic of China, with a principal office located at 1st Floor, 2nd Floor, Area A, 3rd Floor, 5th Floor, 6th Floor, 7th Floor, 8th Floor, 9th Floor, Building 01, 83 Guangwan Street, Xiangzhou District, Zhuhai, Guangdong, China.  Zhuhai Apex Microelectronics Co., Ltd. is engaged in the business of designing, manufacturing, and selling chips used in printer consumables.  Ninestar Corporation is a majority shareholder of Zhuhai Apex Microelectronics Co., Ltd.

13.     Geehy Semiconductor Co., Ltd. is a company organized and existing under the laws of the People's Republic of China, with a principal office located at 2nd Floor, Building 1, Creative

Valley, 1889 Huandao East Road, Hengqin New District, Zhuhai, Guangdong, China. Geehy Semiconductor Co., Ltd. is engaged in the business of designing, manufacturing, and selling microcontroller units. Geehy Semiconductor Co., Ltd. is a wholly owned subsidiary of Zhuhai Apex Microelectronics Co., Ltd.

14.    Zhuhai G&G Digital Technology Co., Ltd. is a company organized and existing under the laws of the People's Republic of China, with a principal office located at East side of 3rd Floor, Building 1, 3883 Zhuhai Avenue, Zhuhai, Guangdong, China. Zhuhai G&G Digital Technology Co., Ltd. is engaged in the business of selling printer consumables. It is a wholly owned subsidiary of Zhuhai Hengqin G&G Technology Co., Ltd., which is a wholly owned subsidiary of Ninestar Corporation.

15.    Zhuhai Seine Printing Technology Co., Ltd. is a company organized and existing under the laws of the People's Republic of China, with a principal office located at No. 16007, 16th Floor, 169 Rongzhu Road, Hengqin New District, Zhuhai, Guangdong, China. Zhuhai Seine Printing Technology Co., Ltd. is engaged in the business of plant leasing operations. It is a parent company of Ninestar Corporation.

16.    Zhuhai Ninestar Management Co., Ltd. is a company organized and existing under the laws of the People's Republic of China, with a principal office located at Office 920, Building 1, 833 Qinhai East Road, Hengqin New District, Zhuhai, Guangdong, China. Zhuhai Ninestar Management Co., Ltd. is engaged in the business of corporate management consultation and intellectual property management, and is a wholly owned subsidiary of Ninestar Corporation.

17.    The Department of Homeland Security is a federal agency headquartered in the District of Columbia with its principal office located at 245 Murray Lane S.W., Washington, D.C. 20528. Among its duties, DHS leads FLETF.

18.     U.S. Customs and Border Protection is a federal agency headquartered in the District of Columbia with its principal office located at 1300 Pennsylvania Avenue, N.W., Washington, D.C. 20229.  CBP is an agency within DHS.  Among its duties, CBP enforces federal laws regulating the importation of goods into the United States.

19.     The Forced Labor Enforcement Task Force is a task force comprising representatives from seven federal agencies.  FLETF was established by Congress in the United States-Mexico-Canada Agreement Implementation Act, Pub. L. No. 116-113, 134 Stat. 11 (2020). *See* 19 U.S.C. § 4681(a).  On information and belief, FLETF primarily holds meetings and conducts its business in the District of Columbia.   Among its duties, FLETF monitors the enforcement of the federal prohibition on importation of goods made with forced labor.

20.     Secretary Kristi Noem is sued solely in her official capacity as Secretary of DHS. In that capacity, Secretary Noem has the ultimate responsibility for the activities of DHS and CBP, including the actions complained of herein.  Secretary Noem maintains an office at 245 Murray Lane S.W., Washington, D.C. 20528.

21.     Rodney S. Scott is sued solely in his official capacity as Commissioner for CBP. In that capacity, Commissioner Scott is responsible for the activities of CBP, including the actions complained of herein.  Commissioner Scott maintains an office at 1300 Pennsylvania Avenue, N.W., Washington, D.C. 20229.

22.     Christopher Pratt is sued solely in his official capacity as Senior Official Performing the Duties of the DHS Under Secretary for Office of Strategy, Policy, and Plans and Chair of FLETF.  In that capacity, Mr. Pratt is responsible for the activities of FLETF, including the actions complained of herein.  Mr. Pratt maintains an office at 245 Murray Lane S.W., Washington, D.C. 20528.

23.    The United States of America is amenable to service through the Attorney-in-Charge, International Trade Field Office, Commercial Litigation Branch, Department of Justice. C.I.T. R. 4(h).

## JURISDICTION AND VENUE

24.    This action arises under the Administrative Procedure Act, 5 U.S.C. §§ 702–706, and the UFLPA, Pub. L. No. 117-78, 135 Stat. 1525 (2021).

