

AR000935

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

Supp.App.355



AR000936    THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION    Supp.App.356

AR000937 THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR000938          THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR000939    THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR000940        THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR000941        THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR000942     **THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION**

AR000943    THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR000944    THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR000945        **THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION**

AR000946

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

UNCLASSIFIED

**Meeting on Ninestar Corporation Request to be Removed from the Uyghur Forced Labor Prevention Act Entity List**

**Protocols**

Ninestar Corporation (Ninestar) submitted a request for removal from the Uyghur Forced Labor Prevention Act (UFLPA) Entity List, consistent with the procedures identified in the Notice on the Addition of Entities to the Uyghur Forced Labor Prevention Act Entity List (87 Fed. Reg. 47777).[1]  The Forced Labor Enforcement Task Force (FLETF) has agreed to accept Ninestar's meeting request prior to voting on the removal request.

**Meeting Protocols:**

1.  Ninestar (or its designated representative) will send a list of individuals to be invited to the meeting to FLETF.UFLPA.EntityList@hq.dhs.gov by close of business on Monday, December 9, 2024.  This list should include participant names, titles, and emails.

2.  The meeting will be held virtually on MS Teams.

3.  DHS will send a meeting invitation to all participants.  Participants should not forward the meeting invitation but can request that DHS add or remove participants from the calendar invitation as necessary.

4.  The meeting will be conducted in English.

5.  FLETF participation will include FLETF member agency representatives as well as subject matter experts, as appropriate.

6.  Ninestar will continue to coordinate with DHS, on behalf of the FLETF, for matters related to the removal request.

7.  The meeting will be structured as a listening session to allow Ninestar to present or highlight information that it would like the FLETF to consider.

8.  There will be no audio or visual recordings of the meeting.  No press engagement is permitted or invited into the meeting.

9.  Ninestar will provide the FLETF a written record of any new information presented at the meeting by close of business on Friday, December 27, 2024 (Ninestar can request an extension if necessary, however an extension may delay the FLETF review process). Ninestar will identify information it believes should be treated as business confidential information.

---

[1] Notice on the Addition of Entities to the Uyghur Forced Labor Prevention Act Entity List, 87 Fed. Reg. 47777 (August 4, 2022).

UNCLASSIFIED

AR000947

UNCLASSIFIED

10. Any follow up questions from the FLETF and answers from Ninestar will be provided in writing.

UNCLASSIFIED

AR000948

Unclassified // Business Confidential



**THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION**

Unclassified // Business Confidential

AR000949



**THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION**

AR000950

**INFORMANT PRIVILEGE**

1300 Pennsylvania Avenue, NW
Washington, DC 20229



**U.S. Customs and Border Protection**

DATE:                              December 20, 2024

MEMORANDUM FOR:      Christa Brzozowski
                                    Assistant Secretary
                                    Trade and Economic Security
                                    Office of Strategy, Policy, and Plans
                                    U.S. Department of Homeland Security

FROM:                           Eric H. Choy
                                    Executive Director
                                    Trade Remedy Law Enforcement Directorate
                                    Office of Trade

SUBJECT:                        Information regarding Ninestar Corporation and its Zhuhai-based
                                    Subsidiaries and Facilities (Ninestar) listed on the Uyghur Forced
                                    Labor Prevention Act Entity List

The purpose of this memo is to provide the Forced Labor Enforcement Task Force (FLETF) information on Ninestar as it relates to the two questions the FLETF requested from CBP on December 13, 2024.

1. Do you [alleger] have (and if so, could you provide) any information to suggest ███████
   ████████████████████████████████████████████████████████████████

2. Do you [alleger] have (and if so, could you provide) any information to suggest ████
   ████████████████████████████████████████████████████████████

On ████████, 2024, in a virtual meeting with the alleger, CBP received information pertaining to ██████████████████████ Although CBP did not have the opportunity to verify the information received from the alleger, a summary of what was provided by the alleger is below.

During the ██████ meeting, the alleger provided information regarding ████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████

Specifically, the alleger told CBP ██████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

FOR OFFICIAL USE ONLY

**THIS PAGE CONTAINS CONFIDENTIAL INFORMATION**

FOR OFFICIAL USE ONLY

FLETF Ninestar Questions Memo
Page 2

There was no information provided on ██████████████████████████████.

Please direct any questions or concerns regarding this memo to ████████, Director, Forced Labor Division at ████████ or ████████@cbp.dhs.gov.

**THIS PAGE CONTAINS CONFIDENTIAL INFORMATION**

FOR OFFICIAL USE ONLY

2

AR000952

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR000953

AR000954          THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

UNCLASSIFIED//BUSINESS CONFIDENTIAL

AR000955          THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR000956          THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR000957          THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



**AR000958**          **THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION**



AR000959        THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR000960    THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR000961        THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR000962          THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR000963          THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR000964    THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR000965          THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR000966          THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR000967    THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR000968    THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR000969    THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR000970     THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR000971    THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR000972    THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR000973    THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR000974    THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR000975

**THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION**

AR000976    THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR000977    THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR000978    THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR000979    THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR000980   THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR000981    THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR000982    THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR000983    THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR000984          THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR000985    THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



**AR000986**    **THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION**

**AR000987     THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION**

**AR000988**    **THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION**



AR000989    THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR000990    THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR000991    THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR000992    THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR000993    THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR000994    THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR000995    THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR000996    THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR000997          THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR000998    THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR000999    THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001000    THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001001    THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001002                THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001003

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR

AR001004

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001005

AR0

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001006

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001007

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001008

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001009        THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001010        THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

A

AR001011

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001012

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001013

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001014

THIS PAGE CONTAINS CONFIDENTIAL INFORMATION



AR001015

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001016

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001017

**THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION**

AR001018

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001019

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001020

**THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION**

AR001021

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001022

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001023

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001024

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001025

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001026

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001027

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



**THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION**

1

AR001028



2

**AR001029 THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION**

3



**THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION**

3

AR001030



# amfori BSCI
# Code of Conduct

This updated version of the amfori BSCI Code of Conduct aligns with the amfori's 2024 brand guidelines;however, the content remains consistent with the version 2021. Any updates pertain solely to design and branding elements.

## 2021

AR001031

# Contents

**Introduction** ...................................................................................3

**Values** ................................................................................... 4

**Principles**................................................................................. 6

**Terms of Implementation** ............................................................12

**References**.............................................................................13

**Glossary**..............................................................................13

**Signatory**............................................................................14

# Introduction

**The amfori BSCI Code of Conduct is a commitment document for amfori members and their business partners to exercise human rights due diligence and environmental protection in their global supply chains in line with internationally recognised principles.**

This document gives a direction to the amfori members and their business partners in order to **conduct responsible business, and to identify, prevent, mitigate, account for and remediate adverse human rights, as well as environmental, impacts in their supply chains.** It is supported and supplemented by the amfori BSCI System Manual, amfori Member Commitment Programme, and the amfori Sustainability Platform. This document, and all the supporting and supplementary material, integrates the characteristics of due diligence as listed by the Organisation for Economic Co-operation and Development (OECD).

amfori members and their business partners, including upstream and downstream producers, intermediaries and those involved in worker recruitment processes, can become signatories of the amfori BSCI Code of Conduct. Throughout this document, the term "signatories" will be used synonymously to refer to amfori members and their business partners.

This version of the amfori BSCI Code of Conduct has been approved by amfori, and overrules all previous versions of the amfori BSCI Code of Conduct in all its translations. The English version of this document is the legally binding one.

# Values

The amfori BSCI Code of Conduct, as well as its supporting documents and tools, are based on, and refer to:

- United Nations (UN) Universal Declaration of Human Rights
- International Labour Organization (ILO) Conventions and Recommendations
- UN Guiding Principles on Business and Human Rights (UNGP)
- OECD Guidelines for Multinational Enterprises
- UN Children's Rights and Business Principles
- Gender Dimensions of the UN Guiding Principles on Business and Human Rights
- OECD Sectoral Guidance Documents

By endorsing the amfori BSCI Code of Conduct, the signatories confirm that their commitment will follow the values below:

- **Continuous improvement:** The signatories undertake to implement the amfori BSCI Code of Conduct in a holistic approach, embedded in their management systems and company culture, to ensure the continuous improvement of due diligence within their organisations and supply chains in a progressive manner.

- **Cooperation:** The signatories will have a greater impact on, and better chance of identifying, preventing, mitigating and remediating human rights and environmental violations in their organisations and supply chains by working together and taking a holistic approach to due diligence. The spirit of cooperation is crucial in the engagement between the signatories and stakeholders at different levels, particularly to create leverage. amfori supports the signatories by creating relevant and meaningful partnerships.

- **Empowerment:** A central aim for amfori is to enable its signatories to develop their organisations and empower supply chains in a way that respects human rights and enables continuous improvement. To this end, amfori provides the needed tools, and expects its signatories to use and cascade these tools within their organisations and supply chains.

- **Code observance:** Complying with national legislation is the first obligation of business enterprises. In countries where the national legislation sets a different standard of protection than the amfori BSCI Code of Conduct and its references, the signatories shall abide by the principles that provide the highest protection to the workers and the environment, without contradicting the legal framework of the country.

- **Protection of vulnerable persons:** The signatories commit to the protection and empowerment of vulnerable individuals, and members of vulnerable groups and communities, to the best of their influence. The signatories understand that vulnerability can depend on the context, and certain individuals, groups, and communities may be vulnerable in more than one aspect.

- **Transparency:** The signatories commit to being transparent:

  With each other, with amfori and with any third party involved as relevant (e.g. auditors, quality partners), and within the context of identification, prevention, and remediation of adverse human rights and environmental impacts. The signatories actively inform each other and amfori on any critical incident, as well as the effectiveness of any responses to an adverse impact to values and principles of the amfori BSCI Code of Conduct,

  Through reasonable disclosure to shareholders, stakeholders, and governments regarding their impacts on the supply chain and in the surrounding communities, in line with national legislation requirements where available.

# Principles

The amfori BSCI Code of Conduct and its values are implemented through the set of principles as explained below:

## Social Management System and Cascade Effect

The signatories commit to:

- Adopt and publicly communicate a written human rights policy statement, in line with the complexity and size of operations, approved at the most senior level,

- Implement a process- and risk-based due diligence management system in their business practices in line with the UNGPs, and adjusted to the business model of the company. The expectations set in this Code of Conduct should be embedded in the system,

- Actively communicate their endorsement of the amfori BSCI Code of Conduct through all the functions in their company, as well as to their business partners and relevant stakeholders,

- Train and incentivize all relevant departments and individuals in a manner that allows them to integrate the principles of responsible and gender-responsive business and purchasing practices in the company culture, and cascade it to their business partners,

- Require their business partners to cascade the information to the relevant business partners and stakeholders in the supply chain,

- Require and follow-up with their business partners to work towards full observance of the amfori BSCI Code of Conduct within the sphere of their influence, including intermediaries that are involved in the worker recruitment process, such as brokers, recruiters and recruitment agencies,

- Include all workers in their due diligence, especially the vulnerable parts in their supply chain such as home-based workers, smallholders, as well as temporary and migrant workers; identify the challenges at these levels, and partner with amfori and other relevant stakeholders for improvements,

- Have the strategy, processes, and sufficient resources in place to meet the responsibilities related to the amfori BSCI Code of Conduct and ensure that there is continuous improvement in its implementation,

- Exercise responsible and gender-responsive purchasing practices, and avoid putting their business partners in a position that prevents them from adhering to the amfori BSCI Code of Conduct.

## Workers Involvement and Protection

The signatories commit to:

- Establish responsible and gender-responsive management practices that involve all workers and their representatives in sound information exchange on the due diligence process,

- Define long-term goals to protect workers in line with the aspirations of the amfori BSCI Code of Conduct,

- Take specific steps, such as trainings, to make workers aware of their rights and responsibilities, with special attention to vulnerable persons. When relevant, intermediaries such as brokers, recruiters, and recruitment agencies should play an active role in achieving these steps,

- Build sufficient competence among the managers, workers, and worker representatives within their company, as well as in the supply chain, in order to embed the amfori BSCI Code of Conduct in their company culture, and promote continuous education and training at each level of work,

- Establish or participate in effective operational-level grievance mechanisms for individuals and communities who may be adversely impacted, and maintain accurate records. The operational-level grievance mechanism must be in line with UNGP Article 31. Where relevant (e.g. when a migrant worker population is present), the operational-level grievance mechanism should be accessible in relevant local languages, and should allow to address and remedy the issues effectively across jurisdictions through partnerships and coordination.

## The Rights of Freedom of Association and Collective Bargaining

The signatories commit to:

- Respect the right of workers to form and join trade unions – or to refrain from doing so – and bargain collectively, in a free and democratic way, without distinction whatsoever and irrespective of gender,

- Ensure meaningful representation of all workers, without distinction whatsoever and irrespective of gender,

- Not discriminate against workers because of trade union membership,

- Not prevent workers' representatives and recruiters from having access to workers in the workplace or from interacting with them,

- Respect this principle by allowing workers to freely elect their own representatives with whom the company can enter into dialogue about workplace issues, when operating in countries where trade union activity is unlawful or where free and democratic trade union activity is not allowed.

## No Discrimination, Violence or Harassment

The signatories commit to:

- Treat all workers with respect and dignity,

- Ensure that workers are not subject to any form of violence, harassment, and inhumane or degrading treatment in the workplace, as well as threats of violence and abuse, including corporal punishment, verbal, physical, sexual, economic or psychological abuse, mental or physical coercion, or other forms of harassment or intimidation,

- Understand the possible grounds for discrimination in their specific context, and not discriminate or exclude persons based on sex, gender, age, religion, race, caste, birth, social background, disability, ethnic and national origin, nationality, membership in unions or any other legitimated organisations, political affiliation or opinions, sexual orientation, family responsibilities, marital status, pregnancy, diseases, or any other condition that could give rise to discrimination,

- Establish disciplinary procedures in writing and explain them verbally to workers in terms and language which they understand. The disciplinary measures must be in line with national legislation,

- Provide gender-sensitive and equal opportunities and treatment throughout recruitment and employment,

- Verify that workers are not harassed, disciplined, or retaliated upon for reporting issues on any of the grounds listed above.

# Fair Remuneration

The signatories commit to:

- Comply, as a minimum, with wages mandated by governments' minimum wage legislation, or industry standards approved based on collective bargaining, whichever is higher. The wages shall refer to standard working hours,

- Pay wages in a regular, timely and stable manner, and fully in legal tender. Partial payment in the form of allowance "in kind" is only accepted in line with ILO specifications,

- Assess the pay gap accurately, and work progressively towards the payment of a living wage that is sufficient to afford a decent, standard of living for the workers and their families,

- Reflect the skills, responsibility, seniority, and education of workers in their level of wages,

- Where a pay rate for production, quota or piece work, is established, allow workers to earn at least a wage which respectively meets or exceeds applicable legal minimum wages, industry standards, or collective bargaining agreements (where applicable) within standard working hours,

- Ensure that workers of all genders and categories, such as migrant and local workers, receive the same remuneration for equal jobs and qualification,

- Implement deductions only under the conditions and to the extent allowed by law or fixed by collective agreement,

- Provide the workers with the social benefits that are legally granted, such as without negative impact on their pay, level of seniority, position, or promotion prospects.

# Decent Working Hours

The signatories commit to:

- Ensure that workers are not required to work more than 48 standard hours per week, without prejudice to the specific expectations set out hereunder. Exceptions specified by the ILO are recognized,

- Interpret applicable national legislation,

industry benchmark standards or collective agreements within the international framework set out by the ILO, and promote working hour practices that enable a healthy work-life balance for the workers,

- Only exceed the limit of hours described above in line with exceptional cases defined by the ILO, in which case overtime is permitted,

- Use overtime as an exceptional and voluntary practice, paid at a premium rate of minimum 125% of the standard rate. Overtime shall not represent a significantly higher likelihood of occupational hazards, and in no circumstance go the limits defined under national legislation,

- Grant their workers the right to resting breaks in every working day and the right to at least one day off in every seven days, unless exceptions defined by collective agreements apply.

# Occupational Health and Safety

The signatories commit to:

- Respect the right to healthy working and living conditions of workers and local communities, without prejudice to the specific expectations set out hereunder. Vulnerable persons, such as - but not limited to - young workers, new and expecting mothers and persons with disabilities, shall receive special protection,

- Comply with national occupational health and safety legislation, or with international standards where national legislation is weak or poorly enforced,

- Ensure that there are systems in place to assess, identify, prevent, and mitigate potential and actual threats to the health and safety of workers,

- Train all departments and individuals on occupational health and safety regularly throughout all stages of employment, and provide information on potential occupational health and safety risks to workers and public, including affected communities,

- Take effective measures to prevent workers from having accidents, injuries, or illnesses, arising from, associated with, or occurring during work. These measures aim at minimizing, so far as is reasonable, the causes of hazards inherent within the workplace,

- Seek improving workers' protection in case of accident, including through compulsory insurance schemes,

- Maintain records of all health and safety incidents in the workplace and all other facilities that are provided or mandated,

- Take all appropriate measures, and obtain all by national legislation, to see to the stability and safety of the equipment and buildings they use, as well as to protect against and prepare for any foreseeable emergency. This includes residential facilities for workers when these are provided or mandated by the employer or a recruitment partner,

- Establish relevant committees, such as an Occupational Health and Safety Committee, to ensure active co-operation between management and workers, and/or their representatives for the development and effective implementation of systems that ensure a safe and healthy work environment. These committees aim to represent the diversity of the workers,

- Provide awareness to workers, and respect their right and responsibility to exit the premises and/or stop working without seeking permission in dangerous situations and uncontrolled hazards,

- Provide adequate occupational medical assistance and related facilities and provide equal access to all workers for these services. Health services (including insurance) should serve the distinctive concerns and needs of all genders and ages,

- Provide access to safe and clean drinking water, and eating and resting areas free of charge, and where applicable, provide access to cooking and food storage areas,

- Provide an adequate number of safe, separate toilets with adequate level of privacy for all genders, and paper towels and washbasins with hand soap in all work areas,

- Ensure that when residential facilities are provided or mandated, they are clean and safe, and they meet all the basic needs of the workers,

- Provide effective and tailored Personal Protective Equipment (PPE) to all workers free of charge, taking the needs of different worker categories, such as pregnant and nursing women, into consideration,

- Compensate the damages incurred to the workers on the occasion that historical or actual failure of adherence to principles is identified.

## No Child Labour

The signatories commit to:

- Not employ, directly or indirectly, children below the minimum age of completion of compulsory schooling as defined by law, which shall not be less than 15 years, unless the exceptions recognised by the ILO apply,

- Protect children from any form of exploitation,

- Establish robust age-verification mechanisms as part of the recruitment process, which may not be in any way degrading or disrespectful to the worker,

- Take special care and identify measures in a proactive manner in case of the dismissal and removal of children, to ensure the protection of affected children.

## Special Protection for Young Workers

The signatories commit to:

- Ensure that young persons do not work at night and that they are protected against conditions of work which are prejudicial to their health, safety, morals, and development, without prejudice to the specific expectations set out in this principle,

- Remove young workers from any hazardous work or source of hazard immediately when such cases are identified, and redefine their scope of work without any loss of income,

- Ensure that (a) the kind of work is not likely to be harmful to young workers' health or development; (b) their working hours allow their attendance in school, their participation in vocational orientation approved by the competent authority or their capacity to benefit from training or instruction programmes,

- Set the necessary mechanisms to prevent, identify and mitigate harm to young workers, with special attention to the provision and access of young workers to effective operational grievance mechanisms and to Occupational Health and Safety trainings schemes and programmes specific to the needs of young workers.

## No Precarious Employment

The signatories commit to:

- Ensure that, their recruitment process and employment relationships do not cause insecurity and social or economic vulnerability for their workers,

- Ensure that work is performed on the basis of a recognised and documented employment relationship, established in compliance with relevant national legislations, custom or practice, and international labour standards, whichever provides greater protection,

- Before entering employment, provide workers with understandable information in their own language and ensure that they are aware about their rights, responsibilities, and employment conditions, including working hours, remuneration and terms of payment in their own language,

- Aim at providing decent, and where relevant, flexible working conditions that also support workers, irrespective of gender, in their roles as parents or caregivers, including migrant and seasonal workers whose children may be left in their hometowns,

- Not use employment arrangements in a way that deliberately does not correspond to the genuine purpose of the law. This includes - but is not limited to - (a) apprenticeship or training schemes where there is no intent to impart skills or provide regular employment, (b) seasonality or contingency work when used to

undermine workers' protection,

- (c) labour-only contracting, and d) contract substitution,

- Not use subcontracting in a way that undermines the rights of workers.

## No Bonded, Forced Labour or Human Trafficking

The signatories commit to:

- Not engage in, or through business partners, be complicit to, any form of servitude, forced, bonded, indentured, trafficked or non-voluntary labour, including state-imposed forced labour,

- Adhere to international principles of responsible recruitment, including the Employer Pays Principle, and require the same from their recruitment partners, when engaging and recruiting all workers, either directly or indirectly, especially members of vulnerable groups such as temporary and migrant workers, . As a minimum, this includes:
  - No recruitment fees and costs are charged to workers
  - Clear and transparent employment contracts
  - Workers' freedom from deception and coercion
  - Freedom of movement and no retention of identity documents
  - Access to free, comprehensive, and accurate information
  - Freedom to terminate contract, change employer, and safely return
  - Access to free dispute resolution and effective remedies

- Progressively compensate the damages incurred to the workers within a reasonable timeframe, and within the framework of the same international principles, if historical or actual failure of adherence to principles is identified.

# Protection of the Environment

The signatories commit to:

- Implement a process- and risk-based environmental due diligence management system in their business practices, adjusted to the business model of the company. This can also be integrated into the overall due diligence management system,

- Comply with national environmental legislation, or with international standards where national legislation is weak or poorly enforced,

- Identify the environmental impacts of their operations, and implement adequate measures to prevent, mitigate and remediate adverse impacts on the surrounding communities, natural resources, climate, and the overall environment.

# Ethical Business Behaviour

The signatories commit to:

- Not take part in any act of corruption, extortion or embezzlement, nor in any form of bribery - including but not limited to - the promising, offering, giving or accepting of any improper monetary or other incentive,

- Develop and adopt adequate internal controls, programmes or measures for preventing and detecting corruption, extortion, embezzlement or any form of bribery, developed on the basis of a company-specific risk assessment,

- Keep accurate information regarding their activities, structure and performance, and disclose these in accordance with applicable regulations and industry benchmark practices to enhance transparency of their activities,

- Not falsify, or participate in falsifying any information or in any act of misrepresentation in the supply chain,

- Provide awareness to the workers about the policies, controls, programmes and measures against unethical behaviour, and promote compliance within the company through trainings and communication,

- Collect, use, and otherwise process personal information (including that from workers, business partners, customers and consumers in their sphere of influence) with reasonable care. The collection, use and other processing of personal information must comply with privacy and information security laws and regulatory requirements.

# Terms of Implementation

The signatories of this Code of Conduct agree to implement the values and principles set out in this document throughout the life cycle of their business relationships, and in close liaison with relevant stakeholders:

- **Before starting a business relationship,** to map and understand potential and actual human rights risks.

- **During a business relationship,** to conduct responsible business, and to coach and support their business partners in continuous improvement.

- **At the end of a business relationship,** to ensure a responsible transition for the business partner.

## Information Management

- The signatories shall maintain the amfori Sustainability Platform with up-to-date and accurate information and will instruct their employees and representatives to use such information in compliance with the Regulation (EU) 2016/679 (General Data Protection Regulation), which is also referred to as EU GDPR.

- The signatories understand that all personal information collected, used, and otherwise processed within the amfori tools and platforms must comply with the EU GDPR, regardless of the geographical location the data is collected.

- The signatories agree that the information gathered through a monitoring activity, including a grievance mechanism, can be shared with third parties (i) insofar as this occurs within the framework of amfori; (ii) insofar as such transfer is necessary for the provisions by or on behalf of amfori-related activities, and/or (iii) the third parties agree to treat the information provided with utmost respect and for the only purpose relevant for the case.

## Monitoring in the Supply Chain

- Business partners monitor that the amfori BSCI Code of Conduct is observed internally and by their upstream business partners involved in the production process, based on a continuous improvement approach.

- Business partners acknowledge that amfori members may choose to include them in monitoring activities. They agree to be monitored on-site and off-site, announced or unannounced, by amfori, or third parties qualified by amfori (e.g. auditing companies, quality partners) for this purpose. These activities may be conducted within the scope of amfori monitoring tools, or amfori Audit Quality Programme. Within the course of a monitoring activity, business partners agree to:

  - Give full access to the facilities as requested by the individuals conducting the activity, including parts that may not have been initially indicated in the activity scope,

  - Give access to personal data on their workers, and let the individuals gather relevant data for reporting purposes as long as in line with the national legislation and EU GDPR,

- Allow the individuals to gather the necessary document evidence relevant to the activity, including but not limited to business documents, licenses, certifications, and pictures,

- Allow the individuals to conduct on-site and off-site interviews with workers in full confidentiality, without any influence or retaliation from the management.

# References



For public consultation purposes, please refer to the separate document in the package.

# Glossary



For public consultation purposes, please refer to the separate document in the package.

# Signatory

**Date**

**Name**

**Name of Company**

**Address**

**Signature**

**Company Stamp/Seal**



**amfori**

Avenue de Tervueren 270
1150 Brussels, Belgium

**T** +32 (0) 2 741 64 76
**E** info@amfori.org

**amfori.org**

AR001045

Responsible Business Alliance
Advancing Sustainability Globally

Version 8.0 (2024)

# RESPONSIBLE BUSINESS ALLIANCE CODE OF CONDUCT

The Responsible Business Alliance (RBA) Code of Conduct establishes standards to ensure that working conditions in supply chains are safe, and that business is conducted responsibly, ethically, and with respect for human rights and the environment.

The Code may be voluntarily adopted by any business and subsequently applied by that business to its direct and indirect supply chain and subcontractors, including providers of contract labor.

To adopt the Code and become a participant ("Participant"), a business shall declare its support for the Code and conduct due diligence in line with the Code and its standards through the establishment of an effective management system.

Participants must regard the Code as a total supply chain initiative. At a minimum, Participants shall also require their next tier suppliers to acknowledge and implement the Code.

Fundamental to adopting the Code is the understanding that a business, in all of its activities, must operate in full compliance with  applicable laws, rules, and regulations[1]. In alignment with internationally recognized standards as listed under the References of this document, and drawing upon best practices in global supply chains, elements of this Code may  go beyond legal compliance in order to advance social and environmental responsibility and business ethics. In no case can complying with the Code violate  applicable laws. If, however, there are differing standards between the RBA Code and  applicable laws, the RBA defines conformance as meeting the strictest requirements.

The provisions of this Code are derived from and respect internationally recognized standards including:

- OECD Guidelines for Multinational Enterprises

- UN Guiding Principles on Business and Human Rights

- ILO Declaration on Fundamental Principles and Rights at Work

- ILO Fundamental Conventions

- UN Universal Declaration of Human Rights

The Code is made up of five sections:

- Sections A, B, and C: Standards for Labor, Health and Safety, and the Environment, respectively.

- Section D: Standards relating to business ethics.

- Section E: Elements of an acceptable system to manage conformity to this Code.

The RBA is committed to obtaining regular input from stakeholders in the continued development and implementation of the Code of Conduct.

---

[1] The Code is not intended to create new and additional third-party rights, including for workers.

Responsible Business Alliance Code of Conduct v8.0

AR001046

**Responsible Business Alliance**
*Advancing Sustainability Globally*

## A.    LABOR

Participants commit to respect the human rights of workers, and to treat them with dignity. This applies to direct and indirect suppliers, as well as all workers including temporary, migrant, student, contract, direct employees, and any other type of worker.

The labor standards are as follows:

### 1)    Prohibition of Forced Labor

Forced labor in any form, including but not limited to, bonded (including debt bondage) or indentured labor, involuntary or exploitative prison labor, slavery or trafficking of persons is not permitted. This includes transporting, harboring, recruiting, transferring, or receiving persons by means of threat, force, coercion, abduction or fraud for labor or services. There shall be no unreasonable restrictions on workers' freedom of movement in the facility in addition to unreasonable restrictions on entering or exiting company- provided facilities including, if applicable, workers' dormitories or living quarters. As part of the hiring process, all workers must be provided with a written employment agreement in their native language, or in a language the worker can understand, that contains a description of terms and conditions of employment. Foreign migrant workers must receive the employment agreement prior to the worker departing from his or her country of origin and there shall be no substitution or change(s) allowed in the employment agreement upon arrival in the receiving country unless these changes are made to meet local law and provide equal or better terms. All work shall be voluntary, and workers shall be free to leave work at any time or terminate their employment without penalty if reasonable notice is given, which shall be clearly stated in workers' contracts. Participants shall maintain documentation on all leaving workers. Employers, agents, and sub-agents' may not hold or otherwise destroy, conceal, or confiscate identity or immigration documents, such as government-issued identification, passports, or work permits. Notwithstanding the foregoing, employers can only hold documentation if necessary to comply with the local law. In this case, at no time shall workers be denied access to their documents. Workers shall not be required to pay employers' agents or sub-agents' recruitment fees or other related fees for their employment. If any such fees are found to have been paid by workers, such fees shall be repaid to the worker.

### 2)    Young Workers

Child labor shall not be used in any stage of manufacturing. The term "child" refers to any person under the age of 15, or under the age for completing compulsory education, or under the minimum age for employment in the country, whichever is greatest. Workers under the age of 18 (Young Workers) shall not perform work that is likely to jeopardize their health or safety, including night shifts and overtime. Participants shall ensure proper management of student workers through proper maintenance of student records, rigorous due diligence of educational partners, and protection of students' rights in accordance with applicable laws and regulations. Participants shall implement an appropriate mechanism to verify the age of workers. The use of legitimate workplace learning programs, which comply with all laws and regulations, is supported. Participants shall provide appropriate support and training to all student workers. In the absence of local law, the wage rate for student workers, interns, and apprentices shall be at least the same wage rate as other entry-level workers performing equal or similar tasks. If child labor is identified, assistance/remediation shall be provided.

Responsible Business Alliance Code of Conduct v8.0

AR001047

**Responsible Business Alliance**
Advancing Sustainability Globally

## 3)    Working Hours

Working hours  shall not exceed the maximum set by local law. Further, a workweek shall not be more than 60 hours per week, including overtime, except in emergency or unusual situations. All overtime  shall be voluntary. Workers shall be allowed at least one day off every seven days.

## 4)    Wages and Benefits

Compensation paid to workers shall comply with all applicable wage laws, including those relating to minimum wages, overtime hours and legally mandated benefits. All workers shall receive equal pay for equal work and qualification. Workers shall be compensated for overtime at pay rates greater than regular hourly rates. Deductions from wages as a disciplinary measure shall not be permitted. For each pay period, workers shall be provided with a timely and understandable wage statement that includes sufficient information to verify accurate compensation for work performed. All use of temporary, dispatch and outsourced labor shall be within the limits of the local law.