25.    This Court has jurisdiction under 28 U.S.C. § 1581(i); *Ninestar Corp. v. United States*, 666 F. Supp. 3d 1351, 1354 (CIT 2023).

## LEGAL BACKGROUND

26.    Since the enactment of the Tariff Act of 1930, Pub. L. No. 71-361, 46 Stat. 590, federal law has prohibited importation of any goods or merchandise produced wholly or in part in any foreign country by forced labor.  19 U.S.C. § 1307.

27.    As part of the United States-Mexico-Canada Agreement Implementation Act, Pub. L. No. 116-113, 134 Stat. 11 (2020), Congress directed the President to establish FLETF to monitor the Nation's enforcement of the prohibition on importation of goods made by forced labor set forth in 19 U.S.C. § 1307.  *See* 19 U.S.C. § 4681(a).  The President established FLETF by executive order on May 15, 2020.  Exec. Order No. 13,923, 85 Fed. Reg. 30,587.

28.    FLETF is chaired by the Secretary of DHS, and includes representatives from six other agencies: the Department of State, the Department of the Treasury, the Department of Justice, the Department of Labor, the Office of the United States Trade Representative, and the Department of Commerce.  The Secretary of DHS later delegated his authority as chair of FLETF to the DHS Under Secretary for Office of Strategy, Policy, and Plans.

29.    In December 2021, Congress passed and the President signed into law the Uyghur Forced Labor Prevention Act, Pub. L. No. 117-78, 135 Stat. 1525 (2021).  The Act aims to strengthen § 1307 by curtailing the importation of goods linked to forced labor of Uyghurs, Kazakhs, Tibetans, and members of other persecuted groups in the People's Republic of China, and especially in the Xinjiang Uyghur Autonomous Region.  UFLPA §§ 1–2.  The Act announces the policy of the United States "to lead the international community in ending forced labor practices wherever such practices occur through all means available to the United States Government" and to combat human trafficking around the globe.  *Id.* § 1.

30.    The Act requires FLETF, after soliciting comments and holding a public hearing, to develop a strategy "to prevent the importation into the United States of goods mined, produced, or manufactured wholly or in part with forced labor in the People's Republic of China."  UFLPA § 2(a)–(c).

31.    As part of that strategy, FLETF must develop and regularly update:

    i.    a list of entities in the Xinjiang Uyghur Autonomous Region that mine, produce, or manufacture wholly or in part any goods, wares, articles and merchandise with forced labor;

    ii.    a list of entities working with the government of the Xinjiang Uyghur Autonomous Region to recruit, transport, transfer, harbor or receive forced labor or Uyghurs, Kazakhs, Kyrgyz, or members of other persecuted groups out of the Xinjiang Uyghur Autonomous Region;

    iii.    a list of entities that exported any products mined, produced, or manufactured by any entity on the preceding two lists from the People's Republic of China into the United States; and

    iv.    a list of facilities and entities, including the Xinjiang Production and Construction Corps, that source material from the Xinjiang Uyghur Autonomous Region or from persons working with the government of the Xinjiang Uyghur Autonomous Region or the Xinjiang Production and Construction Corps for purposes of the "poverty alleviation" program or the "pairing-assistance" program or any other government labor scheme that uses forced labor.  UFLPA § 2(d)(2)(B)(i)–(v), (e)(2).

9

(Collectively, the "UFLPA Entity List").

32.     Under its standard operating procedures, FLETF adds an entity to this list if there is "reasonable cause to believe, based on specific and articulable information, that entities meet" one of the listing criteria.  FLETF Standard Operating Procedures § I(C)(2)(a) (July 2022).

33.     As to any entity on the UFLPA Entity List, the Act directs CBP to "apply a presumption" that importation of "any goods, wares, articles, and merchandise . . . produced by an entity on [the] list" is prohibited under § 1307 and that such items are not entitled to entry at any of the ports of the United States.  UFLPA § 3(a).

34.     For a listed entity, CBP must apply this presumption unless the CBP Commissioner concludes that the importer of record has fully complied with FLETF supply chain "guidance," has cooperated fully with all CBP inquiries, and has proven—"by clear and convincing evidence"—that the goods were not produced in whole or in part by forced labor.  UFLPA § 3(b).

35.     According to CBP, the UFLPA's presumption "exponentially increases the scope and volume of goods subject to examination and enforcement at ports of entry . . . under 19 U.S.C. § 1307."  CBP, *UFLPA Fiscal Year 2022 Obligation and Implementation Plan* 2 (Oct. 12, 2022).[1]

## FACTUAL ALLEGATIONS

**Plaintiffs' Business**

36.     Ninestar Corporation, a listed company on the Shenzhen Stock Exchange, ranks among the 500 largest businesses in China by revenue, and is the world's fourth largest laser printer developer and manufacturer.  Its products include laser printers, integrated circuit chips, and printer consumables such as toner and inkjet cartridges.