## 5)    Non-Discrimination/Non-Harassment/Humane Treatment

Participants shall commit to a workplace free of harassment and unlawful discrimination. There shall be no harsh or inhumane treatment including violence, gender-based violence, sexual harassment, sexual abuse, corporal punishment, mental or physical coercion, bullying, public shaming, or verbal abuse of workers; nor is there to be the threat of any such treatment. Companies shall not engage in discrimination or harassment based on race, color, age, gender, sexual orientation, gender identity or expression, ethnicity or national origin, disability, pregnancy, religion, political affiliation, union membership, covered veteran status, protected genetic information or marital status in hiring and employment practices such as wages, promotions, rewards, and access to training. Disciplinary policies and procedures in support of these requirements shall be clearly defined and communicated to workers. Workers shall be provided with reasonable accommodation for religious practices and disability. In addition, workers or potential workers should not be subjected to medical tests, including pregnancy or virginity tests, or physical exams that could be used in a discriminatory way. This was drafted in consideration of ILO Discrimination (Employment and Occupation) Convention (No.111).

## 6)    Freedom of Association and Collective Bargaining

Open communication and direct engagement between workers and management are the most effective ways to resolve workplace and compensation issues. Workers and/or their representatives shall be able to openly communicate and share ideas and concerns with management regarding working conditions and management practices without fear of discrimination, reprisal, intimidation, or harassment. In alignment with these principles, participants shall respect the right of all workers to form and join trade unions of their own choosing, to bargain collectively, and to engage in peaceful assembly as well as respect the right of workers to refrain from such activities. Where the right of freedom of association and collective bargaining is restricted by applicable laws and regulations, workers shall be allowed to elect and join alternate lawful forms of worker representations.

Responsible Business Alliance Code of Conduct v8.0

AR001048

**Responsible Business Alliance**
Advancing Sustainability Globally

## B.    HEALTH AND SAFETY

Participants recognize that in addition to minimizing the incidence of work-related injuries and illnesses, a safe and healthy working environment enhances the quality of products and services, consistency of production and worker retention and morale. Participants also recognize that ongoing worker input and education are essential to identifying and solving health and safety issues in the workplace.

The health and safety standards are as follows:

### 1)    Occupational Health and Safety

Worker potential for exposure to health and safety hazards (chemical, electrical and other energy sources, fire, vehicles, and fall hazards, etc.) shall be identified and assessed, mitigated using the Hierarchy of Controls. Where hazards cannot be adequately controlled by these means, workers shall be provided with appropriate, well-maintained, personal protective equipment, and educational materials about risks to them associated with these hazards. Gender-responsive measures shall be taken, such as  not having pregnant women and nursing mothers in working conditions, which could be hazardous to them or their child  and to provide reasonable accommodations for nursing mothers.

### 2)    Emergency Preparedness

Potential emergency situations and events  shall be identified and assessed, and their impact minimized by implementing emergency plans and response procedures including emergency reporting, employee notification and evacuation procedures, worker training, and drills. Emergency drills shall be executed at least annually or as required by local law, whichever is more stringent. Emergency plans  shall also include appropriate fire detection and suppression equipment, clear and unobstructed egress, adequate exit facilities, contact information for emergency responders, and recovery plans. Such plans and procedures shall focus on minimizing harm to life, the environment, and property.

### 3)    Occupational Injury and Illness

Procedures and systems shall be in place to prevent, manage, track and report occupational injuries and illnesses, including provisions to encourage worker reporting, classify and record injury and illness cases, provide necessary medical treatment, investigate cases and implement corrective actions to eliminate their causes, and facilitate the return of workers to work. Participants shall allow workers to remove themselves from imminent harm, and not return until the situation is mitigated, without fear of retaliation.

### 4)    Industrial Hygiene

Worker exposure to chemical, biological, and physical agents shall be identified, evaluated, and controlled according to the Hierarchy of Controls. When hazards cannot be adequately controlled, workers shall be provided with and use appropriate, well-maintained, personal protective equipment free of charge. Participants shall provide workers with safe and healthy working environments, which shall be maintained through ongoing, systematic monitoring of workers' health and working environments. Participants shall provide occupational health monitoring to

4

Responsible Business Alliance Code of Conduct v8.0

AR001049

**Responsible Business Alliance**

Advancing Sustainability Globally

routinely evaluate if workers' health is being harmed from occupational exposures. Protective occupational health programs shall be ongoing and include educational materials about the risks associated with exposure to workplace hazards.

## 5)    Physically Demanding Work

Worker exposure to the hazards of physically demanding tasks, including manual material handling and heavy or repetitive lifting, prolonged standing, and highly repetitive or forceful assembly tasks  shall be identified, evaluated, and controlled.

## 6)    Machine Safeguarding

Production and other machinery shall be evaluated for safety hazards. Physical guards, interlocks, and barriers  shall be provided and properly maintained where machinery presents an injury hazard to workers.

## 7)    Sanitation, Food, and Housing

Workers  shall be provided with ready access to clean toilet facilities, potable water and  sanitary food preparation, storage, and eating facilities. Worker dormitories provided by the Participant or a labor agent  shall be maintained to be clean and safe, and provided with appropriate emergency egress, hot water for bathing and showering, adequate lighting, and  adequate conditioned ventilation, individually secured accommodations for storing personal and valuable items, and reasonable personal space along with reasonable entry and exit privileges.

## 8)    Health and Safety Communication

Participants shall provide workers with appropriate workplace health and safety information and training in the language of the worker or in a language the worker can understand for all identified workplace hazards that workers are exposed to, including but not limited to mechanical, electrical, chemical, fire, and physical hazards. Health and safety related information shall be clearly posted in the facility or placed in a location identifiable and accessible by workers. Health information and training shall include content on specific risks to relevant demographics, such as gender and age, if applicable. Training shall be provided to all workers prior to the beginning of work and regularly thereafter. Workers shall be encouraged to raise any health and safety concerns without retaliation.

Responsible Business Alliance Code of Conduct v8.0

AR001050

**Responsible Business Alliance**
Advancing Sustainability Globally

## C.    ENVIRONMENT

Across all business functions, Participants recognize that environmental responsibility is integral to producing world-class products. Participants shall identify the environmental impacts and minimize adverse effects on the community, environment, and natural resources, while safeguarding the health and safety of the public.

The environmental standards are as follows:

### 1)    Environmental Permits and Reporting

All required environmental permits (e.g. discharge monitoring), approvals, and registrations shall be obtained, maintained, and kept current and their operational and reporting requirements shall be followed.

### 2)    Pollution Prevention and Resource Conservation

Emissions and discharges of pollutants and generation of waste shall be minimized or eliminated at the source or by practices such as adding pollution control equipment; modifying production, maintenance, and facility processes; or by other means. The use of natural resources, including water, fossil fuels, minerals, and virgin forest products, shall be conserved by practices such as modifying production, maintenance and facility processes, materials substitution, re-use, conservation, recycling, or other means.

### 3)    Hazardous Substances

Chemicals, waste, and other materials posing a hazard to humans or the environment shall be identified, labeled, and managed to ensure their safe handling, movement, storage, use, recycling or reuse, and disposal. Hazardous waste data shall be tracked and documented.

### 4)    Solid Waste

Participants shall implement a systematic approach to identify, manage, reduce, and responsibly dispose of or recycle solid waste (non-hazardous). Waste data shall be tracked and documented.

### 5)    Air Emissions

Air emissions of volatile organic chemicals, aerosols, corrosives, particulates, ozone depleting substances, and combustion byproducts generated from operations shall be characterized,

routinely monitored, controlled, and treated as required prior to discharge. Ozone- depleting substances shall be effectively managed in accordance with the Montreal Protocol and applicable regulations. Participants shall conduct routine monitoring of the performance of its air emission control systems.

### 6)    Materials Restrictions

Participants shall adhere to all applicable laws, regulations, and customer requirements regarding the prohibition or restriction of specific substances in products and manufacturing, including labeling for recycling and disposal.

6

Responsible Business Alliance Code of Conduct v8.0

AR001051

**Responsible Business Alliance**
Advancing Sustainability Globally

### 7)    Water Management

Participants shall implement a water management program that documents, characterizes, and monitors water sources, use and discharge; seeks opportunities to conserve water; and controls channels of contamination. All wastewater shall be characterized, monitored, controlled, and treated as required prior to discharge or disposal. Participants shall conduct routine monitoring of the performance of its wastewater treatment and containment systems to ensure optimal performance and regulatory compliance.

### 8)    Energy Consumption and Greenhouse Gas Emissions

Participants shall establish and report against an absolute corporate-wide greenhouse gas reduction goal. Energy consumption and all Scopes 1, 2, and significant categories of Scope 3 greenhouse gas emissions shall be tracked, documented, and publicly reported. Participants shall look for methods to improve energy efficiency and to minimize their energy consumption and greenhouse gas emissions.

Responsible Business Alliance Code of Conduct v8.0

AR001052

**Responsible Business Alliance**
*Advancing Sustainability Globally*

## D.   ETHICS

To meet social responsibilities and to achieve success in the marketplace, Participants and their agents shall uphold the highest standards of ethics including the following:

### 1)   Business Integrity
The highest standards of integrity shall be upheld in all business interactions. Participants shall have a zero-tolerance policy to prohibit any and all forms of bribery, corruption, extortion and embezzlement.

### 2)   No Improper Advantage
Bribes or other means of obtaining undue or improper advantage shall not be promised, offered, authorized, given, or accepted. This prohibition covers promising, offering, authorizing, giving or accepting anything of value, either directly or indirectly through a third party, in order to obtain or retain business, direct business to any person, or otherwise gain an improper advantage. Monitoring, record keeping, and enforcement procedures shall be implemented to ensure compliance with anti-corruption laws.

### 3)   Disclosure of Information
All business dealings shall be transparently performed and accurately reflected on the Participant's business books and records. Information regarding participant's labor, health and safety, environmental practices, business activities, structure, financial situation, and performance shall be disclosed in accordance with applicable regulations and prevailing industry practices. Falsification of records or misrepresentation of conditions or practices in the supply chain are unacceptable.

### 4)   Intellectual Property
Intellectual property rights shall be respected. Transfer of technology and know-how is to be done in a manner that protects intellectual property rights, and customer and supplier information shall be safeguarded.

### 5)   Fair Business, Advertising and Competition
Standards of fair business, advertising, and competition shall be upheld.

### 6)   Protection of Identity and Non-Retaliation
Programs that ensure the confidentiality, anonymity, and protection of supplier and employee whistleblowers[2] shall be maintained, unless prohibited by law. Participants shall have a communicated process for their personnel to be able to raise any concerns without fear of retaliation.

---

[2]  Whistleblower definition: Any person who makes a disclosure about improper conduct by an employee or officer of a company, or by a public official or official body.

8

Responsible Business Alliance Code of Conduct v8.0

AR001053

**Responsible Business Alliance**

*Advancing Sustainability Globally*

## 7)    Responsible Sourcing of Minerals

Participants shall adopt a policy and exercise due diligence on the source and chain of custody of the tantalum, tin, tungsten, gold, and cobalt in the products they manufacture to reasonably assure that they are sourced in a way consistent with the Organisation for Economic Co-operation and Development (OECD) Guidance for Responsible Supply Chains of Minerals from Conflict- Affected and High-Risk Areas or an equivalent and recognized due diligence framework.

## 8)    Privacy

Participants shall commit to protecting the reasonable privacy expectations of personal information of everyone they do business with, including suppliers, customers, consumers, and employees. Participants shall comply with privacy and information security laws and regulatory requirements when personal information is collected, stored, processed, transmitted, and shared.

Responsible Business Alliance Code of Conduct v8.0

AR001054

**Responsible Business Alliance**
Advancing Sustainability Globally

# E.    MANAGEMENT SYSTEMS

Participants shall adopt or establish a management system with a scope that is related to the content of this Code. The management system shall be designed to ensure: (a) compliance with applicable laws, regulations and customer requirements related to the participant's operations and products; (b) conformance with this Code; and (c) identification and mitigation of operational risks related to this Code. It shall also facilitate continual improvement.

The management system shall contain the following elements:

## 1)    Company Commitment
Participants shall establish human rights, health and safety,  environmental and ethics policy statements affirming Participant's commitment to due diligence and continual improvement, endorsed by executive management. Policy statements shall be made  public and communicated to workers in a language they understand via accessible channels..

## 2)    Management Accountability and Responsibility
Participants shall clearly identify senior executive and company representative(s) responsible for ensuring implementation of the management systems and associated programs. Senior management reviews the status of the management systems on a regular basis.

## 3)    Legal and Customer Requirements
Participants shall adopt or establish a process to identify, monitor and understand applicable laws, regulations, and customer requirements, including the requirements of this Code.

## 4)    Risk Assessment and Risk Management
Participants shall adopt or establish a process to identify the legal compliance, environmental, health and safety[3], labor practice and ethics risks, including the risks of severe human rights and environmental impacts, associated with Participant's operations. Participants shall determine the relative significance for each risk and implement appropriate procedural and physical controls to control the identified risks and ensure regulatory compliance.

## 5)    Improvement Objectives
Participants shall establish written performance objectives, targets and implementation plans to improve the Participant's social, environmental, and health and safety performance, including a periodic assessment of Participant's performance in achieving those objectives.

---

[3] Areas to be included in a risk assessment for environmental health and safety are production areas, warehouse and storage facilities, plant/facilities support equipment, laboratories and test areas, sanitation facilities (bathrooms), kitchen/cafeteria and worker housing/dormitories.

Responsible Business Alliance Code of Conduct v8.0                                                                    10

AR001055

Responsible Business Alliance
Advancing Sustainability Globally

## 6)    Training

Participants shall establish programs for training managers and workers to implement Participant's policies, procedures, and improvement objectives and to meet applicable legal and regulatory requirements.

## 7)    Communication

Participants shall establish process for communicating clear and accurate information about Participant's policies, practices, expectations, and performance to workers, suppliers, and customers.

## 8)    Worker/Stakeholder Engagement and Access To Remedy

Participants shall establish processes for ongoing two-way communication with workers, their representatives, and other stakeholders where relevant or necessary. The process shall aim to obtain feedback on operational practices and conditions covered by this Code, and to foster continuous improvement.  Workers shall be given a safe environment to provide grievance and feedback without fear of reprisal or retaliation.

## 9)    Audits and Assessments

Participants shall conduct periodic self-evaluations to ensure conformity to legal and regulatory requirements, the content of the Code, and customer contractual requirements related to social and environmental responsibility.

## 10)    Corrective Action Process

Participants shall establish a process for timely correction of deficiencies identified by internal or external assessments, inspections, investigations, and reviews.

## 11)    Documentation and Records

Participants shall create and maintain documents and records to ensure regulatory compliance and conformity to company requirements along with appropriate confidentiality to protect privacy.

## 12)    Supplier Responsibility

Participants shall establish a process to communicate Code requirements to suppliers and to monitor supplier compliance to the Code.

AR001056



# REFERENCES

The following references were used in preparing this Code and may be useful sources of additional information. The following references may or may not be endorsed by each Participant:

**Standards and Conventions:**

- ILO Fundamental Conventions

    - Freedom of Association and Protection of the Right to Organise Convention, 1948 (No.87)

    - Right to Organise and Collective Bargaining Convention, 1949 (No.98)

    - Forced Labour Convention, 1930 (No.29)

    - Abolition of Forced Labour Convention, 1957 (No.105)

    - Minimum Age Convention, 1973 (No.138)

    - Worst Forms of Child Labour Convention, 1999 (No.182)

    - Equal Remuneration Convention, 1999 (No.100)

    - Discrimination (Employment and Occupation) Convention, 1958 (No.111)

    - Occupational Safety and Health Convention, 1981 (No.155), and the Promotional Framework, 2006 (No.187)

- OECD Due Diligence Guidance for Responsible Supply Chains of Minerals from Conflict-Affected and High-Risk Areas

- OECD Guidelines for Multinational Enterprises

- United Nations (UN) Guiding Principles on Business and Human Rights

- Universal Declaration of Human Rights

- United Nations Convention Against Corruption

- United Nations Convention on the Rights of the Child

- United Nations Convention on the Elimination of All Forms of Discrimination Against Women

- United Nations Global Compact

AR001057



**Other Useful References:**

- Dodd-Frank Wall Street Reform and Consumer Protection Act

- Eco Management & Audit System

- Ethical Trading Initiative

- ILO Code of Practice in Safety and Health

- ISO 14001 and related standards – Environmental management

- ISO 45001:2018 - Occupational health and safety management systems

- National Fire Protection Association

- Social Accountability International (SAI)

    o SA 8000

- United States Federal Acquisition Regulation

AR001058

Responsible Business Alliance
Advancing Sustainability Globally

## DOCUMENT HISTORY

Version 1.0 – Released October 2004.

Version 1.1 – Released May 2005. Converted document to RBA format, minor page layout revisions; no content changes.

Version 2.0 – Released October 2005 with revisions to multiple provisions.

Version 3.0 – Released June 2009 with revisions to multiple provisions.

Version 4.0 – Released April 2012 with revisions to multiple provisions.

Version 5.0 – Released November 2014 with revisions to multiple provisions.

Version 5.1 – Released March 2015 with revision to A1 to take effect January 1, 2016.

Version 6.0 – Released January 2018 with revisions to multiple provisions.

Version 7.0 – Released January 2021 with revisions to multiple provisions.

Version 8.0 – Released January 2024 with revisions to multiple provisions.


The RBA Code of Conduct was initially developed by a number of companies engaged in the manufacture of electronics products between June and October 2004. Companies are invited and encouraged to adopt this Code. You may obtain additional information from:

https://www.responsiblebusiness.org

AR001059

# Social Accountability 8000

## International Standard

## by Social Accountability International

## June 2014

### SA8000®: 2014

Supersedes previous versions: 2001, 2004 and 2008

The official language of this Standard and supporting documents is English. In the case of inconsistency between versions, reference shall default to the English version.



AR001060

# International Standard

# About the Standard

This is the fourth issue of SA8000, a voluntary standard for auditable third-party verification, setting out the requirements to be met by organisations, including the establishment or improvement of workers' rights, workplace conditions and an effective management system. However, certification is only available per specific worksite.

The foundational elements of this Standard are based on the UN Declaration of Human Rights, conventions of the ILO, international human rights norms and national labour laws. The normative SA8000 certification audit reference documents are the SA8000: 2014 Standard and the *SA8000 Performance Indicator Annex.* Additionally*,* the *SA8000 Guidance Document* facilitates compliance with the Standard.

The *SA8000 Performance Indicator Annex*, a normative document, sets out the minimum performance expectations of an SA8000 certified organisation. The *Performance Indicator Annex* is found online at the SAI website.

The *SA8000 Guidance Document* provides interpretations of SA8000 and how to implement its requirements; provides examples of methods for verifying compliance; and serves as a handbook for auditors and for organisations seeking SA8000 certification. The *Guidance Document* is found online at the SAI website.

Although SA8000 is universally applicable, and certification is in principle available in any state or industry, there are exceptions to SA8000 certification. The SAI Advisory Board considers that there are some sectors where meeting all Standard requirements poses special difficulty due to industry norms and technical needs. The list of these current exceptions is found online at the SAI website.

SA8000 is revised periodically as conditions change. Its revisions also incorporate corrections and improvements received from interested parties. It is hoped that the Standard, its *Performance Indicator Annex* and its *Guidance Document* will continue to improve, with the help of a wide variety of participants.  SAI welcomes your suggestions as well. To comment on SA8000, the *SA8000 Performance Indicator Annex* or the *SA8000 Guidance Document*, please send written remarks to SAI at the physical or email address indicated below.

SAI
Social Accountability International
**© SAI 2014**

THE SA8000 STANDARD MAY BE REPRODUCED ONLY IF PRIOR WRITTEN PERMISSION FROM SAI IS OBTAINED.

SAI

15 West 44th Street
6th Floor
New York, NY 10036
USA
+1-212-684-1414
+1-212-684-1515 (facsimile)
e-mail:  info@sa-intl.org

AR001061

# International Standard

# Contents

I.    INTRODUCTION

    1.  Intent and Scope

    2.  Management System

II.   NORMATIVE ELEMENTS AND THEIR INTERPRETATION

III.  DEFINITIONS

    1.  Shall

    2.  May

    3.  Child

    4.  Child labour

    5.  Collective bargaining agreement

    6.  Corrective action

    7.  Preventive action

    8.  Forced or compulsory labour

    9.  Home worker

    10. Human trafficking

    11. Interested parties

    12. Living wage

    13. Non-conformance

    14. Organisation

    15. Personnel

    16. Worker

    17. Private employment agency

    18. Remediation of child labourers

    19. Risk assessment

    20. SA8000 worker representative(s)

    21. Social performance

    22. Stakeholder engagement

    23. Supplier/subcontractor

    24. Sub-supplier

    25. Worker organisation

    26. Young worker

IV.   SOCIAL ACCOUNTABILITY REQUIREMENTS

    1.  Child Labour

    2.  Forced or Compulsory Labour

    3.  Health and Safety

    4.  Freedom of Association & Right to Collective Bargaining

    5.  Discrimination

    6.  Disciplinary Practices

    7.  Working Hours

    8.  Remuneration

    9.  Management System

AR001062

# International Standard

# I. Introduction

## 1. INTENT AND SCOPE

**Intent:** The intent of SA8000 is to provide an auditable, voluntary standard, based on the UN Declaration of Human Rights, ILO and other international human rights and labour norms and national labour laws, to empower and protect all personnel within an organisation's control and influence who provide products or services for that organisation, including personnel employed by the organisation itself and by its suppliers, sub-contractors, sub-suppliers and home workers.  It is intended that an organisation shall comply with this Standard through an appropriate and effective Management System.

**Scope:** It is universally applicable to every type of organisation, regardless of e.g., its size, geographic location or industry sector.

## 2. MANAGEMENT SYSTEM

Throughout your review of the next eight elements of SA8000, the requirements of this element - Management System - are central to their correct implementation, monitoring and enforcement. The Management System is the operational map that allows the organisation to achieve full and sustained compliance with SA8000 while continually improving, which is also known as Social Performance.

When implementing the Management System element, it is a required priority that joint worker and management involvement be established, incorporated and maintained throughout the compliance process with all the Standard's elements. This is particularly critical to identify and correct non-conformances and to assure continuing conformance.

AR001063

# International Standard

# II. Normative Elements and Their Interpretation

The organisation *shall* comply with local, national and all other applicable laws, prevailing industry standards, other requirements to which the organisation subscribes and this Standard. When such laws, standards or other requirements to which the organisation subscribes and this Standard address the same issue, the provision most favourable to workers *shall* apply.

The organisation *shall* also respect the principles of the following international instruments:

ILO Convention 1 (Hours of Work – Industry) and Recommendation 116 (Reduction of Hours of Work)

ILO Conventions 29 (Forced Labour) and 105 (Abolition of Forced Labour)

ILO Convention 87 (Freedom of Association)

ILO Convention 98 (Right to Organise and Collective Bargaining)

ILO Conventions 100 (Equal Remuneration) and 111 (Discrimination – Employment and Occupation)

ILO Convention 102 (Social Security - Minimum Standards)

ILO Convention 131 (Minimum Wage Fixing)

ILO Convention 135 (Workers' Representatives)

ILO Convention 138 and Recommendation 146 (Minimum Age)

ILO Convention 155 and Recommendation 164 (Occupational Safety and Health)

ILO Convention 159 (Vocational Rehabilitation and Employment - Disabled Persons)

ILO Convention 169 (Indigenous and Tribal Peoples)

ILO Convention 177 (Home Work)

ILO Convention 181 (Private Employment Agencies)

ILO Convention 182 (Worst Forms of Child Labour)

ILO Convention 183 (Maternity Protection)

ILO Code of Practice on HIV/AIDS and the World of Work

Universal Declaration of Human Rights

The International Covenant on Economic, Social and Cultural Rights

The International Covenant on Civil and Political Rights

The United Nations Convention on the Rights of the Child

The United Nations Convention on the Elimination of All Forms of Discrimination Against Women

The United Nations Convention on the Elimination of All Forms of Racial Discrimination

UN Guiding Principles on Business and Human Rights

AR001064

# International Standard

## III. Definitions (organized either alphabetically or by logical flow)

1.  **Shall**: In this Standard the term "*shall*" indicates a requirement. Note: Italics have been added for emphasis.

2.  **May**: In this Standard the term "*may*" indicates a permission. Note: Italics have been added for emphasis.

3.  **Child:** Any person under 15 years of age, unless the minimum age for work or mandatory schooling is higher by local law, in which case the stipulated higher age applies in that locality.

4.  **Child labour:** Any work performed by a child younger than the age(s) specified in the above definition of a child, except as provided for by ILO Recommendation 146.

5.  **Collective bargaining agreement:** A contract specifying the terms and conditions for work, negotiated between an organisation (e.g. employer) or group of employers and one or more worker organisation(s).

6.  **Corrective action:** Action to eliminate the cause(s) and root cause(s) of a *detected* non-conformance. Note: Corrective action is taken to *prevent recurrence*.

7.  **Preventive action:** Action to eliminate the cause(s) and root cause(s) of a *potential* non-conformance. Note: Preventive action is taken to *prevent occurrence*.

8.  **Forced or compulsory labour:** All work or service that a person has not offered to do voluntarily and is made to do under the threat of punishment or retaliation or that is demanded as a means of repayment of debt.

9.  **Home worker**: A person who is contracted by the organisation or by its supplier, sub-supplier or subcontractor, but does not work on their premises.

10. **Human trafficking:** The recruitment, transfer, harbouring or receipt of persons, by means of the use of threat, force, deception or other forms of coercion, for the purpose of exploitation.

11. **Interested parties:** An individual or group concerned with or affected by the social performance and/or activities of the organisation.

12. **Living Wage:** The remuneration received for a standard work week by a worker in a particular place sufficient to afford a decent standard of living for the worker and her or his family. Elements of a decent standard of living include food, water, housing, education, health care, transport, clothing, and other essential needs including provision for unexpected events.

13. **Non-conformance:** Non-compliance with a requirement.

14. **Organisation:** The entirety of any business or non-business entity responsible for implementing the requirements of this Standard, including all personnel employed by the organisation. Note: For example, organisations include: companies, corporations, farms, plantations, cooperatives, NGOs and government institutions.

15. **Personnel:** All individuals employed or contracted by an organisation, including but not limited to directors, executives, managers, supervisors, workers and contract workers such as security guards, canteen workers, dormitory workers and cleaning workers.

16. **Worker:** All non-management personnel.

17. **Private employment agency:** Any entity, independent of the public authorities, which provides one or more of the following labour market services:

AR001065

# International Standard

- Matching offers of and applications for employment, without the agency becoming a party to the employment relationship(s) which may occur;

- Employing workers with a view to making them available to a third party entity, which assigns their tasks and supervises the execution of these tasks.

18. **Remediation of child labourers:** All support and actions necessary to ensure the safety, health, education and development of children who have been subjected to child labour, as defined above, and whose work has been terminated.

19. **Risk assessment**: A process to identify the health, safety and labour policies and practices of an organisation and to prioritise associated risks.

20. **SA8000 worker representative(s):** One or more worker representative(s) freely elected by workers to facilitate communication with the management representative(s) and senior management on matters related to SA8000. In unionised facilities the worker representative(s) *shall* be from the recognised trade union(s), if they choose to serve. In cases where the union(s) does not appoint a representative or the organisation is not unionised, workers *may* freely elect the worker representative(s) for that purpose.

21. **Social performance:** An organisation's achievement of full and sustained compliance with SA8000 while continually improving.

22. **Stakeholder engagement:** The participation of interested parties, including but not limited to the organisation, trade unions, workers, worker organisations, suppliers, contractors, buyers, consumers, investors, NGOs, media and local and national government officials.

23. **Supplier/subcontractor:** Any entity or individual(s) in the supply chain that directly provides the organisation with goods or services integral to, utilised in or for the production of the organisation's goods or services.

24. **Sub-supplier:** Any entity or individual(s) in the supply chain that provides the supplier with goods and/or services integral to, utilised in or for the production of the supplier's or the organisation's goods or services.

25. **Worker organisation:** An autonomous voluntary association of workers organised for the purpose of furthering and defending the rights and interests of workers.

26. **Young worker:** Any worker under the age of 18 but over the age of a child, as defined above.

AR001066

# International Standard

# IV. Social Accountability Requirements

## 1. CHILD LABOUR

Criteria:

**1.1**    The organisation *shall* not engage in or support the use of child labour as defined above.

**1.2**    The organisation *shall* establish, document, maintain and effectively communicate to personnel and other interested parties, written policies and procedures for remediation of child labourers, and *shall* provide adequate financial and other support to enable such children to attend and remain in school until no longer a child as defined above.

**1.3**    The organisation *may* employ young workers, but where such young workers are subject to compulsory education laws, they *shall* work only outside of school hours. Under no circumstances *shall* any young worker's school, work and transportation time exceed a combined total of 10 hours per day, and in no case *shall* young workers work more than 8 hours a day. Young workers may not work during night hours.

**1.4**    The organisation *shall* not expose children or young workers to any situations – in or outside of the workplace – that are hazardous or unsafe to their physical and mental health and development.

## 2. FORCED OR COMPULSORY LABOUR

Criteria:

**2.1**    The organisation *shall* not engage in or support the use of forced or compulsory labour, including prison labour, as defined in Convention 29, *shall* not retain original identification papers and *shall* not require personnel to pay 'deposits' to the organisation upon commencing employment.

**2.2**    Neither the organisation nor any entity supplying labour to the organisation *shall* withhold any part of any personnel's salary, benefits, property or documents in order to force such personnel to continue working for the organisation.

**2.3**    The organisation *shall* ensure that no employment fees or costs are borne in whole or in part by workers.

**2.4**    Personnel *shall* have the right to leave the workplace premises after completing the standard workday and be free to terminate their employment provided that they give reasonable notice to their organisation.

**2.5**    Neither the organisation nor any entity supplying labour to the organisation *shall* engage in or support human trafficking.

AR001067

# International Standard

## 3. HEALTH AND SAFETY

Criteria:

**3.1**    The organisation *shall* provide a safe and healthy workplace environment and *shall* take effective steps to prevent potential health and safety incidents and occupational injury or illness arising out of, associated with or occurring in the course of work. It *shall* minimise or eliminate, so far as is reasonably practicable, the causes of all hazards in the workplace environment, based upon the prevailing safety and health knowledge of the industry sector and of any specific hazards.

**3.2**    The organisation *shall* assess all the workplace risks to new, expectant and nursing mothers including those arising out of their work activity, to ensure that all reasonable steps are taken to remove or reduce any risks to their health and safety.

**3.3**    Where hazards remain after effective minimisation or elimination of the causes of all hazards in the workplace environment, the organisation *shall* provide personnel with appropriate personal protective equipment as needed at its own expense.  In the event of a work-related injury the organisation *shall* provide first aid and assist the worker in obtaining follow-up medical treatment.