---

[1] https://www.dhs.gov/sites/default/files/2022-12/CBP%20-%20Uyghur%20Forced%20Labor%20Prevention%20Act%20-%20Fiscal%20Year%202022%20Obligation%20and%20Implementation%20Plan.pdf

37.     Ninestar Corporation and the other Plaintiffs manufacture and sell, or support the manufacture and sale of, products directly and indirectly to numerous United States-based customers.  Those customers include wholesalers who resell Ninestar products to consumers and equipment manufacturers who integrate Ninestar components into their own products.

38.     Through its U.S.-based business partners and customers, Plaintiffs contribute to [     ] of products being imported into the United States each year.  For example, from July 2022 to June 2023:

> i.     Plaintiff Ninestar Corporation caused approximately [     ] of printer cartridges to be imported into the United States.  Ninestar Corporation also manufactures components used by other printer manufacturers that export directly to the United States.
>
> ii.     Plaintiff Zhuhai Ninestar Information Technology Co., Ltd. caused approximately [     ] of printer consumables and accessories to be imported into the United States.
>
> iii.     Plaintiff Zhuhai Pantum Electronics Co., Ltd. caused approximately [     ] of printers, printer consumables, and accessories to be imported into the United States.
>
> iv.     Plaintiff Zhuhai Apex Microelectronics Co., Ltd. caused approximately [     ] of chips used in printer consumables to be imported into the United States. Zhuhai Apex Microelectronics Co., Ltd. is also a manufacturer of spare parts used by other manufacturers that export directly to the United States.
>
> v.     Plaintiff Geehy Semiconductor Co., Ltd. caused approximately [     ] of microcontroller units to be imported into the United States.  Geehy

Semiconductor Co., Ltd. is also a manufacturer of spare parts used by other manufacturers that export directly to the United States.

39.     The remaining three plaintiffs—Zhuhai G&G Digital Technology Co., Ltd.; Zhuhai Seine Printing Technology Co., Ltd.; and Zhuhai Ninestar Management Co., Ltd.—are not engaged in the business of mining, production, or manufacturing of goods, wares, articles, or merchandise, but provide support services to other Ninestar companies.

40.     Prior to June 2023, CBP has never suggested that any of Plaintiffs' products violated 19 U.S.C. § 1307, and Plaintiffs therefore have never had difficulties demonstrating to CBP that their products could lawfully be imported into the United States.

**The FLETF Listing**

41.     On June 9, 2023, FLETF announced that it would add "Ninestar Corporation and its eight Zhuhai-based subsidiaries" to the UFLPA Entity List "for working with the government of Xinjiang to recruit, transport, transfer, harbor or receive forced labor or Uyghurs, Kazakhs, Kyrgyz, or member of other persecuted groups out of Xinjiang." The Listing Decision took effect three days later, when DHS, on behalf of FLETF, published an updated UFLPA Entity List in the Federal Register. *See* Listing Decision*, supra*.

42.     The Listing Decision listed eight purported "Zhuhai-based subsidiaries": "Zhuhai Ninestar Information Technology Co. Ltd., Zhuhai Pantum Electronics Co. Ltd., Zhuhai Apex Microelectronics Co., Ltd., Geehy Semiconductor Co., Ltd., Zhuhai Pu-Tech Industrial Co., Ltd., Zhuhai G&G Digital Technology Co., Ltd., Zhuhai Seine Printing Technology Co., Ltd., and Zhuhai Ninestar Management Co., Ltd." 88 Fed. Reg. at 38,082. One of these, Zhuhai Pu-Tech Industrial Co., Ltd., is not affiliated with Ninestar Corporation and is therefore not a party to this action.

43.     The Listing Decision was the only notice any Plaintiff received concerning this action.  The Listing Decision provides no explanation as to why any particular entity was added to the UFLPA Entity List.  And, FLETF provided no explanation to Plaintiffs, publicly or otherwise, for its decision to add Ninestar and its affiliates to the Entity List and by extension to exclude them and their goods entirely from the United States.

44.     Neither FLETF nor any other component of the United States government gave Plaintiffs notice that they would be added to the UFLPA Entity List.  Nor did DHS, CBP, FLETF, or any other federal agency conduct any public hearing, reported investigation, or adjudication regarding Plaintiffs and their labor practices prior to the listing, nor did FLETF make any inquiry directly of Plaintiffs prior to doing so.

45.     Rather, Ninestar first learned of the listing through public reporting after the listing was published in a DHS press release.