**3.4**    The organisation *shall* appoint a senior management representative to be responsible for ensuring a safe and healthy workplace environment for all personnel and for implementing this Standard's Health and Safety requirements.

**3.5**    A Health and Safety Committee, comprised of a well-balanced group of management representatives and workers, *shall* be established and maintained. Unless otherwise specified by law, at least one worker member(s) on the Committee *shall* be by recognised trade union(s) representative(s), *if they choose to serve*. In cases where the union(s) does not appoint a representative or the organisation is not unionised, workers *shall* appoint a representative(s) as they deem appropriate. Its decisions *shall* be effectively communicated to all personnel.  The Committee *shall* be trained and retrained periodically in order to be competently committed to continually improving the health and safety conditions in the workplace. It *shall* conduct formal, periodic occupational health and safety risk assessments to identify and then address current and potential health and safety hazards. Records of these assessments and corrective and preventive actions taken *shall* be kept.

**3.6**    The organisation *shall* provide to personnel, on a regular basis, effective health and safety training, including on-site training and, where needed, job-specific training. Such training *shall* also be repeated for new and reassigned personnel, where incidents have occurred, and when changes in technology and/or the introduction of new machinery present new risks to the health and safety of personnel.

AR001068

# International Standard

**3.7**    The organisation *shall* establish documented procedures to detect, prevent, minimise, eliminate or otherwise respond to potential risks to the health and safety of personnel. The organisation *shall* maintain written records of all health and safety incidents that occur in the workplace and in all residences and property provided by the organisation, whether it owns, leases or contracts the residences or property from a service provider.

**3.8**    The organisation *shall* provide, for use by all personnel, free access to: clean toilet facilities, potable water, suitable spaces for meal breaks, and, where applicable, sanitary facilities for food storage.

**3.9**    The organisation *shall* ensure that any dormitory facilities provided for personnel are clean, safe and meet their basic needs, whether it owns, leases or contracts the dormitories from a service provider.

**3.10**    All personnel *shall* have the right to remove themselves from imminent serious danger without seeking permission from the organisation.

## 4.  FREEDOM OF ASSOCIATION & RIGHT TO COLLECTIVE BARGAINING

Criteria:

**4.1**    All personnel *shall* have the right to form, join and organise trade union(s) of their choice and to bargain collectively on their behalf with the organisation. The organisation *shall* respect this right and *shall* effectively inform personnel that they are free to join a worker organisation of their choosing without any negative consequences or retaliation from the organisation.  The organisation *shall* not interfere in any way with the establishment, functioning or administration of workers' organisation(s) or collective bargaining.

**4.2**    In situations where the right to freedom of association and collective bargaining are restricted under law, the organisation *shall* allow workers to freely elect their own representatives.

**4.3**    The organisation *shall* ensure that union members, representatives of workers and any personnel engaged in organising workers are not subjected to discrimination, harassment, intimidation or retaliation for being union members, representative(s) of workers or engaged in organising workers, and that such representatives have access to their members in the workplace.

## 5.  DISCRIMINATION

Criteria:

**5.1** The organisation *shall* not engage in or support discrimination in hiring, remuneration, access to training, promotion, termination or retirement based on race, national or territorial or social origin, caste, birth, religion, disability, gender, sexual orientation, family responsibilities, marital

AR001069

# International Standard

status, union membership, political opinions, age or any other condition that could give rise to discrimination.

5.2    The organisation *shall* not interfere with the exercise of personnel's rights to observe tenets or practices or to meet needs relating to race, national or social origin, religion, disability, gender, sexual orientation, family responsibilities, union membership, political opinions or any other condition that could give rise to discrimination.

5.3    The organisation *shall* not allow any behaviour that is threatening, abusive, exploitative or sexually coercive, including gestures, language and physical contact, in the workplace and in all residences and property provided by the organisation, whether it owns, leases or contracts the residences or property from a service provider.

5.4    The organisation *shall* not subject personnel to pregnancy or virginity tests under any circumstances.

## 6.  DISCIPLINARY PRACTICES

Criterion:

6.1    The organisation *shall* treat all personnel with dignity and respect.  The organisation *shall* not engage in or tolerate the use of corporal punishment, mental or physical coercion or verbal abuse of personnel. No harsh or inhumane treatment is allowed.

## 7.  WORKING HOURS

Criteria:

7.1    The organisation *shall* comply with applicable laws, collective bargaining agreements (where applicable) and industry standards on working hours, breaks and public holidays. The normal work week, not including overtime, *shall* be defined by law but *shall* not exceed 48 hours.

7.2    Personnel *shall* be provided with at least one day off following every six consecutive days of working. Exceptions to this rule apply only where both of the following conditions exist:

        a) National law allows work time exceeding this limit; and
        b) A freely negotiated collective bargaining agreement is in force that allows work time averaging, including adequate rest periods.

7.3    All overtime work *shall* be voluntary, except as provided in 7.4 below, *shall* not exceed 12 hours per week and *shall* not be requested on a regular basis.

7.4    In cases where overtime work is needed in order to meet short-term business demand and the organisation is party to a freely negotiated collective bargaining agreement representing a significant portion of its workforce, the organisation *may* require such overtime work in

AR001070

accordance with such agreement. Any such agreement must comply with the other requirements of this Working Hours element.

## 8. REMUNERATION

Criteria:

**8.1**    The organisation *shall* respect the right of personnel to a living wage and ensure that wages for a normal work week, not including overtime, *shall* always meet at least legal or industry minimum standards, or collective bargaining agreements (where applicable). Wages *shall* be sufficient to meet the basic needs of personnel and to provide some discretionary income.

**8.2**    The organisation *shall* not make deductions from wages for disciplinary purposes.  Exception to this rule applies only when both of the following conditions exist:

> a) Deductions from wages for disciplinary purposes are permitted by national law; and
> b) A freely negotiated collective bargaining agreement is in force that permits this practice.

**8.3**    The organisation *shall* ensure that personnel's wages and benefits composition are detailed clearly and regularly to them in writing for each pay period. The organisation *shall* lawfully render all wages and benefits due in a manner convenient to workers, but in no circumstances in delayed or restricted forms, such as vouchers, coupons or promissory notes.

**8.4**    All overtime *shall* be reimbursed at a premium rate as defined by national law or established by a collective bargaining agreement. In countries where a premium rate for overtime is not regulated by law or there is no collective bargaining agreement, personnel *shall* be compensated for overtime at the organisation's premium rate or at a premium rate equal to prevailing industry standards, whichever is higher.

**8.5**    The organisation *shall* not use labour-only contracting arrangements, consecutive short-term contracts and/or false apprenticeship or other schemes to avoid meeting its obligations to personnel under applicable laws and regulations pertaining to labour and social security.

AR001071

# International Standard

## 9. MANAGEMENT SYSTEM

Criteria:

### 9.1 Policies, Procedures and Records

**9.1.1**   Senior management *shall* write a policy statement to inform personnel, in all appropriate languages, that it has chosen to comply with SA8000.

**9.1.2**   This policy statement *shall* include the organisation's commitment to conform to all requirements of the SA8000 Standard and to respect the international instruments as listed in the previous section on Normative Elements and Their Interpretation. The statement *shall* also commit the organisation to comply with: national laws, other applicable laws and other requirements to which the organisation subscribes.

**9.1.3**   This policy statement and the SA8000 Standard *shall* be prominently and conspicuously displayed, in appropriate and comprehensible form, in the workplace and in residences and property provided by the organisation, whether it owns, leases or contracts the residences or property from a service provider.

**9.1.4**   The organisation *shall* develop policies and procedures to implement the SA8000 Standard.

**9.1.5**   These policies and procedures *shall* be effectively communicated and made accessible to personnel in all appropriate languages. These communications *shall* also be clearly shared with customers, suppliers, sub-contractors and sub-suppliers.

**9.1.6**   The organisation *shall* maintain appropriate records to demonstrate conformance to and implementation of the SA8000 standard, including the Management System requirements contained in this element. Associated records *shall* be kept and written or oral summaries given to the SA8000 worker representative(s).

**9.1.7**   The organisation *shall* regularly conduct a management review of its policy statement, policies, procedures implementing this Standard and performance results, in order to continually improve.

**9.1.8**   The organisation *shall* make its policy statement publicly available in an effective form and manner to interested parties, upon request.

AR001072

# International Standard

## 9.2 Social Performance Team

**9.2.1**   A Social Performance Team (SPT) *shall* be established to implement all elements of SA8000. The Team *shall* include a balanced representation of:

> a) SA8000 worker representative(s); and
> b) management.

Compliance accountability for the Standard *shall* solely rest with Senior Management.

**9.2.2**   In unionised facilities, worker representation on the SPT *shall* be by recognised trade union(s) representative(s), if they choose to serve. In cases where the union(s) does not appoint a representative or the organisation is not unionised, workers *may* freely elect one or more SA8000 worker representative(s) from among themselves for this purpose. In no circumstances *shall* the SA8000 worker representative(s) be seen as a substitute for trade union representation.

## 9.3 Identification and Assessment of Risks

**9.3.1**   The SPT *shall* conduct periodic written risk assessments to identify and prioritise the areas of actual or potential non-conformance to this Standard. It *shall* also recommend actions to Senior Management that address these risks. Actions to address these risks *shall* be prioritised according to their severity or where a delay in responding would make it impossible to address.

**9.3.2**   The SPT *shall* conduct these assessments based on their recommended data and data collection techniques and in meaningful consultation with interested parties.

## 9.4 Monitoring

**9.4.1**   The SPT *shall* effectively monitor workplace activities for:

> a) compliance with this Standard;
> b) implementation of actions to effectively address the risks identified by the SPT; and
> c) for the effectiveness of systems implemented to meet the organisation's policies and the requirements of this Standard.

It *shall* have the authority to collect information from or include interested parties (stakeholders) in its monitoring activities. It *shall* also liaise with other departments to study, define, analyse and/or address any possible non-conformance(s) to the SA8000 Standard.

**9.4.2**   The SPT *shall* also facilitate routine internal audits and produce reports for senior management on the performance and benefits of actions taken to meet the SA8000 Standard, including a record of corrective and preventive actions identified.

**9.4.3**   The SPT *shall* also hold periodic meetings to review progress and identify potential actions to strengthen implementation of the Standard.

AR001073

# International Standard

## 9.5 Internal Involvement and Communication

**9.5.1**    The organisation *shall* demonstrate that personnel effectively understand the requirements of SA8000, and *shall* regularly communicate the requirements of SA8000 through routine communications.

## 9.6 Complaint Management and Resolution

**9.6.1**    The organisation *shall* establish a written grievance procedure that is confidential, unbiased, non-retaliatory and accessible and available to personnel and interested parties to make comments, recommendations, reports or complaints concerning the workplace and/or non-conformances to the SA8000 Standard.

**9.6.2**    The organisation *shall* have procedures for investigating, following up on and communicating the outcome of complaints concerning the workplace and/or non-conformances to this Standard or of its implementing policies and procedures. These results *shall* be freely available to all personnel and, upon request, to interested parties.

**9.6.3**    The organisation *shall* not discipline, dismiss or otherwise discriminate against any personnel or interested party for providing information on SA8000 compliance or for making other workplace complaints.

## 9.7 External Verification and Stakeholder Engagement

**9.7.1**    In the case of announced and unannounced audits for the purpose of certifying its compliance with the requirements of this Standard, the organisation *shall* fully cooperate with external auditors to determine the severity and frequency of any problems that arise in meeting the SA8000 Standard.

**9.7.2**    The organisation *shall* participate in stakeholder engagement in order to attain sustainable compliance with the SA8000 Standard.

## 9.8 Corrective and Preventive Actions

**9.8.1**    The organisation *shall* formulate policies and procedures for the prompt implementation of corrective and preventive actions and shall provide adequate resources for them. The SPT *shall* ensure that these actions are effectively implemented.

**9.8.2**    The SPT *shall* maintain records, including timelines, that list, at minimum, non-conformances related to SA8000, their root causes, the corrective and preventive actions taken and implementation results.

AR001074

# International Standard

## 9.9 Training and Capacity Building

**9.9.1**   The organisation *shall* implement a training plan for all personnel to effectively implement the SA8000 Standard as informed by the results of risk assessments. The organisation *shall* periodically measure the effectiveness of training and record their nature and frequency.

## 9.10 Management of Suppliers and Contractors

**9.10.1**   The organisation *shall* conduct due diligence on its suppliers/subcontractors, private employment agencies and sub-suppliers' compliance with the SA8000 Standard. The same due diligence approach *shall* be applied when selecting new suppliers/subcontractors, private employment agencies and sub-suppliers. The minimum activities for the organisation to fulfil this requirement *shall* be recorded and *shall* include:

a) effectively communicating the requirements of this Standard to senior leadership of suppliers/subcontractors, private employment agencies and sub-suppliers;

b) assessing significant risks of non-conformance by suppliers/subcontractors, private employment agencies and sub-suppliers. [Note: an explanation of "significant risk" is found in the guidance document];

c) making reasonable efforts to ensure that these significant risks are adequately addressed by suppliers/subcontractors, private employment agencies and sub-suppliers and by the organisation where and when appropriate, and prioritised according to the organisation's ability and resources to influence these entities; [Note: an explanation of "reasonable effort" is found in the guidance document]; and

d) establishing monitoring activities and tracking performance of suppliers/subcontractors, private employment agencies and sub-suppliers to ensure that these significant risks are effectively addressed.

**9.10.2**   Where the organisation receives, handles or promotes goods and/or services from suppliers /subcontractors or sub-suppliers who are classified as home workers, the organisation *shall* take effective actions to ensure that such home workers are afforded a level of protection substantially equivalent to that afforded to the organisation's other workers under the requirements of this Standard.

AR001075

AR0010

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001077

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001078

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001079

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001080

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001081

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001082

AR00108

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001083

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001084

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001085

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001086

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001087

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001088

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001089

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001090

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001091

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001092

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001093

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001094

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001095

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001096

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001097

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001098

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001099

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001100

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001101     THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001102

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001103

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001104

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001105

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001106

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001107

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001108

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001109

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001110

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001111

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001112

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001113

AR001114

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001115

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001116

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001117

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001118

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001119

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001120

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001121

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001122

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001123

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001124

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001125

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001126

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001127

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001128

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR0011

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001131

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001132

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001133

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001134

**THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION**



AR001135

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001136

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001137

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001138

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001140

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001141

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001142

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001143

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001144

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001145

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001146

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001147

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001148

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001149

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001150

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001151

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001152

**THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION**

AR001153

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001154

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001155

**AR001156**    THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



**AR001157**    **THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION**



**AR001158**     THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



**AR001159**    **THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION**



AR001160    THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001161          THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001163

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001164

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001165

Privacy Policy • Terms & Conditions

AR001166

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001167

Privacy Policy · Terms & Conditions

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001168

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001170

AR001171

AR001172

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001173

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001174

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

Case 2:21-cv-00161-xxx    Document 55-7    Filed 06/09/23    Page 24 of 701

THIS PAGE CONTAINS SINESTAR CONFIDENTIAL INFORMATION

AR001175

THIS PAGE CONTAINS SINESTAR CONFIDENTIAL INFORMATION

AR001176

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001177

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001178

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001179

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001180

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001181

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001182    THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



**AR001183**    **THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION**

AR001184    THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001185    THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001186    THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION    5 / 10



AR001187   THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



**AR001188**    **THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION**

AR001189    THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



**AR001190**    THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001191    THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001192

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001193

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001194

AR001195

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001196

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001197

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001198

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001199

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001200

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001201

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

**AR001202**

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001203

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION


THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001204

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001205

AR001206

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001207

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001209

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001210

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001211

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001212

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001213

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001214

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001215

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001216

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001217

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001218

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001219

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001220

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001221

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001222

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001223

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001224

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001225

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001226

**THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION**



AR001227

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001228

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001229

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001230

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001231        THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001232    THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR00123

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001234    THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001235

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001236

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001237    THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001238

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001239

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001240

**THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION**



AR001241

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001242

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001243          THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001244

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001245    THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001246

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

UNCLASSIFIED // FOR OFFICIAL USE ONLY

**UYGHUR FORCED LABOR PREVENTION ACT (UFLPA) ENTITY LIST
PACKAGE 23-002**

**ACTION**

1.  **Name of Submitting FLETF Agency:**

    U.S. Department of Homeland Security (DHS)

2.  **FLETF Agency Point of Contact:**

    Bridget McGovern
    Acting Assistant Secretary
    Trade and Economic Security, Office of Strategy, Policy, and Plans
    U.S. Department of Homeland Security

3.  **Action (select one):**

    ☒ Addition to List        ☐ Removal from List        ☐ Technical Correction

4.  **Entity Identifying Information:**

    Ninestar Corporation and its eight Zhuhai-based subsidiaries. In this package, "Ninestar" refers to Ninestar Corporation and its eight Zhuhai-based subsidiaries, which include Zhuhai Ninestar Information Technology Co. Ltd., Zhuhai Pantum Electronics Co. Ltd., Zhuhai Apex Microelectronics Co., Ltd., Geehy Semiconductor Co., Ltd., Zhuhai Pu-Tech Industrial Co., Ltd., Zhuhai G&G Digital Technology Co., Ltd., Zhuhai Seine Printing Technology Co., Ltd., and Zhuhai Ninestar Management Co., Ltd.

    Ninestar Corporation
    No. 3883 Zhuhai Avenue, Xiangzhou District
    Zhuhai, Guangdong 519075
    https://www.ninestargroup.com/

    纳思达股份有限公司
    中国广东珠海市香洲区珠海大道 3883 号
    邮编：519075

    Ninestar is one of the top 500 listed companies in the PRC and has become one of the four largest laser printer manufacturers in the world.  Ninestar has been listed on the Shenzhen

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001247

UNCLASSIFIED // FOR OFFICIAL USE ONLY

Stock Exchange since 2014.  In 2021, there were 21,787 employees at Ninestar with an operating revenue of CNY 22.792 billon.[1]

## 5. UFLPA Entity List for Addition, Removal, or Correction (select one or more applicable list):

☐ *Section 2(d)(2)(B)(i) – Entities in the Xinjiang Uyghur Autonomous Region that mine, produce, or manufacture wholly or in part any goods, wares, articles, and merchandise with forced labor.*

☒ *Section 2(d)(2)(B)(ii) – Entities working with the government of the Xinjiang Uyghur Autonomous Region to recruit, transport, transfer, harbor or receive forced labor or Uyghurs, Kazakhs, Kyrgyz, or members of other persecuted groups out of the Xinjiang Uyghur Autonomous Region.*

☐ *Section 2(d)(2)(B)(iv) – Entities that exported products mined, produced, or manufactured wholly or in part by entities on the list required by clause (i) or (ii) from the People's Republic of China into the United States.*

☐ *Section 2(d)(2)(B)(v) – Facilities or entities, including the Xinjiang Production and Construction Corps, that source material from the Xinjiang Uyghur Autonomous Region or from persons working with the government of the Xinjiang Uyghur Autonomous Region or the Xinjiang Production and Construction Corps for purposes of the "poverty alleviation" program or the "pairing-assistance" program or any other government labor scheme that uses forced labor.*

## 6. Scope:

Ninestar Corporation 纳思达股份有限公司 (Ninestar), both the parent company and its Zhuhai subsidiaries, is reported to have worked with the government of the Xinjiang Uyghur Autonomous Region (XUAR) through a third-party agency to recruit, transport, transfer, and receive Uyghur laborers out of the XUAR to work in its manufacturing facilities in the city of Zhuhai, located in the Guangdong Province of PRC.  All sources – including an allegation filed ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ PRC government documents, Ninestar's company documents, and media reports – corroborate that Uyghur laborers working at Zhuhai Ninestar facilities were recruited, transferred, and are presently still monitored by the officials of the XUAR government.  Such information reasonably indicates that these workers from the XUAR were coerced to enter state-sponsored labor transfer programs and are unable to leave voluntarily once they begin working in the facilities, which are thousands of miles away from their

---

[1] Ninestar. (2021). 2021 *Environmental, Social, and Governance Report*. Zhuhai. Retrieved from Ninestar: https://en.ninestargroup.com/investor12.html

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001248

UNCLASSIFIED // FOR OFFICIAL USE ONLY

hometowns in the XUAR.  Ninestar products include laser printers, general printing consumables, and integrated circuit chips,[2] some of which are imported into the United States.

## 7.  Basis:

7a. Basis - general description for public release:

Ninestar Corporation 纳思达股份有限公司 (Ninestar) is reported to have worked with the government of the Xinjiang Uyghur Autonomous Region (XUAR) through a third-party agency to recruit, transport, transfer, and receive Uyghur laborers out of the XUAR to work in its manufacturing facilities in the city of Zhuhai, located in the Guangdong Province of the People's Republic of China (PRC).  Ninestar's corporate headquarters and eight subsidiaries in Zhuhai (Zhuhai Ninestar Information Technology Co. Ltd., Zhuhai Pantum Electronics Co. Ltd., Zhuhai Apex Microelectronics Co., Ltd., Geehy Semiconductor Co., Ltd., Zhuhai Pu-Tech Industrial Co., Ltd., Zhuhai G&G Digital Technology Co., Ltd., Zhuhai Seine Printing Technology Co., Ltd., and Zhuhai Ninestar Management Co., Ltd.) are all located in the city of Zhuhai, in the Guangdong Province of the PRC.

Sources – including, but not limited to, PRC government documents, Ninestar's company documents, and media reports – corroborate that Uyghur laborers working at Zhuhai Ninestar facilities were recruited, transferred, and are presently still monitored by officials of the XUAR government.  Such information provides evidence that workers from the XUAR were coerced to enter state-sponsored labor transfer programs and are unable to leave voluntarily once they begin working in the facilities, which are thousands of miles away from their hometowns in the XUAR.  Ninestar's products include laser printers, general printing consumables, and integrated circuit chips, some of which are imported into the United States.

7b. Standard

Under the UFLPA Entity List Standard Operating Procedures (SOP), entities may be added to the UFLPA Entity List described in Section 2(d)(2)(B)(ii) if "there is reasonable cause to believe, based on specific and articulable information, that . . . [they are] working with the government of [Xinjiang] to recruit, transport, transfer, harbor or receive forced labor or Uyghurs, Kazakhs, Kyrgyz, or members of other persecuted groups out of [Xinjiang]."  SOP at Sec. I(C)(2)(a).

7c. Basis

This package to add Ninestar Corporation and its subsidiaries in Zhuhai (Zhuhai Ninestar Information Technology Co. Ltd., Zhuhai Pantum  Electronics  Co. Ltd., Zhuhai Apex Microelectronics Co., Ltd., Geehy Semiconductor Co., Ltd., Zhuhai Pu-Tech Industrial Co., Ltd., Zhuhai G&G Digital Technology Co., Ltd., Zhuhai Seine Printing Technology Co., Ltd., and Zhuhai Ninestar Management Co., Ltd.) to the UFLPA Entity List is based on a reasonable belief

---

[2] Ninestar. Ninestar Products. Retrieved from Ninestar: https://en.ninestargroup.com/products.html

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001249

INFORMANT PRIVILEGE

UNCLASSIFIED // FOR OFFICIAL USE ONLY

of Ninestar's participation in state-sponsored coercive labor transfer programs.  Credible information of Ninestar's participation comes from several sources: an allegation from a credible ███, PRC government documents, Ninestar's corporate documents, PRC state media reports, and █████████ that document the presence of Uyghur workers at Ninestar facilities in Zhuhai that are unable to leave.  Ninestar's company documents disclose its participation in the "poverty alleviation" programs sponsored by the Guangdong provincial government.  Such information is further supported, both directly and circumstantially, by PRC government agencies and state media reports



AR001250

THIS PAGE CONTAINS CONFIDENTIAL INFORMATION

UNCLASSIFIED // FOR OFFICIAL USE ONLY

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001251

THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION

INFORMANT PRIVILEGE

UNCLASSIFIED // FOR OFFICIAL USE ONLY



UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001252

THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION

UNCLASSIFIED // FOR OFFICIAL USE ONLY

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001253

THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION

INFORMANT PRIVILEGE

UNCLASSIFIED // FOR OFFICIAL USE ONLY



UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001254

THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION

UNCLASSIFIED // FOR OFFICIAL USE ONLY



UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001255

THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION

UNCLASSIFIED // FOR OFFICIAL USE ONLY



AR001256

THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION

UNCLASSIFIED // FOR OFFICIAL USE ONLY



UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001257    THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION

UNCLASSIFIED // FOR OFFICIAL USE ONLY



UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001258

THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION

UNCLASSIFIED // FOR OFFICIAL USE ONLY



UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001259

THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION

UNCLASSIFIED // FOR OFFICIAL USE ONLY

UNCLASSIFIED // FOR OFFICIAL USE ONLY

THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION

UNCLASSIFIED // FOR OFFICIAL USE ONLY

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001261

**AR001262**

THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION

AR001263
THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION

Case 1:23-cv-00182-GSK    Document 217-4    Filed 01/08/26    Page 329 of 701

AR001264                    **THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION**

AR001265

AR001266

THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION

Case 1:23-cv-00182-GSK    Document 217-4    Filed 01/08/26    Page 333 of 701

THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION

AR001268

THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION

**AR001269**

THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION

**AR001270**

**THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION**

AR001271

THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION

AR001272

AR001273

THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION

AR001274

THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION

AR001275

THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION

AR001276

AR001277

AR001278

THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION

AR001279

THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION

AR001280

THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION

AR001281

THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION

AR001282

THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION

AR001283

THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION

THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION

AR001284

THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION

AR001285

THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION

AR001286

AR001287

AR001288

AR001289

AR001290

AR001291

AR001292

AR001293

AR001294

AR001295

AR001296

AR001297

AR001298

AR001299

 INDEPENDENT

Support Now

Menu

NEWS    SPORTS    VOICES    CULTURE    LIFESTYLE    TRAVEL    CLIMATE    PREMIUM

**Asia > China**

# China frees staff of US consulting firm after two years in prison

The release of Mintz Group staff comes amid Beijing's efforts to revive foreign investment

Maroosha Muzaffar  •  Tuesday 25 March 2025 10:37 GMT  •   Comments

    

 2

File. The closed office of the Mintz Group is seen in an office building in Beijing on 24 March 2023 *(AFP via Getty Images)*

## Your support helps us to tell the story

**Read more** ⌄

**SUPPORT NOW**

PayPal    Pay

**Read more** ⌄



**AR001300**

Chinese authorities have released five employees of a US due diligence firm from detention two years after China cracked down on consultancies working with foreign multinationals.

"We understand that the Mintz Group Beijing employees who were detained, all Chinese nationals, have now all been released," Mintz Group said in a statement.



"We are grateful to the Chinese authorities that our former colleagues can now be home with their families."

In 2023, Beijing's public security bureau raided the Mintz Group office in the capital and detained the five employees – alarming foreign investors in the country.

AR001301

Case 1:23-cv-00182-GSK    Document 217-4    Filed 01/08/26    Page 368 of 701

This marked the start of a series of raids by Chinese authorities on foreign consultancy and due diligence firms, including Bain & Company and Capvision Partners.

Later that year, China's National Bureau of Statistics announced that New York-headquartered Mintz Group had been fined $1.5m for undertaking "foreign-related statistical investigations" without seeking and obtaining necessary approvals.

AR001302

In another notice on its website, the bureau claimed that Mintz Group conducted 37 such investigations from March 2019 to July 2022. As a penalty, the bureau seized 5.34 million yuan of the firm's "illegal proceeds" and imposed an additional administrative fine of the same amount, bringing the total to roughly $1.5m.



File. The closed office of the Mintz Group is seen in an office building in Beijing on 24 March 2023 *(AFP via Getty Images)*

The US firm previously maintained that it was licensed to conduct legitimate business in China and has always operated within the law.

AR001303

5/15/25, 10:22 AM
Case 1:23-cv-00182-GSK Document 217-4 Filed 01/08/26 Page 370 of 701
China frees staff of US consulting firm after two years in prison | The Independent

After the detentions in 2023, Mintz shut down its offices in both China and Hong Kong.

Meanwhile, the employees' release on Tuesday came shortly after the China Development Forum, a key platform for Beijing to appeal to foreign investors.

Top business leaders like Apple's Tim Cook and Pfizer's Albert Bourla attended the event. Chinese premier Li Qiang assured increased market access for foreign investors and called for resisting protectionism, emphasising the need for global cooperation amid rising instability. It coincides with China's efforts to attract investment amid slowing growth in the country's economy and escalating tariffs from the US under president Donald Trump.

**More about:**   US    Multinationals    Beijing    Consultancy

---

 **Join our commenting forum**

Join thought-provoking conversations, follow other Independent readers and see their replies

 **Comments** ↓

---

**AR001304**

AR001305

5/15/25, 10:22 AM
Case 1:23-cv-00182-GSK    Document 217-4    Filed 01/08/26    Page 372 of 701
China frees staff of US consulting firm after two years in prison | The Independent

LOG IN | SIGN UP

# Comments

FOLLOW

LOG IN | SIGN UP



Start the conversation

ALL COMMENTS                                                                    NEWEST ⌄    🔔

💬  Start the conversation

Powered by ⓥ viafoura

**AR001307**

5/15/25, 10:22 AM
Case 1:23-cv-00182-GSK   Document 217-4   Filed 01/08/26   Page 374 of 701
China frees staff of US consulting firm after two years in prison | The Independent



## GET IN TOUCH

Contact us

 

## OUR PRODUCTS

Register

Newsletters

Donate

Today's Edition

Install our app

Archive

## OTHER PUBLICATIONS

International editions

Independent en Español

Independent Arabia

Independent Turkish

Independent Persian

Independent Urdu

The Standard

## LEGAL

Code of conduct and complaints

Contributors

Cookie policy

Donations Terms & Conditions

Privacy policy

Do Not Sell or Share My Information

User policies

Modern Slavery Statement

## EXTRAS

Puzzles

All topics

Betting Offers

Voucher codes

Competitions and offers

Independent Advertising

Independent Ignite

Syndication

Working at The Independent

AR001308

5/15/25, 10:23 AM
Case 1:23-cv-00182-GSK    Document 217-4    Filed 01/08/26    Page 375 of 701
Exclusive: US consultancy Mintz's executives leave Hong Kong after China raid | Reuters

Learn more about  **LSEG**

## Exclusive: US consultancy Mintz's executives leave Hong Kong after China raid

By **James Pomfret** and **Engen Tham**

May 19, 2023 3:05 AM EDT · Updated 2 years ago

  



[1/3] The U.S. corporate due diligence firm Mintz Group's office is seen in Hong Kong, China, May 18, 2023. REUTERS/James Pomfret/File Photo  Purchase Licensing Rights ⧉

Companies

**Mintz Group Llc**

Follow

HONG KONG/SHANGHAI, May 19 (Reuters) - Some Hong Kong-based staff with U.S. consultancy Mintz Group have left the city after the firm's Beijing office was raided by Chinese police in March, according to two sources with direct knowledge of the matter.