46.     The UFLPA Entity List does identify which of the statutorily-mandated lists each listed entity appears on.  Plaintiffs have been added to a list of entities purportedly "working with the government of the Xinjiang Uyghur Autonomous Region to recruit, transport, transfer, harbor or receive forced labor or Uyghurs, Kazakhs, Kyrgyz, or members of other persecuted groups out of the Xinjiang Uyghur Autonomous Region."

47.     The inclusion of Plaintiffs on the UFLPA Entity List, automatically and without any intervening action or cause, requires CBP to presume that any good produced in whole or in part by any Plaintiff was made using forced labor and, therefore, is prohibited from entry into the United States.  The listing thus constitutes final agency action which adversely affects and aggrieves Plaintiffs.

48.    Plaintiffs are unaware of any facts relating to their respective businesses or otherwise supporting such an allegation.  Without learning the bases upon which Defendants added Plaintiffs to the UFLPA Entity List, Plaintiffs are unable meaningfully to seek removal from the list.

49.    Plaintiffs' counsel, having received the Confidential Administrative Record through this litigation, now know that FLETF's decision lacks evidentiary support.

50.    FLETF relied in part on the conclusory, conflicting, and undated allegations of an unidentified confidential source.  The source asserts that Ninestar was at some point harboring forced Uyghur laborers because:

  i.    [      ]

  ii.   [      ]

  iii.  [      ]

  iv.   [      ]

  v.    [      ]

51.    The bulk of FLETF's case is a mélange of dubious inferences drawn from outdated public records, including media reports, Chinese government documents, and Ninestar company disclosures.  For example:

  i.    FLETF concluded that Ninestar received forced laborers from Xinjiang because, in 2021, Ninestar acknowledged its [      ] and was [      ].  The Administrative Record, however, admits that [      ].  Other than the allegations of the still-unnamed informant, nothing in the Administrative Record links Ninestar to [      ].  And in any event, nothing in the Administrative Record

supports the conclusion that Ninestar [      ] at the time of the Listing Decision, rather than in the past, prior to the UFLPA's enactment.

ii.    The Administrative Record also suggests that Ninestar is hiding its receipt of laborers from Xinjiang because [      ].    The Record does not even acknowledge, let alone reject, the numerous benign explanations for [      ]. And, again, it does not link the alleged pre-UFLPA violations to prohibited conduct occurring at the time of the Listing Decision.

iii.    Ninestar's behavior is all the more suspicious, FLETF says, because there is [      ].    The report fails to mention that [      ].

**Injuries Caused by the FLETF Listing**

52.    Since FLETF's decision to add Plaintiffs to the UFLPA Entity List, Plaintiffs have suffered significant, irreparable harm to their businesses and reputation.

53.    By virtue of the listing, Plaintiffs' goods are automatically presumed to have been manufactured using forced labor (notwithstanding that the Listing Decision alleges transportation of protected persons, not the use of forced labor) and, therefore, cannot be imported into the United States directly or indirectly.    Any such goods will be—and are already being—detained by CBP at U.S. ports of entry, unable to be brought to market and sold.    Plaintiffs are aware of at least [      ] shipments that have been excluded by CBP on the basis of the Listing Decision.

54.    Plaintiffs lost business relationships quickly after the Listing Decision.    For example, one of Ninestar's largest United States-based customers at the time of the Listing Decision, Kentucky-based Lexmark, announced that it had "stopped shipments" from Ninestar and

15

would "replace Ninestar as a supplier globally."  Lexmark International, Inc., *Lexmark Issues Statement on Supply Chain* (June 2023).[2]

55.    In just the first two months after FLETF added Plaintiffs to the UFLPA Entity List, Plaintiffs' U.S. customers cancelled approximately [        ] worth of purchase orders because of the Listing Decision.  Customers also notified Plaintiffs that they have or were actively trying to transfer their orders for Plaintiffs' products to other suppliers.  Shortly after the Listing Decision, Plaintiffs' anticipated that, if the ban on importing their products was not rescinded, they stood to lose [      ] in revenue from U.S. customers over the next year.

56.    [      ]

57.    The potential harm is not limited to the United States.  In light of the Listing Decision, the leader of a trade group for European businesses in the printing and printing consumables industry has called for European distributors to "quickly distance themselves from Ninestar to avoid being associated with forced labor."  ETIRA, *ETIRA Shocked that Ninestar is Found Engaged in Forced Labor, Asks EU Regulators to Act* (June 12, 2023).[3]  In just the first couple of months after the Listing Decision, customers in Europe and the People's Republic of China cancelled about [        ] in orders as a direct result of the Listing Decision, and customers in Canada and Japan announced that they would no longer cooperate with Ninestar.

58.    The Listing Decision has also tarnished and continues to tarnish Ninestar's reputation.  FLETF has effectively accused Plaintiffs of aiding and abetting human trafficking, which harms Plaintiffs in the eyes of their investors and business partners, and of the consuming public.  Even after Plaintiffs clear their name, this taint will persist.