Investigations by Chinese authorities into Mintz, as well as U.S. management consultancy Bain & Co and mainland consultancy Capvision Partners, have sent a chill through companies that deal with China, with many unclear where red lines stand as Beijing prepares to introduce stricter anti-espionage laws in July.

The Reuters Tariff Watch newsletter is your daily guide to the latest global trade and tariff news. Sign up here.

Moving people swiftly out of Hong Kong underscores how the crackdown in China has unnerved some companies in the global financial hub, many of which are still navigating a national security law Beijing imposed on the city in 2020.

**AR001309**

The relocations over the last couple of months are meant to be a temporary measure to ensure staff safety, given the uncertainty of the Chinese police probe, the sources said, and involved around half a dozen employees including investigators and the head of the Hong Kong office.

One source with direct knowledge of the matter, and four other sources briefed by Mintz employees, said the firm had engaged in corporate due diligence work examining the possible use of forced labour in supply chains linked to China's Xinjiang region up until this year.

Reuters could not ascertain whether the Chinese police probe was triggered by Mintz's work on Xinjiang. But at least two other senior executives at international due diligence firms operating in China told Reuters authorities had explicitly warned them off such work in recent months.

One of the sources who has dealt with Mintz in a business capacity said several of the Hong Kong-based Mintz employees are now in Singapore, and there is no plan for them to return to Hong Kong until the probe by Chinese authorities is over.

No one was present when Reuters visited the Hong Kong office of Mintz during business hours, with the doors locked and lights off. A building management office employee said Mintz was still paying rent on its office but two employees at neighbouring offices said no one had been seen in the Mintz premises in the past few months.

Several Mintz staff profiles have been removed from Mintz's website, according to a Reuters review of archived versions of the site. It was not clear the roles of all those that had left.

Mintz declined to comment.

Confirming the raid at its Beijing office in late March, Mintz at that time said it had closed its operations there and that it was ready to work with the Chinese authorities to "resolve any misunderstanding that may have led to these events".


**XINJIANG 'OFF LIMITS'**

While Chinese authorities have not detailed the scope of the investigation against Mintz, the office raid and detentions of five mainland Chinese staffers, including the head of Mintz's Beijing office, have rattled the professional advisory service industry within China, with ripples now being felt in Hong Kong.

As a global financial centre, Hong Kong has a deep pool of professional services talent, including in corporate investigations, with international firms including Kroll, Control Risks, McKinsey and FTI based there.

In recent years, following the enactment of a China-imposed national security law in 2020, the United States has revised its risk assessment for U.S. citizens in Hong Kong, highlighting the

 Reuters                                                                                      My News

China's State Council Information Office, the Ministry of Foreign Affairs and the Hong Kong and Macau Affairs Office did not respond to Reuters requests for comment.

The Hong Kong government said it did not comment on individual business decisions.

A spate of laws and regulations enacted during President Xi Jinping's rule - including laws on cybersecurity, personal information protection, data security, as well as the upcoming anti-espionage law that will ban the transfer of any information related to national security - have complicated the landscape for compliance.

Two due diligence executives with international firms and extensive dealings in China said Chinese security officials periodically arranged meetings in recent years to issue explicit warnings on areas to avoid in corporate investigations.

"They would tell us exactly what areas are off-limits," said one executive. "Xinjiang was one of these."

Rights groups accuse Beijing of abuses against mainly Muslim Uyghurs in the western region of Xinjiang, including the mass use of forced labour.

The U.S. has compiled a list of companies it is sanctioning for using forced labour in Xinjiang and has passed a law that puts the onus on companies to prove that goods sourced there are free from forced labour.

China denies abuses in Xinjiang, a major cotton producer and supplier of materials for solar panels.

Mintz's Asia head, Randal Phillips, a former senior CIA official, co-authored an article carried on the firm's website last year on "sanctions due diligence" under the U.S. Uyghur Forced Labour Prevention Act, specific to Xinjiang, which has since been removed.

Phillips wrote "for some suppliers, public records and questionnaires may be sufficient; for others, independent verification, on-the-ground investigation and interviews with industry sources may be called for."

Phillips declined to comment.

Reporting by James Pomfret in Hong Kong, Engen Than in Shanghai and Hong Kong Newsroom; Editing by Lincoln Feast

Our Standards: **The Thomson Reuters Trust Principles.**

Suggested Topics:

China      Human Rights

Purchase Licensing Rights



**James Pomfret**
Thomson Reuters

James Pomfret is a Special Correspondent for Reuters covering politics and policy in Asia, with a specialization on China, Hong Kong and Taiwan. A two-time Pulitzer finalist, his multimedia career has spanned print, radio, TV and photography. His reporting includes "The Revolt of Hong Kong" - an investigative series he helped lead that was a Pulitzer finalist for International Reporting in 2020, and a series on China's weaponization of the rule of law against its critics that won a 2023 SOPA award.

 

AR001310

## Read Next

China
**US slashes 'de minimis' tariff on small China parcels to as low as 30%**
May 14, 2025



Business
**China accuses US of 'abusing' export control measures in Huawei AI chip curb**
9:09 AM UTC



World
**China grants visa-free entry to some of Latin America's biggest economies**
8:48 AM UTC

Asia Pacific
**Driver held after hitting pedestrians near Beijing primary school, state-run outlet reports**
ago

## Sponsored Content

Dianomi ▷


E*TRADE
from Morgan Stanley
Morgan Stanley Private Bank
National Association, Member FDIC
**4.00**%APY
Member FDIC

E*TRADE PREMIUM
SAVINGS
GET STARTED


AXOS BANK
**4.66**%APY ⓘ
Member FDIC

AXOS ONE®
START EARNING


Sponsors of GOBankingRates

Advertiser Disclosure


**Schwab's Opening Market Update**

Sponsored by
Charles Schwab


**What Every Retired Person Should Do**

Sponsored by
Charles Schwab

## Sponsored Content

Dianomi ▷

**Today's Markets: What Investors Should Know Now**
Sponsored by Charles Schwab



**Tax Credits: What They Are and How They Work**
Sponsored by Charles Schwab



**Earnings Season: What to Watch**
Sponsored by Charles Schwab



**Seniors Born 1941-1979 Receive 55 Benefits This Month if They Ask**
Sponsored by WalletJump



**At Schwab, how you invest is your choice. Not ours. Invest your way.**
Sponsored by Charles Schwab



**Trade futures, forex, and more, all on thinkorswim® at Schwab.**
Sponsored by Charles Schwab




Feedback

## World ›


AR001311

5/15/25, 10:23 AM
Case 1:23-cv-00182-GSK    Document 217-4    Filed 01/08/26    Page 378 of 701
Exclusive: US consultancy Mintz's executives leave Hong Kong after China raid | Reuters

## Russian-backed union free trade deal with Iran goes into effect

Asia Pacific · May 15, 2025 · 10:17 AM EDT · 5 min ago

The Russian-led Eurasian Economic Union (EEU) free trade deal with Iran went into effect on Thursday, paving the way for increased trade across sectors ranging from agriculture to metals, a senior Russian official was quoted as saying.

Middle East
**Israeli military strikes kill scores in Gaza, as Trump visits the region**
10 min ago

United States
**Wisconsin judge pleads not guilty to impeding immigrant's arrest**
11 min ago

Europe
**Watch: Ukraine's Zelenskiy speaks after meeting Turkey's Erdogan**
11 min ago

World
**Trump says US close to a nuclear deal with Iran**
14 min ago

Feedback

**AR001312**

5/15/25, 10:23 AM
Case 1:23-cv-00182-GSK    Document 217-4    Filed 01/08/26    Page 379 of 701
Exclusive: US consultancy Mintzs executives leave Hong Kong after China raid | Reuters

## Sponsored Content







**Charles Schwab**

Medicare Decisions to Make Now

**WalletJump**

Seniors Born 1941-1979 Receive 55 Benefits This Month if They Ask

**Charles Schwab**

Start a Schwab financial plan today and help get more from your money.







**Charles Schwab**

Schwab's Weekly Market Outlook

**Fidelity Investments**

Watch now: The Search for the Next Great Portfolio

**Charles Schwab**

Sharpen your skills with Schwab's online library of trader education.







**Northern Trust**

How to not over-react in reactive markets

**Charles Schwab**

Washington: What to Watch Now

**HBS Executive Education**

Discover why past participants call it a "life-changing experience."

### Latest

Home

Authors

Topic Sitemap

Archive

Article Sitemap

### Media

 Videos

 Pictures

 Graphics

Podcasts

### Browse

World

Business

Markets

Sustainability

Legal

Breakingviews

Technology

Investigations

Sports

Science

Lifestyle

### About Reuters

About Reuters

Advertise with Us

Careers

Reuters News Agency

Brand Attribution Guidelines

Reuters and AI

Reuters Leadership

Reuters Fact Check

Reuters Diversity Report

### Stay Informed

Download the App (iOS)

Download the App (Android)

Newsletters

Feedback

**AR001313**

5/15/25, 10:23 AM
Case 1:23-cv-00182-GSK    Document 217-4    Filed 01/08/26    Page 380 of 701
Exclusive: US consultancy Mintz's executives leave Hong Kong after China raid | Reuters

Information you can trust

Reuters, the news and media division of Thomson Reuters, is the world's largest multimedia news provider, reaching billions of people worldwide every day. Reuters provides business, financial, national and international news to professionals via desktop terminals, the world's media organizations, industry events and directly to consumers.

Follow Us



## LSEG Products

### Workspace ⧉

Access unmatched financial data, news and content in a highly-customised workflow experience on desktop, web and mobile.

### Data Catalogue ⧉

Browse an unrivalled portfolio of real-time and historical market data and insights from worldwide sources and experts.

### World-Check ⧉

Screen for heightened risk individual and entities globally to help uncover hidden risks in business relationships and human networks.

Advertise With Us ⧉    Advertising Guidelines    Purchase Licensing Rights ⧉

All quotes delayed a minimum of 15 minutes. See here for a complete list of exchanges and delays.

Cookies ⧉    Terms of Use    Privacy ⧉    Digital Accessibility ⧉    Corrections    Site Feedback ⧉

© 2025 Reuters. All rights reserved

Feedback

AR001314

AR001315

Case 1:23-cv-00182-GSK    Document 217-4    Filed 01/08/26    Page 382 of 701

AR001316

5/15/25, 10:23 AM
Case 1:23-cv-00182-GSK    Document 217-4    Filed 01/08/26    Page 383 of 701
Exclusive: US consultancy Mintzs executives leave Hong Kong after China raid | Reuters

AR001317

Case 1:23-cv-00182-GSK    Document 217-4    Filed 01/08/26    Page 384 of 701

AR001318

AR001319

# STRATEGY RISKS

48 Wall Street, Ste. 1012, New York, NY 10005

My name is Isaac Stone Fish, the CEO and founder of Strategy Risks, a business intelligence firm. We provide detailed data, analysis, and due diligence on matters of global risk, often involving China.

Through my training and professional experience,

Isaac Stone Fish

CEO & Founder, Strategy Risks

## Disclaimer

THIS DOCUMENT IS PROVIDED FOR GENERAL INFORMATION PURPOSES ONLY, IT IS NOT INTENDED TO CONSTITUTE LEGAL, INVESTMENT, OR OTHER PROFESSIONAL ADVICE AND/OR ANY BASIS FOR RELIANCE. THE CLIENT MUST MAKE ITS OWN INDEPENDENT INVESTIGATION, REVIEW AND ANALYSIS OF THE INFORMATION PROVIDED. ANY ACTIONS THAT THE CLIENT TAKES AS A RESULT OF RECEIVING THIS INFORMATION SHALL BE ITS OWN INDEPENDENT ACT AND TAKEN AT ITS SOLE RISK. WE MAKE NO WARRANTIES, REPRESENTATIONS OR UNDERTAKINGS ABOUT ANY OF THE CONTENT OF THIS REPORT (INCLUDING, WITHOUT LIMITATION, ANY AS TO THE QUALITY, ACCURACY, COMPLETENESS OR FITNESS FOR ANY PARTICULAR PURPOSE OF SUCH CONTENT), OR ANY CONTENT OF ANY OTHER SOURCE OF INFORMATION. IN NO EVENT WILL WE BE LIABLE FOR ANY LOSS OR DAMAGE, INCLUDING WITHOUT LIMITATION, INDIRECT OR CONSEQUENTIAL LOSS OR DAMAGE, OR ANY LOSS OR DAMAGE WHATSOEVER ARISING FROM THE RECEIPT OR USE OF THIS REPORT, EXCEPT AS AGREED TO IN WRITING BY STRATEGY RISKS IN THE CONTRACT BETWEEN STRATEGY RISKS AND THE CLIENT.

**THIS PAGE CONTAINS CONFIDENTIAL INFORMATION**

AR001320

# Isaac Stone Fish



48 Wall Street, Suite 1012
New York, NY 10005

CEO & FOUNDER, Strategy Risks, Corp.

Author of *America Second: How America's Elites Are Making China Stronger*
Published by Knopf (February, 2022)

## Career Summary

Founded a research New York City based start-up focusing on understanding and managing China risk.

## Functional Skill Areas

Strategic Planning | Leadership | Data Analysis | Research Auditing | Operations & Compliance | Investigative Writing | Public Speaking | Foreign Policy

## Areas of Impact

A fluent Mandarin speaker, Stone Fish spent seven years in China, where he visited every province, municipality, and special administrative region. He is an experienced speaker on US-China relations and his views on international affairs are widely quoted on MSNBC, ABC, NPR, CBS, CNN, the New York Times, the Washington Post, and other major news media.

## Education

**Columbia University |** New York, NY
September 2002-May 2006
Earned a BA in East Asian Languages and Cultures.

**Columbia in Beijing |** Beijing, China
June-August 2004
Studied Mandarin at the Beijing Language and Culture University.

## Languages

- o Fluent in reading, writing, and speaking Mandarin Chinese (5.5 years of professional experience in the PRC, 4 years of university classes).
- o Interpreted for Davy Process Technology, a British chemicals company, for multi-week trips in China (October 2008-November 2008 and April 2009).

## Professional Record

Strategy Risks, Corp.  |  New York, NY
*CEO & Founder* |  2020 – Present
- o Launched a business intelligence firm to help clients understand, manage, and reduce their China risk.
- o Provide Xinjiang and China audits, to quantify U.S. corporate exposure to the Chinese Communist Party.

AR001321    THIS PAGE CONTAINS CONFIDENTIAL INFORMATION

# ISAAC STONE FISH



48 Wall Street, Suite 1012
New York, NY 10005

- o Pioneered alternative data tools that help investors, corporates, and regulators limit their exposure to the Chinese Communist Party.

**Asia Society's Center on U.S.-China Relations | New York City, USA**
*Senior* Fellow | August 2016 - April 2019
- o Wrote investigative articles and op-eds focusing on China and the United States for a variety of publications.
- o Spoke regularly at events about U.S. foreign policy, Chinese politics, and Sino-U.S relations.
- o Served as editor-in-chief for the Chinese news website Chinafile.

**Foreign Policy Magazine | Washington DC, USA**
*Asia* Editor | February 2014-July 2016
- o Oversaw Foreign Policy Magazine's Asia coverage, especially for its website, which draws several million unique visitors a month.
- o Wrote dozens of reported and opinion pieces about China and its place in the world, as well as stories about Japan, North Korea, and India.
- o Edited, commissioned, and planned Asia-related web and print stories.

**Foreign Policy Magazine | Washington DC, USA**
*Associate* Editor | December 2011-January 2014
- o Built a network of dozens of contributors for opinion and reported pieces.
- o Edited, reported, and blogged hundreds of articles, mostly about East Asia.
- o Managed Foreign Policy's integration of Chinese news site Tea Leaf Nation; helped plan editorial strategy for targeting Chinese readers and readers interested in China.

**Newsweek Magazine | Beijing, China**
*Beijing* Correspondent | November 2009-December 2011
- o Published more than fifty articles in the print magazine on China's business, culture, and politics, including four cover stories.
- o Developed an extensive network of Chinese and foreign businesspeople, academics, journalists, and officials.

*Freelance Journalist* | Beijing, China
September 2008-October 2009
- o Wrote articles for The Economist, Far Eastern Economic Review, The National and other publications.
- o Contributed reports and collected provincial economic data with on-the-ground interviews for the Economist Intelligence Unit.

**Creative Work Agency | Beijing, China**
*Beijing Chief Representative* and *Literary Agent* | August 2006-April 2008
- o Oversaw all mainland China efforts to sign and promote Chinese and China-based authors in their global publishing endeavors.
- o Evaluated manuscripts of potential clients, supervised translation efforts, and advised clients on tailoring manuscripts to target audiences.

AR001322

**THIS PAGE CONTAINS CONFIDENTIAL INFORMATION**

# ISAAC STONE FISH

██████████████████

48 Wall Street, Suite 1012
New York, NY 10005

## Professional Record

- o   Have been quoted on MSNBC, CNN, BBC, NPR, ABC, Fox, and Al-Jazeera, most large print outlets in the United States and Europe, and in Chinese, Japanese, Korean, Taiwanese, and Vietnamese media.
- o   Articles published in The New York Times, the Washington Post, the Los Angeles Times, the Economist, Slate, The Atlantic, the Guardian, Newsweek, Time, The Daily Beast, The New Republic, Politico Magazine, Foreign Policy, Foreign Affairs, among others.

## Fellowships & Other Positions

- o   Visiting Fellow, the Atlantic Council (2021-present)
- o   Columnist on China risk, Barron's (2021-present)
- o   Senior Advisor, Korea Society (2020-present)
- o   Term Member, Council on Foreign Relations (2020-present)
- o   Adjunct, New York University's Center for Global Affairs (2019-present)
- o   On contract with CBS News as a foreign policy contributor (2017-present)
- o   Truman National Security Fellow (2017-present)
- o   Contributing Columnist, Washington Post (2019-2023)
- o   Visiting Fellow, German Marshall Fund (2019-2021)
- o   Consultant, Academy Award Winning-documentary American Factory (2019)
- o   International Affairs Analyst, PRI's The World (2017-2019)
- o   Non-Resident Senior Fellow, the University of Nottingham's China Policy Institute (2017-2019)
- o   Global Shaper, World Economic Forum (2012-2017)
- o   Board Member, Foreign Correspondents Club of China (2011)

**THIS PAGE CONTAINS CONFIDENTIAL INFORMATION**

AR001323

AR001324

THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION



AR001325

THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION



AR001326

AR001327

AR001328

THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION



AR001329

AR001330

THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION

THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION

AR001331

UNCLASSIFIED // FOR OFFICIAL USE ONLY

U.S. Department of Homeland Security
Washington, DC 20528



**Homeland Security**

June 23, 2025

Ted Murphy
Sidley Austin LLP
1501 K Street, N.W.
Washington, D.C. 20005

Subject:    **The Forced Labor Enforcement Task Force's Decision Regarding Ninestar Corporation and its subsidiaries Geehy Semiconductor Co., Ltd., Zhuhai Apex Microelectronics Co., Ltd., Zhuhai G&G Digital Technology Co., Ltd., Zhuhai Ninestar Information Technology Co. Ltd., Zhuhai Ninestar Management Co., Ltd., Zhuhai Pantum Electronics Co. Ltd., Zhuhai Seine Printing Technology Co., Ltd. Request for Removal from the Uyghur Forced Labor Prevention Act Entity List**

Dear Mr. Murphy:

Thank you for your submissions and engagement with the Forced Labor Enforcement Task Force (FLETF) related to Ninestar Corporation and its Zhuahai-based subsidiaries' (collectively, "Ninestar") request for removal from the Uyghur Forced Labor Prevention Act (UFLPA) Entity List. Upon consideration of Ninestar's request for removal, supporting information, and responses to questions, the FLETF has determined that the information provided by Ninestar in support of its removal request does not demonstrate that Ninestar either does not meet or no longer meets the criteria described in Section 2(d)(2)(B)(ii) of the UFLPA. Ninestar will remain on the UFLPA Entity List.

As you are aware, on June 12, 2023, the U.S. Department of Homeland Security published a Federal Register Notice announcing the addition of Ninestar to the UFLPA Entity List described in Section 2(d)(2)(B)(ii) of the UFLPA (Public Law 117-78). The addition of Ninestar to the UFLPA Entity List was based on the FLETF's determination that there was reasonable cause to believe, based on specific and articulable information, that Ninestar works with the government of the Xinjiang Uyghur Autonomous Region (XUAR) to recruit, transport, transfer, harbor or receive forced labor or Uyghurs, Kazakhs, Kyrgyz, or members of other persecuted groups out of the XUAR.

The Federal Register Notice described the process for entities to request removal from the UFLPA Entity List. The Federal Register Notice stated that "[a]ny listed entity may submit a request for removal (removal request) from the UFLPA Entity List along with supporting information to the FLETF Chair at FLETF.UFLPA.EntityList@hq.dhs.gov. In the removal request, the entity (or its designated representative) should provide information that demonstrates

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001332

UNCLASSIFIED // FOR OFFICIAL USE ONLY

that the entity no longer meets or does not meet the criteria described in the applicable clause ((i), (ii), (iv), or (v)) of section 2(d)[(2)](B) of the UFLPA."

On July 18, 2024, Ninestar submitted a removal request to the FLETF. The FLETF reviewed Ninestar's removal request and the information submitted in support, and prepared questions for Ninestar. On September 26, 2024, the FLETF Chair sent the FLETF questions to Ninestar. On November 6, 2024, the FLETF Chair received responses from Ninestar to the September 26, 2024, FLETF questions.

Ninestar's removal request also included a request to meet with the FLETF. On November 27, 2024, the FLETF Chair informed Ninestar that the FLETF agreed to meet with Ninestar prior to voting on the removal request. On December 5, 2024, the FLETF Chair provided Ninestar a meeting agenda and meeting protocols. In the protocols, the FLETF advised Ninestar that the meeting would be structured as a listening session to allow Ninestar to present or highlight information that it would like the FLETF to consider. The protocols also provided that any new information presented by Ninestar during the meeting must be submitted to the FLETF in writing. On December 9, 2024, Ninestar withdrew its request for a meeting with the FLETF. The FLETF sent additional questions to Ninestar on December 9, 2024. On December 11, 2024, Ninestar provided responses to the additional questions and confirmed its desire to withdraw the request for a meeting with the FLETF.

The FLETF sent additional questions to Ninestar on April 18, 2025, to which Ninestar provided responses on April 22, 2025. The FLETF sent follow-up questions to Ninestar on May 9, 2025, and Ninestar responded to those questions on May 13, 2025. Ninestar provided no additional information to the FLETF after May 13, 2025.

In its removal request and responses to the FLETF's questions, Ninestar asserted that "there is no reasonable cause to believe Ninestar meets the criteria for continued listing under Section 2(d)(2)(B)(ii) of the UFLPA," and "[w]hile Ninestar believes that the evidence it is providing here [in its removal request] casts doubt on the bases for the original Listing Decision, it is not asking [the] FLETF to revisit that decision in this removal request. Rather, Ninestar requests delisting on the separate and prospective ground that, regardless of whatever went before, there is no reasonable cause to believe today that Ninestar meets the criteria for continued listing under Section 2(d)(2)(B)(ii) of the UFLPA." Ninestar's basis for this assertion is its claim that "Ninestar is not working with any of the same third-party dispatch agencies it worked with prior to the listing decision," and that "Ninestar currently has only one Uyghur employee."

In support of its removal request, Ninestar submitted documentation including labor dispatch agency contracts and terminations, personnel records, certain labor recruitment policies, grievance mechanisms, and audits as evidence that there is no longer reasonable cause to believe that the company works with the XUAR government to recruit, transfer, or transport Uyghurs out of the XUAR.

Following a significant period of review of the totality of information provided, including all submissions from Ninestar, the FLETF has determined that Ninestar's removal from Section 2(d)(2)(B)(ii) of the UFLPA is not warranted.

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001333

UNCLASSIFIED // FOR OFFICIAL USE ONLY

Specifically, Ninestar's statements and evidence are inconsistent with the information provided by a confidential source indicating that the company has worked with the government of the XUAR to recruit, transport, transfer, or receive Uyghurs out of the XUAR. Therefore, Ninestar's arguments do not persuade the FLETF that the information supporting the initial listing determination is no longer accurate.

Ninestar further fails to assert that it would not accept Uyghur laborers from the XUAR transferred through labor dispatch agencies via government sponsored labor transfers. In an effort to verify Ninestar's claims, the FLETF obtained additional information that also indicates the record submitted by Ninestar regarding its cooperation with labor dispatch agencies and the recruitment of labor is incomplete, and in some instances, unreliable.

After reviewing the totality of the information and weighing the credibility of Ninestar's new information compared to the information that supported the FLETF's initial determination, the FLETF concluded that there is still reasonable cause to believe that Ninestar works with the government of the XUAR to recruit, transport, transfer, or receive Uyghurs out of the XUAR.

Therefore, the FLETF has determined not to remove Ninestar from the UFLPA Entity List. The FLETF's decision to deny Ninestar's request for removal is not appealable; however, Ninestar may submit a new request for removal if it can provide new information to support such a request.

If you have any further questions, please email the FLETF at FLETF.UFLPA.EntityList@hq.dhs.gov.

Thank you for your engagement on this request.

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001334

UNCLASSIFIED // FOR OFFICIAL USE ONLY

## FLETF Member Agency Vote

(U//FOUO) Does your agency approve the removal of Ninestar Corporation from the UFLPA Entity List described in 2(d)(2)(B)(ii) of the Uyghur Forced Labor Prevention Act?

Yes (REMOVE from UFLPA Entity List):    ☐

No (REMAIN on UFLPA Entity List):    ☑

_____
Agency Official's Signature

Chistopher C. Pratt
_____
Agency Official's Name

SoPDUS
_____
Agency Official's Title

DHS
_____
Agency

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001335

UNCLASSIFIED // FOR OFFICIAL USE ONLY

**FLETF Member Agency Vote**

(U//FOUO) Does your agency approve the removal of Ninestar Corporation from the UFLPA Entity List described in 2(d)(2)(B)(ii) of the Uyghur Forced Labor Prevention Act?

Yes (REMOVE from UFLPA Entity List):  ☐

No (REMAIN on UFLPA Entity List):  ☑

BRENNA
DOUGAN
Digitally signed by BRENNA
DOUGAN
Date: 2025.06.20 09:48:24 -04'00'

Agency Official's Signature

## Brenna Dougan

Agency Official's Name

Deputy Assistant USTR for Labor Affairs

Agency Official's Title

United States Trade Representative

Agency

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001336

UNCLASSIFIED // FOR OFFICIAL USE ONLY

## FLETF Member Agency Vote

(U//FOUO) Does your agency approve the removal of Ninestar Corporation from the UFLPA Entity List described in 2(d)(2)(B)(ii) of the Uyghur Forced Labor Prevention Act?

Yes (REMOVE from UFLPA Entity List):    ☐

No (REMAIN on UFLPA Entity List):    ☒

_____
Agency Official's Signature

_Ana M Guevara_____
Agency Official's Name

_Deputy Under Secretary, Bureau of International Labor Affairs_
Agency Official's Title

_Dept. of Labor_____
Agency

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001337

UNCLASSIFIED // FOR OFFICIAL USE ONLY

**FLETF Member Agency Vote**

(U//FOUO) Does your agency approve the removal of Ninestar Corporation from the UFLPA Entity List described in 2(d)(2)(B)(ii) of the Uyghur Forced Labor Prevention Act?

Yes (REMOVE from UFLPA Entity List):    ☐

No (REMAIN on UFLPA Entity List):    ☑

JOSHUA KROON
Digitally signed by JOSHUA KROON
Date: 2025.06.20 07:32:31 -04'00'

Agency Official's Signature

# Joshua Kroon

Agency Official's Name

Deputy Assistant Secretary for Textiles, Consumer Goods, Materials, Minerals and Metals

Agency Official's Title

# Department of Commerce

Agency

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001338

UNCLASSIFIED // FOR OFFICIAL USE ONLY

## FLETF Member Agency Vote

(U//FOUO) Does your agency approve the removal of Ninestar Corporation from the UFLPA Entity List described in 2(d)(2)(B)(ii) of the Uyghur Forced Labor Prevention Act?

**Yes** (REMOVE from UFLPA Entity List):    ☐

**No** (REMAIN on UFLPA Entity List):    ☑

Scott Rembrandt
Digitally signed by Scott Rembrandt
Date: 2025.06.20 10:58:17 -04'00'
_____
Agency Official's Signature

# Scott Rembrandt
_____
Agency Official's Name

Acting Principal Deputy Assistant Secretary
_____
Agency Official's Title

U.S. Department of the Treasury
_____
Agency

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001339

UNCLASSIFIED // FOR OFFICIAL USE ONLY

**FLETF Member Agency Vote**

(U//FOUO) Does your agency approve the removal of Ninestar Corporation from the UFLPA Entity List described in 2(d)(2)(B)(ii) of the Uyghur Forced Labor Prevention Act?

**Yes** (REMOVE from UFLPA Entity List):  ☐

**No** (REMAIN on UFLPA Entity List):  ☑

Agency Official's Signature

## Rachel Poynter

Agency Official's Name

Acting Director, Office to Monitor and Combat Trafficking in Persons

Agency Official's Title

## Department of State

Agency

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001340

UNCLASSIFIED // FOR OFFICIAL USE ONLY

**FLETF Member Agency Vote**

(U//FOUO) Does your agency approve the removal of Ninestar Corporation from the UFLPA Entity List described in 2(d)(2)(B)(ii) of the Uyghur Forced Labor Prevention Act?

Yes (REMOVE from UFLPA Entity List):  ☐

No (REMAIN on UFLPA Entity List):  ☑

HILARY AXAM  Digitally signed by HILARY AXAM
Date: 2025.06.17 12:38:26 -04'00'
_____
Agency Official's Signature

Hilary Axam
_____
Agency Official's Name

National Human Trafficking Coordinator,
Human Trafficking Prosecution Unit
_____
Agency Official's Title

Department of Justice
_____
Agency

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001341

UNCLASSIFIED // FOR OFFICIAL USE ONLY

## FLETF Member Agency Vote

(U//FOUO) Does your agency approve the removal of Geehy Semiconductor Co., Ltd. from the UFLPA Entity List described in 2(d)(2)(B)(ii) of the Uyghur Forced Labor Prevention Act?

Yes (REMOVE from UFLPA Entity List):  ☐

No (REMAIN on UFLPA Entity List):  ☑

_____
Agency Official's Signature

CHRISTOPHER C. PRATT
_____
Agency Official's Name

SoPDUS
_____
Agency Official's Title

DHS
_____
Agency

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001342

UNCLASSIFIED // FOR OFFICIAL USE ONLY

## FLETF Member Agency Vote

(U//FOUO) Does your agency approve the removal of Geehy Semiconductor Co., Ltd. from the UFLPA Entity List described in 2(d)(2)(B)(ii) of the Uyghur Forced Labor Prevention Act?