---

[2] https://newsroom.lexmark.com/statement_June_2023.
[3] https://www.etira.org/posts/etira-shocked-that-ninestar-is-found-engaged-in-forced-labor-asks-eu-regulators-to-act/.

59.    Despite the fact that the Listing Decision provided no basis whatsoever for the listing, customers and industry analysts have taken the announcement alone as proof positive of Ninestar's liability.  Indeed, Plaintiffs are deemed guilty until proven innocent.

60.    Ninestar's commercial competitors have every incentive to repeat and amplify the unadorned and unexplained allegation in the Listing Decision directly and through trade groups, to their own commercial benefit.

61.    Because of the Listing Decision, several American printing-industry trade associations have cut off their relationships with Plaintiffs.  *See, e.g.*, Business Tech. Ass'n, *Ninestar, Lexmark & the Business Technology Association* (July 25, 2023).[4]  In addition, [      ]

**The Removal Request and Decision**

62.    FLETF permits listed entities to "submit a request for removal from the UFLPA Entity List." FLETF Standard Operating Procedures § III(A)(1).  FLETF will remove entities upon a showing that "there is no longer reasonable cause to believe that they meet the criteria" for listing. *Id.* § I(C)(2)(b).

63.    Pursuant to the above procedures, on July 18, 2024, Ninestar submitted to FLETF a request to be removed from the UFLPA Entity List.  Ninestar asserted that there was no reasonable cause to believe that Ninestar meets the criteria for continued listing because [      ] In support, Ninestar submitted several hundred pages of evidence, including [      ].  Along with its application, Ninestar also took up FLETF's invitation to seek a meeting with FLETF to discuss Ninestar's delisting petition.  Ninestar anticipated that such a meeting would afford Ninestar an

---

[4] https://businesstechnologyassociation.growthzoneapp.com/news/Details/ninestar-lexmark-the-business-technology-association-a-message-to-all-bta-members-176918.

opportunity to address directly any areas of concern that FLETF had regarding Ninestar's application, and otherwise to speak directly to any additional questions FLETF may have.

64.    On September 26, 2024, FLETF sent Ninestar 12 questions regarding Ninestar's removal request.  The questions spanned a variety of topics, including Ninestar's recruitment processes, social audit practices, and employment records.  FLETF did not ask Ninestar to assert that it would not accept Uyghur laborers from the XUAR transferred through labor dispatch agencies via government sponsored labor transfers.  Ninestar submitted its responses, along with several hundred more pages of supporting records, on November 6, 2024.

65.    On November 27, 2024, FLETF informed Ninestar that it had accepted Ninestar's request for a meeting.  On December 5, 2024, however, FLETF informed Ninestar that the meeting would be structured as a "listening session" only, at which Ninestar would be permitted to present orally the same arguments and evidence it had already detailed in writing, but during which FLETF members would not be asking questions, sharing perspectives, or otherwise engaging in any way. Thus, for example, FLETF members would not use this opportunity to ask directly whether Ninestar would commit to not accepting Uyghur laborers from the XUAR transferred through labor dispatch agencies via government sponsored labor transfers.  Because such a meeting as designed by FLETF would do nothing to further Ninestar's request and might have only delayed it further, Ninestar withdrew its request for a meeting on December 9, 2024.

66.    Shortly after Ninestar withdrew its request for a meeting, FLETF sent three additional questions to Ninestar.  These questions asked about Ninestar's social welfare programs, whether Ninestar had hired or contracted Turkic language workers since 2017, and whether Ninestar has a policy against recruiting from the XUAR.  FLETF again did not ask Ninestar to assert that it would not accept Uyghur laborers from the XUAR transferred through labor dispatch

agencies via government sponsored labor transfers.  Ninestar provided answers to FLETF's December 9 questions on December 11, 2024.

67.     On April 18, 2025, the FLETF sent a third round of questions to Ninestar.  FLETF asked Ninestar to identify impediments to responding to FLETF's questions, to update prior responses, and to certify that its responses were fully accurate.  FLETF for a third time did not ask Ninestar to assert that it would not accept Uyghur laborers from the XUAR transferred through labor dispatch agencies via government sponsored labor transfers.  Ninestar provided answers to FLETF's April 18 questions on April 22, 2025.

68.     FLETF sent a fourth round of questions to Ninestar on May 9, 2025.  FLETF asked Ninestar five questions, including questions regarding Ninestar's labor suppliers and third-party social audits.  FLETF for a fourth and final time did not ask Ninestar to assert that it would not accept Uyghur laborers from the XUAR transferred through labor dispatch agencies via government sponsored labor transfers.  Ninestar provided answers, including hundreds of additional pages of supporting records, to FLETF's May 9 questions on May 13, 2025.