Yes (REMOVE from UFLPA Entity List): ☐

No (REMAIN on UFLPA Entity List): ☑

BRENNA DOUGAN
Digitally signed by BRENNA DOUGAN
Date: 2025.06.20 09:48:51 -04'00'

Agency Official's Signature

## Brenna Dougan

Agency Official's Name

Deputy Assistant USTR for Labor Affairs

Agency Official's Title

United States Trade Representative

Agency

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001343

UNCLASSIFIED // FOR OFFICIAL USE ONLY

**FLETF Member Agency Vote**

(U//FOUO) Does your agency approve the removal of Geehy Semiconductor Co., Ltd. from the UFLPA Entity List described in 2(d)(2)(B)(ii) of the Uyghur Forced Labor Prevention Act?

**Yes** (REMOVE from UFLPA Entity List):    ☐

**No** (REMAIN on UFLPA Entity List):    ☒

Ana M. Guevara
Agency Official's Signature

ANA M GUEVARA
Agency Official's Name

Deputy Undersecretary, Bureau of International Labor Affairs
Agency Official's Title

Department of Labor
Agency

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001344

UNCLASSIFIED // FOR OFFICIAL USE ONLY

**FLETF Member Agency Vote**

(U//FOUO) Does your agency approve the removal of Geehy Semiconductor Co., Ltd. from the UFLPA Entity List described in 2(d)(2)(B)(ii) of the Uyghur Forced Labor Prevention Act?

**Yes** (REMOVE from UFLPA Entity List):  ☐

**No** (REMAIN on UFLPA Entity List):  ☑

JOSHUA KROON  Digitally signed by JOSHUA KROON
Date: 2025.06.20 07:35:18 -04'00'

Agency Official's Signature

# Joshua Kroon

Agency Official's Name

Deputy Assistant Secretary for Textiles, Consumer Goods, Materials, Minerals and Metals

Agency Official's Title

# Department of Commerce

Agency

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001345

UNCLASSIFIED // FOR OFFICIAL USE ONLY

## FLETF Member Agency Vote

(U//FOUO) Does your agency approve the removal of Geehy Semiconductor Co., Ltd. from the UFLPA Entity List described in 2(d)(2)(B)(ii) of the Uyghur Forced Labor Prevention Act?

**Yes** (REMOVE from UFLPA Entity List):  ☐

**No** (REMAIN on UFLPA Entity List):  ☑

Scott Rembrandt  Digitally signed by Scott Rembrandt
Date: 2025.06.20 10:59:11 -04'00'
_____
Agency Official's Signature

# Scott Rembrandt
_____
Agency Official's Name

Acting Principal Deputy Assistant Secretary
_____
Agency Official's Title

U.S. Department of the Treasury
_____
Agency

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001346

UNCLASSIFIED // FOR OFFICIAL USE ONLY

## FLETF Member Agency Vote

(U//FOUO) Does your agency approve the removal of Geehy Semiconductor Co., Ltd. from the UFLPA Entity List described in 2(d)(2)(B)(ii) of the Uyghur Forced Labor Prevention Act?

Yes (REMOVE from UFLPA Entity List): ☐

No (REMAIN on UFLPA Entity List): ☑

Agency Official's Signature

**Rachel Poynter**

Agency Official's Name

Acting Director, Office to Monitor and Combat Trafficking in Persons

Agency Official's Title

**Department of State**

Agency

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001347

UNCLASSIFIED // FOR OFFICIAL USE ONLY

**FLETF Member Agency Vote**

(U//FOUO) Does your agency approve the removal of Geehy Semiconductor Co., Ltd. from the UFLPA Entity List described in 2(d)(2)(B)(ii) of the Uyghur Forced Labor Prevention Act?

**Yes** (REMOVE from UFLPA Entity List): ☐

**No** (REMAIN on UFLPA Entity List): ☑

HILARY AXAM  Digitally signed by HILARY AXAM
Date: 2025.06.17 12:38:59 -04'00'

Agency Official's Signature

## Hilary Axam

Agency Official's Name

National Human Trafficking Coordinator,
Human Trafficking Prosecution Unit

Agency Official's Title

## Department of Justice

Agency

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001348

UNCLASSIFIED // FOR OFFICIAL USE ONLY

## FLETF Member Agency Vote

(U//FOUO) Does your agency approve the removal of Zhuhai Apex Microelectronics Co., Ltd. from the UFLPA Entity List described in 2(d)(2)(B)(ii) of the Uyghur Forced Labor Prevention Act?

**Yes** (REMOVE from UFLPA Entity List):   ☐

**No** (REMAIN on UFLPA Entity List):   ☑

Agency Official's Signature

CHRISTOPHEN C. PRATT
Agency Official's Name

SOPDUS
Agency Official's Title

DHS
Agency

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001349

UNCLASSIFIED // FOR OFFICIAL USE ONLY

**FLETF Member Agency Vote**

(U//FOUO) Does your agency approve the removal of Zhuhai Apex Microelectronics Co., Ltd. from the UFLPA Entity List described in 2(d)(2)(B)(ii) of the Uyghur Forced Labor Prevention Act?

**Yes** (REMOVE from UFLPA Entity List):  ☐

**No** (REMAIN on UFLPA Entity List):  ☑

BRENNA DOUGAN
Digitally signed by BRENNA DOUGAN
Date: 2025.06.20 09:49:21 -04'00'

Agency Official's Signature

# Brenna Dougan

Agency Official's Name

Deputy Assistant USTR for Labor Affairs

Agency Official's Title

United States Trade Representative

Agency

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001350

UNCLASSIFIED // FOR OFFICIAL USE ONLY

**FLETF Member Agency Vote**

(U//FOUO) Does your agency approve the removal of Zhuhai Apex Microelectronics Co., Ltd. from the UFLPA Entity List described in 2(d)(2)(B)(ii) of the Uyghur Forced Labor Prevention Act?

Yes (REMOVE from UFLPA Entity List):    ☐

No (REMAIN on UFLPA Entity List):    ☒

_____
Agency Official's Signature

_ANA M GUEVARA_
Agency Official's Name

Deputy Undersecretary, Bureau of International Bureau Affairs
Agency Official's Title

Department of Labor
Agency

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001351

UNCLASSIFIED // FOR OFFICIAL USE ONLY

**FLETF Member Agency Vote**

(U//FOUO) Does your agency approve the removal of Zhuhai Apex Microelectronics Co., Ltd. from the UFLPA Entity List described in 2(d)(2)(B)(ii) of the Uyghur Forced Labor Prevention Act?

Yes (REMOVE from UFLPA Entity List):  ☐

No (REMAIN on UFLPA Entity List):  ☑

JOSHUA KROON  Digitally signed by JOSHUA KROON
Date: 2025.06.20 07:38:04 -04'00'

Agency Official's Signature

# Joshua Kroon

Agency Official's Name

Deputy Assistant Secretary for Textiles, Consumer Goods, Materials, Minerals and Metals

Agency Official's Title

# Department of Commerce

Agency

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001352

UNCLASSIFIED // FOR OFFICIAL USE ONLY

**FLETF Member Agency Vote**

(U//FOUO) Does your agency approve the removal of Zhuhai Apex Microelectronics Co., Ltd. from the UFLPA Entity List described in 2(d)(2)(B)(ii) of the Uyghur Forced Labor Prevention Act?

**Yes** (REMOVE from UFLPA Entity List):  ☐

**No** (REMAIN on UFLPA Entity List):  ☑

Scott Rembrandt  Digitally signed by Scott Rembrandt
Date: 2025.06.20 12:54:46 -04'00'

Agency Official's Signature

## Scott Rembrandt

Agency Official's Name

Acting Principal Deputy Assistant Secretary

Agency Official's Title

U.S. Department of the Treasury

Agency

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001353

UNCLASSIFIED // FOR OFFICIAL USE ONLY

**FLETF Member Agency Vote**

(U//FOUO) Does your agency approve the removal of Zhuhai Apex Microelectronics Co., Ltd. from the UFLPA Entity List described in 2(d)(2)(B)(ii) of the Uyghur Forced Labor Prevention Act?

Yes (REMOVE from UFLPA Entity List):    ☐

No (REMAIN on UFLPA Entity List):    ☑

_____
Agency Official's Signature

## Rachel Poynter
_____
Agency Official's Name

Acting Director, Office to Monitor and Combat Trafficking in Persons
_____
Agency Official's Title

## Department of State
_____
Agency

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001354

UNCLASSIFIED // FOR OFFICIAL USE ONLY

**FLETF Member Agency Vote**

(U//FOUO) Does your agency approve the removal of Zhuhai Apex Microelectronics Co., Ltd. from the UFLPA Entity List described in 2(d)(2)(B)(ii) of the Uyghur Forced Labor Prevention Act?

Yes (REMOVE from UFLPA Entity List):  ☐

No (REMAIN on UFLPA Entity List):  ☑

HILARY AXAM  Digitally signed by HILARY AXAM
Date: 2025.06.17 12:39:40 -04'00'

Agency Official's Signature

# Hilary Axam

Agency Official's Name

National Human Trafficking Coordinator,
Human Trafficking Prosecution Unit

Agency Official's Title

# Department of Justice

Agency

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001355

UNCLASSIFIED // FOR OFFICIAL USE ONLY

**FLETF Member Agency Vote**

(U//FOUO) Does your agency approve the removal of Zhuhai G&G Digital Technology Co., Ltd. from the UFLPA Entity List described in 2(d)(2)(B)(ii) of the Uyghur Forced Labor Prevention Act?

**Yes** (REMOVE from UFLPA Entity List): ☐

**No** (REMAIN on UFLPA Entity List): ☑

_____
Agency Official's Signature

CHRISTOPHER C. PRATT
_____
Agency Official's Name

Soppus
_____
Agency Official's Title

DHS
_____
Agency

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001356

UNCLASSIFIED // FOR OFFICIAL USE ONLY

**FLETF Member Agency Vote**

(U//FOUO) Does your agency approve the removal of Zhuhai G&G Digital Technology Co., Ltd. from the UFLPA Entity List described in 2(d)(2)(B)(ii) of the Uyghur Forced Labor Prevention Act?

**Yes** (REMOVE from UFLPA Entity List):

**No** (REMAIN on UFLPA Entity List):    ☑

| BRENNA DOUGAN | Digitally signed by BRENNA DOUGAN<br>Date: 2025.06.20 09:49:42 -04'00' |
|---|---|

Agency Official's Signature

# Brenna Dougan

Agency Official's Name

Deputy Assistant USTR for Labor Affairs

Agency Official's Title

United States Trade Representative

Agency

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001357

UNCLASSIFIED // FOR OFFICIAL USE ONLY

**FLETF Member Agency Vote**

(U//FOUO) Does your agency approve the removal of Zhuhai G&G Digital Technology Co., Ltd. from the UFLPA Entity List described in 2(d)(2)(B)(ii) of the Uyghur Forced Labor Prevention Act?

**Yes** (REMOVE from UFLPA Entity List):  ☐

**No** (REMAIN on UFLPA Entity List):  ☒

_Ana M. Guevara_
Agency Official's Signature

_ANA M GUEVARA_
Agency Official's Name

_Deputy Undersecretary, Bureau of International Bureau Affairs_
Agency Official's Title

_Department of Labor_
Agency

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001358

UNCLASSIFIED // FOR OFFICIAL USE ONLY

## FLETF Member Agency Vote

(U//FOUO) Does your agency approve the removal of Zhuhai G&G Digital Technology Co., Ltd. from the UFLPA Entity List described in 2(d)(2)(B)(ii) of the Uyghur Forced Labor Prevention Act?

Yes (REMOVE from UFLPA Entity List):      ☐

No (REMAIN on UFLPA Entity List):      ☑

JOSHUA KROON    Digitally signed by JOSHUA KROON
Date: 2025.06.20 07:34:07 -04'00'

Agency Official's Signature

# Joshua Kroon

Agency Official's Name

Deputy Assistant Secretary for Textiles, Consumer Goods, Materials, Minerals and Metals

Agency Official's Title

# Department of Commerce

Agency

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001359

UNCLASSIFIED // FOR OFFICIAL USE ONLY

**FLETF Member Agency Vote**

(U//FOUO) Does your agency approve the removal of Zhuhai G&G Digital Technology Co., Ltd. from the UFLPA Entity List described in 2(d)(2)(B)(ii) of the Uyghur Forced Labor Prevention Act?

**Yes** (REMOVE from UFLPA Entity List):  ☐

**No** (REMAIN on UFLPA Entity List):  ☑

Scott Rembrandt  Digitally signed by Scott Rembrandt
Date: 2025.06.20 12:57:24 -04'00'

Agency Official's Signature

## Scott Rembrandt

Agency Official's Name

Acting Principal Deputy Assistant Secretary

Agency Official's Title

U.S. Department of the Treasury

Agency

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001360

UNCLASSIFIED // FOR OFFICIAL USE ONLY

**FLETF Member Agency Vote**

(U//FOUO) Does your agency approve the removal of Zhuhai G&G Digital Technology Co., Ltd. from the UFLPA Entity List described in 2(d)(2)(B)(ii) of the Uyghur Forced Labor Prevention Act?

**Yes** (REMOVE from UFLPA Entity List):    ☐

**No** (REMAIN on UFLPA Entity List):    ☑

_Rachel Poynter_
Agency Official's Signature

# Rachel Poynter

Agency Official's Name

Acting Director, Office to Monitor and Combat Trafficking In Persons

Agency Official's Title

# Department of State

Agency

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001361

UNCLASSIFIED // FOR OFFICIAL USE ONLY

**FLETF Member Agency Vote**

(U//FOUO) Does your agency approve the removal of Zhuhai G&G Digital Technology Co., Ltd. from the UFLPA Entity List described in 2(d)(2)(B)(ii) of the Uyghur Forced Labor Prevention Act?

**Yes** (REMOVE from UFLPA Entity List):  ☐

**No** (REMAIN on UFLPA Entity List):  ☑

HILARY AXAM  Digitally signed by HILARY AXAM
Date: 2025.06.17 12:40:46 -04'00'
_____
Agency Official's Signature

# Hilary Axam
_____
Agency Official's Name

National Human Trafficking Coordinator,
Human Trafficking Prosecution Unit
_____
Agency Official's Title

# Department of Justice
_____
Agency

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001362

UNCLASSIFIED // FOR OFFICIAL USE ONLY

**FLETF Member Agency Vote**

(U//FOUO) Does your agency approve the removal of Zhuhai Ninestar Information Technology Co. Ltd. from the UFLPA Entity List described in 2(d)(2)(B)(ii) of the Uyghur Forced Labor Prevention Act?

Yes (REMOVE from UFLPA Entity List):    ☐

No (REMAIN on UFLPA Entity List):    ☑

Agency Official's Signature

CHRISTOPHER C. PRATT
Agency Official's Name

SOPOUS
Agency Official's Title

DHS
Agency

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001363

UNCLASSIFIED // FOR OFFICIAL USE ONLY

## FLETF Member Agency Vote

(U//FOUO) Does your agency approve the removal of Zhuhai Ninestar Information Technology Co. Ltd. from the UFLPA Entity List described in 2(d)(2)(B)(ii) of the Uyghur Forced Labor Prevention Act?

Yes (REMOVE from UFLPA Entity List):    ☐

No (REMAIN on UFLPA Entity List):    ☑

BRENNA DOUGAN
Digitally signed by BRENNA DOUGAN
Date: 2025.06.20 09:50:09 -04'00'

Agency Official's Signature

## Brenna Dougan

Agency Official's Name

Deputy Assistant USTR for Labor Affairs

Agency Official's Title

United States Trade Representative

Agency

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001364

UNCLASSIFIED // FOR OFFICIAL USE ONLY

**FLETF Member Agency Vote**

(U//FOUO) Does your agency approve the removal of Zhuhai Ninestar Information Technology Co. Ltd. from the UFLPA Entity List described in 2(d)(2)(B)(ii) of the Uyghur Forced Labor Prevention Act?

Yes (REMOVE from UFLPA Entity List): ☐

No (REMAIN on UFLPA Entity List): ☒

_Ana M Guevara_
Agency Official's Signature

ANA M GUEVARA
Agency Official's Name

Deputy Undersecretary, Bureau of International Bureau Affairs
Agency Official's Title

Department of Labor
Agency

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001365

UNCLASSIFIED // FOR OFFICIAL USE ONLY

## FLETF Member Agency Vote

(U//FOUO) Does your agency approve the removal of Zhuhai Ninestar Information Technology Co. Ltd. from the UFLPA Entity List described in 2(d)(2)(B)(ii) of the Uyghur Forced Labor Prevention Act?

**Yes** (REMOVE from UFLPA Entity List):  ☐

**No** (REMAIN on UFLPA Entity List):  ☑

JOSHUA KROON
Digitally signed by JOSHUA KROON
Date: 2025.06.20 07:37:09 -04'00'

Agency Official's Signature

# Joshua Kroon

Agency Official's Name

Deputy Assistant Secretary for Textiles, Consumer Goods, Materials, Minerals and Metals

Agency Official's Title

# Department of Commerce

Agency

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001366

UNCLASSIFIED // FOR OFFICIAL USE ONLY

**FLETF Member Agency Vote**

(U//FOUO) Does your agency approve the removal of Zhuhai Ninestar Information Technology Co. Ltd. from the UFLPA Entity List described in 2(d)(2)(B)(ii) of the Uyghur Forced Labor Prevention Act?

**Yes** (REMOVE from UFLPA Entity List):  ☐

**No** (REMAIN on UFLPA Entity List):  ☑

Scott Rembrandt
Digitally signed by Scott Rembrandt
Date: 2025.06.20 13:05:02 -04'00'

_____
Agency Official's Signature

# Scott Rembrandt
_____
Agency Official's Name

Acting Principal Deputy Assistant Secretary
_____
Agency Official's Title

U.S. Department of the Treasury
_____
Agency

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001367

UNCLASSIFIED // FOR OFFICIAL USE ONLY

## FLETF Member Agency Vote

(U//FOUO) Does your agency approve the removal of Zhuhai Ninestar Information Technology Co. Ltd. from the UFLPA Entity List described in 2(d)(2)(B)(ii) of the Uyghur Forced Labor Prevention Act?

Yes (REMOVE from UFLPA Entity List): ☐

No (REMAIN on UFLPA Entity List): ☑

_Rachel Poynter_
Agency Official's Signature

**Rachel Poynter**
Agency Official's Name

Acting Director, Office to Monitor and Combat Trafficking in Persons
Agency Official's Title

**Department of State**
Agency

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001368

UNCLASSIFIED // FOR OFFICIAL USE ONLY

**FLETF Member Agency Vote**

(U//FOUO) Does your agency approve the removal of Zhuhai Ninestar Information Technology Co. Ltd. from the UFLPA Entity List described in 2(d)(2)(B)(ii) of the Uyghur Forced Labor Prevention Act?

Yes (REMOVE from UFLPA Entity List):　　☐

No (REMAIN on UFLPA Entity List):　　☑

HILARY AXAM  Digitally signed by HILARY AXAM
Date: 2025.06.17 12:41:50 -04'00'
_____
Agency Official's Signature

Hilary Axam
_____
Agency Official's Name

National Human Trafficking Coordinator,
Human Trafficking Prosecution Unit
_____
Agency Official's Title

Department of Justice
_____
Agency

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001369

UNCLASSIFIED // FOR OFFICIAL USE ONLY

## FLETF Member Agency Vote

(U//FOUO) Does your agency approve the removal of Zhuhai Ninestar Management Co., Ltd. from the UFLPA Entity List described in 2(d)(2)(B)(ii) of the Uyghur Forced Labor Prevention Act?

Yes (REMOVE from UFLPA Entity List):  ☐

No (REMAIN on UFLPA Entity List):  ☑

_Agency Official's Signature_

CHRISTOPHER C. PRATT
Agency Official's Name

/OPDUS
Agency Official's Title

DHS
Agency

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001370

UNCLASSIFIED // FOR OFFICIAL USE ONLY

**FLETF Member Agency Vote**

(U//FOUO) Does your agency approve the removal of Zhuhai Ninestar Management Co., Ltd. from the UFLPA Entity List described in 2(d)(2)(B)(ii) of the Uyghur Forced Labor Prevention Act?

Yes (REMOVE from UFLPA Entity List):    ☐

No (REMAIN on UFLPA Entity List):    ☑

BRENNA DOUGAN
Digitally signed by BRENNA DOUGAN
Date: 2025.06.20 09:50:29 -04'00'

Agency Official's Signature

# Brenna Dougan

Agency Official's Name

Deputy Assistant USTR for Labor Affairs

Agency Official's Title

United States Trade Representative

Agency

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001371

UNCLASSIFIED // FOR OFFICIAL USE ONLY

**FLETF Member Agency Vote**

(U//FOUO) Does your agency approve the removal of Zhuhai Ninestar Management Co., Ltd. from the UFLPA Entity List described in 2(d)(2)(B)(ii) of the Uyghur Forced Labor Prevention Act?

**Yes** (REMOVE from UFLPA Entity List): ☐

**No** (REMAIN on UFLPA Entity List): ☒

_____
Agency Official's Signature

ANA M GUEVARA
Agency Official's Name

Deputy Undersecretary, Bureau of International Bureau Affairs
Agency Official's Title

Department of Labor
Agency

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001372

UNCLASSIFIED // FOR OFFICIAL USE ONLY

**FLETF Member Agency Vote**

(U//FOUO) Does your agency approve the removal of Zhuhai Ninestar Management Co., Ltd. from the UFLPA Entity List described in 2(d)(2)(B)(ii) of the Uyghur Forced Labor Prevention Act?

Yes (REMOVE from UFLPA Entity List): ☐

No (REMAIN on UFLPA Entity List): ☑

JOSHUA KROON   Digitally signed by JOSHUA KROON
Date: 2025.06.20 07:38:33 -04'00'

Agency Official's Signature

## Joshua Kroon

Agency Official's Name

Deputy Assistant Secretary for Textiles, Consumer Goods, Materials, Minerals and Metals

Agency Official's Title

## Department of Commerce

Agency

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001373

UNCLASSIFIED // FOR OFFICIAL USE ONLY

**FLETF Member Agency Vote**

(U//FOUO) Does your agency approve the removal of Zhuhai Ninestar Management Co., Ltd. from the UFLPA Entity List described in 2(d)(2)(B)(ii) of the Uyghur Forced Labor Prevention Act?

Yes (REMOVE from UFLPA Entity List):  ☐

No (REMAIN on UFLPA Entity List):  ☑

Scott Rembrandt  Digitally signed by Scott Rembrandt
Date: 2025.06.20 13:05:55 -04'00'
_____
Agency Official's Signature

# Scott Rembrandt
_____
Agency Official's Name

Acting Principal Deputy Assistant Secretary
_____
Agency Official's Title

U.S. Department of the Treasury
_____
Agency

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001374

UNCLASSIFIED // FOR OFFICIAL USE ONLY

### FLETF Member Agency Vote

(U//FOUO) Does your agency approve the removal of Zhuhai Ninestar Management Co., Ltd. from the UFLPA Entity List described in 2(d)(2)(B)(ii) of the Uyghur Forced Labor Prevention Act?

Yes (REMOVE from UFLPA Entity List): ☐

No (REMAIN on UFLPA Entity List): ☑

_____
Agency Official's Signature

**Rachel Poynter**
_____
Agency Official's Name

Acting Director, Office to Monitor and Combat Trafficking in Persons
_____
Agency Official's Title

**Department of State**
_____
Agency

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001375

UNCLASSIFIED // FOR OFFICIAL USE ONLY

**FLETF Member Agency Vote**

(U//FOUO) Does your agency approve the removal of Zhuhai Ninestar Management Co., Ltd. from the UFLPA Entity List described in 2(d)(2)(B)(ii) of the Uyghur Forced Labor Prevention Act?

**Yes** (REMOVE from UFLPA Entity List):    ☐

**No** (REMAIN on UFLPA Entity List):    ☑

HILARY AXAM  Digitally signed by HILARY AXAM
Date: 2025.06.17 12:42:53 -04'00'
_____
Agency Official's Signature

# Hilary Axam
_____
Agency Official's Name

National Human Trafficking Coordinator,
Human Trafficking Prosecution Unit
_____
Agency Official's Title

# Department of Justice
_____
Agency

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001376

UNCLASSIFIED // FOR OFFICIAL USE ONLY

**FLETF Member Agency Vote**

(U//FOUO) Does your agency approve the removal of Zhuhai Pantum Electronics Co. Ltd. from the UFLPA Entity List described in 2(d)(2)(B)(ii) of the Uyghur Forced Labor Prevention Act?

**Yes** (REMOVE from UFLPA Entity List):     ☐

**No** (REMAIN on UFLPA Entity List):     ☑

Agency Official's Signature

CHRISTOPHER C. PRATT
Agency Official's Name

SOPDV
Agency Official's Title

DHS
Agency

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001377

UNCLASSIFIED // FOR OFFICIAL USE ONLY

## FLETF Member Agency Vote

(U//FOUO) Does your agency approve the removal of Zhuhai Pantum Electronics Co. Ltd. from the UFLPA Entity List described in 2(d)(2)(B)(ii) of the Uyghur Forced Labor Prevention Act?

Yes (REMOVE from UFLPA Entity List):    ☐

No (REMAIN on UFLPA Entity List):    ☑

BRENNA
DOUGAN

Digitally signed by BRENNA
DOUGAN
Date: 2025.06.20 09:50:49 -04'00'

Agency Official's Signature

## Brenna Dougan

Agency Official's Name

Deputy Assistant USTR for Labor Affairs

Agency Official's Title

United States Trade Representative

Agency

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001378

UNCLASSIFIED // FOR OFFICIAL USE ONLY

**FLETF Member Agency Vote**

(U//FOUO) Does your agency approve the removal of Zhuhai Pantum Electronics Co. Ltd. from the UFLPA Entity List described in 2(d)(2)(B)(ii) of the Uyghur Forced Labor Prevention Act?

**Yes** (REMOVE from UFLPA Entity List): ☐

**No** (REMAIN on UFLPA Entity List): ☒

_Ana M. Guevara_
Agency Official's Signature

ANA M. GUEVARA
Agency Official's Name

Deputy Undersecretary, Bureau of International Labor Affairs
Agency Official's Title

Department of Labor
Agency

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001379

UNCLASSIFIED // FOR OFFICIAL USE ONLY

**FLETF Member Agency Vote**

(U//FOUO) Does your agency approve the removal of Zhuhai Pantum Electronics Co. Ltd. from the UFLPA Entity List described in 2(d)(2)(B)(ii) of the Uyghur Forced Labor Prevention Act?

**Yes** (REMOVE from UFLPA Entity List):     ☐

**No** (REMAIN on UFLPA Entity List):     ☑

JOSHUA KROON    Digitally signed by JOSHUA KROON
Date: 2025.06.20 07:34:43 -04'00'

Agency Official's Signature

## Joshua Kroon

Agency Official's Name

Deputy Assistant Secretary for Textiles, Consumer Goods, Materials, Minerals and Metals

Agency Official's Title

## Department of Commerce

Agency

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001380

UNCLASSIFIED // FOR OFFICIAL USE ONLY

**FLETF Member Agency Vote**

(U//FOUO) Does your agency approve the removal of Zhuhai Pantum Electronics Co. Ltd. from the UFLPA Entity List described in 2(d)(2)(B)(ii) of the Uyghur Forced Labor Prevention Act?

**Yes** (REMOVE from UFLPA Entity List): ☐

**No** (REMAIN on UFLPA Entity List): ☑

Scott Rembrandt
Digitally signed by Scott Rembrandt
Date: 2025.06.20 13:07:57 -04'00'

Agency Official's Signature

# Scott Rembrandt

Agency Official's Name

Acting Principal Deputy Assistant Secretary

Agency Official's Title

U.S. Department of the Treasury

Agency

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001381

UNCLASSIFIED // FOR OFFICIAL USE ONLY

**FLETF Member Agency Vote**

(U//FOUO) Does your agency approve the removal of Zhuhai Pantum Electronics Co. Ltd. from the UFLPA Entity List described in 2(d)(2)(B)(ii) of the Uyghur Forced Labor Prevention Act?

**Yes** (REMOVE from UFLPA Entity List):  ☐

**No** (REMAIN on UFLPA Entity List):  ☑

Agency Official's Signature

## Rachel Poynter

Agency Official's Name

Acting Director, Office to Monitor and Combat Trafficking in Persons

Agency Official's Title

## Department of State

Agency

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001382

UNCLASSIFIED // FOR OFFICIAL USE ONLY

**FLETF Member Agency Vote**

(U//FOUO) Does your agency approve the removal of Zhuhai Pantum Electronics Co. Ltd. from the UFLPA Entity List described in 2(d)(2)(B)(ii) of the Uyghur Forced Labor Prevention Act?

Yes (REMOVE from UFLPA Entity List):    ☐

No (REMAIN on UFLPA Entity List):    ☑

HILARY AXAM    Digitally signed by HILARY AXAM
Date: 2025.06.17 12:43:35 -04'00'
_____
Agency Official's Signature

## Hilary Axam
_____
Agency Official's Name

National Human Trafficking Coordinator,
Human Trafficking Prosecution Unit
_____
Agency Official's Title

## Department of Justice
_____
Agency

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001383

UNCLASSIFIED // FOR OFFICIAL USE ONLY

## FLETF Member Agency Vote

(U//FOUO) Does your agency approve the removal of Zhuhai Seine Printing Technology Co., Ltd. from the UFLPA Entity List described in 2(d)(2)(B)(ii) of the Uyghur Forced Labor Prevention Act?

Yes (REMOVE from UFLPA Entity List):  ☐

No (REMAIN on UFLPA Entity List):  ☑

Agency Official's Signature

CHRISTOPHER L. PRATT
Agency Official's Name

S o p o v s
Agency Official's Title

DHS
Agency

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001384

UNCLASSIFIED // FOR OFFICIAL USE ONLY

**FLETF Member Agency Vote**

(U//FOUO) Does your agency approve the removal of Zhuhai Seine Printing Technology Co., Ltd. from the UFLPA Entity List described in 2(d)(2)(B)(ii) of the Uyghur Forced Labor Prevention Act?

**Yes** (REMOVE from UFLPA Entity List):  ☐

**No** (REMAIN on UFLPA Entity List):  ☑

| BRENNA DOUGAN | Digitally signed by BRENNA DOUGAN Date: 2025.06.20 09:51:10 -04'00' |
|---|---|

Agency Official's Signature

# Brenna Dougan

Agency Official's Name

Deputy Assistant USTR for Labor Affairs

Agency Official's Title

United States Trade Representative

Agency

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001385

UNCLASSIFIED // FOR OFFICIAL USE ONLY

**FLETF Member Agency Vote**

(U//FOUO) Does your agency approve the removal of Zhuhai Seine Printing Technology Co., Ltd. from the UFLPA Entity List described in 2(d)(2)(B)(ii) of the Uyghur Forced Labor Prevention Act?

Yes (REMOVE from UFLPA Entity List):  ☐

No (REMAIN on UFLPA Entity List):  ☒

_Ana M. Guevara_
Agency Official's Signature

_ANA M GUEVARA_
Agency Official's Name

_Deputy Undersecretary, Bureau of International Bureau Affairs_
Agency Official's Title

_Department of Labor_
Agency

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001386

UNCLASSIFIED // FOR OFFICIAL USE ONLY

## FLETF Member Agency Vote

(U//FOUO) Does your agency approve the removal of Zhuhai Seine Printing Technology Co., Ltd. from the UFLPA Entity List described in 2(d)(2)(B)(ii) of the Uyghur Forced Labor Prevention Act?