69.     FLETF did not request any further information from Ninestar.

70.     On June 23, 2025, FLETF sent Ninestar its final decision denying Ninestar's removal request.  After spending two full pages reciting the procedural history recounted above, FLETF's final decision devotes just four conclusory sentences to asserting what appear to be three distinct and unsupported grounds for denying Ninestar's request.

71.     First, FLETF states that "Ninestar's statements and evidence are inconsistent with the information provided by a confidential source," so Ninestar failed to "persuade the FLETF that the information supporting the initial listing determination is no longer accurate."  FLETF does

not explain what information was provided by the confidential source or why the confidential source's information was deemed more credible than Ninestar's statements and evidence.

72.    Second, FLETF states that Ninestar "fails to assert that it would not accept Uyghur laborers from the XUAR transferred through labor dispatch agencies via government sponsored labor transfers." FLETF never asked Ninestar to make such an assertion. FLETF also fails to explain why the lack of such an assertion is dispositive despite: (1) the extensive evidence detailing the steps Ninestar has taken to ensure it is [      ]; (2) Ninestar's statement that [      ]; (3) Ninestar's statement that "[r]egardless of the recruitment method, Ninestar is committed to ensuring that all employees voluntarily choose to work at Ninestar; and (4) Ninestar's statement that [      ].

73.    Third, FLETF stated without any elaboration that it "obtained additional information that also indicates the record submitted by Ninestar regarding its cooperation with labor dispatch agencies and the recruitment of labor is incomplete, and in some instances, unreliable." FLETF does not explain what information it obtained, the source of that information, or why that information was deemed more credible than Ninestar's submissions.

74.    The Removal Decision states that FLETF's "decision to deny Ninestar's request for removal is not appealable" but Ninestar may submit a new delisting request if it "can provide new information to support such a request." FLETF did not explain how Ninestar could possibly "provide new information" to rebut the evidence on which FLETF based decision, when FLETF had not shared that evidence with Ninestar or Ninestar's counsel.

75.    On June 26, 2025, Ninestar sent FLETF a letter explaining that it is "shocked by the FLETF's final decision, including the lack of any reasonably detailed explanation of that decision." Ninestar affirmed its commitment to "work with the FLETF to obtain delisting through

a fair, transparent, and lawful response." To that end, Ninestar asked FLETF to "provide a more detailed justification of its decision and the 'additional information' the FLETF obtained while considering Ninestar's removal request."

76. FLETF did not respond.

## CLAIMS FOR RELIEF

### COUNT I—5 U.S.C. § 706(2)(A)
### (ARBITRARY AND CAPRICIOUS AGENCY ACTION)

77. Plaintiffs incorporate by reference all allegations contained in paragraphs 1 through 60 as if set forth fully herein.

78. Plaintiffs are adversely affected by the Listing Decision because it has terminated their ability to sell and ship goods directly or indirectly to United States-based customers. *See* 5 U.S.C. § 702.

79. The Listing Decision constitutes "final agency action," 5 U.S.C. § 704, because it "mark[s] the consummation of the agency's decisionmaking process" and "the action [is] one by which rights or obligations have been determined, or from which legal consequences will flow," *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (internal quotation marks omitted). Indeed, without further action by Plaintiffs seeking to satisfy an onerous standing for discretionary relief from a different agency, Plaintiffs goods are today completely barred from the United States.

80. The APA requires courts to hold unlawful and set aside agency action, findings, and conclusions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A).

81. "The requirement that agency action not be arbitrary or capricious includes a requirement that the agency adequately explain its result." *Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993); *see also Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut.*

*Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (explaining that an agency acts unlawfully when it fails to "articulate a satisfactory explanation for its action").

82.     The Listing Decision is arbitrary and capricious because FLETF not only failed to provide an adequate explanation, it failed to provide *any* explanation, for adding Plaintiffs to the UFLPA Entity List. *See Aqua Prods., Inc. v. Matal*, 872 F.3d 1290, 1325 (Fed. Cir. 2017) ("[A]n agency must explain why it decides any question the way it does.  That obligation means that the agency must 'articulate a satisfactory explanation' of its reasoning; it may not simply provide a conclusion." (citations omitted)); *Tourus Recs., Inc. v. Drug Enf't Admin.*, 259 F.3d 731, 737 (D.C. Cir. 2001) ("A 'fundamental' requirement of administrative law is that an agency 'set forth its reasons' for decision; an agency's failure to do so constitutes arbitrary and capricious agency action."); *Clarke v. CFTC*, 74 F.4th 627, 641 (5th Cir. 2023) (holding agency action arbitrary and capricious "for the obvious reason that it gives no explanation whatsoever").