Yes (REMOVE from UFLPA Entity List):    ☐

No (REMAIN on UFLPA Entity List):    ☑

JOSHUA KROON    Digitally signed by JOSHUA KROON
Date: 2025.06.20 07:37:36 -04'00'

Agency Official's Signature

# Joshua Kroon

Agency Official's Name

Deputy Assistant Secretary for Textiles, Consumer Goods, Materials, Minerals and Metals

Agency Official's Title

# Department of Commerce

Agency

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001387

UNCLASSIFIED // FOR OFFICIAL USE ONLY

## FLETF Member Agency Vote

(U//FOUO) Does your agency approve the removal of Zhuhai Seine Printing Technology Co., Ltd. from the UFLPA Entity List described in 2(d)(2)(B)(ii) of the Uyghur Forced Labor Prevention Act?

Yes (REMOVE from UFLPA Entity List):     ☐

No (REMAIN on UFLPA Entity List):     ☑

Scott Rembrandt    Digitally signed by Scott Rembrandt
Date: 2025.06.20 13:08:32 -04'00'

Agency Official's Signature

# Scott Rembrandt

Agency Official's Name

Acting Principal Deputy Assistant Secretary

Agency Official's Title

U.S. Department of the Treasury

Agency

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001388

UNCLASSIFIED // FOR OFFICIAL USE ONLY

**FLETF Member Agency Vote**

(U//FOUO) Does your agency approve the removal of Zhuhai Seine Printing Technology Co., Ltd. from the UFLPA Entity List described in 2(d)(2)(B)(ii) of the Uyghur Forced Labor Prevention Act?

Yes (REMOVE from UFLPA Entity List): ☐

No (REMAIN on UFLPA Entity List): ☑

Agency Official's Signature

**Rachel Poynter**

Agency Official's Name

Acting Director, Office to Monitor and Combat Trafficking in Persons

Agency Official's Title

**Department of State**

Agency

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001389

UNCLASSIFIED // FOR OFFICIAL USE ONLY

**FLETF Member Agency Vote**

(U//FOUO) Does your agency approve the removal of Zhuhai Seine Printing Technology Co., Ltd. from the UFLPA Entity List described in 2(d)(2)(B)(ii) of the Uyghur Forced Labor Prevention Act?

**Yes** (REMOVE from UFLPA Entity List):   ☐

**No** (REMAIN on UFLPA Entity List):   ☑

HILARY AXAM   Digitally signed by HILARY AXAM
Date: 2025.06.17 12:44:21 -04'00'

Agency Official's Signature

## Hilary Axam

Agency Official's Name

National Human Trafficking Coordinator, Human Trafficking Prosecution Unit

Agency Official's Title

## Department of Justice

Agency

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001390

UNCLASSIFIED // FOR OFFICIAL USE ONLY // DELIBERATIVE // PREDECISIONAL

June 11, 2025

## MEMORANDUM FOR FORCED LABOR ENFORCEMENT TASK FORCE
## PAPER VOTE ON REMOVAL REQUEST RR24-001

**Purpose:** (U//FOUO) Forced Labor Enforcement Task Force (FLETF) Member Agencies are requested to vote on the request for removal of Ninestar Corporation and its Zhuhai-based subsidiaries (Ninestar)[1] from the Uyghur Forced Labor Prevention Act (UFLPA) Entity List.

**Standard:** (U//FOUO) In determining whether to grant Ninestar's removal request, FLETF member agencies should consider if there is no longer reasonable cause to believe that Ninestar meets the criteria described in Section 2(d)(2)(B)(ii) of the UFLPA.

**Background:** (U//FOUO) On June 12, 2023, the FLETF added Ninestar Corporation and its Zhuhai-based subsidiaries (hereafter referred to as "Ninestar") to the UFLPA Entity List pursuant to Section 2(d)(2)(B)(ii).[2]  Section 2(d)(2)(B)(ii) of the UFLPA requires that the FLETF compile a list of entities that work with the government of the Xinjiang Uyghur Autonomous Region (XUAR) to recruit, transport, transfer, harbor or receive forced labor or Uyghurs, Kazakhs, Kyrgyz, or members of other persecuted groups out of the XUAR.

(U//FOUO) In a Federal Register Notice published on August 4, 2022, the FLETF described the process for entities to request removal from the UFLPA Entity List: "[a]ny listed entity may submit a request for removal (removal request) from the UFLPA Entity List along with supporting information to the FLETF Chair at FLETF.UFLPA.EntityList@hq.dhs.gov.  In the removal request, the entity (or its designated representative) should provide information that demonstrates that the entity no longer meets or does not meet the criteria described in the applicable clause ((i), (ii), (iv), or (v)) of section 2(d)[(2)](B) of the UFLPA."[3]

(U//FOUO) On July 18, 2024, Ninestar submitted Removal Request RR24-001 (RR24-001) to the FLETF Chair.[4]  On July 19, 2024, the FLETF Chair referred RR24-001 to the FLETF.  The

---

[1] In this memo "Ninestar" refers to Ninestar Corporation and its Zhuhai-based subsidiaries, which include Zhuhai Ninestar Information Technology Co. Ltd., Zhuhai Pantum Electronics Co. Ltd., Zhuhai Apex Microelectronics Co., Ltd., Geehy Semiconductor Co., Ltd., Zhuhai G&G Digital Technology Co., Ltd., Zhuhai Seine Printing Technology Co., Ltd. and Zhuhai Ninestar Management Co., Ltd.

Ninestar states that "[t]he FLETF mistakenly identified Zhuhai Pu-Tech Industrial Co., Ltd. as one of Ninestar Corporation's 'Zhuhai-based subsidiaries.' … Zhuhai Pu-Tech Industrial Co., Ltd. is not affiliated with Ninestar, so its continued inclusion on the UFLPA Entity List provides no basis for the embargo of Ninestar goods." Attachment A, p. 1, note 1.  The FLETF will therefore not consider the removal of Zhuhai Pu-Tech Industrial Co., Ltd. as part of Ninestar's removal request.  The FLETF will separately evaluate Zhuhai Pu-Tech Industrial Co., Ltd.'s inclusion under Section 2(d)(2)(B)(ii) of the UFLPA in a later action.

[2] 88 Fed. Reg. 38080.

[3] 87 Fed. Reg. 47777.  The FLETF describes the removal process in each Federal Register Notice that updates the UFLPA Entity List, including the Ninestar listing. 88 Fed. Reg. 38080, 38082 (June 12, 2023).

[4] Attachment A.

UNCLASSIFIED // FOR OFFICIAL USE ONLY // DELIBERATIVE // PREDECISIONAL

UNCLASSIFIED // FOR OFFICIAL USE ONLY // DELIBERATIVE // PREDECISIONAL

FLETF reviewed RR24-001 and prepared questions for Ninestar.  The FLETF Chair sent the FLETF questions to Ninestar on September 26, 2024.[5]  The FLETF Chair received responses to FLETF questions from Ninestar on November 6, 2024.[6]

(U//FOUO) The August 4, 2022 Federal Register Notice also provides that "[l]isted entities may request a meeting with the FLETF after submitting a removal request in writing to the FLETF Chair at FLETF.UFLPA.EntityList@hq.dhs.gov.  Following its review of a removal request, the FLETF may accept the meeting request at the conclusion of the review period and, if accepted, will hold the meeting prior to voting on the entity's removal request."[7]

(U//FOUO) RR24-001 included Ninestar's request to meet with the FLETF.  On November 27, 2024, the FLETF Chair informed Ninestar that the FLETF agreed to meet with Ninestar prior to voting on the removal request.  On December 5, 2024, the FLETF Chair provided a meeting agenda and meeting protocols to Ninestar.[8]  In the protocols, the FLETF advised Ninestar that the meeting would be structured as a listening session to allow Ninestar to present or highlight information that it would like the FLETF to consider.  The protocols also provided that any new information presented by Ninestar during the meeting must be submitted to the FLETF in writing.  On December 9, 2024, Ninestar withdrew its request for a meeting with the FLETF. The FLETF sent additional questions for Ninestar on December 9, 2024.[9]  On December 11, 2024, Ninestar provided responses to the additional questions[10] and confirmed its desire to withdraw the request for a meeting with the FLETF.

(U//FOUO) The FLETF sent additional questions for Ninestar on April 18, 2025.[11]  On April 22, 2025, Ninestar provided responses to the additional questions.[12]  The FLETF sent follow-up questions for Ninestar on May 9, 2025.[13]  On May 13, 2025, Ninestar provided responses to the follow-up questions.[14]

(U//FOUO) The FLETF Chair will initiate the FLETF's vote on RR24-001 on June 17, 2025. The voting period will end on June 20, 2025 at 3pm.

---

[5] Attachment B.

[6] Attachment C.

[7] 87 Fed. Reg. 47778.

[8] Attachment D.

[9] Attachment E.

[10] Attachment F.

[11] Attachment H.

[12] Attachment I.

[13] Attachment J.

[14] Attachment K.

UNCLASSIFIED // FOR OFFICIAL USE ONLY // DELIBERATIVE // PREDECISIONAL

AR001392

UNCLASSIFIED // FOR OFFICIAL USE ONLY // DELIBERATIVE // PREDECISIONAL

(U//FOUO) The FLETF should consider information from the following documents when evaluating RR24-001 (included as Attachments).

   A.  Ninestar's Request for Removal from the UFLPA Entity list (RR24-001)
   B.  FLETF Questions to Ninestar (September 26, 2024)
   C.  Ninestar Response to FLETF Questions (November 6, 2024)
   D.  Removal Request Meeting Protocols
   E.  Additional FLETF Questions to Ninestar (December 9, 2024)
   F.  Ninestar Response to Additional FLETF Questions (December 11, 2024)
   G.  U.S. Customs and Board Protection Response to FLETF Data Call (December 20, 2024)
   H.  Additional FLETF Questions to Ninestar (April 18, 2025)
   I.  Ninestar Response to Additional FLETF Questions (April 22, 2025)
   J.  Additional FLETF Questions to Ninestar (May 9, 2025)
   K.  Ninestar Response to Additional FLETF Questions (May 13, 2025).
   L.  UFLPA Entity List Package 23-002
   M.  ██████████████████████████████████
   N.  ████████████████████
   O.  █████████████
   P.  ████████
   Q.  The Independent Article
   R.  Reuters Article
   S.  ████ Declaration
   T.  ██████

Discussion:

1.     The FLETF's addition of Ninestar to Section 2(d)(2)(B)(ii) of the UFLPA Entity List

(U//FOUO) According to UFLPA Entity List Package 23-002: "Both the parent company [Ninestar] and its Zhuhai subsidiaries [are] reported to have worked with the government of the XUAR through a third-party agency to recruit, transport, transfer, and receive Uyghur laborers out of the XUAR to work in its manufacturing facilities in the city of Zhuhai, located in the Guangdong Province of PRC."  All sources—including information provided to U.S. Customs and Border Protection (CBP) by a confidential source, PRC government documents, Ninestar's company documents, and media reports—corroborated that Uyghur laborers working at Zhuhai Ninestar facilities were recruited, transferred, and monitored by the officials of the XUAR government.  Such information reasonably indicated that these workers from the XUAR were coerced to enter state-sponsored labor transfer programs to work "thousands of miles away from their hometowns in the XUAR."[15]



---

[15] Attachment L, pg. 2.

UNCLASSIFIED // FOR OFFICIAL USE ONLY // DELIBERATIVE // PREDECISIONAL

THIS PAGE CONTAINS CONFIDENTIAL INFORMATION

AR001393

**INFORMANT PRIVILEGE**

UNCLASSIFIED // FOR OFFICIAL USE ONLY // DELIBERATIVE // PREDECISIONAL



(U//FOUO) The above information, in addition to other supporting documents, led the FLETF to determine UFLPA Entity List Package 23-002 supported a reasonable cause to believe that Ninestar and its Zhuhai-based subsidiaries work with the XUAR government to recruit, transport, transfer, and receive Uyghur laborers out of the XUAR and therefore met the criteria of Section 2(d)(2)(B)(ii) of the UFLPA. The FLETF added Ninestar and its Zhuhai-based subsidiaries to Section 2(d)(2)(B)(ii) of the UFLPA Entity List on June 12, 2023.

2.    Ninestar's Removal Request Summary

(U//FOUO) In RR24-001, Ninestar asserts that "there is no reasonable cause to believe Ninestar meets the criteria for continued listing under Section 2(d)(2)(B)(ii) of the UFLPA."[24] "While Ninestar believes that the evidence it is providing here [in its removal request] casts doubt on the bases for the original Listing Decision, it is not asking [the] FLETF to revisit that decision in this removal request. Rather, Ninestar requests delisting on the separate and prospective ground that, regardless of whatever went before, there is no reasonable cause to believe today that Ninestar

---

[16] *Id.* at pg. 4.

[17] *Id.*

[18] *Id.* at pg. 4.

[19] *Id.*

[20] *Id.*

[21] *Id.* at pg. 6

[22] *Id.*

[23] *Id.* at pg. 5.

[24] Attachment A, pg. 1.

UNCLASSIFIED // FOR OFFICIAL USE ONLY // DELIBERATIVE // PREDECISIONAL

AR001394

**THIS PAGE CONTAINS CONFIDENTIAL INFORMATION**

UNCLASSIFIED // FOR OFFICIAL USE ONLY // DELIBERATIVE // PREDECISIONAL

meets the criteria for continued listing under Section 2(d)(2)(B)(ii) of the UFLPA."[25]  Ninestar's basis for this assertion is its claim that "Ninestar is not working with any of the same third-party dispatch agencies it worked with prior to the listing decision," and that "Ninestar currently has only one Uyghur employee."[26]

(U//FOUO) In support of its removal request, Ninestar submitted documentation including labor dispatch agency contracts and terminations, personnel records, certain labor recruitment policies, grievance mechanisms, and audits as evidence that there is no longer reason to believe that the company works with the XUAR government to recruit, transfer, or transport Uyghurs out of the XUAR.

(U//FOUO) When considering whether there remains a reasonable cause to believe that Ninestar meets the criteria for inclusion under Section(2)(d)(2)(B)(ii), the FLETF must also consider the completeness, veracity, and reliability of the information submitted by Ninestar in its removal request, and whether or not additional publicly available information has been identified in addition to the information previously identified in the initial determination.  While Ninestar states that it is not challenging the initial listing in its removal request, Ninestar's evidence and arguments must be considered in the context of the evidence for the initial listing.

### A.  Ninestar argues that it does not employ Uyghur laborers.

(U//FOUO) Ninestar claims in its removal request that "Ninestar does not currently employ any Uyghur Laborers" and that "Ninestar's employment records show that the ███████████████ ████████ were incorrect," regarding the presence of Uyghurs at Ninestar's Zhuhai facilities.[27] Ninestar claims its "historical employment data shows that Ninestar hired just two Uyghur employees from 2016 to 2024, both of whom came to the Company from Hunan Province," and that "those employees resigned in 2019."[28]  Ninestar further indicates that it "currently has only one Uyghur employee, and that employee joined the Company in 2015, was not hired through a dispatch agency, and is not a laborer."[29]  The employment data provided by Ninestar represents that this individual is from Xinjiang and was hired via online recruitment.[30]  In sum, Ninestar represents that its employment records show that it hired only one Uyghur from Xinjiang in 2015 through online recruitment, who is still with the company, and two other Uyghurs from Hunan Province, both of whom left the company in 2019.

---

[25] Attachment A, pg. 5.

[26] *Id.* at pg. 9.

[27] *Id.* at pg. 7.

[28] *Id.* at pg. 8.

[29] *Id.* at pg. 9.

[30] Attachment A, Appendix, pg. 72.

UNCLASSIFIED // FOR OFFICIAL USE ONLY // DELIBERATIVE // PREDECISIONAL

THIS PAGE CONTAINS CONFIDENTIAL INFORMATION

INFORMANT PRIVILEGE

UNCLASSIFIED // FOR OFFICIAL USE ONLY // DELIBERATIVE // PREDECISIONAL

(U//FOUO) Ninestar describes the process by which it collects employee information.  When employees begin with Ninestar, they self-report information, including ethnicity.[31]  If the employee provides a form of government identification, Ninestar will confirm the self-reported information.[32]  Ninestar does not say what happens in a situation in which the employee does not provide an official identification.

(U//FOUO) Ninestar argues its employment data indicates the confidential source's allegations regarding Uyghurs at the company are incorrect and that the confidential source's  allegations rely primarily on the fact



[33]  The confidential source did state

.[34]  Based on the information presented by Ninestar in its removal request, only one Uyghur worker from the XUAR would have worked at the company during the ▇ visit in ▇ 2022, and the subsequent ▇ visit in the ▇ of 2022.  However, the confidential source,

.

(U//FOUO) The employment information provided by Ninestar does not fully and comprehensively account for the claims made by the confidential source's allegation. There are inherent contradictions between Ninestar's represented employment data and the allegations made by the credible confidential source.  In Ninestar's telling, there is currently one Uyghur employee in management hired in 2015, and it recruited only two Uyghurs out of Hunan Province in 2016 who resigned in 2019.  Although Ninestar therefore claims it employed only one Uyghur during 2022, the confidential source indicated in its allegations, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.  Therefore, concerns exist over the reliability of Ninestar's disclosures regarding its past and present employment records and the historical presence of Uyghur workers transferred from the XUAR through government-sponsored labor programs at Ninestar's Zhuhai facilities.  Given the disparity between Ninestar's records concerning the number of Uyghur employees it had in 2022 and the allegations made by the confidential source ▇▇▇▇▇▇▇▇▇▇▇▇▇▇, these records lack sufficient credibility to

---

[31] Attachment A at App.038

[32] *Id*.

[33] Attachment A, pg. 7.

[34] Attachment L, pg. 4.

[35] *Id*.

[36] Attachment A, pg. 8.

UNCLASSIFIED // FOR OFFICIAL USE ONLY // DELIBERATIVE // PREDECISIONAL

THIS PAGE CONTAINS CONFIDENTIAL INFORMATION

UNCLASSIFIED // FOR OFFICIAL USE ONLY // DELIBERATIVE // PREDECISIONAL

demonstrate that Ninestar only employs one Uyghur at present such that removal from the UFLPA Entity List is warranted.

**B.** 



(U//FOUO)



. Therefore, the FLETF

---

[37] Attachment L, pg. 4.

[38] *Id.*

[39] Attachment A, pg. 3.

[40] *Id.*

[41] *Id.* at pg. 4.

[42] *Id.* at pg. 5.

[43] Attachment L, pg. 4.

UNCLASSIFIED // FOR OFFICIAL USE ONLY // DELIBERATIVE // PREDECISIONAL

THIS PAGE CONTAINS CONFIDENTIAL INFORMATION

AR001397

UNCLASSIFIED // FOR OFFICIAL USE ONLY // DELIBERATIVE // PREDECISIONAL

remains confident in the credibility of the information initially provided by the confidential source, and the FLETF's initial decision in adding Ninestar to the entity list.

### C. Ninestar argues that all contracts with labor dispatch agencies that could have been the basis for the listing decision have been terminated or have expired.

(U//FOUO): "Of the 35 dispatch agencies Ninestar used [from January 1, 2022 through June 3, 2024], 20 have not been used since the Listing Decision and, therefore, provide no basis for continued listing.  Another [two] agencies were not used prior to the Listing Decision at all, and, therefore, cannot have been the basis for listing in the first place.  Of the 13 agencies that Ninestar used both before and after the Listing Decision, Ninestar's contracts with 8 have expired as of the date of this request, and Ninestar terminated its contracts with the remaining [five] in late June 2024."[44]

(U//FOUO) As evidence of these claims, Ninestar submitted for the FLETF's consideration the termination agreements for the five former labor dispatch agencies.[45]  Ninestar also submitted a declaration from Yangxiong Huang, Deputy Director of Human Resources at Ninestar Corporation, stating that all labor dispatch contracts that existed prior to listing have either expired or been terminated.[46]  Ninestar states that "Ninestar is working with only one labor dispatch agency, Zhuhai Lehuo Enterprise Management Consulting Co., Ltd," which is based in Zhuhai.[47]

(U//FOUO) Independent FLETF research identified ███████████████████



---

[44] Attachment A, pg. 7.

[45] Attachment A, Appendix, pg. 11-36.

[46] Attachment A, Appendix pg. 3.

[47] Attachment C, pg. 4.

[48] ████████████████████████████████████████ *see* ██████████, pgs. 1 & 5.

[49] ████████████████████████████████████████████████████████████. *See* Attachment C, pg. 4.

[50] ██████████ p. 1.

[51] *Id.*

UNCLASSIFIED // FOR OFFICIAL USE ONLY // DELIBERATIVE // PREDECISIONAL

AR001398

**THIS PAGE CONTAINS CONFIDENTIAL INFORMATION**

UNCLASSIFIED // FOR OFFICIAL USE ONLY // DELIBERATIVE // PREDECISIONAL



[redacted] [52] The original Chinese of the name, "[redacted]," can also be translated to [redacted] [53] one of Ninestar's Zhuhai-based subsidiaries listed with Ninestar on the UFLPA Entity List. [redacted] [54] Ninestar does not list [redacted]. as a labor dispatch agency it worked with starting in January of 2022.[55] Ninestar explicitly represents in its removal request that "Ninestar's HR staff collected all labor dispatch agencies in effect from January 1, 2022 through June 3, 2024" and identified 35 dispatch agencies.[56] [redacted] indicates that Ninestar was working with a labor dispatch agency during the indicated period that it did not disclose to the FLETF. This raises questions about the completeness, and therefore the potential veracity and reliability, of Ninestar's representations to the FLETF about its labor suppliers and leaves reasons to doubt the information provided by Ninestar regarding the company's relationship to firms with which it worked when the FLETF added Ninestar to Section (2)(d)(2)(B)(ii), which is a key argument represented by Ninestar as to why there is no longer reasonable cause to believe the company meets the criteria under Section (2)(d)(2)(B)(ii).

### D. Ninestar claims it adopted measures tailored to the labor dispatch agencies it terminated agreements with.

(U//FOUO) In response to questions from the FLETF, Ninestar describes three measures it has adopted to ensure that their newly contracted labor dispatch agencies are not related in any way to the ones with which Ninestar terminated agreements.[57] "First, Ninestar has requested that all newly contracted labor dispatch agencies not cooperate with labor dispatch agencies terminated by Ninestar or affiliates of any such agencies. Second, Ninestar staff verify that there is no equity, shareholder, or leadership relationship between a newly contracted labor dispatch agency and any labor dispatch agencies terminated by Ninestar or affiliates of any such agencies. Third, Ninestar requires all newly contracted labor dispatch agencies to disclose to Ninestar their direct suppliers, if any, so that Ninestar can verify through publicly available information whether those suppliers have any affiliation with any labor dispatch agencies terminated by Ninestar or affiliates of any such agencies. If, during this process, Ninestar learns that a labor dispatch agency is related to ones with which Ninestar terminated cooperation, Ninestar will not work

---

[52] *Id.*

[53] This translation was verified by FLETF analysts.

[54] [redacted] pgs. 2-4.

[55] Attachment A, Appendix, pgs. 6-10.

[56] Attachment A, pgs. 6-7

[57] Attachment C, pgs. 4-5.

UNCLASSIFIED // FOR OFFICIAL USE ONLY // DELIBERATIVE // PREDECISIONAL

THIS PAGE CONTAINS CONFIDENTIAL INFORMATION

UNCLASSIFIED // FOR OFFICIAL USE ONLY // DELIBERATIVE // PREDECISIONAL

with that agency."[58]  Ninestar additionally submitted with its materials a recruitment Management Process and Recruitment Manual.[59]  These materials generally outline the processes and requirements for the recruitment of personnel.   Ninestar further indicated that the company had "established a reasonable suggestions office and an anonymous grievance channel, providing employees with diverse democratic communication platforms to ensure their right to information, participation, and supervision in corporate management."[60]

(U//FOUO) Aside from these measures, however, Ninestar does not represent to the FLETF that it has adopted specific corporate policies such as compliance or risk management policies to ensure that it does not work with the XUAR to recruit Uyghurs or other members of persecuted groups out of the XUAR through other labor dispatch agencies or other recruitment means.  Nor does Ninestar provide evidence that outside of the terminated agreements that it will conduct due diligence or risk assessment to ensure that new contractors will not work with the XUAR to recruit Uyghur workers or other members of persecuted groups out of the XUAR through state-sponsored labor transfer programs.  Ninestar itself represents that the company has recruited labor through means outside of labor dispatch agencies, including online recruitment and school-enterprise cooperation, but does not represent that its measures are also applied through all such recruitment channels.[61]  Therefore, the measures put in place by Ninestar would not address all channels through which Ninestar acquires labor, nor do they demonstrate comprehensive UFLPA compliance.  As Ninestar is attempting to represent that there is no longer a reasonable cause to believe it meets the criteria under Section (2)(d)(2)(B)(ii) by indicating it has instituted measures to ensure it does not work with those agencies or related individuals it worked with to acquire labor under the original listing decision, the narrow compliance measures fail to assure the FLETF that the information initially used in the determination to add Ninestar is no longer relevant and that there is no reasonable cause to believe that Ninestar meets the criteria under Section (2)(d)(2)(B)(ii).

(U//FOUO) Ninestar noted in its submission that "Ninestar is working with only one labor dispatch agency, Zhuhai Lehuo Enterprise Management Consulting Co., Ltd.," which is based in Zhuhai.[62]  In Ninestar's May 13 responses to FLETF questions, Ninestar states again, "Ninestar has only one current labor supplier: Zhuhai Lehuo Enterprise Management Consulting Co., Ltd., which is located at Room A308, 3rd Floor, No. 107 Building 7, Baishi Road, Xiangzhou District, Zhuhai City, Guangdong Province, PRC."[63]  Ninestar did not provide the official Chinese language name of the company even though Ninestar disclosed the Chinese names of the 35 other labor suppliers it claims to have worked with.  Based on the English name and address

---

[58] *Id.*

[59] Attachment C, Appendix, pgs. 2-92.

[60] Attachment A, Appendix, pg. 344.

[61] Attachment A, Appendix, pgs. 49-72.

[62] Attachment C, pg. 4.

[63] Attachment K, pg. 1.

UNCLASSIFIED // FOR OFFICIAL USE ONLY // DELIBERATIVE // PREDECISIONAL

UNCLASSIFIED // FOR OFFICIAL USE ONLY // DELIBERATIVE // PREDECISIONAL

provided by Ninestar, the FLETF identified

████████ [64] A Chinese Language analyst confirmed ████████████████████" could also be translated as

█████ [5] which is consistent with the address Ninestar provided for Zhuhai Lehuo Enterprise Management Consulting Co., Ltd. Therefore, ████████████ ████████████ is likely the same company as Zhuhai Lehuo Enterprise Management Consulting Co., Ltd. ████████████████████████

████████ June 2024 is the same time Ninestar states that it terminated the agreements with the remaining five labor dispatch agencies whose agreements had not yet expired.[67] Ninestar represents in its argument that by cancelling its labor contracts with dispatch agencies it used during the period in which it was added under Section (2)(d)(2)(B)(ii) it no longer meets the criteria for inclusion. However, Ninestar only provided the English name and address of the new labor dispatch agency for the FLETF to consider in determining if the entity no longer meets the criteria described in Section (2)(d)(2)(B)(ii). The limited information provided by Ninestar in its disclosure to the FLETF and responses to questions about what Ninestar claims is its singular labor dispatch agency, including the omittance of the official Chinese name in its materials where Ninestar provided the Chinese name for all previous labor dispatch agencies, does bring into question the completeness of the information provided to the FLETF about Ninestar's current labor practices.

(U//FOUO) ████████████████████████ ████████████████████████████ ████████████████████████ ████████ Ninestar did not disclose a prior connection to Zhuhai Lehuo Enterprise Management Consulting Co., Ltd. or any of its representatives, ████████████ ████████████████████████████ ████████████████████

---

[64] ████████ pg. 1.

[65] *Id.*

[66] *Id.* at pg. 1.

[67] Attachment A, Appendix, pg. 3.

[68] ████████ pg. 2.

[69] ████████

UNCLASSIFIED // FOR OFFICIAL USE ONLY // DELIBERATIVE // PREDECISIONAL

AR001401

THIS PAGE CONTAINS CONFIDENTIAL INFORMATION

UNCLASSIFIED // FOR OFFICIAL USE ONLY // DELIBERATIVE // PREDECISIONAL



. Ninestar's failure to disclose a potential connection ████████████████████████ prior to its listing decision bring into question the completeness and reliability of the information submitted by Ninestar regarding its new labor dispatch contract.

(U//FOUO) Therefore, independent research by the FLETF ████████████████████████████████████████████████, provides evidence that the information Ninestar provided to the FLETF regarding its labor channels may be incomplete. This is particularly concerning considering Ninestar has represented to the FLETF that it would verify that there is no equity, shareholder, or leadership relationship between a newly contracted labor dispatch agency and any labor dispatch agencies terminated by Ninestar or affiliates of any such agencies. Additionally, Ninestar indicates in the delisting petition appendix that it participates in external recruitment through "school-enterprise cooperation."[72] However, Ninestar does not specifically mention ████████████████ ████████ in its materials. While the materials initially submitted by Ninestar included details regarding specific labor dispatch agencies, that same level of detail was not provided by Ninestar with regard to each method in which Ninestar acquires labor. The additional information the FLETF identified therefore calls into question the completeness or accuracy of Ninestar's assertions to the FLETF regarding its labor recruitment methods. As discussed in greater detail in Section 4, the FLETF is at an informational deficit with respect to information coming out of the PRC. Because of this, it is incredibly important that submissions made by Ninestar are complete and accurate.

(U//FOUO) Given it is evident that Ninestar recruits labor through means other than labor dispatch agencies, and Ninestar does not represent to the FLETF that it has adopted broader corporate policies such as compliance or risk management policies to ensure that it does not work with the XUAR to recruit Uyghurs or other members of persecuted groups out of the XUAR through other labor dispatch agencies or other recruitment means, Ninestar's current mitigation methods fail to assure the FLETF that the information initially used in the determination to add Ninestar is no longer relevant and therefore do not support Ninestar's claim that there is no longer a reasonable cause to believe that the company meets the criteria under Section (2)(d)(2)(B)(ii).

---

[70] *Id.*

[71] *Id.* at pg. 2.

[72] Attachment C, Appendix, pg. 350.