83.     The Confidential Administrative Record cannot cure this failure because the record was not issued publicly.  *Invenergy Renewables LLC v. United States*, 476 F. Supp. 3d 1323, 1331 (Ct. Int'l Trade 2020) (holding agency's explanation must be "made available to the parties or to the public at large").

84.     Even if the Confidential Administrative Record qualifies as FLETF's explanation, it is inadequate.   The Confidential Administrative Record suffers from several explanatory deficiencies, including, but not limited to:

      i.     FLETF failed to explain why it concluded that Ninestar works "with the government of the [XUAR]" when [     ]  *See State Farm*, 463 U.S. at 43 (holding explanation insufficient if it "runs counter to the evidence before the agency").

ii.   FLETF failed to explain why it concluded that Ninestar "works"—present tense—with the XUAR government, AR000002, when all of its evidence is stale, dating [      ].  *See Cayuga Nation v. United States*, 594 F. Supp. 3d 64, 74 (D.D.C. 2022) (holding agency must "rationally explain" link between improper factors for decision and a proper conclusion).

iii.   FLETF failed to explain why Ninestar's [      ]  *See State Farm*, 463 U.S. at 50–51 (holding agency action arbitrary and capricious for failing to explain rejection of obvious alternative).

### COUNT II—5 U.S.C. § 706(2)(A)
### (ARBITRARY AND CAPRICIOUS AGENCY ACTION)

85.   Plaintiffs incorporate by reference all allegations contained in paragraphs 1 through 68 as if set forth fully herein.

86.   Agency action is arbitrary and capricious when it is not supported by substantial evidence.  *Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 745 F.2d 677, 683–84 (D.C. Cir. 1984) (Scalia, J.).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Fujian Mach. & Equip. Imp. & Exp. Corp. v. United States*, 25 C.I.T. 1150, 1152 (2001) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

87.   The Listing Decision is arbitrary and capricious because it is not supported by substantial evidence.  The numerous flaws in the evidentiary record include, but are not limited to:

i.   There is no evidence to support the conclusion that Ninestar works "with the government of the Xinjiang Uyghur Autonomous Region" to recruit Uyghur laborers.  The evidence alleges only that Ninestar worked with a "third-party agency," who in turn worked with the Xinjiang government.  *E.g.*, AR000004;

23

*see Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 844 (D.C. Cir. 2006) (Kavanaugh, J.) (holding agency action arbitrary and capricious where it was premised on a factual conclusion with "*zero*" supporting evidence).

ii.   There is no evidence to support the conclusion that Ninestar, at the time of the Listing Decision, was "working" with the Xinjiang government to recruit and receive Uyghur laborers.  All of FLETF's evidence is stale, dating [      ].

iii.   FLETF assumed all of Ninestar's Zhuhai affiliates were guilty based solely on [      ].

### COUNT III—5 U.S.C. § 706(2)(C)
### (AGENCY ACTION IN EXCESS OF STATUTORY AUTHORITY)

88.    Plaintiffs incorporate by reference all allegations contained in paragraphs 1 through 71 as if set forth fully herein.

89.    "An administrative agency's power … must always be grounded in a valid grant of authority from Congress." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 161 (2000). "[A]n agency literally has no power to act … unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).

90.    It is "well-established" that, absent statutory direction to the contrary, "preponderance of the evidence is the minimal appropriate burden of proof in administrative proceedings." *Rodriguez v. Dep't of Vet. Affairs*, 8 F.4th 1290, 1301 (Fed. Cir. 2021).  FLETF has no authority to list entities based on a lower standard simply because the UFLPA does not expressly prohibit it from doing so, or expressly specify the quantum of proof FLETF must have to add someone to the Entity List.  *See FAG Italia S.p.A. v. United States*, 291 F.3d 806, 816 (Fed. Cir. 2002) ("It is … well established that the absence of a statutory prohibition cannot be the source of agency authority.").

24

91.    FLETF exceeded its statutory authority when it added Ninestar to the UFLPA Entity List based solely on having "reasonable cause to believe, based on specific and articulable information," that Ninestar received Uyghur laborers from Xinjiang, AR000002, rather than the statutorily required preponderance standard.

## COUNT IV—5 U.S.C. § 706(2)(C)
## (AGENCY ACTION IN EXCESS OF STATUTORY AUTHORITY)

92.    Plaintiffs incorporate by reference all allegations contained in paragraphs 1 through 91 as if set forth fully herein.

93.    There is a strong presumption that statutes do not apply retroactively. *U.S. Fid. & Guar. Co. v. United States*, 209 U.S. 306, 314 (1908).  To overcome that presumption, Congress must use "clear, strong, and imperative" language.  *Id.*  There is no such language in the UFLPA.  To the contrary, the language of the UFLPA shows that it applies only prospectively.  The Act prohibits "working" with the XUAR government—present tense—and we normally understand Congress to use verb tenses intentionally.  *See Carr v. United States*, 560 U.S. 438, 447–48 (2010) ("Consistent with normal usage, we have frequently looked to Congress' choice of verb tense to ascertain a statute's temporal reach.").