UNCLASSIFIED // FOR OFFICIAL USE ONLY // DELIBERATIVE // PREDECISIONAL

THIS PAGE CONTAINS CONFIDENTIAL INFORMATION

AR001402

UNCLASSIFIED // FOR OFFICIAL USE ONLY // DELIBERATIVE // PREDECISIONAL

E. **Ninestar states it is unable to lawfully tell a labor agency not to recruit candidates from a particular region, country, or ethnic group.**

(U//FOUO) In response to the question from the FLETF: "What due diligence does Ninestar conduct to ensure that newly contracted labor dispatch companies do not recruit workers through state-sponsored labor transfer programs in the [XUAR]?" Ninestar stated it must follow the PRC Labor Law, which prohibits discrimination based on nationality, race, gender, religious beliefs, or place of origin. Ninestar drew comparisons to "an American company," which Ninestar states "could not lawfully tell a temporary staffing agency not to recruit candidates from a particular region, country or ethnic group."[73] Ninestar appears to imply that they must accept Uyghur employees, even if part of an XUAR labor transfer program. By this logic, Ninestar could not prevent the recruitment of forced labor moving forward.

(U//FOUO) In response to FLETF questions, Ninestar represented to the FLETF that it is unlikely that newly recruited workers will be from the XUAR because "labor dispatch agencies typically recruit from specific geographic regions, usually locally, using a combination of in-person recruitment at job fairs and similar events and online recruitment through platforms such as WeChat or 58 Tongcheng."[74] Ninestar represents this in response to FLETF questions on whether the company conducts due diligence to ensure that newly contracted labor dispatch companies do not recruit workers through state-sponsored labor transfer programs in the XUAR. Given Ninestar asserts the only labor dispatch agency it currently employs is located in Zhuhai, the statement appears to indicate that its current dispatch agency would typically recruit locally from Zhuhai. However, this statement alone is insufficient to conclude that Ninestar does not work with the XUAR government to recruit Uyghurs out of the XUAR. The FLETF's initial determination found reasonable cause to believe that Ninestar worked with the XUAR government to recruit, transport, and transfer Uyghurs from the XUAR through such labor dispatch agencies. None of the 35 labor dispatch agencies noted as being used by Ninestar are located within the XUAR.[75] Therefore, geographic location alone is not indicative of whether Ninestar works with the XUAR government to recruit, transport, and transfer Uyghurs out of the XUAR, and accordingly, geographic location does not answer definitively whether the current labor dispatch agency Ninestar utilizes does not work with the XUAR government to recruit, transport, and transfer Uyghurs out of the XUAR to Ninestar. Ninestar also does not make any representations regarding whether it will continue to work with the XUAR government to receive such labor. Accordingly, Ninestar's statements to the FLETF allow for the possibility that Ninestar may continue to recruit Uyghurs out of the XUAR as part of a XUAR government labor or poverty alleviation program, acknowledging a lack of a comprehensive UFLPA remediation and future compliance effort.

---

[73] Attachment I, pg. 5.

[74] Attachment C, pg. 4.

[75] Attachment A, Appendix, pgs. 6-10.

UNCLASSIFIED // FOR OFFICIAL USE ONLY // DELIBERATIVE // PREDECISIONAL

**THIS PAGE CONTAINS CONFIDENTIAL INFORMATION**

UNCLASSIFIED // FOR OFFICIAL USE ONLY // DELIBERATIVE // PREDECISIONAL

**F. CBP received additional information from a confidential source.**

(U//FOUO) On December 20, 2024, CBP provided the FLETF with a memo documenting a ████████ 2024, virtual meeting with the same confidential source as provided the initial disclosure in ████ of 2022. In that meeting the confidential source ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Though the confidential source provided this conclusion, the report does not include objective evidence to support these broad claims.

(U//FOUO) The final disclosure via virtual meeting provided to CBP on ████████, 2024, does not cite evidence, sources, or a basis for means in which the confidential source drew its conclusions. Thus, it is difficult for the FLETF to assess the conclusion offered by the confidential source in the ████████, 2024, meeting. This is in contrast with the confidential source's initial disclosure, the reliability of which was strengthened by ████████, photographs, and other evidence ████████████████████ Ninestar spanning ████████████, evidence that not only bolstered the confidential source's claims but also allowed the FLETF to independently evaluate their accuracy. The verbal nature of the final disclosure provided by the confidential source precludes the FLETF from independently verifying the updated information to obtain further information concerning the changed circumstances. █████████████████ ███████████████████████████.[76]

(U//FOUO) According to the CBP memo, the confidential source told CBP ████████████ █████████████████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████████████████████ █████████████████████████████ Given the final disclosure was not supported by further evidence, the information provided by the confidential source is less reliable than the initial disclosure. Furthermore, notwithstanding the source's credibility (as supplemented with additional information) in the initial disclosure, the FLETF has additional reason to doubt the information provided in the final disclosure by the confidential source, as outlined below in the risk assessment portion of the FLETF's analysis. As discussed in greater detail below, the FLETF also has reason to believe that the reliability of the confidential source is now potentially in question given recent factual developments regarding inadvertent disclosure of the source's identity.

---

[76] *Id.*

[77] Attachment G, pg. 1.

[78] *Id.* at pgs. 1-2.

UNCLASSIFIED // FOR OFFICIAL USE ONLY // DELIBERATIVE // PREDECISIONAL

THIS PAGE CONTAINS CONFIDENTIAL INFORMATION

UNCLASSIFIED // FOR OFFICIAL USE ONLY // DELIBERATIVE // PREDECISIONAL

4.      Risk Assessment

(U//FOUO) In the consideration of Ninestar's removal request, the FLETF notes additional concerns that could impact the information presented in the evaluation of Ninestar's arguments.

(U//FOUO) It is important to note that over the past decade China has enacted laws and regulations that have made it increasingly difficult to research Chinese businesses from outside of China.

(U//FOUO) Chinese authorities have repeatedly stressed that Xinjiang is a critical "██████," [79] and many recent enforcement actions have focused on Xinjiang-related due diligence. For example, in 2023 the Beijing office of U.S. due diligence firm the Mintz Group was raided by Chinese authorities, and five employees were detained for two years before being released in late March 2025.  The Mintz Group was fined by the Chinese government $1.5m for undertaking "foreign-related statistical investigations" without seeking and obtaining necessary approvals. [80] *Reuters* reported that the employees had been engaged in conducting Xinjiang-related due diligence. [81]

(U//FOUO) This trend has impacted the FLETF's ability to verify information provided by Ninestar in practical ways.  For example, the FLETF has noticed through its own research that since the passage of the UFLPA in 2021, ████████████████████████ ███████████████████████████████████████ ████████████████████ [82]  This has made it increasingly difficult to access information on the Chinese internet that could be used to independently verify information presented by Ninestar.

(U//FOUO) Following prominent media articles, NGO, or academic reporting on companies in potential violation of the UFLPA, or listings of entities onto the UFLPA Entity List, the FLETF has noticed that publicly available information is removed or made inaccessible outside of mainland China.  Given the information environment, and the FLETF's reliance on publicly available information, the identification of new information for companies listed on the UFLPA Entity List can be extremely difficult.  Therefore, when considering whether there remains a reasonable cause to believe that Ninestar meets the criteria for inclusion under Section (2)(d)(2)(B)(ii), the FLETF must also consider the completeness, veracity, and reliability of the information submitted by Ninestar in its removal request, and whether or not additional publicly available information has been identified in addition to the information previously identified in

---

[79] *See* e.g., ███████████ .

[80] Attachment Q

[81] Attachment R

[82] *See e.g.,* ████████████████████████████████████ ████████████████████████████████████████ ███████████████████████████

UNCLASSIFIED // FOR OFFICIAL USE ONLY // DELIBERATIVE // PREDECISIONAL

AR001405

THIS PAGE CONTAINS CONFIDENTIAL INFORMATION

UNCLASSIFIED // FOR OFFICIAL USE ONLY // DELIBERATIVE // PREDECISIONAL

the initial determination. Verifying or evaluating the veracity and completeness of the information Ninestar submitted as part of its removal request is an essential element of any decision the FLETF makes to remove a party from the UFLPA Entity List.  A lack of verifiable information from reliable sources renders this evaluation challenging.  This interpretation is supported by the information provided in the FRN regarding requesting removal from the Entity List where it states: "In the removal request, the entity (or its designated representative) should provide information that demonstrates that the entity no longer meets or does not meet the criteria described in the applicable clause ((i), (ii), (iv), or (v)) of section 2(d)[(2)](B) of the UFLPA."[83]

(U//FOUO) Furthermore, the final disclosure received by CBP from the confidential source is at risk for being unreliable.  This report from the confidential source follows an inadvertent disclosure to counsel for Ninestar of information that could be reasonably used to identify the confidential source.  Upon August 2023 requests under the Freedom of Information Act (FOIA), one FLETF member agency produced emails that discussed the FLETF's use of an ▮▮▮▮ as a confidential source, which could be reasonably used to identify the confidential source when combined with other contextual information such as dates and locations, particularly if disclosed to Ninestar, on or around January 24, 2024.  On March 14, 2024, counsel for the FLETF became aware of the inadvertent disclosure.  The FLETF member agency responsible for the disclosure contacted Ninestar's counsel on March 19, 2024 and instructed Ninestar's counsel, as well as any person to whom they disseminated the FOIA production, to immediately destroy all copies of such production. Following this initial disclosure, on or around April 23, 2024, a second inadvertent disclosure of information that could reasonably be used to identify the confidential source was disclosed by a second FLETF member agency pursuant to the original August 2023 FOIA request.  Following this disclosure, the FLETF member agency responsible for the second disclosure contacted Ninestar's counsel on or around April 25, 2024, instructing them and any person to whom the FOIA production was disseminated to immediately destroy all copies of such production.  On July 10, 2024, the Court ordered Ninestar's counsel, and any person to whom Ninestar's counsel has disseminated the disclosures, to immediately destroy all physical and electronic copies of the productions. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

(U//FOUO) There is a potential risk that testimony from the confidential source may have been impacted by this disclosure.

5.    Summary of Analysis

(U//FOUO) Following a significant period of review, questions remain regarding  the completeness, veracity, and reliability of the information submitted by Ninestar to support its claim that there is no longer a reasonable cause to believe Ninestar is working with the XUAR government to recruit, transport, transfer, harbor, or receive forced labor or Uyghurs, Kazakhs, Kyrgyz, or members of other persecuted groups out of the XUAR.  Ninestar's statements

---

[83] 87 Fed. Reg. 47777.  The FLETF describes the removal process in each Federal Register Notice that updates the UFLPA Entity List, including the Ninestar listing. 88 Fed. Reg. 38080, 38082 (June 12, 2023).

UNCLASSIFIED // FOR OFFICIAL USE ONLY // DELIBERATIVE // PREDECISIONAL

THIS PAGE CONTAINS CONFIDENTIAL INFORMATION

UNCLASSIFIED // FOR OFFICIAL USE ONLY // DELIBERATIVE // PREDECISIONAL

contradict and do not fully overcome the information provided by a confidential source indicating that the company has worked with the government of the XUAR to recruit, transport, and transfer Uyghurs out of the XUAR. Therefore, Ninestar's arguments do not conclusively indicate that the information put forward in the initial listing determination is no longer accurate. Ninestar further fails to assert that it would not accept Uyghur laborers from the XUAR transferred through labor dispatch agencies via government sponsored labor transfers. Additional information identified by the FLETF also indicates the record submitted by Ninestar regarding its cooperation with labor dispatch agencies and the recruitment of labor to be incomplete, and in some instances, unreliable. In weighing the persuasiveness and credibility of Ninestar's arguments, information as outlined in its removal request, and answers to the FLETF's follow-up questions, against the information that originally supported Ninestar's designation and additional information identified in an attempt to verify Ninestar's claims, the arguments and evidence presented by Ninestar in its removal request do not outweigh the evidence relied on by the FLETF in its initial determination that there exists a reasonable cause to believe that the company works with the XUAR government to recruit, transport, transfer, and receive Uyghur laborers out of the XUAR.

**Action Requested**: (U//FOUO) Signature of official with authority or delegated authority to make FLETF decisions on behalf of your department/agency documenting your department/agency's vote on the removal of the entity identified in RR24-001 to the UFLPA Entity List.

**Attachments**: (U//FOUO)

A. Ninestar's Request for Removal from the UFLPA Entity list (RR24-001)
B. FLETF Questions to Ninestar (September 26, 2024)
C. Ninestar Response to FLETF Questions (November 6, 2024)
D. Removal Request Meeting Protocols
E. Additional FLETF Questions to Ninestar (December 9, 2024)
F. Ninestar Response to Additional FLETF Questions (December 11, 2024)
G. U.S. Customs and Board Protection Response to FLETF Data Call (December 20, 2024)
H. Additional FLETF Questions to Ninestar (April 18, 2025)
I. Ninestar Response to Additional FLETF Questions (April 22, 2025)
J. Additional FLETF Questions to Ninestar (May 9, 2025)
K. Ninestar Response to Additional FLETF Questions (May 13, 2025).
L. UFLPA Entity List Package 23-002
M. ███████████████████████████████
N. ███████████████████
O. ████████████████
P. ████████████
Q. The Independent Article
R. Reuters Article
S. ████████ Declaration
T. ██████████

**THIS PAGE CONTAINS CONFIDENTIAL INFORMATION**

UNCLASSIFIED // FOR OFFICIAL USE ONLY // DELIBERATIVE // PREDECISIONAL

UNCLASSIFIED // FOR OFFICIAL USE ONLY



U.S. Department of Homeland Security
Washington, DC 20528

## Homeland Security

May 24, 2023

MEMORANDUM FOR THE FORCED LABOR ENFORCEMENT TASK FORCE
MEMBER AGENCIES

FROM:       Robert Silvers
            Under Secretary for Strategy, Policy, and Plans
            Forced Labor Enforcement Task Force Chair

SUBJECT:    **Forced Labor Enforcement Task Force Addition of Ninestar
            Corporation and its Eight Zhuhai-Based Subsidiaries to the Uyghur
            Forced Labor Prevention Act Entity List**

(U//FOUO) On March 3, 2023, the U.S. Department of Homeland Security submitted Uyghur Forced Labor Prevention Act (UFLPA) Entity List Package 23-002 (Package 23-002) to the Forced Labor Enforcement Task Force (FLETF).  Package 23-002 proposed adding Ninestar Corporation and its eight Zhuhai-based subsidiaries to include Zhuhai Ninestar Information Technology Co. Ltd., Zhuhai Pantum Electronics Co. Ltd., Zhuhai Apex Microelectronics Co., Ltd., Geehy Semiconductor Co., Ltd., Zhuhai Pu-Tech Industrial Co., Ltd., Zhuhai G&G Digital Technology Co., Ltd., Zhuhai Seine Printing Technology Co., Ltd., and Zhuhai Ninestar Management Co., Ltd. (collectively "Ninestar") to the Entity List described in Section 2(d)(2)(B)(ii) of the UFLPA; i.e., "a list of entities working with the government of the Xinjiang Uyghur Autonomous Region to recruit, transport, transfer, harbor or receive forced labor or Uyghurs, Kazakhs, Kyrgyz, or members of other persecuted groups out of the Xinjiang Uyghur Autonomous Region."

(U//FOUO) Package 23-002 explains that Ninestar, headquartered in Zhuhai, Guangdong Province, is one of the top 500 listed companies in the People's Republic of China (PRC) and is one of the four largest laser printer manufacturers in the world.  Ninestar's products include laser printers, general printing consumables, and integrated circuit chips, some of which are imported into the United States.

(U//FOUO) The information in Package 23-002 demonstrates that Ninestar has worked with the government of the Xinjiang Uyghur Autonomous Region through a third-party agency to recruit, transport, transfer, and receive Uyghur laborers out of the Xinjiang Uyghur Autonomous Region to work in its manufacturing facilities in t███████████████████████████████████vince. Package 23-002 references an allegation ██████████████████████████████ PRC government documents, Ninestar's comp███████████████████████te that Ninestar is participating in the PRC government's "poverty alleviation" programs transferring laborers from "remote and underdeveloped areas" to its facilities.  This information reasonably indicates that these workers from the Xinjiang Uyghur Autonomous Region were coerced to enter state-sponsored labor transfer programs and are unable to leave voluntarily once they begin working in the facilities, which are thousands of miles away from their hometowns in the Xinjiang Uyghur Autonomous Region.

**THIS PAGE CONTAINS CONFIDENTIAL INFORMATION**

AR001408

AR000001

FOR OFFICIAL USE ONLY

(U//FOUO) After DHS submitted Package 23-002 to the FLETF on March 3, 2023, FLETF Member Agencies had the opportunity to review the information, submit questions to DHS, provide any relevant information in their control regarding Package 23-002, and prepare to vote on the disposition of Package 23-002. Following review and consideration of the information provided by DHS in Package 23-002, FLETF Member Agencies found that there was reasonable cause to believe, based on specific and articulable information, that Ninestar works with the government of the Xinjiang Uyghur Autonomous Region to recruit, transport, transfer, harbor, or receive Uyghurs, Kazakhs, Kyrgyz, or members of other persecuted groups out of the Xinjiang Uyghur Autonomous Region.

(U//FOUO) Accordingly, on May 15, 2023, FLETF Member Agencies voted unanimously to add Ninestar Corporation to the Entity List described in Section 2(d)(2)(B)(ii) of the UFLPA. Six of the FLETF Member agencies voted to add the eight Zhuhai-based subsidiaries of Ninestar Corporation, which include Zhuhai Ninestar Information Technology Co. Ltd., Zhuhai Pantum Electronics Co. Ltd., Zhuhai Apex Microelectronics Co., Ltd., Geehy Semiconductor Co., Ltd., Zhuhai Pu-Tech Industrial Co., Ltd., Zhuhai G&G Digital Technology Co., Ltd., Zhuhai Seine Printing Technology Co., Ltd., and Zhuhai Ninestar Management Co., Ltd. to this same list and one FLETF Member Agency abstained as the vote pertained to the eight Zhuhai-based subsidiaries:

1. U.S. Department of Homeland Security (Chair) - **Yes**
2. The Office of the United States Trade Representative - **Yes**
3. U.S. Department of Labor - **Yes**
4. U.S. Department of Commerce - **Yes**
5. U.S. Department of the Treasury - **Yes**
6. U.S. Department of State - **Yes**
7. U.S. Department of Justice - **\*Yes to add Ninestar Corporation. Abstention on adding its eight Zhuhai-based subsidiaries.**

Attachment:
1. (U//FOUO) UFLPA Entity List Package 23-002 (Ninestar Corporation and its Eight Zhuhai-Based Subsidiaries)

AR001409

AR000002

UNCLASSIFIED // FOR OFFICIAL USE ONLY

**UYGHUR FORCED LABOR PREVENTION ACT (UFLPA) ENTITY LIST
PACKAGE 23-002**

**ACTION**

1. **Name of Submitting FLETF Agency:**

   U.S. Department of Homeland Security (DHS)

2. **FLETF Agency Point of Contact:**

   Bridget McGovern
   Acting Assistant Secretary
   Trade and Economic Security, Office of Strategy, Policy, and Plans
   U.S. Department of Homeland Security

3. **Action (select one):**

   ☒ Addition to List          ☐ Removal from List          ☐ Technical Correction

4. **Entity Identifying Information:**

   Ninestar Corporation and its eight Zhuhai-based subsidiaries. In this package, "Ninestar"
   refers to Ninestar Corporation and its eight Zhuhai-based subsidiaries, which include Zhuhai
   Ninestar Information Technology Co. Ltd., Zhuhai Pantum Electronics Co. Ltd., Zhuhai
   Apex Microelectronics Co., Ltd., Geehy Semiconductor Co., Ltd., Zhuhai Pu-Tech Industrial
   Co., Ltd., Zhuhai G&G Digital Technology Co., Ltd., Zhuhai Seine Printing Technology Co.,
   Ltd., and Zhuhai Ninestar Management Co., Ltd.

   Ninestar Corporation
   No. 3883 Zhuhai Avenue, Xiangzhou District
   Zhuhai, Guangdong 519075
   https://www.ninestargroup.com/

   纳思达股份有限公司
   中国广东珠海市香洲区珠海大道 3883 号
   邮编：519075

   Ninestar is one of the top 500 listed companies in the PRC and has become one of the four
   largest laser printer manufacturers in the world.  Ninestar has been listed on the Shenzhen

Page **1** of **15**

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001410

AR000003

UNCLASSIFIED // FOR OFFICIAL USE ONLY

Stock Exchange since 2014.  In 2021, there were 21,787 employees at Ninestar with an operating revenue of CNY 22.792 billon.[1]

5.  **UFLPA Entity List for Addition, Removal, or Correction (select one or more applicable list):**

☐ *Section 2(d)(2)(B)(i) – Entities in the Xinjiang Uyghur Autonomous Region that mine, produce, or manufacture wholly or in part any goods, wares, articles, and merchandise with forced labor.*

☒ *Section 2(d)(2)(B)(ii) – Entities working with the government of the Xinjiang Uyghur Autonomous Region to recruit, transport, transfer, harbor or receive forced labor or Uyghurs, Kazakhs, Kyrgyz, or members of other persecuted groups out of the Xinjiang Uyghur Autonomous Region.*

☐ *Section 2(d)(2)(B)(iv) – Entities that exported products mined, produced, or manufactured wholly or in part by entities on the list required by clause (i) or (ii) from the People's Republic of China into the United States.*

☐ *Section 2(d)(2)(B)(v) – Facilities or entities, including the Xinjiang Production and Construction Corps, that source material from the Xinjiang Uyghur Autonomous Region or from persons working with the government of the Xinjiang Uyghur Autonomous Region or the Xinjiang Production and Construction Corps for purposes of the "poverty alleviation" program or the "pairing-assistance" program or any other government labor scheme that uses forced labor.*

6.  **Scope:**

Ninestar Corporation 纳思达股份有限公司 (Ninestar), both the parent company and its Zhuhai subsidiaries, is reported to have worked with the government of the Xinjiang Uyghur Autonomous Region (XUAR) through a third-party agency to recruit, transport, transfer, and receive Uyghur laborers out of the XUAR to work in its manufacturing facilities in the city of Zhuhai, located in the Guangdong Province of PRC.  All sources – including an allegation filed ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ PRC government documents, Ninestar's company documents, and media reports – corroborate that Uyghur laborers working at Zhuhai Ninestar facilities were recruited, transferred, and are presently still monitored by the officials of the XUAR government.  Such information reasonably indicates that these workers from the XUAR were coerced to enter state-sponsored labor transfer programs and are unable to leave voluntarily once they begin working in the facilities, which are thousands of miles away from their

---

[1] Ninestar. (2021). 2021 *Environmental, Social, and Governance Report*. Zhuhai. Retrieved from Ninestar: https://en.ninestargroup.com/investor12.html

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001411

AR000004

UNCLASSIFIED // FOR OFFICIAL USE ONLY

hometowns in the XUAR.  Ninestar products include laser printers, general printing consumables, and integrated circuit chips,[2] some of which are imported into the United States.

## 7.  Basis:

7a. Basis - general description for public release:

Ninestar Corporation 纳思达股份有限公司 (Ninestar) is reported to have worked with the government of the Xinjiang Uyghur Autonomous Region (XUAR) through a third-party agency to recruit, transport, transfer, and receive Uyghur laborers out of the XUAR to work in its manufacturing facilities in the city of Zhuhai, located in the Guangdong Province of the People's Republic of China (PRC).  Ninestar's corporate headquarters and eight subsidiaries in Zhuhai (Zhuhai Ninestar Information Technology Co. Ltd., Zhuhai Pantum Electronics Co. Ltd., Zhuhai Apex Microelectronics Co., Ltd., Geehy Semiconductor Co., Ltd., Zhuhai Pu-Tech Industrial Co., Ltd., Zhuhai G&G Digital Technology Co., Ltd., Zhuhai Seine Printing Technology Co., Ltd., and Zhuhai Ninestar Management Co., Ltd.) are all located in the city of Zhuhai, in the Guangdong Province of the PRC.

Sources – including, but not limited to, PRC government documents, Ninestar's company documents, and media reports – corroborate that Uyghur laborers working at Zhuhai Ninestar facilities were recruited, transferred, and are presently still monitored by officials of the XUAR government.  Such information provides evidence that workers from the XUAR were coerced to enter state-sponsored labor transfer programs and are unable to leave voluntarily once they begin working in the facilities, which are thousands of miles away from their hometowns in the XUAR.  Ninestar's products include laser printers, general printing consumables, and integrated circuit chips, some of which are imported into the United States.

7b. Standard

Under the UFLPA Entity List Standard Operating Procedures (SOP), entities may be added to the UFLPA Entity List described in Section 2(d)(2)(B)(ii) if "there is reasonable cause to believe, based on specific and articulable information, that . . . [they are] working with the government of [Xinjiang] to recruit, transport, transfer, harbor or receive forced labor or Uyghurs, Kazakhs, Kyrgyz, or members of other persecuted groups out of [Xinjiang]."  SOP at Sec. I(C)(2)(a).

7c. Basis

This package to add Ninestar Corporation and its subsidiaries in Zhuhai (Zhuhai Ninestar Information Technology Co. Ltd., Zhuhai Pantum  Electronics  Co. Ltd., Zhuhai Apex Microelectronics Co., Ltd., Geehy Semiconductor Co., Ltd., Zhuhai Pu-Tech Industrial Co., Ltd., Zhuhai G&G Digital Technology Co., Ltd., Zhuhai Seine Printing Technology Co., Ltd., and Zhuhai Ninestar Management Co., Ltd.) to the UFLPA Entity List is based on a reasonable belief

---

[2] Ninestar. Ninestar Products. Retrieved from Ninestar: https://en.ninestargroup.com/products.html

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001412

AR000005

INFORMANT PRIVILEGE

UNCLASSIFIED // FOR OFFICIAL USE ONLY

of Ninestar's participation in state-sponsored coercive labor transfer programs.  Credible information of Ninestar's participation comes from several sources: an allegation from a credible ███, PRC government documents, Ninestar's corporate documents, PRC state media reports, and ███████████ that document the presence of Uyghur workers at Ninestar facilities in Zhuhai that are unable to leave.  Ninestar's company documents disclose its participation in the "poverty alleviation" programs sponsored by the Guangdong provincial government.  Such information is further supported, both directly and circumstantially, by PRC government agencies and state media reports

THIS PAGE CONTAINS CONFIDENTIAL INFORMATION

AR001413

AR000006

THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION

UNCLASSIFIED // FOR OFFICIAL USE ONLY



UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001414

AR000007

INFORMANT PRIVILEGE

UNCLASSIFIED // FOR OFFICIAL USE ONLY



AR001415                    UNCLASSIFIED // FOR OFFICIAL USE ONLY

THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION  AR000008

THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION

UNCLASSIFIED // FOR OFFICIAL USE ONLY



UNCLASSIFIED // FOR OFFICIAL USE ONLY

INFORMANT PRIVILEGE

UNCLASSIFIED // FOR OFFICIAL USE ONLY



UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001417

THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION AR000010

UNCLASSIFIED // FOR OFFICIAL USE ONLY



UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001418 THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION  AR000011

THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION

UNCLASSIFIED // FOR OFFICIAL USE ONLY



UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001419

AR000012

THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION

UNCLASSIFIED // FOR OFFICIAL USE ONLY



AR001420

AR000013



AR001421

AR000014

THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION

UNCLASSIFIED // FOR OFFICIAL USE ONLY



UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR000015

THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION

UNCLASSIFIED // FOR OFFICIAL USE ONLY



UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001423

AR000016



UNCLASSIFIED // FOR OFFICIAL USE ONLY

UNCLASSIFIED // FOR OFFICIAL USE ONLY

AR001424

AR000017

# ATTACHMENT A

AR001425

AR000018

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001426

# ATTACHMENT B

**AR001427**

AR000020

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001428

AR000021

# ATTACHMENT C

**AR001429**

AR000022

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR000023



AR001431

AR000024

AR001432

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION     AR000025



AR0



AR001434

AR000027

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001435

AR000028



AR001436

AR000029

THIS PAGE CONTAINS CONFIDENTIAL BUSINESS INFORMATION



AR001437

AR000030

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001438

AR000031



AR001439

AR000032



AR001440



AR001441

AR000034



AR000035



AR001443

AR000036



AR001444

AR000037

A



**AR001445**

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001446

AR000039

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001447

AR000040



AR001448

AR000041



AR001449

AR000042



AR001450

AR000043



AR001451

AR000044

**THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION**



AR000045

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001453

AR000046



AR001454

AR000047



AR001455

AR000048



AR001456

AR000049



AR001457

AR000050

AR001458
THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION AR000051



AR001459
THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR000052

AR001460
THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION AR000053

AR001461
THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION    AR000054

AR001462

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION    AR000055



AR001463



AR001464

AR000057



AR001465

AR000058



AR001466

AR000059

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001467

AR000060



AR001468

AR000061



AR001469

AR000062

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001470

AR000063



AR001471

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR000064



AR001472

AR000065

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001473



AR001474



AR001475



AR001476

AR000069

THIS PAGE DOES NOT CONTAIN ORIGINAL INFORMATION



AR001477

AR000070



AR001478

AR000071



AR001479

AR000072

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001480



AR001481

AR000074



AR001482

AR000075

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001483

AR000076

**THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION**



**AR001484**

AR000077

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001485

AR000078

# ATTACHMENT D

AR001486

AR000079

THIS PAGE CONTAINS THAR CONFIDENTIAL INFORMATION



AR001487

AR000080

# ATTACHMENT E

AR001488

AR000081



**THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION**

AR001489

AR000082

# ATTACHMENT F

**AR001490**

AR000083

**THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION**

AR001491

AR000084

**THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION**

AR001492

AR000085

# ATTACHMENT G

AR001493

AR000086

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001494

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION    AR000088

AR001495

AR001496

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION    AR000089

AR001497

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION AR000090

AR001498
THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION    AR000091

AR001499
THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION    AR000092

AR001500

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION    AR000093

AR001501
THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION AR000094

AR001502

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION    AR000095

AR001503
THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION  AR000096

AR001504
THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION    AR000097

AR001505
THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION    AR000098

AR001506
THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION    AR000099

AR001507
THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION AR000100

AR001508
THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION    AR000101

AR001509

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION AR000102

AR001510
THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION    AR000103

AR001511
THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION AR000104

AR001542

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION    AR000105

AR001513

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION    AR000106

AR001544    THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION    AR000107

AR001515
THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION    AR000108

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001516

AR000109

AR001547
THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION AR000110

AR001518

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION   AR000111

AR001519    THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION AR000112

# ATTACHMENT H

AR001520

AR000113



**THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION**

AR001521

AR000114

# ATTACHMENT I

AR001522

AR000115

AR001523
THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION

AR000116

AR001524
THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION

AR000117

AR001525

THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION    AR000118

AR001526

THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION    AR000119

**THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION**

AR001527

AR000120

AR001528

THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION

AR000121

AR001529
THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION

AR000122

AR001530
THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION    AR000123

AR001531
THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION    AR000124

AR001532
THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION AR000125

AR001533
THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION    AR000126

AR001534
THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION    AR000127

# ATTACHMENT J

AR001535

AR000128

AR001536
THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION

AR001537
**THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION**    AR000130