94.    Accordingly, the UFLPA does not authorize FLETF to list companies for conduct that occurred prior to the statute's enactment.

95.    FLETF added Ninestar to the UFLPA Entity List based solely on conduct that occurred before the enactment of the UFLPA.  *See, e.g.*, AR000001 ("The information in Package 23-002 demonstrates that Ninestar *has worked* with [the XUAR government] … ." (emphasis added)).  In doing so, FLETF exceeded its statutory authority.

## COUNT V—5 U.S.C. § 706(2)(A)
## (ARBITRARY AND CAPRICIOUS AGENCY ACTION)

96.     Plaintiffs incorporate by reference all allegations contained in paragraphs 1 through 95 as if set forth fully herein.

97.     Plaintiffs are adversely affected by the Removal Decision because it maintained Ninestar's inability to sell and ship goods directly or indirectly to United States-based customers. *See* 5 U.S.C. § 702.

98.     The Removal Decision constitutes "final agency action," 5 U.S.C. § 704, because it "mark[s] the consummation of the agency's decisionmaking process" and "the action [is] one by which rights or obligations have been determined, or from which legal consequences will flow," *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (internal quotation marks omitted). The Removal Decision constitutes FLETF's final, non-appealable decision to retain Ninestar on the UFLPA Entity List.

99.     The Removal Decision is arbitrary and capricious because FLETF "simply provide[d] a conclusion" and failed to "articulate a satisfactory explanation" for its decision. *Aqua Prods.*, 872 F.3d at 1325. FLETF failed to explain, among other things:

     i.    What information was provided by its confidential source, and why it deemed the confidential source more credible than Ninestar's statements and evidence;

    ii.    What "additional information" FLETF obtained while Ninestar's removal request was pending, and why it deemed that information more credible than Ninestar's statements and evidence;

   iii.    Why it was dispositive that Ninestar failed to assert that "it would not accept Uyghur laborers from the XUAR transferred through labor dispatch agencies via government sponsored labor transfers," when FLETF never asked Ninestar

26

to make such an affirmation, and when the evidence and statements Ninestar amounted to such an assertion.

## COUNT VI—5 U.S.C. § 706(2)(A)
### (ARBITRARY AND CAPRICIOUS AGENCY ACTION)

100.    Plaintiffs incorporate by reference all allegations contained in paragraphs 1 through 99 as if set forth fully herein.

101.    The Removal Decision is arbitrary and capricious because it is not supported by substantial evidence.  On information and belief, the evidence on which FLETF relied in reaching its decision was not sufficient for a reasonable person to conclude—particularly against the extensive evidence presented by Ninestar—that Ninestar [       ]

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter a Judgment:

(1)    Declaring that Defendants have acted in an arbitrary and capricious manner in violation of the APA by failing to provide a reasoned explanation for the Listing Decision;

(2)    Declaring that Defendants have acted in an arbitrary and capricious manner in violation of the APA by listing Ninestar without substantial evidence to support that action;

(3)    Declaring that Defendants exceeded their statutory authority by listing Ninestar based solely on "reasonable cause to believe" a violation occurred;

(4)    Declaring that Defendants exceeded their statutory authority by listing Ninestar based solely on conduct that occurred prior to the UFLPA's enactment;

(5)    Declaring that Defendants acted arbitrarily and capriciously in violation of the APA by denying Plaintiffs' request for removal from the UFLPA Entity List;

(6)     Vacating FLETF's determination to add Plaintiffs to the UFLPA Entity List and remanding to FLETF for such further action as is lawful and appropriate consistent with the APA and other applicable laws;

(7)     Vacating FLETF's decision denying Plaintiffs' request for removal from the UFLPA Entity List;

(8)     Enjoining DHS and CBP from enforcing the UFLPA's adverse importation presumption against Plaintiffs;

(9)     Awarding Plaintiffs their attorneys' fees, expert witness fees, and all other reasonable expenses incurred in pursuit of this Action under 28 U.S.C. § 2412; and

(10)    Awarding such other relief as the Court deems just and proper.


Dated: August 27, 2025

                                        Respectfully submitted,

                                        */s/ Gordon D. Todd*

                                        MICHAEL E. MURPHY
                                        GORDON D. TODD
                                        MICHAEL E. BORDEN
                                        CODY M. AKINS
                                        SIDLEY AUSTIN LLP

                                        1501 K Street, N.W.
                                        Washington, D.C. 20005
                                        (202) 736-8760
                                        gtodd@sidley.com

                                        *Counsel for Plaintiffs*