AR001538

THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION

AR000131

AR001539
THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION    AR000132

AR001540

THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION    AR000133

AR001541
THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION    AR000134

THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION

AR001542

AR000135

AR001543
THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION

AR000136

AR001544

THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION    AR000137

AR001545

THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION    AR000138

AR001546

THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION    AR000139

AR001547

THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION    AR000140

AR001548
THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION    AR000141

AR001549

THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION    AR000142

AR001550
THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION   AR000143

AR001551
THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION    AR000144

AR001552
THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION

AR000145

AR001553

THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION    AR000146

AR001554
THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION

AR000147

# ATTACHMENT K

AR001555

AR000148

AR001556
THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION    AR000149

AR001557
THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION    AR000150

AR001558
THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION    AR000151

AR001559

THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION

AR000152

AR001560

**THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION**    AR000153

AR001561
THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION    AR000154

AR001562

THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION    AR000155

# ATTACHMENT L

AR001563

AR000156

AR001564
THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION

AR000157

AR001565
THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION   AR000158

AR001566
THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION    AR000159

AR001567
THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION    AR000160

AR001568
THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION   AR000161

# ATTACHMENT M

AR001569

AR000162

AR001570
THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION

AR000163

AR001571

THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION

AR000164

AR001572
THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION    AR000165

AR001573

THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION    AR000166

AR001574
THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION    AR000167

# ATTACHMENT N

AR001575

AR000168



AR001576 THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION     AR000169



AR001577
THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION AR000170



AR001578    THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION    AR000171

AR001579
THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION    AR000172

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001580

AR00158

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001582

# ATTACHMENT O

AR001583

AR000176

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001584

AR000177

AR001585



**THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION**

AR001586

AR000179

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR000180

**THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION**

AR001588

AR000181



**THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION**

AR001589

AR000182

# ATTACHMENT P

AR001590

AR000183

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION

AR001591

AR000184

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001592

THIS PAGE CONTAINS NINESTAR CONFIDENTIAL INFORMATION



AR001593

# ATTACHMENT Q

AR001594

AR000187

**AR001595**

THIS ENTIRE PAGE CONTAINS
CONFIDENTIAL INFORMATION

AR000188

AR001596

AR

THIS ENTIRE PAGE CONTAINS
CONFIDENTIAL INFORMATION

AR000189

AR001597

AR

THIS ENTIRE PAGE CONTAINS
CONFIDENTIAL INFORMATION

AR000190

AR001598

THIS ENTIRE PAGE CONTAINS
CONFIDENTIAL INFORMATION

AR000191

**AR001599**

**THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION**

AR000192

AR000193

THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION



**THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION**

AR001601

AR000194

THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION

AR001602

AR000195

AR001603



**THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION**

AR000196

AR001604

THIS ENTIRE PAGE CONTAINS
CONFIDENTIAL INFORMATION

AR000197

**THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION**

AR001605

AR000198

THIS ENTIRE PAGE CONTAINS
CONFIDENTIAL INFORMATION

AR001606

AR000199

**THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION**

AR001607

AR000200

AR000201

AR001608

**THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION**

# INFORMANT PRIVILEGE

## FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

# THIS PAGE CONTAINS CONFIDENTIAL INFORMATION

**Ninestar Corporation and its Zhuhai-based Subsidiaries and Facilities**

**Uyghur Forced Labor Prevention Act – Forced Labor Enforcement TF**

**Entity List Allegation Summary**: 26 January 2023

(FOUO) **Entity Identifying Information.**

Ninestar Corporation and its Zhuhai-based subsidiaries and facilities
No. 3883 Zhuhai Avenue, Xiangzhou District
Zhuhai, Guangdong 519075
https://www.ninestargroup.com/

纳思达股份有限公司
中国广东珠海市香洲区珠海大道3883号
邮编：519075



(FOUO//LES) **Allegation.** ███ ████████████████████████████████████ contacted U.S. Customs and Border Protection (CBP) through email correspondence that Ninestar uses laborers obtained through state-sponsored labor transfer programs through a third-party agency to recruit, transport, transfer, and receive Uyghur laborers out of the XUAR to work in its facilities in the city of Zhuhai, located in the Guangdong Province of the PRC. ████████████

(FOUO//LES) **Assessment Methodology.** In assessing the allegation, the agency conducted interviews of confidential human sources, email correspondence, and independent research to validate a reasonable level of suspicion that Ninestar participated in state sponsored labor transfer programs. The basis for this review is from the *UFLPA Section 2(d)(2)(B)(ii) – Entities working with the government of the Xinjiang Uyghur Autonomous Region to recruit, transport, transfer, harbor or receive forced labor or Uyghurs, Kazakhs, Kyrgyz, or members*

## FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

This document contains Law Enforcement Sensitive (LES) information that requires confidentiality protections because of the potential negative impact unauthorized disclosure would have on law enforcement activities and effectiveness. Unauthorized release of such information could interfere with law enforcement investigations and proceedings, deprive a person of a fair trial, disclose the identity of a confidential source, disclose techniques and procedures used by law enforcement which could be used to circumvent the law, endanger the physical safety of an individual, including a law enforcement officer, and undermine the agency's ability to receive information to facilitate its mission responsibilities.

AR001609

AR000202

**INFORMANT PRIVILEGE**
**FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE**
**THIS PAGE CONTAINS CONFIDENTIAL INFORMATION**

*of other persecuted groups out of the Xinjiang Uyghur Autonomous Region.* This review process is specific to allegations received for additions to the UFLPA Entity List and the evidentiary standards established in statute and the Forced Labor Enforcement Task Force.



**FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE**

This document contains Law Enforcement Sensitive (LES) information that requires confidentiality protections because of the potential negative impact unauthorized disclosure would have on law enforcement activities and effectiveness. Unauthorized release of such information could interfere with law enforcement investigations and proceedings, deprive a person of a fair trial, disclose the identity of a confidential source, disclose techniques and procedures used by law enforcement which could be used to circumvent the law, endanger the physical safety of an individual, including a law enforcement officer, and undermine the agency's ability to receive information to facilitate its mission responsibilities.

AR001610

AR000203

**INFORMANT PRIVILEGE**
**FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE**



**THIS PAGE CONTAINS CONFIDENTIAL INFORMATION**

**FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE**

This document contains Law Enforcement Sensitive (LES) information that requires confidentiality protections because of the potential negative impact unauthorized disclosure would have on law enforcement activities and effectiveness. Unauthorized release of such information could interfere with law enforcement investigations and proceedings, deprive a person of a fair trial, disclose the identity of a confidential source, disclose techniques and procedures used by law enforcement which could be used to circumvent the law, endanger the physical safety of an individual, including a law enforcement officer, and undermine the agency's ability to receive information to facilitate its mission responsibilities.

AR001611                                                        AR000204

INFORMANT PRIVILEGE

**FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE**
**THIS PAGE CONTAINS CONFIDENTIAL INFORMATION**



**FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE**

This document contains Law Enforcement Sensitive (LES) information that requires confidentiality protections because of the potential negative impact unauthorized disclosure would have on law enforcement activities and effectiveness. Unauthorized release of such information could interfere with law enforcement investigations and proceedings, deprive a person of a fair trial, disclose the identity of a confidential source, disclose techniques and procedures used by law enforcement which could be used to circumvent the law, endanger the physical safety of an individual, including a law enforcement officer, and undermine the agency's ability to receive information to facilitate its mission responsibilities.

AR001612

AR000205

**INFORMANT PRIVILEGE**

**FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE**



**FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE**

This document contains Law Enforcement Sensitive (LES) information that requires confidentiality protections because of the potential negative impact unauthorized disclosure would have on law enforcement activities and effectiveness. Unauthorized release of such information could interfere with law enforcement investigations and proceedings, deprive a person of a fair trial, disclose the identity of a confidential source, disclose techniques and procedures used by law enforcement which could be used to circumvent the law, endanger the physical safety of an individual, including a law enforcement officer, and undermine the agency's ability to receive information to facilitate its mission responsibilities.

AR001613

AR000206

**THIS PAGE CONTAINS CONFIDENTIAL INFORMATION**

**INFORMANT PRIVILEGE**

**FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE**



**FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE**

This document contains Law Enforcement Sensitive (LES) information that requires confidentiality protections because of the potential negative impact unauthorized disclosure would have on law enforcement activities and effectiveness. Unauthorized release of such information could interfere with law enforcement investigations and proceedings, deprive a person of a fair trial, disclose the identity of a confidential source, disclose techniques and procedures used by law enforcement which could be used to circumvent the law, endanger the physical safety of an individual, including a law enforcement officer, and undermine the agency's ability to receive information to facilitate its mission responsibilities.

AR001614 **THIS PAGE CONTAINS CONFIDENTIAL INFORMATION** AR000207

**INFORMANT PRIVILEGE**

**FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE**
**THIS PAGE CONTAINS CONFIDENTIAL INFORMATION**



**FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE**

This document contains Law Enforcement Sensitive (LES) information that requires confidentiality protections because of the potential negative impact unauthorized disclosure would have on law enforcement activities and effectiveness. Unauthorized release of such information could interfere with law enforcement investigations and proceedings, deprive a person of a fair trial, disclose the identity of a confidential source, disclose techniques and procedures used by law enforcement which could be used to circumvent the law, endanger the physical safety of an individual, including a law enforcement officer, and undermine the agency's ability to receive information to facilitate its mission responsibilities.

AR001615

AR000208

**INFORMANT PRIVILEGE**

**FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE**



**THIS PAGE CONTAINS CONFIDENTIAL INFORMATION**

**FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE**

This document contains Law Enforcement Sensitive (LES) information that requires confidentiality protections because of the potential negative impact unauthorized disclosure would have on law enforcement activities and effectiveness. Unauthorized release of such information could interfere with law enforcement investigations and proceedings, deprive a person of a fair trial, disclose the identity of a confidential source, disclose techniques and procedures used by law enforcement which could be used to circumvent the law, endanger the physical safety of an individual, including a law enforcement officer, and undermine the agency's ability to receive information to facilitate its mission responsibilities.

AR001616

AR000209

FOR OFFICIAL USE ONLY / LAW ENFORCEMENT SENSITIVE
BUSINESS CONFIDENTIAL INFORMATION

To support FLETF Recommendation 23-002 (Ninestar), the following includes information on Zhuhai Based Subsidiaries of Ninestar, the evidence of the subsidiaries' connection to Ninestar, and the Overall Trade Impact resulting from an import prohibition from the named parties.

- **(FOUO) Company Names of Subsidiaries of Ninestar in Zhuhai**
    - Zhuhai Ninestar Information Technology Co., Ltd.
    - Zhuhai Pantum Electronics Co., Ltd.
    - Zhuhai Apex Microelectronics Co., Ltd.
    - Geehy Semiconductor Co., Ltd.
    - Zhuhai Pu-Tech Industrial Co., Ltd.
    - Zhuhai G&G Digital Technology Co., Ltd.
    - Zhuhai Seine Printing Technology Co., Ltd.
    - Zhuhai Ninestar Management Co., Ltd.



FOR OFFICIAL USE ONLY / LAW ENFORCEMENT SENSITIVE
BUSINESS CONFIDENTIAL INFORMATION

AR001617

AR000210

FOR OFFICIAL USE ONLY / LAW ENFORCEMENT SENSITIVE
BUSINESS CONFIDENTIAL INFORMATION



FOR OFFICIAL USE ONLY / LAW ENFORCEMENT SENSITIVE
BUSINESS CONFIDENTIAL INFORMATION

AR001618    THIS PAGE CONTAINS CONFIDENTIAL INFORMATION    AR000211

FOR OFFICIAL USE ONLY / LAW ENFORCEMENT SENSITIVE
BUSINESS CONFIDENTIAL INFORMATION



**THIS PAGE CONTAINS CONFIDENTIAL INFORMATION**

FOR OFFICIAL USE ONLY / LAW ENFORCEMENT SENSITIVE
BUSINESS CONFIDENTIAL INFORMATION

AR001619

AR000212



UFLPA Entity List Recommendation:

Ninestar Corporation

FOR OFFICIAL USE ONLY

Ninestar is one of the world's largest producers of laser printers. The company's products also include, printing components, and integrated circuit chips, some of which are imported to the U.S.

IF ASKED: Ninestar and their subsidiaries' exports of printer units and printer parts account for a small percentage (under 3%) of US imports of printer units and printer parts globally

AR001620

AR000213



AR000214

**THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION**

AR001621

INFORMANT PRIVILEGE



AR000215

**THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION**

AR001622



AR000216

**THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION**

AR001623

**INFORMANT PRIVILEGE**



**THIS ENTIRE PAGE CONTAINS CONFIDENTIAL INFORMATION**

AR001624

AR000217

 Sufficient reasonable cause to believe that Ninestar and its Zhuhai subsidiaries should be added to the UFLPA Entity List

➤ Multiple primary and secondary sources serve to corroborate Ninestar's involvement with the Government of Xinjiang Uyghur Autonomous Region to recruit, transfer, harbor, or receive Uyghurs out of Xinjiang to work at Ninestar facilities in Zhuhai.

➤ Ninestar and its eight Zhuhai-based subsidiaries export printer units and printer parts to the United States.

FOR OFFICIAL USE ONLY
NOT FOR DISTRIBUTION

Section 2(d)(2)(B)(ii) of the act. Uyghurs AND forced labor

AR001625

AR000218



AR001626

AR000219

FOR OFFICIAL USE ONLY

**Forced Labor Enforcement Task Force Standard Operating Procedures**
**Uyghur Forced Labor Prevention Act Entity List**
*(July 2022)*

I.  GENERAL

   A.  Purpose

      1.  This Forced Labor Enforcement Task Force (FLETF) Standard Operating
          Procedure (SOP) outlines the FLETF's process for adding entities to and
          removing entities from the Uyghur Forced Labor Prevention Act (UFLPA)
          Entity List, as required under Section 2(d)(2)(B) of the UFLPA (P.L. No. 117-
          78).

   B.  Definitions

      1.  UFLPA Entity List: A consolidated register of the four lists required by clauses
          (i), (ii), (iv), and (v) of Section 2(d)(2)(B) of the UFLPA.

      2.  FLETF: The FLETF is the Forced Labor Enforcement Task Force, which is
          chaired by the Secretary of the Department of Homeland Security (DHS) or
          designee, and is made up of member agencies and observer agencies.

      3.  FLETF Member Agencies: The Department of Homeland Security, the Office of
          the U.S. Trade Representative, the Department of Labor, the Department of
          State, the Department of Treasury, the Department of Justice, and the
          Department of Commerce (invited by the Chair of the Task Force).

      4.  FLETF Observer Agencies: Non-FLETF member agencies, invited by the
          FLETF Chair to participate.  Observer agencies do not have voting rights.

      5.  FLETF Chair: The Department of Homeland Security official responsible for
          carrying out the duties necessary to manage the work of the FLETF, including
          but not limited to distributing UFLPA Entity List recommendations to FLETF
          member agencies, convening meetings of the FLETF, setting agendas for FLETF
          meetings, and drafting FLETF decision memoranda and other related
          documentation to implement FLETF decisions.

      6.  Technical Correction: A change to an UFLPA Entity List entry that does not
          alter the scope or impact of the entry, i.e., a non-substantive change such as
          correction of a misspelling or citation.

   C.  Scope

      1.  The FLETF is composed of representatives from seven voting member agencies
          (Department of Homeland Security, Department of State, Department of

FOR OFFICIAL USE ONLY

AR001627

AR000220

Case 1:23-cv-00182-GSK   Document 217-4   Filed 01/08/26   Page 694 of 701

FOR OFFICIAL USE ONLY

Commerce, Department of Treasury, Department of Justice, Department of Labor, and the U.S. Trade Representative) and six observer agencies (Department of Energy, Department of Agriculture, and U.S. Agency for International Development, the National Security Council, U.S. Customs and Border Protection, and U.S. Immigration and Customs Enforcement).

2. Criteria for Adding Entities to, Removing Entities from, or Making a Technical Correction to the UFLPA Entity List:

   a. When there is reasonable cause to believe, based on specific and articulable information, that entities meet the criteria described in clauses (i), (ii), (iv), or (v) of Section 2(d)(2)(B) of the UFLPA, outlined below, those entities shall be added to the UFLPA Entity List pursuant to the procedures defined in section II of this SOP.
      - Section 2(d)(2)(B)(i) – Entities in the Xinjiang Uyghur Autonomous Region that mine, produce, or manufacture wholly or in part any goods, wares, articles, and merchandise with forced labor.
      - Section 2(d)(2)(B)(ii) – Entities working with the government of the Xinjiang Uyghur Autonomous Region to recruit, transport, transfer, harbor or receive forced labor or Uyghurs, Kazakhs, Kyrgyz, or members of other persecuted groups out of the Xinjiang Uyghur Autonomous Region.
      - Section 2(d)(2)(B)(iv) – Entities that exported products mined, produced, or manufactured wholly or in part by entities on the list required by clause (i) or (ii) from the People's Republic of China into the United States.
      - Section 2(d)(2)(B)(v) – Facilities or entities, including the Xinjiang Production and Construction Corps, that source material from the Xinjiang Uyghur Autonomous Region or from persons working with the government of the Xinjiang Uyghur Autonomous Region or the Xinjiang Production and Construction Corps for purposes of the poverty alleviation program or the pairing-assistance program or any other government labor scheme that uses forced labor.

   b. Entities may be **removed** from the UFLPA Entity List, if there is no longer reasonable cause to believe that they meet the criteria described in clauses (i), (ii), (iv), or (v) of Section 2(d)(2)(B) of the UFLPA, pursuant to the procedures provided in Section II of this SOP.

   c. UFLPA Entity List entities may be subject to **technical correction**, pursuant to the procedures defined in section II of this SOP.

II. PROCESS AND PROCEDURES

FOR OFFICIAL USE ONLY

AR001628

AR000221

FOR OFFICIAL USE ONLY

A. Submission of Recommendations to the FLETF Chair and Initial Processing

1. Any FLETF member agency may submit a recommendation to the FLETF Chair to add, remove, or make technical corrections to an entry on the UFLPA Entity List. Such recommendations will be submitted to the FLETF Chair at FLETF.UFLPA.EntityList@hq.dhs.gov using the recommendation questionnaire provided in Annex 1.

2. Whenever possible, the recommending FLETF member agency will include publicly available information to serve as the basis for the recommendation. If an agency is unable to provide publicly available information, the recommending agency will submit to the FLETF Chair the classified or otherwise non-releasable information that serves as the basis for the recommendation. The FLETF Chair will include this supporting information when forwarding the recommendation to the FLETF member and observer agencies.

   a. Regardless of whether the supporting information is releasable, recommending FLETF member agencies will include in the recommendation an unclassified, general description of the basis for its recommendation that is suitable for public release to explain the addition, removal or technical correction to the UFLPA Entity List.

B. FLETF Review

1. The FLETF Chair will circulate recommendations and the underlying information to the FLETF member agencies for formal consideration at least 30 calendar days in advance of a vote on the recommendation. Prior to circulating the recommendation and supporting information to the FLETF member and observer agencies, the FLETF Chair will review the supporting information (addressed in II.A.1 above), and if the supporting information is not provided or is incomplete, the FLETF Chair may request the recommending agency provide additional supporting information, which the recommending agency may provide to the FLETF Chair prior to circulation. Recommendations are not under formal consideration until circulated to the FLETF member agency representatives by the FLETF Chair.

2. The FLETF Chair will provide the following materials to the FLETF member and observer agency representatives for review:

   a. A copy of the recommendation received from the recommending agency; and

   b. Associated supporting information for the recommendation (publicly available and/or classified or sensitive), on the appropriate electronic platform.

3. Within 30 calendar days of receiving a recommendation from the FLETF Chair, unless the FLETF member agencies unanimously agree to postpone

FOR OFFICIAL USE ONLY

AR001629

AR000222

FOR OFFICIAL USE ONLY

action, the FLETF member agencies will:

    a.  Review the recommendation;

    b.  Submit questions to the recommending FLETF member agency, as necessary;

    c.  Provide any relevant information in their control regarding the recommendation; and

    d.  Prepare to vote on disposition of the recommendation at the next FLETF meeting.

4. The FLETF observer agencies may provide any relevant information regarding the recommendation to the FLETF member agencies during the review period.

C. FLETF Meeting and Voting Procedures for UFLPA Entity List Determinations

1. The FLETF Chair may convene the FLETF on a quarterly basis - in-person, virtually, or through a paper process - or the FLETF Chair may convene meetings other than a quarterly meeting for the purpose of considering the disposition of recommendations circulated pursuant to Part II, Sections A and B of this SOP.

    a.  When convening the FLETF for an in-person or virtual meeting, the FLETF Chair will circulate a FLETF Meeting Agenda to member and observer agencies at least 24 hours in advance of each FLETF meeting. The agenda will include outstanding UFLPA Entity List recommendations under consideration by the FLETF.

    b.  When convening the FLETF for a paper meeting, the FLETF Chair will circulate a paper identifying the issues up for a vote before the FLETF and requesting a written response from each FLETF member agency reflecting its vote on those issues.

    c.  Following an in-person, virtual, or paper meeting, the FLETF Chair will draft and circulate to each FLETF member agency a summary of the meeting, including: decisions reached, follow up actions required of FLETF member agencies, requests for additional information, agency positions articulated at the meeting, and the status of each discussed recommendation.

    d.  The FLETF member agencies may contact the FLETF Chair to request amendments or changes to the summary. The FLETF Chair will take these requests under consideration and provide amended summaries to all the FLETF member and observer agencies, as appropriate.

2. Voting will take place at FLETF meetings, unless the FLETF member agencies unanimously agree to vote at a different time. The FLETF member agencies will

FOR OFFICIAL USE ONLY

AR001630

AR000223

FOR OFFICIAL USE ONLY

submit their agency's vote to the FLETF Chair, via voice vote, at an in-person or virtual FLETF meeting or via a written response to a paper meeting.

    a.  Decisions to add, remove, or make a technical correction to an entry on the UFLPA Entity List will be made by majority vote of the FLETF member agencies.

    b.  In the event of a tie vote, the FLETF Chair will break the tie vote.

D.  Post-Determination Procedures

    a.  Within seven days of a FLETF vote to add or remove an entity from the UFLPA Entity List, the FLETF Chair will circulate to the FLETF member agencies an UFLPA Entity List Decision Memorandum reflecting the FLETF member agency votes and the FLETF's final decision on the recommendation. This memorandum will specify the applicable section(s) of the UFLPA that provide(s) the basis for the FLETF's determination and a summary of the reasons supporting the determination.

    2.  The FLETF will publish updates, as applicable, to the UFLPA Entity List following FLETF meetings through a Federal Register Notice.

## III. POST-ADDITION REVIEWS

A.  Requests for Removal from an Entity

    1.  An entity listed on the UFLPA Entity List may submit a request for removal from the UFLPA Entity List to the FLETF Chair. The FLETF Chair will refer all such requests and supporting information to the FLETF member agencies. The FLETF member agencies will review and vote on all such requests. The review and voting procedures that govern the FLETF member agency proposals, set forth in Part II, Sections B through D of this SOP, will apply to removal requests. The decision of the FLETF on requests for removal will not be appealable, and any new removal request will require additional information to be provided.

    2.  Once a request for removal has been submitted to the FLETF Chair, only the FLETF Chair, or the Chair's representative, may contact the entity on behalf of the FLETF regarding questions on the submission, including requests for additional information.

    3.  If, after being added to the UFLPA Entity List, an entity (or its designated representative) contacts the FLETF Chair or an individual FLETF member agency to request a meeting regarding the UFLPA Entity List, the FLETF Chair or member agency will respond as follows:

        a.  The FLETF will consider a meeting request only after the entity has

FOR OFFICIAL USE ONLY

AR001631

AR000224

FOR OFFICIAL USE ONLY

submitted a request for removal from or technical correction to the UFLPA Entity List to the FLETF Chair.

b. Any such meeting will not occur before FLETF member agencies have reviewed a request for removal. The FLETF will determine, at the conclusion of the review period but before voting on the request for removal, if it will accept the meeting request. The FLETF Chair, or the Chair's representative, will advise the entity in writing whether the FLETF will accept the meeting request. An accepted meeting will be held prior to the FLETF's vote on the request for removal.

4. The FLETF Chair will advise the entity in writing of the FLETF's decision.

B. Annual Reviews

1. The FLETF Chair will coordinate annual updates of the UFLPA Entity List as part of statutorily-prescribed updates to the appropriate congressional committees. The update will include a review of the current UFLPA Entity List, highlighting any additions and removals since the prior year.

IV. Records Management

A. All records concerning the FLETF's review of the UFLPA Entity List, including recommendations and requests for removal, associated supporting documentation, documentation of the FLETF's decisions, and any supplementary information shared with the FLETF, will be withheld from public disclosure unless disclosure is required by law or the information or records are publicly released via the processes identified in this SOP. The FLETF member and observer agencies will apprise DHS, as the FLETF Chair, of any requests for disclosure of records, and DHS will coordinate review of such requests.

B. All Government and/or contract employees assigned to, or working in conjunction with, the FLETFfor the purpose of reviewing the UFLPA Entity List are responsible for ensuring the proper handling, storage, and distribution of both electronic and hard copy documents produced and/or maintained for use during the UFLPA Entity List review process. Classified documents must be handled pursuant to U.S. Government requirements.

C. Records concerning the FLETF's review of the UFLPA Entity List that constitute records of the individual member and observer agencies, will be handled in accordance with each agency's existing document retention and disclosure policies.

V. NO PRIVATE RIGHT CREATED. The guidelines set forth in this SOP do not create any right or benefit, substantive or procedural, enforceable by law or party against the United States, its agencies, its officers, or any person.

VI. AMENDMENT. This SOP may be modified on the written mutual consent of the FLETF member agencies.

6

FOR OFFICIAL USE ONLY

AR001632

AR000225

FOR OFFICIAL USE ONLY

**Annex 1:**

**UYGHUR FORCED LABOR PREVENTION ACT (UFLPA) ENTITY LIST**

**RECOMMENDATION FOR ACTION**

1. **Name of Submitting FLETF Agency**:

   *Provide the name of the FLETF agency submitting the recommendation.*

2. **FLETF Agency Point of Contact**:

   *Provide the name, email address, and phone number of the agency POC for this recommendation.*

3. **Recommended Action (select one):**

   ☐ *Addition to List*        ☐ *Removal from List*        ☐ *Technical Correction*

4. **Entity Identifying Information**:

   *Provide identifying information of the entities that are the subject of this recommendation, including names, aliases, and addresses. Also include additional information to assist in identifying the entities, if available (e.g., telephone numbers, websites, e-mail addresses, etc.).*

5. **UFLPA Entity List for Addition, Removal, or Correction (select one or more applicable list):**

   ☐ *Section 2(d)(2)(B)(i) – Entities in the Xinjiang Uyghur Autonomous Region that mine, produce, or manufacture wholly or in part any goods, wares, articles, and merchandise with forced labor.*

   ☐ *Section 2(d)(2)(B)(ii) – Entities working with the government of the Xinjiang Uyghur Autonomous Region to recruit, transport, transfer, harbor or receive forced labor or Uyghurs, Kazakhs, Kyrgyz, or members of other persecuted groups out of the Xinjiang Uyghur Autonomous Region.*

   ☐ *Section 2(d)(2)(B)(iv) – Entities that exported products mined, produced, or manufactured wholly or in part by entities on the list required by clause (i) or (ii) from the People's Republic of China into the United States.*

   ☐ *Section 2(d)(2)(B)(v) – Facilities or entities, including the Xinjiang Production and*

FOR OFFICIAL USE ONLY

AR001633

AR000226

FOR OFFICIAL USE ONLY

*Construction Corps, that source material from the Xinjiang Uyghur Autonomous Region or from persons working with the government of the Xinjiang Uyghur Autonomous Region or the Xinjiang Production and Construction Corps for purposes of the "poverty alleviation" program or the "pairing-assistance" program or any other government labor scheme that uses forced labor.*

6. **Scope:**

   *For **additions**, provide a short description of any forced labor violations committed or alleged to have been committed by the entity or entities that support their inclusion on one or more of the four entity lists noted above. Additionally, include a description of the product(s) mined, produced, or manufactured wholly or in part by the entity or entities.*

7. **Basis for Recommendation**:

   *For **additions** to the UFLPA Entity List, include a narrative explaining in detail why there is reasonable cause to believe that the entity or entities meet the criteria described in clauses (i), (ii), (iv), or (v) of Section (d)(2)(B) of the UFLPA. Include a description of applicable forced labor indicators.[1]*

   *For **removal** from the UFLPA Entity List, include an explanation detailing why there is no longer reasonable cause to believe that the entity or entities meet the criteria described in clauses (i), (ii), (iv), or (v) of Section 2(d)(2)(B) of the UFLPA.*

   *For **technical corrections**, include full details and justification for the request. Technical corrections are changes to a UFLPA Entity List entry that do not alter the scope of the entry, i.e., a non-substantive change, such as correction of a misspelling or a citation.*

   *Please keep the narrative summary to 2-3 pages maximum. Inclusion of report excerpts, figures, pictures, etc. within that page limit is encouraged. Additional supporting documents (such as full reports) that are referenced or cited in the narrative should be submitted as addenda to the recommendation. References from web sources should be provided in a standardized format indicating the website, date accessed, and description of the source.[2] Digital copies (PDFs, HTML, or other standard file format) of such web sources should be*

---

[1] *ILO Indicators of Forced Labour, International Labour Organization, 3 (Oct. 1, 2012), https://www.ilo.org/wcmsp5/groups/public/---ed_norm/---declaration/documents/publication/wcms_203832.pdf.* The ILO has developed 11 forced labor indicators to identify the most common signs that point to the possible existence of forced labor. With respect to PRC's forced-labor schemes (including transfer of workers from Xinjiang), the most common ILO indicators of forced labor are: intimidation and threats; exploitation of a position of dependency and vulnerability; restriction on freedom of movement; isolation; abusive working and living conditions; and excessive hours.

[2] TITLE OF WEBSITE | www.website.com/fullURLinOriginalCapitalization.html | DATE ACCESSED | SOURCEDESCRIPTOR (STATE WHETHER SOURCE IS PUBLIC).

FOR OFFICIAL USE ONLY

AR001634

AR000227

FOR OFFICIAL USE ONLY

*included as addenda. Classified sources must be referenced in accordance with Intelligence Community Directive Number 206 (ICD 206),[3] as updated on January 22, 2015.*

8. **Supporting Information**:

*Provide any supporting information not covered in the sections above that would bolster the case for the recommendation. If the agency will be submitting classified information to support the recommendation, please note that here as well.*

---

[3] Office of the Director of National Intelligence, *Sourcing Requirements for Disseminated Analytic Products,* ICD 206 (Jan. 2015), https://www.dni.gov/index.php/what-we-do/ic-related-menus/ic-related-links/intelligence-community-directives.

FOR OFFICIAL USE ONLY

AR001635

AR000228